NO. 10-1619

---

IN THE UNITED STATES COURT
OF APPEALS FOR THE THIRD CIRCUIT

---

JOSEPH O. BOGGI

*Appellant*

v.

MEDICAL REVIEW AND ACCREDITING COUNCIL, ET AL

*Appellees*

---

**SUPPLEMENTAL APPENDIX
ON BEHALF OF ALL APPELLEES**

---

Appeal from the Orders of Schiller, J., entered January 26, 2010, and September 15, 2009, in the United States District Court for Eastern District of Pennsylvania, No. 08-CV-4941.

---

NEIL J. HAMBURG
MICHAEL E. SACKS
HAMBURG & GOLDEN, P.C.
1601 Market St., Suite 3310
Philadelphia, PA 19103-1443
(215) 255-8590

Counsel for Appellees
National Board of Medical
Examiners, Andrea Ciccone,
Scott Manaker, M.D., Richard
Hawkins, M.D. and Donald
Melnick, M.D.

## TABLE OF CONTENTS OF SUPPLEMENTAL APPENDIX

1.    Docket entries ...................................... SA-1

**PLEADINGS AND ORDERS IN THIS CASE**

2.    Complaint .......................................... SA-13

3.    Amended Complaint (August 24, 2009)                SA-35

4.    September 15, 2009, Order and Opinion of the        SA-44
      District Court

5.    January 26, 2010, Order of the District Court       SA-66

6.    February 25, 2010, Notice of Appeal                 SA-68

**OTHER DOCUMENTS**

7.    June 24, 1998, Amended Order for Summary Suspension  SA-78
      of License to Practice Medicine (Maryland State
      Board of Physician Quality Assurance) ..............

8.    September 22, 1999, Final Opinion and Order          SA-89
      (Maryland State Board of Physician Quality
      Assurance) ........................................
9.    December 13, 2001, Unreported Opinion of the Court   SA-124
      of Special Appeals of Maryland, Joseph O. Boggi v.
      State Board of Physician Quality Assurance .........

10.   July 17, 2006, Letter from MRAC to Dr. Boggi, with   SA-174
      May 25, 2006, report attached

11.   October 16, 2006, Letter from MRAC to Dr. Boggi      SA-183

CLOSED, APPEAL, STANDARD

# United States District Court
## Eastern District of Pennsylvania (Philadelphia)
## CIVIL DOCKET FOR CASE #: 2:08-cv-04941-BMS

| | |
|---|---|
| BOGGI v. MEDICAL REVIEW AND ACCREDITING COUNCIL et al | Date Filed: 10/16/2008 |
| Assigned to: HONORABLE BERLE M. SCHILLER | Date Terminated: 01/26/2010 |
| Case in other court: USCA FOR THE THIRD CIRCUIT, 10-01619 | Jury Demand: Defendant |
| | Nature of Suit: 440 Civil Rights: Other |
| Cause: 42:12101 The Americans with Disabilities Act of 1990 | Jurisdiction: Federal Question |

**Plaintiff**

**JOSEPH O. BOGGI**
*D.O.*

represented by **JOSEPH O. BOGGI**
INTERNAL MEDICINE
1207 BALLARD STREET
SILVER SPRING, MD 20910
Email: joboggi@pol.net
PRO SE

V.

**Defendant**

**MEDICAL REVIEW AND ACCREDITING COUNCIL**
*TERMINATED: 09/15/2009*

represented by **JOSEPH GOLDBERG**
WEBER GALLAGHER SIMPSON STAPLETON FIRES & NEWBY LLP
2000 MARKET ST., 13TH FL
PHILADELPHIA, PA 19103
215-825-7225
Email: jgoldberg@wglaw.com
*TERMINATED: 09/15/2009*
*LEAD ATTORNEY*

**CALEB H. WHEELER**
WEBER GALLAGHER SIMPSON STAPLETON FIRES & NEWBY LLP
2000 MARKET ST., 13TH FL
PHILADELPHIA, PA 19103
215-972-7900
Email: cwheeler@wglaw.com
*TERMINATED: 09/15/2009*

SA-1

MICHAEL B. PULLANO
WEBER GALLAGHER
2000 MARKET STREET
13TH FLOOR
PHILADELPHIA, PA 19103
215-972-7909
Email: mpullano@wglaw.com
*TERMINATED: 09/15/2009*

**Defendant**

**LARRY DOWNS**                    represented by    **JOSEPH GOLDBERG**
*ESQ.*                                               (See above for address)
*TERMINATED: 09/15/2009*                             *TERMINATED: 09/15/2009*
                                                     *LEAD ATTORNEY*

                                                     **CALEB H. WHEELER**
                                                     (See above for address)
                                                     *TERMINATED: 09/15/2009*

                                                     **MICHAEL B. PULLANO**
                                                     (See above for address)
                                                     *TERMINATED: 09/15/2009*

**Defendant**

**JOE SOKOLOWSKI**                 represented by    **JOSEPH GOLDBERG**
*M.D.*                                               (See above for address)
*TERMINATED: 09/15/2009*                             *TERMINATED: 09/15/2009*
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **CALEB H. WHEELER**
                                                     (See above for address)
                                                     *TERMINATED: 09/15/2009*

                                                     **MICHAEL B. PULLANO**
                                                     (See above for address)
                                                     *TERMINATED: 09/15/2009*

**Defendant**

**INSTITUTE FOR PHYSICIAN**        represented by    **NEIL J. HAMBURG**
**EDUCATION**                                        HAMBURG & GOLDEN PC
*TERMINATED: 09/15/2009*                             1601 MARKET ST
                                                     SUITE 3310
                                                     PHILADELPHIA, PA 19103-1443

SA-2

215-255-8592
Fax: 215-255-8583
Email: hamburgnj@hamburg-
golden.com
*TERMINATED: 09/15/2009*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**MAUREEN HOGAN KRUEGER**
HAMBURG & GOLDEN, P.C.
1601 MARKET STREET
SUITE 3310
PHILADELPHIA, PA 19103
215-255-8594
Fax: 215-255-8583
Email: kruegermh@hamburg-
golden.com
*TERMINATED: 09/15/2009*
*ATTORNEY TO BE NOTICED*

**MICHAEL E. SACKS**
HAMBURG & GOLDEN PC
1601 MARKET ST
STE 3310
PHILADELPHIA, PA 19103-1443
215-255-8596
Fax: 215-255-8583
Email: sacksme@hamburg-golden.com
*TERMINATED: 09/15/2009*
*ATTORNEY TO BE NOTICED*

**Defendant**

**ANDREA CICCONE**
*DIRECTOR*
*TERMINATED: 09/16/2009*

represented by **NEIL J. HAMBURG**
(See above for address)
*TERMINATED: 09/16/2009*
*LEAD ATTORNEY*

**MAUREEN HOGAN KRUEGER**
(See above for address)
*TERMINATED: 09/16/2009*

**MICHAEL E. SACKS**
(See above for address)
*TERMINATED: 09/16/2009*

6/25/10 9:50 AM

SA-3

**Defendant**

**SCOTT MANNEKER**
*M.D.*
*TERMINATED: 09/16/2009*

represented by **NEIL J. HAMBURG**
(See above for address)
*TERMINATED: 09/16/2009*
*LEAD ATTORNEY*

**MAUREEN HOGAN KRUEGER**
(See above for address)
*TERMINATED: 09/16/2009*

**MICHAEL E. SACKS**
(See above for address)
*TERMINATED: 09/16/2009*

**Defendant**

**Richard Hawkins**
*M.D.*
*TERMINATED: 09/16/2009*

represented by **NEIL J. HAMBURG**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**MICHAEL E. SACKS**
(See above for address)
*TERMINATED: 09/16/2009*

**Defendant**

**DONALD MELNICK**
*M.D.*
*TERMINATED: 09/16/2009*

represented by **NEIL J. HAMBURG**
(See above for address)
*TERMINATED: 09/16/2009*
*LEAD ATTORNEY*

**MAUREEN HOGAN KRUEGER**
(See above for address)
*TERMINATED: 09/16/2009*

**MICHAEL E. SACKS**
(See above for address)
*TERMINATED: 09/16/2009*

**Defendant**

**UMDNJ**
*AND THE UN-NAMED*
*"CONSULTANT" ALL PARTIES ARE*
*SUED BOTH INDIVIDUALLY AND AS*
*AGENTS OF THEIR REPECTIVE*

represented by **KERRI E. CHEWNING**
ARCHER & GREINER
ONE CENTENNIAL SQUARE
HADDONFIELD, NJ 08033
856-616-2685

6/25/10 9:50 AM

SA-4

*ORGANIZATIONS.*

Email: kchewning@archerlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/16/2008 | 1 | MOTION AND ORDER TO PROCEED IN FORMA PAUPERIS TOGETHER WITH DECLARATION IN SUPPORT filed by JOSPEH O. BOGGI.(ti, ) (Entered: 10/17/2008) |
| 10/22/2008 | 2 | ORDER THAT PLAINTIFFS MOTION TO PROCEED IN FORMA PAUPERIS GRANTED. THE COMPLAINT IS TO BE FILED AND THE SUMMONS IS TO ISSUE. THE UNITED STATES MARSHAL FOR THE EASTERN DISTRICT OF PENNSYLVANIA SHALL SERVE THE SUMMONS AND COMPLAINT UPON THE DEDFENDANTS AT NO COST TO THE PLAINTIFF.SIGNED BY HONORABLE BERLE M. SCHILLER ON 10/22/08. 10/23/08 ENTERED AND COPIES MAILED TO ALL PARTIES.(rf, ) (Entered: 10/23/2008) |
| 10/22/2008 | 3 | COMPLAINT against UMDNJ, MEDICAL REVIEW AND ACCREDITING COUNCIL, LARRY DOWNS, JOE SOKOLOWSKI, INSTITUTE FOR PHYSICIAN EDUCATION, ANDREA CICCONE, SCOTT MANNEKER, Richard Hawkins, DONALD MELNICK filed by JOSPEH O. BOGGI. (Attachments: # 1 COMPLAINT)(rf, ) (Entered: 10/23/2008) |
| 10/22/2008 |  | 9 Original Summons Issued as to UMDNJ, MEDICAL REVIEW AND ACCREDITING COUNCIL, LARRY DOWNS, JOE SOKOLOWSKI, INSTITUTE FOR PHYSICIAN EDUCATION, ANDREA CICCONE, SCOTT MANNEKER, Richard Hawkins, DONALD MELNICK, forwarded to US Marshals for service on 10/23/08. (rf, ) (Entered: 10/23/2008) |
| 02/26/2009 | 4 | Letter from Jean M. Pennie, Deputy to Judge Schiller to Joseph O. Boggi dated February 26, 2009 re: Return of Service. (sc, ) (Entered: 02/27/2009) |
| 05/15/2009 | 5 | MOTION for Extension of Time to File Answer *to the complaint* filed by INSTITUTE FOR PHYSICIAN EDUCATION, ANDREA CICCONE, DONALD MELNICK, Memoradum of Law, Certificate of Service. (KRUEGER, MAUREEN) Modified on 5/18/2009 (nd). (Entered: 05/15/2009) |
| 05/18/2009 | 6 | NOTICE of Appearance by NEIL J. HAMBURG on behalf of INSTITUTE FOR PHYSICIAN EDUCATION, ANDREA CICCONE, DONALD MELNICK with Certificate of Service(HAMBURG, NEIL) (Entered: 05/18/2009) |
| 05/18/2009 | 7 | NOTICE of Appearance by MAUREEN HOGAN KRUEGER on behalf of INSTITUTE FOR PHYSICIAN EDUCATION, ANDREA CICCONE, DONALD MELNICK with Certificate of Service(KRUEGER, MAUREEN) (Entered: 05/18/2009) |

SA-5

| 05/18/2009 | 8 | ORDER THAT MOTION OF DEFENDANTS FOR EXTENSION OF TIME TO ANSWER, PLEAD OR OTHERWISE MOVE IN RESPONSE TO COMPLAINT IS GRANTED. DEFENDANTS HAVE UNTIL 7/13/09 TO ANSWER PLEAD OR MOVE IN RESPONSE TO COMPLAINT.SIGNED BY HONORABLE BERLE M. SCHILLER ON 5/18/09. 5/19/09 ENTERED AND COPIES MAILED TO BOGGI, E-MAILED.(rf, ) (Entered: 05/19/2009) |
|---|---|---|
| 06/02/2009 | 9 | NOTICE of Appearance by JOSEPH GOLDBERG on behalf of MEDICAL REVIEW AND ACCREDITING COUNCIL, LARRY DOWNS with Jury Demand(GOLDBERG, JOSEPH) (Entered: 06/02/2009) |
| 06/03/2009 | 10 | MOTION for Extension of Time to File Answer *To Plaintiff's Complaint* filed by MEDICAL REVIEW AND ACCREDITING COUNCIL, LARRY DOWNS.Memorandum of Law, Certificate of Service.(GOLDBERG, JOSEPH) (Entered: 06/03/2009) |
| 06/04/2009 | 11 | ORDER THAT MOTION OF DEFENDANTS FOR EXTENSION TO ANSWER OR OTHERWISE PLEAD TO PLAINTIFFS COMPLAINT IS GRANTED. IT IS FURTHER ORDERED THAT DEFENDANTS HAVE UNTIL 7/3/09 TO ANSWER, PLEAD OR OTHERWISE MOVE IN RESPONSE TO COMPLAINT.SIGNED BY HONORABLE BERLE M. SCHILLER ON 6/3/09. 6/5/09 ENTERED AND COPIES MAILED, E-MAILED, MAILED UNREP.(rf, ) (Entered: 06/05/2009) |
| 06/10/2009 | 12 | US Marshal Return Re: Served Summons and Complaint upon MRAC by Personal Service on 5/27/09. (rf, ) (Entered: 06/11/2009) |
| 06/10/2009 | 13 | US Marshal Return Re: Served Summons and Complaint upon Joseph Sokolowski, via Personal Service on 5/27/09.(rf, ) (Entered: 06/11/2009) |
| 06/10/2009 | 14 | US Marshal Return Re: Served Summons and Complaint upon Larry Downs, MRAC via Personal Service on 5/27/09.(rf, ) (Entered: 06/11/2009) |
| 06/10/2009 | 15 | US Marshal Return Re:Served Summons and Complaint upon UMDNJ & "Unnamed Consultant" by Personal Service on 4/27/09. (rf, ) (Entered: 06/11/2009) |
| 06/10/2009 | 16 | US Marshal Return Re: Attempted service of Summons and Complaint upon IPE via Personal Service, but IPE is a program not an entity. Returned UNEXECUTED.(rf, ) (Additional attachment(s) added on 3/1/2010: # 1 r&r notice) (rf, ). (Entered: 06/11/2009) |
| 06/10/2009 | 17 | US Marshal Return Re:Served Summons and Complaint upon Scott Manater via Personal Service on 4/21/09. (rf, ) (Entered: 06/11/2009) |
| 06/10/2009 | 18 | US Marshal Return Re: Served Summons and Complaint upon Donald Melanic, M.D. via Personal Service on 4/21/09. (rf, ) (Entered: 06/11/2009) |
| 06/10/2009 | 19 | US Marshal Return Re: Served Summons and Complaint upon Andrea Ciccone via Personal Service on 4/21/09. (rf, ) (Entered: 06/11/2009) |

| 06/11/2009 | 20 | Disclosure Statement Form pursuant to FRCP 7.1 with Certificate of Service by INSTITUTE FOR PHYSICIAN EDUCATION, ANDREA CICCONE, DONALD MELNICK. (Attachments: # 1 Certficate of Service)(KRUEGER, MAUREEN) (Entered: 06/11/2009) |
|---|---|---|
| 06/24/2009 | 21 | NOTICE of Appearance by NEIL J. HAMBURG on behalf of SCOTT MANNEKER with Certifcate of Service(HAMBURG, NEIL) (Entered: 06/24/2009) |
| 06/24/2009 | 22 | NOTICE of Appearance by MAUREEN HOGAN KRUEGER on behalf of SCOTT MANNEKER with Certifcate of Service(KRUEGER, MAUREEN) (Entered: 06/24/2009) |
| 06/24/2009 | 23 | MOTION for Extension of Time to File Answer *to the Complaint* filed by SCOTT MANNEKER.Memorandum, Certificate of Service.(KRUEGER, MAUREEN) (Entered: 06/24/2009) |
| 06/24/2009 | 24 | AMENDED DOCUMENT by SCOTT MANNEKER. Amendment to 22 Notice of Appearance, 21 Notice of Appearance *(Amended Certificate of Service)*. (HAMBURG, NEIL) (Entered: 06/24/2009) |
| 06/24/2009 | 25 | AMENDED DOCUMENT by SCOTT MANNEKER. Amendment to 23 MOTION for Extension of Time to File Answer *to the Complaint (Amended Certificate of Service)*. (KRUEGER, MAUREEN) (Entered: 06/24/2009) |
| 07/01/2009 | 26 | First MOTION to Dismiss *pursuant to Rule 12(b)(6)* filed by MEDICAL REVIEW AND ACCREDITING COUNCIL, LARRY DOWNS.Memorandum, Certificate of Service. (Attachments: # 1 Exhibit)(GOLDBERG, JOSEPH) (Entered: 07/01/2009) |
| 07/01/2009 | 27 | ORDER THAT DEFENDANTS MOTION FOR AN EXTENSION OF TIME TO ANSWER PLEAD OR OTHERWISE MOVE IS GRANTED. DEFENDANT SCOTT MANAKER, MD SHALL HAVE AN EXTENSION UNTIL 7/13/09 TO ANSWER PLEAD OR OTHER WISE MOVE IN RESPONSE TO THE COMPLAINT.SIGNED BY HONORABLE BERLE M. SCHILLER ON 7/1/09. 7/1/09 ENTERED AND COPIES MAILED TO UNREP, EMAILED.(rf, ) (Entered: 07/01/2009) |
| 07/13/2009 | 28 | NOTICE of Appearance by MICHAEL E. SACKS on behalf of INSTITUTE FOR PHYSICIAN EDUCATION, ANDREA CICCONE, SCOTT MANNEKER, Richard Hawkins, DONALD MELNICK with Certifcate of Service(SACKS, MICHAEL) (Entered: 07/13/2009) |
| 07/13/2009 | 29 | MOTION to Dismiss *the Complaint* filed by INSTITUTE FOR PHYSICIAN EDUCATION, ANDREA CICCONE, SCOTT MANNEKER, Richard Hawkins, DONALD MELNICK.Memorandum, Certificate of Service. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit)(SACKS, MICHAEL) (Entered: 07/13/2009) |

SA-7

| 07/13/2009 | 30 | US Marshal Return Re: Service of Summons and Complaint made upon Richard Hawkins-American Board of Med. Spec. Service made on 7/6/09. (rf, ) (Entered: 07/14/2009) |
| --- | --- | --- |
| 07/24/2009 | 31 | MOTION FOR EXTENSION OF TIME TO RESPOND TO THE DEFENDANTS filed by JOSPEH O. BOGGI..(rf, ) (Entered: 07/27/2009) |
| 07/24/2009 | 32 | ORDER THAT THE PLAINTIFF'S MOTION FOR EXTENSION OF TIME IS GRANTED. PLAINTIFF SHALL HAVE THIRTY (30) DAYS TO ANSWER THE PENDING MOTIONS OR OTHERWISE MOVE. SIGNED BY HONORABLE BERLE M. SCHILLER ON 7/24/09. 7/27/09 ENTERED AND COPIES MAILED AND E-MAILED. (jpd) (Entered: 07/27/2009) |
| 08/03/2009 | 33 | NOTICE of Appearance by JOSEPH GOLDBERG on behalf of JOE SOKOLOWSKI, JOE SOKOLOWSKI with Jury Demand(GOLDBERG, JOSEPH) (Entered: 08/03/2009) |
| 08/03/2009 | 34 | NOTICE of Appearance by CALEB H. WHEELER on behalf of MEDICAL REVIEW AND ACCREDITING COUNCIL, LARRY DOWNS, JOE SOKOLOWSKI, JOE SOKOLOWSKI with Jury Demand(WHEELER, CALEB) (Entered: 08/03/2009) |
| 08/03/2009 | 35 | NOTICE of Appearance by MICHAEL B. PULLANO on behalf of MEDICAL REVIEW AND ACCREDITING COUNCIL, LARRY DOWNS, JOE SOKOLOWSKI, JOE SOKOLOWSKI with Jury Demand(PULLANO, MICHAEL) (Entered: 08/03/2009) |
| 08/06/2009 | 36 | Plaintiff's Exhibits and Miscellaneous Papers by JOSPEH O. BOGGI.(stb, ) (Entered: 08/07/2009) |
| 08/07/2009 | 37 | MOTION to Dismiss *Plaintiff's Complaint* filed by JOE SOKOLOWSKI.Memorandum, Certificate of Service. (Attachments: # 1 Exhibit)(PULLANO, MICHAEL) (Entered: 08/07/2009) |
| 08/13/2009 | 38 | PRAECIPE FOR NEW SUMMONS by JOSPEH O. BOGGI. (rf, ) (Entered: 08/17/2009) |
| 08/14/2009 | | 1 Summons Issued as to UMDNJ forwarded to US Marshals Service on 8/17/09. (rf, ) (Entered: 08/17/2009) |
| 08/24/2009 | 39 | Memorandum FOR RECORD - DATE OF NEXT FILING by JOSEPH O. BOGGI. (tomg, ) (Entered: 08/25/2009) |
| 08/24/2009 | 40 | Memorandum for Record - Voice Recordings in Support of my Case by JOSPEH O. BOGGI. (tomg, ) (Entered: 08/25/2009) |
| 08/24/2009 | 41 | Memorandum regarding agencies, non profits, and other organizations who act under color of state law by JOSPEH O. BOGGI. (tomg, ) (Entered: 08/25/2009) |

SA-8

| 08/24/2009 | 42 | Memorandum concerning issues for my 1983 case against defendants by JOSPEH O. BOGGI. (tomg, ) (Entered: 08/25/2009) |
| 08/24/2009 | 43 | MOTION to Add the National Board of Medical Examiners as a defendant. filed by JOSEPH O. BOGGI..(tomg, ) (Entered: 08/25/2009) |
| 08/24/2009 | 44 | MOTION UNDER RULE 706 OF THE RULES OF EVIDENCE. COURT APPOINTED EXPERT filed by JOSEPH O. BOGGI.MEMORANDUM IN SUPPORT. (Attachments: # 1 MEMORANDUM IN SUPPORT)(tomg, ) (Entered: 08/25/2009) |
| 08/24/2009 | 45 | MOTION to Amend THE ORIGINAL Complaint, filed by JOSPEH O. BOGGI.MEMORANDUM IN SUPPORT. (Attachments: # 1 MEMORANDUM IN SUPPORT, # 2 EXHIBIT A)(tomg, ) (Entered: 08/25/2009) |
| 08/24/2009 | 46 | Memorandum IN SUPPORT OF AMENDING THE INITIAL FILING OF A PRO SE LITIGANT by JOSEPH O. BOGGI. (tomg, ) (Entered: 08/25/2009) |
| 08/24/2009 | 47 | EXHIBITS FILED IN HARD COPY by JOSEPH O. BOGGI.. (tomg, ) (Entered: 08/25/2009) |
| 08/27/2009 | 48 | MEMORANDUM IN RESPONSE TO DEFENDANTS MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by JOSEPH O. BOGGI. (rf, ) (Entered: 08/28/2009) |
| 08/28/2009 | | COPY OF AN ORDER DATED 7/24/09 MAILED TO UMDNJ, RETURNED AS UNDELIVERABLE ON 8/28/09 (rf, ) (Entered: 08/31/2009) |
| 09/04/2009 | 49 | Response in Opposition re 44 MOTION to Appoint Expert by INSTITUTE FOR PHYSICIAN EDUCATION, ANDREA CICCONE, SCOTT MANNEKER, Richard Hawkins, DONALD MELNICK. (SACKS, MICHAEL) (Entered: 09/04/2009) |
| 09/04/2009 | 50 | Praecipe for Leave to File Reply Memorandum by INSTITUTE FOR PHYSICIAN EDUCATION, ANDREA CICCONE, SCOTT MANNEKER, Richard Hawkins, DONALD MELNICK. (Attachments: # 1 Exhibit Reply Memorandum)(SACKS, MICHAEL) (Entered: 09/04/2009) |
| 09/04/2009 | 51 | Response in Opposition re 45 MOTION to Amend/Correct 3 Complaint, by INSTITUTE FOR PHYSICIAN EDUCATION, ANDREA CICCONE, SCOTT MANNEKER, Richard Hawkins, DONALD MELNICK. (SACKS, MICHAEL) (Entered: 09/04/2009) |
| 09/04/2009 | 52 | Response re 43 MOTION for Leave to Appear /Add National Board of Medical Examiners as Defendant by INSTITUTE FOR PHYSICIAN EDUCATION, ANDREA CICCONE, SCOTT MANNEKER, Richard Hawkins, DONALD MELNICK. (SACKS, MICHAEL) (Entered: 09/04/2009) |
| 09/08/2009 | 53 | MOTION for Leave to File a Reply to Plaintiff's Opposition to Defendants Rule 12(b)(6) Motions to Dismiss filed by MEDICAL REVIEW AND |

SA-9

| | | |
|---|---|---|
| | | ACCREDITING COUNCIL, LARRY DOWNS, JOE SOKOLOWSKI.Certificate of Service.(PULLANO, MICHAEL) (Entered: 09/08/2009) |
| 09/09/2009 | 54 | CERTIFICATE OF SERVICE, EXHIBITS (FILED IN HARD COPY) by JOSPEH O. BOGGI (rf, ) (Entered: 09/10/2009) |
| 09/15/2009 | 55 | MEMORANDUM AND/OR OPINION. SIGNED BY HONORABLE BERLE M. SCHILLER ON 9/15/09. 9/15/09 ENTERED AND COPIES MAILED, E-MAILED.(rf, ) (Entered: 09/15/2009) |
| 09/15/2009 | 56 | MEMORANDUM AND ORDER THAT PLAINTIFFS MOTION TO ADD BOARD OF MEDICAL EXAMINERS (DOC. 43) IS GRANTED. THE MRAC/DOWNS MOTION TO DISMISS (DOC. 26) IS GRANTED. PLAINTIFFS COMPLAINT AGAINST THESE DEFENDANTS IS DISMISSED. THE NBME/IPE DEFENDANTS MOTION TO DISMISS (DOC. 29) IS GRANTED, AND PLAINTIFFS COMPLAINT AGAINST THESE DEFENDANTS IS DISMISSED. PLAINTIFFS MOTION FOR EXTENSION OF TIME (DOC. 31) IS GRANTED. DEFT. SOKOLOWSKIS MOTION TO DISMISS (DOC. 37) IS GRANTED, AND PLAINTIFFS COMPLAINT AGAINST DEFT.IS DISMISSED. PLAINTFFS MOTION FOR A COURT APPOINTED EXPERT (DOC. 44) IS DENIED. PLANITIFFS MOTION TO AMEND THE COMPLAINT (DOC. 45) IS GRANTED, ETC. DEFTS. IPE, CICCONE, MANAKER, MELNICKS PRAECIPE TO FILE A REPLY MEMORANDUM (DOC. 50) IS GRANTED. DEFTS MRAC, DOWNS, SOKOLOWSKIS MOTION FOR LEAVE TO FILE A REPLY BRIEF (DOC. 53) IS GRANTED.. SIGNED BY HONORABLE BERLE M. SCHILLER ON 9/15/09. 9/15/09 ENTERED AND COPIES MAILED, E-MAILED.(rf, ) (Entered: 09/15/2009) |
| 10/09/2009 | 57 | Praecipe *to Place Document on Court Docket* by INSTITUTE FOR PHYSICIAN EDUCATION, ANDREA CICCONE, SCOTT MANNEKER, Richard Hawkins, DONALD MELNICK. (Attachments: # 1 Exhibit) (HAMBURG, NEIL) (Entered: 10/09/2009) |
| 10/15/2009 | 58 | MOTION FOR MORE TIME TO SUBMIT A MOTION FOR RECONSIDERATION. FILED BY JOSPEH O. BOGGI..(sg, ) (Entered: 10/16/2009) |
| 10/19/2009 | 59 | CERTIFICATE OF SERVICE by JOSPEH O. BOGGI (rf, ) (Entered: 10/19/2009) |
| 10/20/2009 | 60 | MOTION FOR RECONSIDERATION, EXHIBITS, CERTIFICATE OF SERVICE filed by JOSEPH O. BOGGI..(rf, ) (Entered: 10/21/2009) |
| 10/21/2009 | 61 | ORDER THAT MOTION FOR MORE TIME TO SUBMIT A MOTION FOR RECONSIDERATION IS DENIED.SIGNED BY HONORABLE BERLE M. SCHILLER ON 10/20/09. 10/22/09 ENTERED AND COPIES MAILED, |

SA-10

| | | |
|---|---|---|
| | | E-MAILED.(rf, ) (Entered: 10/22/2009) |
| 10/26/2009 | 62 | EXHIBITS 15 & 16 by JOSEPH O. BOGGI.. (rf, ) (Entered: 10/26/2009) |
| 10/27/2009 | 63 | ORDER THAT PLAINTIFFS MOTION FOR RECONSIDERATION IS DENIED.SIGNED BY HONORABLE BERLE M. SCHILLER ON 10/26/09. 10/27/09 ENTERED AND COPIES MAILED TO UNREP, E-MAILED.(rf, ) (Entered: 10/27/2009) |
| 10/30/2009 | 64 | US Marshal Return Re: Served Summons and Complaint upon UMDNJ & Unnamed Consultant via Personal Service on 10/6/09. (rf, ) (rf, ) (Entered: 11/12/2009) |
| 12/01/2009 | 65 | NOTICE of Appearance by KERRI E. CHEWNING on behalf of UMDNJ, UMDNJ (CHEWNING, KERRI) (Entered: 12/01/2009) |
| 12/01/2009 | 66 | MOTION for Extension of Time to File Response/Reply as to 3 Complaint,, MOTION for Extension of Time to File Answer re 3 Complaint, filed by UMDNJ, UMDNJ.Memorandum, Certificate of Service.(CHEWNING, KERRI) (Entered: 12/01/2009) |
| 12/02/2009 | 67 | ORDER THAT DEFENDANT UNIVERSITY OF MEDICINE AND DENTISTRY OF NEW JERSEYS MOTION FOR AN EXTENSION OF TIME IS GRANTED, AND DEFENDANT HAS 30 DAYS AFTER DATE OF ENTRY OF THIS ORDER TO ANSWER PLEAD OR RESPOND TO COMPLAINT AND AMENDED COMPLAINT.. SIGNED BY HONORABLE BERLE M. SCHILLER ON 12/2/09. 12/3/09 ENTERED AND COPIES MAILED TO PRO SE, E-MAILED.(rf, ) (Entered: 12/03/2009) |
| 12/09/2009 | 68 | MOTION IN SUPPORT OF ADDING EMAIL ADDRESS TO ECF TO FACILITATE COMMUNICATION filed by JOSEPH O. BOGGI..(rf, ) (Entered: 12/10/2009) |
| 12/17/2009 | 69 | ORDER THAT MOTION IN SUPPORT OF ADDING PLAINTIFFS EMAIL ADDRESS (DOC. 68) IS GRANTED.SIGNED BY HONORABLE BERLE M. SCHILLER ON 12/16/09. 12/17/09 ENTERED AND COPIES EMAILED(rf, ) (Entered: 12/17/2009) |
| 01/04/2010 | 70 | MOTION to Dismiss *Plaintiff's Complaint and Amended Complaint* filed by UMDNJ, UMDNJ.Memorandum, Certificate of Service. (Attachments: # 1 Memorandum in Support of Motion to Dismiss)(CHEWNING, KERRI) (Entered: 01/04/2010) |
| 01/19/2010 | 71 | NOTICE by UMDNJ *Corporate Disclosure Statement* (CHEWNING, KERRI) (Entered: 01/19/2010) |
| 01/19/2010 | | Disclosure Statement Form pursuant to FRCP 7.1 by UMDNJ. (SEE PAPER #71 FOR ATTACHMENT) (nd) (Entered: 01/20/2010) |

SA-11

| 01/19/2010 | 72 | ANSWER TO THE DEFENDANTS ANSWER DATED 1/4/10 IN OPPOSITION TO DISMISSAL AND DEMAND FOR JURY TRIAL by JOSEPH O. BOGGI. (Attachments: # 1 EX)(rf, ) (Additional attachment(s) added on 3/1/2010: # 2 pages 3 & 4) (rf, ). (Entered: 01/20/2010) |
| 01/19/2010 | 73 | MOTION IN SUPPORT OF AN ORAL ARGUMENT IN THIS CASE, CERTIFICATE OF SERVICE filed by JOSEPH O. BOGGI..(rf, ) (Entered: 01/20/2010) |
| 01/19/2010 | 74 | MOTION IN SUPPORT OF A DECLARATION OF DEFAULT AGAINST THE PRECEPTOR/CONSULTANT, AND EMPLOYEE OF UMDNJ filed by JOSEPH O. BOGGI..(rf, ) (Entered: 01/20/2010) |
| 01/26/2010 | 75 | ORDER THAT DEFENDANT MOTION TO DISMISS (DOC. 70) IS GRANTED. PLAINTIFFS MOTION IN SUPPORT OF AN ORAL ARGUMENT IN THIS CASE (DOC. 73) IS DENIED, PLAINTIFFS MOTION FOR DEFAULT AGAINST PRECEPTOR/CONSULTANT (DOC. 74) IS DENIED. THE CLERK OF COURT IS DIRECTED TO CLOSE THIS CASE.SIGNED BY HONORABLE BERLE M. SCHILLER ON 1/26/10. 1/27/10 ENTERED AND COPIES EMAILED(rf, ) (Entered: 01/27/2010) |
| 02/25/2010 | 76 | NOTICE OF APPEAL by JOSEPH O. BOGGI. GRANTED Copies to Judge, Clerk USCA, Appeals Clerk and (rf, ) (Entered: 03/01/2010) |
| 02/25/2010 | 77 | Clerk's Notice to USCA re 76 Notice of Appeal : (rf, ) (Entered: 03/01/2010) |
| 03/10/2010 | | NOTICE of Docketing Record on Appeal from USCA re 76 Notice of Appeal filed by JOSEPH O. BOGGI. USCA Case Number 10-1619 (rf, ) (Entered: 03/10/2010) |

| PACER Service Center | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 06/25/2010 09:50:32 | | |
| **PACER Login:** | hg0104 | **Client Code:** | nbme/boggi |
| **Description:** | Docket Report | **Search Criteria:** | 2:08-cv-04941-BMS |
| **Billable Pages:** | 8 | **Cost:** | 0.64 |

SA-12

**BMS**

United States District Court
Eastern District of Pennsylvania
Office of the Clerk of Court
James A. Byrne Federal Courthouse
601 Market Street, Room 2609
Philadelphia, PA 19106-1797
Phone: (215) 597-7704
Fax: (215) 597-6390

October 16, 2008

Joseph O. Boggi D.O.    Plaintiff
Internal Medicine
1207 Ballard Street
Silver Spring, Maryland 20910

V.

Medical Review and Accrediting Council
Larry Downs Esq
Joe Sokolowski M.D.
Two Princess Road
Lawrenceville, NJ 08648

Institute for Physician Education *IPME*
Andrea Ciccone Director
Scott Manneker M.D.
Richard Hawkins M.D.
Donald Melnick M.D.
3750 Market Street
Philadelphia Pennsylvania, 19104
215-590-9772

UMDNJ
and the un-named "consultant"
675 HOES LANE, PISCATAWAY, NJ 08854
( I was not given the location of the branch of UMDNJ associated with MRAC)
( so I chose this one. This may need to be corrected)

All parties are sued both individually and as agents of their respective organizations.

SA-13

Original

1    I applied to MRAC et al for testing and retraining, and they declined to retrain me in Medicine.

3

5    This action was taken by MRAC and their associates, under color of the law. The Court has

7    jurisdiction on this case under 42 USC § 1983 and Title II of the ADA.

9

11   In this case, the state actors have attacked my property right, my medical license. Several

13   cases have held that testing by these state actors is covered under §1983. ( More later )

15   Given the violation of my property rights, I am entitled to relief.  No state in the Union retrains

17   doctors on their own. They develop associations with organizations, as follows. The Federation

19   of State Medical Boards and National Board Medical Examiers formed the Post Licensure

21   Assessment System (PLAS). The PLAS formed the SPEX ( covered later ) and the Institute for

23   Physician Evaluation(IPE). Essentially an arm of the National Board of Medical Examiners, the

25   IPE located at the NBME headquarters in Philadelphia, writes the tests and establishes standards.

27   The IPE is associated with several centers around the country who do the testing and retraining.

29   One of those centers is the MRAC. I tested in Philadelphia at the IPE and at MRAC.

31   The primary defendants in this case MRAC, do the evaluations and retraining for the State of NJ.

33   MRAC does that through the UMDNJ a state school. As you can see from exhibit one MRAC is

35   associated with UMDNJ, a state sponsored Medical School.

37

39   A government entity acts only through it's agents or employees hence the agents, MRAC are

41   state actors as agents of the state.

43

2

SA-14

Original

The way I see it, someone is doing the work of the state in this nation, in regards to

retraining of doctors. Some of these state actors, the folks in NJ are named in this complaint.

*The cases that support my claim* - As you can probably discern, I primarily used a monograph,

written by Karen Blum Suffolk Univ. Law, and Kathryn Urbonya William and Mary college of

Law for the first section. The specific 1983 cases that pertain to testing and the like came from an

Internet search. I will be reading Nahmod over the coming weeks.

1. A private person who acts under color of the state acts under color of the law. Adickes v Kress

and Co. 398 US 144,152 1970

2. When sifting through the facts, it is clear that private conduct is that of a state actor. Burton v

Wilmington Parking Authority 386 US 715,722 1961 In this case, there is a symbiotic

relationship between the state, the MRAC and the IPE. The link between the three is obvious.

MRAC would not exist were it not for the need of the state to have a retraining authority. By the

report, noted above, exhibit one, it is clear that the state has a large amount of control over the

MRAC. MRAC took the one Psychiatry report out of many, the one proffered by the state. The

MRAC inconceivably affirmed that findings of the state, when better alternatives were available.

Furthermore, as will be seen in testimony. The contacts with the state, were said to be close. So

said the President of the MRAC, Larry Downs. This supports the notion that MRAC et al are

state actors

3. I anticipate that the state will ask the court in this case to enforce or authorize a discriminatory

practice. That is not permitted  Jackson v Metropolitan Edison Co. 419 US 345,353

1974. Taking the discipline of Psychiatry, and bastardizing it in order to bend the rules and

3

Original

1  prohibit me from getting retraining is clearly discriminatory.  I am sure that the MRAC et al, will

3  ask the court to affirm the discrimination of the state of Maryland against me.

5  In this country the courts based, on NLRB v Universal Camera 1951, are asked to affirm notions

7  otherwise struck down by the judge for lack of evidence. In Boggi v State of Maryland, this

9  occurred in my case on three counts. The judge, Ann Kehinde said that I had no criteria for a

11  dangerous person, or a mentally incompetent person or a narcissistic personality disorder. On it's

13  face there remain no criteria, for any of these things. There is also no evidence of difficulty with

15  communication. There were many reasons for Judge Kehinde to recommend reversal of the

17  board's action. Furthermore, the State of Maryland never asserted I had any criteria for the

19  disorders mentioned.

21

23  During my first state ordered psychiatric evaluation, I told the evaluator how I came to be

25  diagnosed with ADHD. I told her that at one time, I had performance anxiety. She smiled luridly,

27  said, I can use that. Since, according to my record, I have had difficulty with communication. It

29  should be noted for the record that I went directly from residency to a teaching position in the

31  Emergency Department at Walter Reed Army Medical Center. It is not often that an Osteopath

33  gets to teach in an M.D. Institution.  I gave a one hour lecture about 8 - 12 times a month for

35  three years, and then went on to a position as Chief of Internal Medicine at a

37  local army hospital. Repeating for emphasis, the state never challenged the notion that they were

39  making assertions _not_ supported by generally accepted medical criteria. This is otherwise known

41  as the standard of care.

43  In all cases, the authorities must live up to the standard of care. There is a history of abuse of

Psychiatric evaluations. Mileikowsky v. Medical Board of California

4

Original

1    In Mileikowsky the court found that they failed to present good cause for Dr. Meleikowsky to

3    submit to a Psychiatric examination. As you can see from his web site. Dr. Meleikowsky is a

5    patient advocate. http://www.allianceforpatientsafety.org/ His efforts as a patient advocate led to

7    his troubles.

9    These two cases allow this court ( Meleikowsky and Jackson ) allow this court to find that

11   psychiatric evaluations made without proper authority or *basis* can be struck down.

13

15   I will ask the court to rule on my Psychiatric diagnosis in this case. In addition to expert

17   testimony, you will get to see me be the regular fellow that I am.

19   Jackson says that the state cannot use the court to enforce a discriminatory practice. Meleikowsky

21   says that the state must have cause to send a doctor for Psychiatric evaluation. Meleikowsky

23   prevailed and his license was returned.

25   4. This is also a claim enforceable under the substantive component of the due process clause.

27   This bars arbitrary, wrongful government actions Zimmerman v Burch 494 US 113, 124 1990

29   Burch is particularly pertinent since listing someone as mentally incompetent, dangerous,

31   narcissistic, with communication difficulties amounts to ten years ( so far ) of incarceration.

33   Quoting from the case, " He seeks to hold state officials accountable, for their abuse of their

35   broadly delegated, uncircumscribed power to effect the deprivation at issue."

37

39

41

43

5

SA-17

5. State of mind

I've been listed as Mentally incompetent for ten years. Are you shocked? " For an action to be
arbitrary it must shock the conscience." I am still shocked. Any time I relate the facts of the
Psychiatric portion of the case, folks are shocked. Giving me the diagnoses mentioned above
shocks the conscience. They were determined arbitrarily, render a person unemployable, and
relatively unable to defend himself. County of Sacramento v Lewis 118 S CT. at 1717.

On the last occasion that the term mentally incompetent was applied to me, I complained to the
examiner about that diagnosis. Her response was shock. She said, " who did that?"
Paraphrasing, she went on to say that while I was mentally incompetent I could be retrained.
Initially, even the examiner was shocked by the arbitrary nature of her actions. It is also
notable that while that diagnosis remains on my record, the MRAC et al chose not to call me
mentally incompetent. Could they have been shocked to see that on my chart?

6

SA-18

place where Mitchell was." *Id.* at 840.).

106. County of Sacramento v. Lewis, 523 U.S. —, 118 S. Ct. 1708, 1716 (1998); *see also* Collins v. City of Harker Heights, 503 U.S. 115, 130 (1992) (holding that city's alleged failure to train or warn sanitation department employees was not arbitrary).

107. *County of Sacramento*, 118 S. Ct. at 1717. Justice Souter authored an opinion joined by five Justices: Chief Justice Rehnquist and Justices O'Connor, Kennedy, Ginsburg, and Breyer. He stated that when a plaintiff challenges a "specific act of a governmental officer," rather than legislation, *id.* at 1716, the plaintiff must show that the act "shocks the conscience" to establish a substantive due process violation. *Id.* at 1717. Justices Kennedy and O'Connor, however, in a concurring opinion, stated that "the reasons the Court gives in support of its judgment go far toward establishing that objective considerations, including history and precedent, are the controlling principle, regardless of whether the State's action is legislative or executive in character." *Id.* at 1722 (Kennedy, J., concurring).

108. Davidson v. Cannon, 474 U.S. 344, 347 (1986); Daniels v. Williams, 474 U.S. 327, 333 (1986).

109. 523 U.S. —, 118 S. Ct. 1708 (1998).

110. *Id.* at 1718 (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)).

111. *Id.* at 1720.

1    I continue to follow the outline of the monograph noted above.

3    6. While there are no specific free speech claims in this case. I need to mention Leape et al Ann

5    Intern Med 2006; 144: 107-115 and my two response letters.

7    Leape needs to be brought to the attention of this court. For two reasons. Firstly, it mentions in

9    writing, examples of disruptive behavior that can be interpreted in many different ways by state

11    authorities. Most notably criticizing Hospital staff, and criticizing the treatment of other

13    caregivers by writing in the chart are reasons for discipline.

15    The interesting and more pertinent reason to list Leape is the remedy for a disruptive Physician. It

17    includes sending him to the IPE, of which the MRAC is a member.

19

21    I bring this to the court's attention for another reason. With some courts chastising the use of

Psychiatry to discipline doctors, this Disruptive Physician category, and "Sham peer review" are

23    rising as tools to use against the Patient advocate. This trend is not opposed by any major

25    Medical Society.

27

29    *Table 1.* Examples of Disruptive Behavior*

31    Profane or disrespectful language
Demeaning behavior (for example, referring to hospital staff as "stupid")
Sexual comments or innuendo
33    Outbursts of anger
Throwing instruments or charts
Criticizing hospital staff in front of patients or other staff
35    Negative comments about another physician's care
Boundary violations with staff or patients
Inappropriate chart notes (for example, criticizing the treatment provided by
37    other caregivers)
Unethical or dishonest behavior

39    * From reference 3

41

43

8

SA-20

9. Due to the subjective nature of the cause for declination, any attempt at a move for dismissal by the defendant must proceed *after* the matter of credibility is determined. Material facts are in dispute and must be settled by the court.

10 Harlow does not apply because a matter of clearly established law, violations to Section 1983 and title II of the ADA are in question.

11. Statute is per 42 USC § 1988 and so it runs two years. That takes it to Oct 16th 2008. The letter of declination took some time to produce. As noted on that letter, exhibit one, consultation with an official at UMDNJ took place. I assume that was the reason the declination letter arrived a couple of months after the testing ended.

12. Venue per 28 USC § 1391 makes it appropriate to file in Pa Eastern District

13. Supporting cases          I will be researching to find more cases. While Ewing supports retest of the Part I NBME, I have not found not found IPE related cases, although I know that they exist. In fact, several franchises of the IPE, including the IPE have stopped retraining because of litigation expense.

```
Hadix v. Caruso, No. 4:92-CV-1b WD.Mich. Nov. 13, 2006
VI.
```

Scott E. Ewing, Plaintiff-appellant, v. Board of Regents of the University of Michigan, Defendant-appellee
United States Court of Appeals, Sixth Circuit. - 742 F.2d 913
Argued July 18, 1984. Decided Sept. 6, 1984

Wood v. Strickland, 420 U.S. 308 (1975)
Wood v. Strickland
No. 73-1285
Argued October 16, 1974
decided February 25, 1975 420 U.S. 308

9

1

A review of your case showed that you performed well on some of the standardized testing, however problems were revealed on the Transaction Stimulated Recall (TSR) portion of your testing. The results of the TSR indicate disordered thinking which is consistent with some of the findings reported in the Maryland Board summary. The underlying dual problems of adult variant ADD and narcissistic personality disorder present real problems for any remediation plan MRAC could provide.

3

5

7    *The facts of this case in brief*

9    I sought retraining from MRAC. They declined.

The above paragraph summarizes their response on Oct 16th, 2006. It says that I have disordered

11    thinking, ADHD, and Narcissistic personality disorder. It should go without saying that you

cannot do well on standardized testing if you have disordered thinking, especially when the

13    questions are given at SIXTY per hour. That diagnosis, disordered thinking, goes with a long

differential, none of which has anything to do with ADHD or a Personality Disorder. Contrary to

15    the assertion of the MRAC, the state never found that I have disordered thinking.

17    The Personality Disorder was added to my chart literally as an afterthought by one examiner out

of veritable sea other doctors. The state never said that I have disordered thinking. I have no

19    criteria for disordered thinking or Narcissistic Personality disorder. Merging diagnoses that are

bizarre on their face, the MRAC declined to offer me retraining in Medicine. This action on their

21    part, leads to my complaint. An appearance in your court will promptly reveal that the notions

proposed by the MRAC are arbitrary, unreasonable, and capricious.

10

1     *The details of the testing in brief*

3     From my perspective, the issue here is improper testing procedures, and interviewing procedures. From the perspective of the testing agency, they say that during the testing, I showed disordered

5     thinking ( exhibit 1 ) and in their final report had no other negative things to say about my performance in the testing. The testing agency went on to say that this supposed disordered

7     thinking, in addition to my ADHD, and a supposed diagnosis of Narcissistic Personality Disorder disqualify me from retraining in Medicine.

9

I first contacted MRAC in mid Nov 2005. Essentially because the MRAC, and their associates

11    the IPE refused to tell me the exact nature of the testing, the date for testing kept moving, and I finally tested in May 2006. Nevertheless, the testing was not as advertised. Furthermore, if you

13    check the pertinent web site the testing organization *still* does not reveal the nature of the testing properly and continues to follow along the lines noted below.

15    http://www.nbme.org/programs-services/practicing-physicians/description.html

17    The first day of testing. I did not formerly complain about the first day of testing. I did complain about it verbally, and in writing after the fact. Regarding the first day of testing two of the three

19    tests were 60 questions per minute. No one told me that would happen despite *six* months of inquiry. For most, that many questions per minute requires a lot of practice. I did not worry about

21    that so much, since, despite my ADHD, I can go that fast. Next, I am an General Internist. Despite the *final* assertions to the contrary, Pediatrics, Ob Gyn and Surgery were on the test.

11

1    Also, in grading the test, the organization does not separate your scores by these categories, they

just break them down to the more basic headings of heart, lung and so on. This decreases the

3    perception of the overall score. Since your retraining period is related to your score, and this

retraining is expensive, you want to score as high as possible. Many obstacles are placed in your

5    way in this regard. Wanting to get along, and knowing that I did well on the tests I did not

complain formally about this portion of the testing.

7

I know that I did well on the second day of testing, but it was even more bizarre, and so I

9    complained about that set of testing verbally many times that day, in my notes from that day (

which were refused by the examiner ) made at lunch and during the afternoon testing, and

11   subsequently, on many occasions. Of note, when I showed my notes to the examiner on that day,

she quietly exclaimed, "He wrote them down."

13

Details of the second day of testing. Among other tests, I was given Computer simulated patient

15   care cases. Just before I clicked start for the test to begin,  I was told that this computer would be

slower than anything you have used. I hesitated, the examiner said that everyone has to use the

17   same one, and so I went on.

I did not imagine it would wind up being two to three times slower than my practice computer.

19   That one second warning by the IPE director amounted to no notice at all. Absolutely no time

was given to practice on the computer. The speed of the computer changes the nature of the test

21   tremendously. It seemed that the computer was two to three times slower then the recommended

minimum computer. Picture this, many years ago, your computer would groan for awhile when

12

SA-24

1    you saved a word processing file. That is how I described this computer to all concerned. The test

center did not fail me on that test, but the relationship of that test to the next test is critical.

3    During the morning test, I was not permitted to take notes. Furthermore, I was told that the

afternoon testing would go over my mistakes from the morning test. At lunch, I made note of my

5    complaint about the computer, and wrote down what I thought were my mistakes. I also prepared

to discuss the cases in the standard fashion.

7

As the afternoon began, the IPE staff complained about my skills with the computer and I

9    complained about the computer. That notion raised by the IPE verbally never showed up again,

and I do not understand that complaint. I told them I had reasonable computer skills. The IPE

11    director and the examining physician must have asked me five or six times about my computer

skills. 20 years ago, I was beta testing medical software in the army. I am not an expert, but I

13    handle computers very well.

15    Quoting from the software orientation packet,  "In evaluating case performance, the domains of

diagnosis, including physical exam and appropriate diagnostic tests, therapy, monitoring, timing,

17    sequencing, and location are considered."

Taking care of a patient by computer is essentially a computer game. I really do not play many

19    computer games, but I think I can paint the picture. If you use a slow computer it effects the

performance of the game.  The more you practice with the game, the better you get at using it and

21    the higher you score. I note the problems with this section, because they were severe. They did

not effect the subsequent conclusion of the testing agency and so they are only noted here for the

13

1    moment.

Then came the interview with an Examiner. Firstly because of my experience, it has been awhile

3    since I have allowed myself to submit to an unrecorded interview. I tend to be naive. I was at

THE National Board of Medical Examiners. I knew that I did well enough on the previous

5    testing. I had studied for this part for three years, and more. I could not have been more ready.


7    In a word, it was an ambush interview. I was yelled at, scolded, derided for not knowing any

medicine, and generally abused. This went on for the entire hour. I complained incessantly,

9    verbally, and in my notes that I made at the time. I complained later that day and essentially ever

since.

11

Avoiding the blow by blow description of that hour, I was asked to describe the case, and then

13    actually give a blow by blow description of what I did, what I was thinking when I did it, and

how I reacted to the things that happened in real time during the morning patient care testing.

15    That is not what I was told would happen. Secondly, very few people can come close to recalling

three hours of data in order, about three hours after the fact. Because I make pictures ( for the

17    most part ) I can come close to recalling all of that data off the cuff. And that is what I did. Now,

I would say that I was able to get 75-85% of the data for each case in order on the first try ( after

19    first describing the case, in the standard manner ) After that, I went back and filled in the few

holes and on the report, the examiner noted that eventually I was able to tell him all of what I did.

21


14

1    Well, that in itself is an accomplishment for a person with a very good memory. Somehow, out

of this, the final report notes that I have disordered thinking, furthermore, this disordered

3    thinking disqualifies me from re training. The examiner report did not say that I had disordered

thinking on his report.

5

There are more details to relate. However, as bizarre as it is, that is the crux of this case.

7    Somehow, my excellent memory, which is not perfect, is being portrayed as disordered thinking

in the final report. It should be noted that the examiner noted in his report that I took good care of

9    all the patients, at least in one sentence. The examiner also claimed that the interview was

collegial. That is a bold faced lie. Without a doubt, when I wasn't talking, I was being subjected

11    to a verbal lashing. It lasted the entire hour.

13    There is no connection between eventually being able to remember three hours of data, and

disordered thinking. Trying to remember things as requested is non standard by any means. This

15    testing is still not properly described on the web site. In and of itself this procedure is not

dispositive of anything short of a memory test, which all but a few, like me, will most definitely

17    fail. Most people need to take notes to remember that amount of detail. Saving that, they need to

have time to recreate the memory. I had just enough time to recreate the memory, but not always

19    put it in perfect order.

Having properly complained in real time, I considered what to do next, I asked to be retested on

21    the interview. I wanted it to be monitored this time. That was before I received the report on any

of the testing. I figured that would be a fair way to deal with all involved. Two principals agreed

15

1     to that but then it was declined. Over the coming weeks, with the report in my possession, it

clearly shows that I passed the testing and should be retrained. However, the MRAC refuses to

3     do that for the reason noted in the first paragraph.

5     *<u>Request for Relief.</u>*

       Given that I can prove that my actions were worthy, the relief I seek is retraining in medicine, by

7     injunctive relief. I realize that the court may need an extra step in order to be completely

convinced and so alternatively, I am asking for a monitored test, followed by retraining. Please

9     note, folks who are permitted to make up diagnoses (disordered thinking and Narcissistic

Personality Disorder ) that would lead others ( folks like me ) to be reprimanded, by the

11    authorities is very serious business.

       It sets up a catch 22 in that these folks are the authorities, the state authorities, and national

13    authorities. While I will show that I performed well during the testing, again, I realize that your

Honor may want to repeat the testing in order to be sure before ruling against the state actor in

15    this case.

       If your honor chooses option number two, just approving a retest, without a monitored retraining

17    will lead to more litigation and further harm to me, since the state actors seem to think they are in

an environment that let's them do whatever they want. If your honor finds that the results of the

19    testing are in question, I would point out that the MRAC and IPE are asserting that this is the

ONLY test in medicine that cannot be repeated. The last communication in this regard came

21    from the IPE. It noted that I cannot retake the test because they only have One set of multiple

choice questions. Please keep in mind that the IPE is essentially the National Board of Medicine,

16

1   and the questions on the test are essentially all from Step 3 tests and above. Step 1, 2, 3, and all

    Boards are given more than once.

3

    Since I can prove monetary damages, I am applying for those. For many years now I have had a

5   firm job waiting for me.

    Furthermore, the court will clearly see that the actions of a couple of the state actors was

7   malicious, by any standard. In keeping with that notion, I am also seeking punitive damages. I

    also ask that you order these testing folks to accurately tell future clients just what tests they are

9   taking, in a timely manner. It took me six months of agony, about three with no response at all to

    my specific requests for information about the testing. That should never happen to another client

11  of MRAC or the IPE. As of the date of this  filing, the IPE continues to refuse to do give the

    specific details of the testing on their web site. Most importantly, since these state and national

13  actors have shown that they cannot be trusted to perform an objective evaluation on physicians

    attempting to reenter the practice of Medicine, future clients should be warned of this and make

15  arrangements to have these subjective tests monitored.


17

1

3

# *Compensatory Damages*

The full range of common-law remedies is available to a plaintiff assert-
ing a claim under § 1983. Legal relief may take the form of nominal,
compensatory, as well as punitive damages. "When § 1983 plaintiffs seek
damages for violations of constitutional rights, the level of damages is
ordinarily determined according to principles derived from the common
law of torts." [596] The Supreme Court has stressed, however, that "[t]he
rule of damages . . . is a federal rule responsive to the need whenever a
federal right is impaired." [597]

Compensatory damages generally fall into one of three categories: spe-
cial, general, or nominal damages. Special damages relate to specific pe-
cuniary losses, such as lost earnings, medical expenses, and loss of earn-
ing capacity. General damages include compensation for physical pain
and suffering, as well as emotional distress. Nominal damages reflect the
violation of a right with no proven actual injury.

In *Carey v. Piphus*, [598] the Supreme Court held that "although mental
and emotional distress caused by the denial of procedural due process
itself is compensable under § 1983, neither the likelihood of such injury
nor the difficulty of proving it is so great as to justify awarding compen-
satory damages without proof that such injury actually was caused."
Thus, actual damages will not be presumed in a procedural due process
case and, without proof of damages, the plaintiff will be entitled only to

18

"nominal damages not to exceed one dollar." [600] The Court noted in *Carey* that the primary purpose of the damages remedy in § 1983 litigation is "to compensate persons for injuries caused by the deprivation of constitutional rights." [601]

The Court relied on *Carey* and extended its holding to a case involving the violation of a plaintiff's First Amendment rights in *Memphis Community School District v. Stachura*. [602] In *Stachura*, the Supreme Court held that "damages based on the abstract 'value' or 'importance' of constitutional rights are not a permissible element of compensatory damages" in § 1983 cases. [603] The problem identified in *Stachura* was that the district court's jury instructions allowed for an award of damages that was neither compensatory nor punitive, but was based solely on the perceived "value" or "importance" of the particular constitutional right violated. [604] The Court distinguished the line of common-law voting rights cases in which presumed damages have been awarded "for a nonmonetary harm that cannot easily be quantified." [605] Thus, while presumed damages ordinarily will not be available in § 1983 actions, presumed damages may be appropriate "[w]hen a plaintiff seeks compensation for an injury that is likely to have occurred but difficult to establish." [606]

## *Punitive Damages*

A plaintiff may be awarded punitive damages against an individual defendant "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." [607] As is the case with compensatory damages, federal law governs the availability of punitive damages in a federal civil rights action under § 1983. [608] A local government unit is immune from punitive damages under § 1983. [609]

## *Attorney's Fees*

The Civil Rights Attorney's Fees Awards Act of 1976 [644] provides that prevailing party in actions brought under specified civil rights statutes, including § 1983, may be entitled to an award of attorney's fees as part of the costs of litigation. The Act has generated a tremendous volume of litigation and is treated as the subject of a separate monograph on attorney's fees. [645]

I can easily show that I suffered mental stress as a result of the remarkable actions of this group. I will apply for all pertinent damages pursuant to the notes above. The emails will show how long I persevered to get them to tell me the least bit about the testing. Being ignored is a powerful cause of anxiety. I sought relief for that anxiety and will provide records to that effect. Should I somehow scare up some money for an attorney, I will apply for attorney fees as well.

20

1    By now you are wondering how a series of events could lead me to your door. Afterall, right out of training I was allowed to teach, and then three years later become a chief, let me tease you

3    with this.

        In brief, this is a case of a staunch patient advocate, me, who as the Chief of Internal

5    Medicine at Kimbrough Army Hospital, happened upon a chart. 17 years later I still shudder at the thought of a confirmed Potassium of 7.5. It was on the chart of a patient cared for by a middle

7    aged woman physician from a protected class. She had no business practicing medicine. What ensued was horrific. This is more a case of the Peter Principle than anything else. Except for

9    perhaps ten minutes in my life, I have held myself and my family name up to the very highest of standards.   www.totalqualitymedicine.com

11

13

15

17

19

21

21



1

3  *Joseph O. Boggi D.O.* Date Oct 16th 2008

   Joseph O. Boggi D.O.

5     Internal Medicine

   1207 Ballard Street

7     Silver Spring, Maryland 20910

   301-534-1038

9

11

13

15

22

United States District Court
Eastern District of Pennsylvania
Office of the Clerk of Court
James A. Byrne Federal Courthouse
601 Market Street, Room 2609
Philadelphia, PA 19106-1797
Phone: (215) 597-7704
Fax: (215) 597-6390

October 16, 2008     ( revised August 24, 2009)

Joseph O. Boggi D.O.    Plaintiff                          Case No. 08-4941
Internal Medicine
1207 Ballard Street
Silver Spring, Maryland 20910

V.

Medical Review and Accrediting Council
Larry Downs Esq
Joe Sokolowski M.D.
Two Princess Road
Lawrenceville, NJ

National Board of Medical Examiners
Institute for Physician Education
Andrea Ciccone Director IPE
Scott Manneker M.D. consultant
Richard Hawkins M.D. VP NBME
Donald Melnick M.D. President
3750 Market Street
Philadelphia Pennsylvania, 19104
215-590-9772

UMDNJ
and the un-named "consultant"
65 Bergen Street, Newark, NJ 08854

All parties are sued both individually and as agents of their respective organizations.

## As and for a First Cause of Action

**FILED**

AUG 2 4 2009

MICHAEL E. KUNZ, Clerk

By_____ Dep. Clerk

1. That plaintiff resides in Montgomery County Maryland and contracted with MRAC et al for testing and retraining.

2. That upon information and belief, defendant MRAC et al are public institutions under the jurisdiction of the District Court for the Eastern District of Pennsylvania.

3. That, upon information and belief, defendants were at all times relevantly employed as noted for the institutions listed on the complaint.

4. That this is a civil action brought for retraining in medicine, and money damages to redress the injuries defendants have caused to plaintiff by the deprivation under color of state law of the right to due process secured to plaintiff by the fourteenth amendment of the Constitution of the United States.

5. This action is brought pursuant to 42 U.S.C. § 1983. This court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

6. The Plaintiff engaged MRAC et al, in the spring of 2006.

7. On or about October 16 2006, the following letter arrived after testing in May 2006.

> A review of your case showed that you performed well on some of the standardized testing, however problems were revealed on the Transaction Stimulated Recall (TSR) portion of your testing. The results of the TSR indicate disordered thinking which is consistent with some of the findings reported in the Maryland Board summary. The underlying dual problems of adult variant ADD and narcissistic personality disorder present real problems for any remediation plan MRAC could provide.

8. All of the defendants were consulted regarding this matter. All were working in their official capacities as noted in the header of the complaint. One defendant was never contacted. The

unnamed consultant who apparently played a large part in this decision. Per the protocol of the MRAC et al, I was supposed to meet that consultant on the first day of the evaluation, or thereabouts. There are no criteria for disordered thinking met in this case. There are no criteria met for Narcissistic Personality Disorder in this case. The level of performance on the testing says that a MRAC et al should re train the plaintiff.

9. The official acts of the defendants, upon information and belief, a public institution under the jurisdiction of the states of NJ and Pa, must be deemed state action and under color of State law.

10. That defendants have violated plaintiff's rights as guaranteed by the fourteenth amendment of the United State's Constitution and 42 U.S.C. § 1983 in that defendants had failed to retrain the plaintiff. That decision was arbitrarily discriminatory, capriciously and illegally deprived plaintiff of his right to continue in the MRAC program without affording to plaintiff rights to due process. The standard broken amounted to one that shock's the conscience, in all respects.

11. The plaintiff was further damaged by mental and emotional distress suffered by defendant's illegal refusal to retrain and subsequent relegation to menial duties in violation of my constitutional rights. It is most important that I be readmitted to the program and retrained.

12. The Plaintiff also prays for Compensatory and punitive damages. The details of the information provided to me, leading up to the testing, the testing itself, and the long delay in determining what to do with me are detailed in the following exhibits.

13. The Defendants rely on medical information that is not determined according to the standard of care. To wit, I am mentally competent. I have normal thinking. I have ADHD, and that is all.

### As and for a Second Cause of Action

14. Plaintiff repeats, reiterates and realleges each and every allegation as contained in paragraphs

one through thirteen as if the same were fully set forth herein at length.

15. The defendants mentioned were supposed to clearly delineate the topics tested.

16. The exhibits detail how several months of obfuscation occurred, instead of an upfront, detailed

list of topics to study, number of questions per hour, and other details as noted on the Exhibit.

17. While I did well in the testing, the uncertainty associated with the actual testing procedures led

to severe anxiety, and lack of income down the line. I have never dealt with a more difficult group

of people. The details of this episode were sent to the parties, in real time, and ignored.

18. This action is brought pursuant to 42 U.S.C. § 1983. This court has jurisdiction under 28

U.S.C. §§ 1331 and 1343. The participants acted under color of state law, and violated my civil

rights by failing to disclose the proper study materials for this set of tests. Checking Exhibit ____.

downloaded from the internet, they continue to obfuscate in this manner. They need to tell all

prospective clients that these are step three level tests. They also need to tell all clients that Peds,

OB, and surgery topics are on these tests.

19. That defendants have violated plaintiff's rights as guaranteed by the fourteenth amendment of

the United State's Constitution and 42 U.S.C. § 1983 in that defendants had failed to retrain the

plaintiff. That decision was arbitrarily discriminatory, capriciously and illegally deprived plaintiff

of his right to continue in the MRAC program without affording to plaintiff rights to due process.

The standard broken amounted to one that shock's the conscience, in all respects.

It shocks the conscience that a Nationally respected entity could not immediately reveal all of the

topics covered and procedures followed during the testing.

20. Compensatory, and Punitive damages are sought along the lines of action number one.

### As and for a third Cause of Action

21. Plaintiff repeats, reiterates and realleges each and every allegation as contained in paragraphs one through twenty as if the same were fully set forth herein at length.

22. Scott Mannaker, M.D. conducted what can only be described as an ambush interview. On

hearing about these events, all parties signed off on this abuse.

23 When I contacted John Hansen Flashen about the conduct of his employee who was acting as a consultant to the board, Dr. Hansen - Flachen told me " We have that problem with Scott." The details of this conversation can be determined from a voice recording I made of my side of the conversation.

24. This means that the defendants did not do any due diligence. Dr. Mannaker should not be employed in interviews of this nature, and I have reason to believe that he treatment of \ me was deliberate and sanctioned from the outset.

25. This   action is brought pursuant to 42 U.S.C. § 1983. This court has jurisdiction under 28 U.S.C. §§ 1331 and 1343. The participants acted under color of state law, and violated my civil rights by failing to conduct a civil interview. Checking Exhibit ___ it is very likely that this activity was deliberate.

26. That defendants have violated plaintiff's rights as guaranteed by the fourteenth amendment of the United State's Constitution and 42 U.S.C. § 1983 in that defendants had failed to retrain the plaintiff. That decision was arbitrarily discriminatory, capriciously and illegally deprived plaintiff of his right to continue in the MRAC program without affording to plaintiff rights to due process. The standard broken amounted to one that shock's the conscience, in all respects.

27. It shocks the conscience that this Nationally known facility would first not tell you that an interview would proceed in a non standard manner, and then condone such conduct under it's roof.

### As and for a Fourth Cause of Action

**28.** Plaintiff repeats, reiterates and realleges each and every allegation as contained in paragraphs one through twenty seven as if the same were fully set forth herein at length.

**29. After MRAC et al, denied me retraining, the IPE and Andrea Ciccone denied me the opportunity to re test at another facility. The reason given for that was this. They said that they only had one copy of multiple choice questions. As delineated in the initial filing, there are several locations supervised by Andrea Ciccone and the IPE ( now NBME )**

**30. This** action is brought pursuant to 42 U.S.C. § 1983. This court has jurisdiction under 28 U.S.C. §§ 1331 and 1343. The participants acted under color of state law, and violated my civil rights by failing to conduct a civil interview. Checking Exhibit ___ it is very likely that this activity was deliberate.

31. That defendants have violated plaintiff's rights as guaranteed by the fourteenth amendment of the United State's Constitution and 42 U.S.C. § 1983 in that defendants had failed to retrain the plaintiff. That decision was arbitrarily discriminatory, capriciously and illegally deprived plaintiff

of his right to continue in the MRAC program without affording to plaintiff rights to due process.
The standard broken amounted to one that shock's the conscience, in all respects.

32. It shocks the conscience that this Nationally known facility would first not tell you that they only

have one set of multiple choice questions. The NBME is known for it's high quality tests. These

tests are essentially step 3 tests. There is an entire industry supported by Interns who study to pass

the step 3 of the boards.

### As and for a Fifth Cause of Action

33. Plaintiff repeats, reiterates and realleges each and every allegation as contained in paragraphs

one through thirty two as if the same were fully set forth herein at length

34. The first step in this process stated I was to meet with a preceptor. This person would also be

the consultant associated with UMDNJ. This never happened.

35. To this minute, I have not been told who the identity of this person. I have decided this person

does not exist until I find out otherwise.

36. Of all of the many difficulties I have had with MRAC et al, this problem, the cause of the fifth

cause of action against the defendants is most egregious and speaks to one thing. MRAC et al

never intended to retrain me. They planned on taking my money, and causing me pain in the

process.

37. It shocks the conscience that the very first step in this process, the assignment of a preceptor,

was never accomplished.

38. The same prayers for damages are made for this **cause of action.**

### As and for a Sixth Cause of Action

39. Plaintiff repeats, reiterates and realleges each and every allegation as contained in paragraphs

one through thirty eight as if the same were fully set forth herein at length

40. All of the actions of the defendants revolve around my psychiatric diagnosis. The details of the
shenanigans in this area are shown above and in the many psychiatric reports. This is
discriminatory in nature and violates the American's  with Disability's act of 1990 ( the ADA) 42
U.S.C.A §§ 12101 et seq, as amended in 2008. This action was filed prior to the enforcement date
of the updated ADA. As the discrimination is ongoing, the plaintiff makes a claim under the NEW
act.

41. As the Court is aware, the rulings subsequent to 1990 essentially set up a catch 22. Congress
restored it's original intent in the updated law. It is incumbent upon the court to enforce the law as
Congress intended all along, especially since the discrimination in this case is ongoing.
Furthermore, an adverse ruling in this case will without ANY doubt, render me in the same
unemployable state I am in currently.

42.  Plaintiff seeks an order granting injunctive relief against the wrongful acts of the defendants.

Claims

43. Plaintiff is a person with a disability as defined by the ADA and it's implementing regulations.

44. Defendant, through its policies and conduct has violated the ADA by discriminating against
persons on the basis of their disabilities.

45. The violation here under the ADA is frank discrimination. I do not need an accommodation,
never asked for an accommodation and under the new law, I believe that I remain covered.
Frankly, the diagnosis of ADHD was the worst thing that ever happened to me. I got to age 32
without it thank you very much. While treatment helps me, the discrimination is MUCH worse.
Hence my comment regarding this regrettable set of circumstances.

46. Plaintiff has no adequate remedy of law, or otherwise, for the harm done by defendant.
Plaintiff has suffered, and continues to suffer great and irreparable loss, damage and injury as a

proximate result of the above mentioned acts of conduct of the defendants for which the plaintiff has no adequate remedy at law. Plaintiff will continue to suffer unless such acts and conduct of defendant is enjoined.

## Request for Relief

1. Assume jurisdiction

2. Retraining in medicine or retesting and then retraining.

3. Issue an injunction enjoining the defendants from continuing these practices noted in each count.

4. Grant such other and additional relief as the court deems just and proper. Some details of these categories were discussed in the original pleading.

Respectfully submitted

August 24, 2009

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOSEPH O. BOGGI,                          :
                Plaintiff,          :          CIVIL ACTION
                             :
        v.                           :
                             :
MEDICAL REVIEW AND                        :
ACCREDITING COUNCIL, *et al.*,            :          No. 08-4941
           Defendants.          :

## ORDER

**AND NOW**, this **15th** day of **September, 2009**, upon consideration of the First Motion

to Dismiss Pursuant to Rule 12(b)(6) filed by MRAC and Larry Downs, the Motion to Dismiss

filed by NBME/IPE, Andrea Ciccone, Scott Manaker, Richard Hawkins and Donald Melnick, the

Motion to Dismiss Plaintiff's Complaint filed by Joseph Sokolowski, Plaintiff's responses

thereto, Defendant's replies thereon, and for the reasons stated in this Court's Memorandum

dated September 15, 2009, it is hereby **ORDERED** that:

1.    Plaintiff's Motion to add the National Board of Medical Examiners as a defendant

      (Document No. 43) is **GRANTED**.

2     The MRAC/Downs' motion to dismiss (Document No. 26) is **GRANTED** and

      Plaintiff's Complaint against these Defendants is **DISMISSED**.

3.    The NBME/IPE Defendants' motion to dismiss (Document No. 29) is

      **GRANTED** and Plaintiff's Complaint against these Defendants is **DISMISSED**.

4.    Plaintiff's motion for extension of time (Document No. 31) is **GRANTED**.

5.    Defendant's Sokolowski's motion to dismiss (Document No. 37) is **GRANTED**

      and Plaintiff's Complaint against this Defendant is **DISMISSED**.

6.    Plaintiff's motion for a court appointed expert (Document No. 44) is **DENIED**.

7.  Plaintiff's motion to amend the complaint (Document No. 45) is **GRANTED** to the extent that the Court considered all of Dr. Boggi's filed Complaints in reaching its decision.

8.  Defendants IPE, Ciccone, Manaker, Hawkins, Melnick's Praecipe to File a Reply Memorandum (Document No. 50) is **GRANTED**.

9.  Defendants MRAC, Downs, and Sokolowski's Motion for Leave to File a Reply Brief (Document No. 53) is **GRANTED**.

BY THE COURT:

Berle M. Schiller, J.

2

SA-45

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOSEPH O. BOGGI, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MEDICAL REVIEW AND | : | |
| ACCREDITING COUNCIL, *et al.*, | : | No. 08-4941 |
| Defendants. | : | |

MEMORANDUM

Schiller, J.                                                September 15, 2009

Dr. Joseph O. Boggi, D.O., brings this action under 42 U.S.C. § 1983 and Title II of the Americans with Disabilities Act ("ADA"). He seeks medical retraining from the Medical Review and Accrediting Council ("MRAC") and alleges that state actors have attacked his property right – his medical license. (Compl. at 2.)[1] Before the Court are three separate motions to dismiss filed by various Defendants: (1) the motion of MRAC and Larry Downs; (2) the motion of Dr. Joseph Sokolowski; and (3) the motion of the Institute for Physician Education ("IPE"), Drs. Andrea Ciccone, Scott Manaker, Richard Hawkins, and Donald Melnick.[2] For the reasons that follow, the motions are granted.

---

[1] Dr. Boggi filed an Amended Complaint which the Court has considered along with his original Complaint so as to broadly construe his factual allegations and claims.

[2] According to IPE's motion to dismiss, IPE is a discontinued program of the National Board of Medical Examiners ("NBME"), which is an "independent, not-for-profit organization" that offers examinations for the health professions. (NBME Mem. of Law at 1-2.) The IPE is not a legal entity but counsel for IPE accepted service of the Complaint on behalf of NBME and asks this Court to substitute the NBME for IPE. (*Id.* at 2 n.2.) Dr. Boggi filed a motion to amend his Complaint to add the NBME as a Defendant. This Court will allow the amendment and substitute NBME for IPE in this action.

## I.    BACKGROUND[3]

As recounted by Dr. Boggi, in order to retrain doctors, states associate with organizations. MRAC evaluates and retrains doctors for New Jersey through the University of Medicine and Dentistry of New Jersey, a state institution. (Compl. at 2.) The IPE is an arm of the National Board of Medical Examiners responsible for developing tests and establishing standards for retraining doctors. (Compl. at 2.) Dr. Boggi tested in Philadelphia at the IPE and at MRAC. (*Id.*) Specifically, Dr. Boggi contracted with MRAC for testing and retraining. (Am. Compl. ¶ 1.)

### A.    Dr. Boggi's Medical Background

Dr. Boggi received his doctorate in osteopathy from the University of Osteopathic Medicine and Surgery in Des Moines, Iowa in 1983. (MRAC Mot. to Dismiss Ex. B [Final Opinion & Order] at 3.) He was a resident at the Walter Reed Army Medical Hospital from 1985 to 1988 and he received his certification in internal medicine in 1988. (*Id.*) He was initially licensed to practice medicine in Maryland in 1988. (NBME Mot. to Dismiss Ex. 2 [Summary Suspension Order] at 1.)

Dr. Boggi was first diagnosed with Attention Deficit Disorder (ADD) in 1988 and took medication for the condition. (Final Opinion & Order at 4.) In October of 1992, Dr. Boggi was diagnosed with an Adjustment Disorder and Attention Deficit Hyperactivity Disorder ("ADHD"). (*Id.* at 5.) He was honorably discharged from the Army in 1994, although based on an incident

---

[3] Although this litigation is currently at the pleading stage, both parties submitted a number of documents for the Court to review. Dr. Boggi has filed what appears to be every piece of paper he has regarding his quest for retraining. This is inappropriate. With limited exceptions, the Court cannot consider the correspondence, taped conversations, and notes submitted on a motion to dismiss. To provide a complete background of this litigation, the Court has recounted facts from sources outside of the Complaint and Amended Complaint. However, the Court has accepted Dr. Boggi's well-pleaded factual allegations as true and liberally construed his pleadings. Nonetheless, Dr. Boggi has failed to state a claim.

involving the military police, Dr. Boggi's privileges at the hospital where he was practicing were suspended and he received psychiatric evaluation and treatment. (*Id.* at 3-4.)

**B.    Suspension of Dr. Boggi's License**

*1.    Summary suspension*

On June 24, 1998, the Maryland State Board of Physician Quality Assurance (BPQA) summarily suspended Dr. Boggi's medical license. According to the written findings accompanying the summary suspension, the BPQA was required to take emergency action under Maryland law because it "received reliable information that questions the mental competency of [Boggi] to practice medicine; specifically, that [he] is displaying threatening, maladaptive behavior." (Summary Suspension Order at 1.) Additionally, the Summary Suspension Order recounts a number of interactions staff members of the BPQA had with Dr. Boggi as well as correspondence and phone calls containing "bizarre" content. (*Id.* at 5-7.) Dr. Boggi was examined by a psychiatrist who concluded that he "has demonstrated a pattern of behavior that physically threatens other people" and that he "lacks the ability to look at his behavior from another person's perspective and thereby does not learn from past experiences." (*Id.* at 7-8.) The psychiatrist, Dr. Ellen McDaniel, recommended that Dr. Boggi stop practicing medicine until he could control his behavior and that he undergo neuropsychological testing. (*Id.* at 8.) The BPQA determined that it had probable cause to believe that Dr. Boggi was "mentally incompetent to practice medicine, and that his continued practicing of medicine would jeopardize the health, safety and welfare of the citizens of Maryland." (*Id.* at 8.) Accordingly, Dr. Boggi's license was summarily suspended and a hearing was scheduled.

*2.    Final Opinion and Order and Appeal*

Following an evidentiary hearing, an Administrative Law Judge ("ALJ") issued a proposed

3

decision in which she concluded that Dr. Boggi's condition rendered him mentally incompetent to practice medicine but did not recommend revocation of his license. Instead, she suggested supervision of Dr. Boggi's treatment and monitoring of his practice. Both the State and Dr. Boggi filed exceptions. On April 28, 1999, Dr. Boggi and the State appeared before the BPQA for an oral hearing on the exceptions. On September 22, 1999, the BPQA issued its Final Opinion and Order, which contained extensive factual findings detailing a number of incidents involving Dr. Boggi and largely adopted the findings of facts made by the ALJ. Based on the evaluation conducted by Dr. McDaniel, the BPQA found that Dr. Boggi's ADHD resulted in numerous disruptive incidents causing co-workers and others to be intimidated by Dr. Boggi and fearful of him. (Final Opinion & Order at 19.) The BPQA found that Dr. Boggi "consistently displayed significant communication problems when dealing with people in a wide range of professional settings" which stemmed from his sense of entitlement and lack of empathy. (*Id.* at 19-20.) Dr. Boggi never physically injured a patient, staff member, or colleague but has "engaged in a physical confrontation, spoken abrasively, raised his voice inappropriately, destroyed property and caused others to have a justified fear of his presence. (*Id.* at 20.) His ADHD rendered him unable to control his behavior towards others and effectively communicate in a manner required to provide competent medical care. (*Id.* at 20, 24.) Furthermore, the ability to interact with and to effectively communicate with other medical personnel is an essential element of the competent practice of medicine. (*Id.* at 24.) The BPQA viewed Dr. Boggi's inability to competently practice medicine as a direct threat to the patient population. (*Id.* at 20, 30.)

As a result, the BPQA suspended Dr. Boggi's license for one year and thereafter until Dr. Boggi obtained treatment that enabled him to safely and competently practice medicine. (*Id.* at 34.)

4

The BPQA ordered Dr. Boggi to satisfy six conditions prior to having his license reinstated: (1) obtain neuropsychological testing and complete a personality inventory; (2) begin treatment with a BPQA-approved psychiatrist within thirty days of the Order suspending his license; (3) undergo at least one-year of treatment with said psychologist; (4) be re-evaluated by Dr. McDaniel after completing condition three; (5) appear before the BPQA's Case Resolution Conference to provide evidence that he is competent to safely practice medicine; and (6) provide evidence satisfactory to the BPQA that he has become competent to safely practice medicine. (*Id.* at 34.)

On December 13, 2001, the Maryland Court of Special Appeals affirmed the suspension of Dr. Boggi's medical license. (NBME Mot. to Dismiss Ex. 4 [Md. Appeals Decision].) The court considered, *inter alia*, Dr. Boggi's objection that the BPQA failed to correctly apply the ADA. The court concluded that Dr. Boggi failed to make a showing that he could perform the essential functions of his job with reasonable accommodation. (Md. Appeals Decision at 35-36.) Further, the court found that Dr. Boggi was not a "qualified individual" under the ADA because the BPQA established substantial evidence that Dr. Boggi's continued practice of medicine posed a direct threat to the health or safety of others due to his disability that reasonable accommodation could not eliminate. (*Id.* at 36-38.) Ultimately, the court affirmed the Final Opinion and Order of the BPQA.

### C.    Dr. Boggi's MRAC testing

Dr. Boggi first contacted MRAC in November of 2005 and was eventually tested over two days in May of 2006. (Compl. at 11.) Dr. Manaker was the independent contractor for the IPE who, on those days, tested and evaluated Dr. Boggi's ability to practice medicine. (NBME Mem. of Law at 10.) Although Dr. Boggi did not formally complain about the first day of testing, he verbally, and later in writing, objected that two of three tests on the first day were "60 questions per minute," a fact

SA-50

that he was not informed of prior to testing. (Compl. at 11.) However, Dr. Boggi stated that "I do not worry about that so much, since, despite my ADHD, I can go that fast." (*Id.*) Dr. Boggi's also complained about the topics on the exam and the manner in which the test was scored. (*Id.* at 11-12.)

Regarding the second day of testing, Dr. Boggi contends that "I know that I did well on the second day of testing, but it was even more bizarre, and so I complained about that set of testing verbally many times that day." (Compl. at 12.) Among Dr. Boggi's complaints was that the computer used during the simulated patient care cases was exceedingly slow, although he continued with the test because "everyone has to use the same one." (Compl. at 12.) Nonetheless, Dr. Boggi was unaccustomed to using such slow machinery and the "speed of the computer changes the nature of the test tremendously." (*Id.*) Dr. Boggi also noted that the IPE staff complained to him about his computer skills. (*Id.* at 13.) He further claims that Defendants failed to disclose the proper study materials for the test. (Am. Compl. ¶ 20.)

Dr. Boggi also expressed concerns about the interview portion of his exam, which he described as "an ambush interview." (Compl. at 14.) He contends that he was "yelled at, scolded, derided for not knowing any medicine, and generally abused." (*Id.*) He claims surprise that the examiner charged that Dr. Boggi displayed "disordered thinking" which disqualified him from re-training. (*Id.* at 15.) According to Dr. Boggi, he was asked to recall three hours of data in order, three hours after the fact and to describe the various patient cases he was given in the morning, including what he did and what he was thinking when he did it. (*Id.* at 14-15.) Dr. Boggi performed well on this memory test, and the examiner's report even noted that he took good care of all of the patients. (*Id.* at 15.)

6

Unhappy with the testing, Dr. Boggi asked to be retested on the interview and requested that the retest be monitored. (*Id.*) His request was denied. (*Id.* at 16; Am. Compl. ¶ 31.)

On July 17, 2006, MRAC provided Dr. Boggi with the results of his evaluation. (Testing Results.) Based on the result of the test, Dr. Boggi performed acceptably on the multiple choice portion of the exam. With respect to the eight-case computer simulation, "Dr. Boggi concluded the correct diagnosis for all 8 of the 8 cases during the simulation." (NBME Mot. to Dismiss Ex. 5 [Testing Results] at 1.) Indeed, he scored above the mean for six of the eight cases. (*Id.*) During the Transaction Stimulated Recall (TSR) Interview portion of the exam, however, Dr. Manaker observed that although Dr. Boggi recalled most of the details of the eight cases, his discussion of the cases was marked by an "inability to maintain a logical and orderly train of thought, his frequent digressions from a specific question or topic, and his frequent assertions regarding his knowledge, experience, and clinical competence." (*Id.* at 1-2.) None of the patients involved in the simulations were offered dangerous, improper or even inappropriate testing or therapy. (*Id.* at 3.) Nonetheless, his inability to discuss certain types of therapy could lead to increased risks for patients. (*Id.* at 4.) In summary, "Dr. Boggi demonstrated basic medical knowledge that was adequate, but limited in scope and dated in currency." (*Id.* at 4.) He also struggled to describe and articulate his rationale in making clinical decisions. (*Id.*)

After he received notice of his results, Dr. Boggi requested that MRAC develop a remedial program to address the deficiencies he displayed in the competency evaluation. (Compl. Ex. 1 [Oct. 16, 2006 Letter from Downs to Dr. Boggi].) After reviewing his case, MRAC concluded that it lacked the capacity to engage in remediation for him based on his disordered thinking. (*Id.*) His underlying dual problems of ADHD and narcissistic personality disorder presented a "real problem"

7

for any possible MRAC remediation plan. (*Id.*)  MRAC closed his file. (*Id.*)

Dr. Boggi seeks injunctive relief, namely a Court order requiring that Dr. Boggi be retrained in medicine. (Compl. at 16.)  He also seeks compensatory and punitive damages. (*Id.* at 17; Am. Compl. ¶¶ 12-13, 22, 38, 43, 47.)

## II.     STANDARD OF REVIEW

In reviewing a motion to dismiss for failure to state a claim, a district court must accept as true all well-pleaded allegations and draw all reasonable inferences in favor of the non-moving party. *See Bd. of Trs. of Bricklayers and Allied Craftsman Local 6 of N.J. Welfare Fund v. Wettlin Assocs.*, 237 F.3d 270, 272 (3d Cir. 2001).  A court should accept the complaint's allegations as true, read those allegations in the light most favorable to the plaintiff, and determine whether a reasonable reading indicates that relief may be warranted. *Umland v. PLANCO Fin. Servs.*, 542 F.3d 59, 64 (3d Cir. 2008).  Dr. Boggi is proceeding pro se, so this Court must construe his Complaint liberally and apply the applicable law, even if he failed to mention it by name. *See Alston v. Parker*, 363 F.3d 229, 234 (3d Cir. 2004); *Dluhos v. Strasberg*, 321 F.3d 365, 369 (3d Cir. 2003).  A court need not credit "bald assertions" or "legal conclusions" when deciding a motion to dismiss. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

"Factual allegations [in a complaint] must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  To survive a motion to dismiss, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.  Although the federal rules impose no probability requirement at the pleading

8

stage, a plaintiff must present "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element[s]" of a cause of action. *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. Simply reciting the elements will not suffice. *Id.* (concluding that pleading that offers labels and conclusions without further factual enhancement will not survive motion to dismiss); *see also Philips*, 515 F.3d at 231.

The Third Circuit Court of Appeals has recently directed district courts to conduct a two-part analysis when faced with a 12(b)(6) motion. First, the legal elements and factual allegations of the claim should be separated, with the well-pleaded facts accepted as true but the legal conclusions disregarded. *Fowler v. UPMC Shadyside, Inc.*, App. A. No. 07-4285, – F.3d –, 2009 WL 2501662, at *5 (3d Cir. Aug. 18, 2009). Second, the court must then make a common sense determination of whether the facts alleged in the complaint are sufficient to show a plausible claim for relief. *Id.* If the court can only infer the mere possibility of misconduct, the complaint must be dismissed because it has alleged – but has failed to show – that the pleader is entitled to relief. *Id.*

When faced with a motion to dismiss for failure to state a claim, courts may consider the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim. *Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004). A district court may also consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document. *Pension Ben. Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

### III.    DISCUSSION

#### A.    Section 1983

All moving Defendants have argued in their motions that Dr. Boggi's § 1983 claims must be dismissed because none of their actions were performed under color of state law. Section 1983 does not create substantive rights but rather provides remedies for the deprivation of rights established by the Constitution or federal laws. *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006). To establish a claim under § 1983, the plaintiff must show that the defendant, acting under color of state law, deprived him or her of a right secured by the Constitution or the laws of the United States. *Id.*

A private party may be the appropriate subject of a § 1983 action under certain circumstances. The Supreme Court has created a number of tests to determine whether a private actor has performed an act under color of state law. For example, the "close nexus" test determines if the state can be deemed responsible for the specific conduct of which the plaintiff complains. *Jackson v. Metro. Edison Co.*, 419 U.S. 345 (1974). The "symbiotic relationship" or "joint participation" test asks if the state has "insinuated itself into a position of interdependence with [the acting party]" sufficiently to be recognized as a joint participant in the challenged activity. *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961). The "public function" test looks at whether the private party is engaged in activities traditionally left to the state. *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982); *see also McKeesport Hosp. v. The Accreditation Council for Graduate Med. Educ.*, 24 F.3d 519, 524 (3d Cir. 1994) (noting that state action may be found if private party has been delegated power normally reserved to the state) (citing *Flagg Bros. v. Brooks*, 436 U.S. 149,

10

SA-55

157 (1978)).[4] The state actor inquiry is fact intensive, and multiple tests may apply to a given case; in fact, the tests may overlap. *Goussis v. Kimball*, 813 F. Supp. 352, 357 (E.D. Pa. 1993). The Third Circuit Court of Appeals has described the color of state law analysis as "difficult" but has reminded district courts that it is grounded in a "basic and clear requirement that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Groman v. Twp. of Manalapan*, 47 F.3d 628, 638 (3d Cir. 1995) (internal quotations omitted). Thus, for private action to be deemed state action, the act must be fairly attributed to the state itself. *Id.* (citing *Jackson*, 419 U.S. at 351.). Plaintiff bears the burden of proof on the issue of acting under color of state law. *Groman*, 47 F.3d at 638.

    *1.    Close nexus test*

    Under this test, the state must have exercised coercive power or have provided such significant encouragement that the private actor's decision can be deemed that of the state. *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). This test looks at the connection between the state and the specific action that allegedly infringed on the plaintiff's rights, in contrast to the symbiotic relationship test which focuses on the entire relationship between the state and the private actor. *Klavan v. Crozer-Chester Med. Ctr.*, 60 F. Supp. 2d 436, 442 (E.D. Pa. 1999). This test is met only if it can be said that the state is responsible for the specific conduct about which the plaintiff complains. *Id.* (citing *Blum*, 457 U.S. at 1004.)

    According to the letter that Dr. Boggi included with his Complaint, MRAC reviewed his case

---

    [4] In a recent opinion from this District, the court references a fourth test: the "joint action" test, which applies if a private party is a "willful participant in joint action with the State or its agents." *See Pugh v. Chester Downs and Marina, LLC*, Civ. A. No. 09-1572, 2009 WL 2251658, at *3 n.4 (E.D. Pa. July 27, 2009) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982)).

and determined that it could not offer him further services. MRAC's decision was made by private parties and in no way involved the State of Maryland. The decision was made according to standards established by MRAC, not by Maryland. MRAC is a private organization that merely offers testing and retraining services to assist doctors in getting their medical licenses back. The BPQA, on the other hand, was the state actor that suspended Dr. Boggi's license and placed conditions on his ability to have his license reinstated. But there is no connection between the BPQA and MRAC. Under such circumstances, a "close nexus" cannot be said to exist between MRAC and the State of Maryland. *See Imperiale v. Hahnemann Univ.*, 776 F. Supp. 189, 199 (E.D. Pa. 1991) (holding that ultimate decision by hospital to revoke medical degree was not state action under close nexus test). The same can be said of NBME, which facilitates testing for medical professionals. There is no indication that the State of Maryland, or any other state, holds sway over the policies or procedures of NBME nor is there any evidence that Maryland plays any role in devising questions or medical tests for those seeking to become doctors.

2.    *Symbiotic relationship test*

If a "symbiotic relationship" exists between the private party and the state, the private party's conduct may be held attributable to the state. *See Reitz v. County of Bucks*, 125 F.3d 139, 147-48 (3d Cir. 1997) ("[I]f the facts support a finding that the private parties acted as a 'joint participant' in the challenged activity with the state, then they can be found to have acted under color of state law and to be liable under § 1983."). Courts have held that this test is not satisfied – and thus the actions of a private institution cannot be attributed to the state – even upon a showing of state regulation in a particular area, even if such regulation is "pervasive, extensive, and detailed," nor is it satisfied due to extensive financial assistance. *Klavan*, 60 F. Supp. 2d at 442 (citations omitted).

12

Dr. Boggi explicitly references the "symbiotic relationship" between the state, NBME, and MRAC. (Compl. at 3.) He contends that MRAC would not exist but for the state's need to have an institute to retrain doctors. (*Id.*) He also relies on the fact that MRAC affirmed the findings of Maryland. (*Id.*) The Court concludes that no basis exists for finding a symbiotic relationship between the State of Maryland and Defendants. Maryland is under no duty to use MRAC or NBME. There is no evidence of any financial relationship or any legislative powers that Maryland maintains over these entities. At most, NBME and MRAC are companies with which certain states deal in the realm of medical licensing. But that interaction does not render them state actors.

### 3.    *Public Function test*

This approach reaches "only those activities that have been traditionally the *exclusive* prerogative of the State." *Groman*, 47 F.3d at 640. Because few functions have traditionally been the sole domain of the states, this test is rarely satisfied. *See Pugh*, 2009 WL 2251658, at *3 n.4 (E.D. Pa. July 27, 2009) (quoting *Flagg Bros.*, 436 U.S. at 158 ("While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.'")).

Neither NBME nor MRAC is performing an activity left solely to the state. Testing and test score reporting are not tasks left solely to the state. *See Metzger v. Nat'l Comm'n of Certification of Physician Assistants*, Civ. A. No. 00-4823, 2001 WL 76331, at *3 (E.D. Pa. Jan. 26, 2001); *see also Johnson v. Educ. Testing Serv.*, 754 F.2d 20, 25 (1st Cir. 1985) ("[T]he formulation, grading, and reporting of standardized tests is not an exclusive public function."). More broadly, the Third Circuit Court of Appeals has concluded that "[t]he evaluation and accreditation of medical education in this country is neither a traditional nor an exclusive state function." *McKeesport*, 24 F.3d at 525. Neither entity is empowered to license physicians, a task left to the State of Maryland. *See* MD.

13

CODE ANN., [HEALTH OCC.] § 14-201, *et seq.* (2009) (establishing State Board of Physicians and setting forth duty of Board, including power to issue, suspend, and reinstate licenses). Furthermore, Dr. Boggi's Complaint states that "no state in the union retrains doctors on their own," an acknowledgment that retraining is not a task left solely to the states. (*See* Compl. at 2.)

       4.    *Additional state actor analysis*

Dr. Boggi's Complaint is short on factual allegations that would render any of the moving Defendants state actors. Furthermore, his conclusory assertions that they are state actors is a matter of law for the Court. His Complaint asserts that Defendant IPE is "an arm of the National Board of Medical Examiners" which writes tests and establishes standards. (Compl. at 2.) IPE is associated with several centers around the country who perform the testing and retraining of doctors. (*Id.*) Defendant MRAC is one such center. (*Id.*) A review of cases containing allegations similar to those made by Dr. Boggi demonstrates that Defendants are not state actors for § 1983 purposes.

In *Metzger v. National Commission on Certification of Physician Assistants*, the court considered whether the defendant, which had required the plaintiff to take a recertification examination and notified her after she failed the exam that her certification would expire, was a state actor. The court concluded that the defendant, which simply provided a mechanism by which a candidate for recertification could meet requirements set by Pennsylvania, was not a state actor. *Metzger*, 2001 WL 76331, at *2. The court considered the three tests outlined by the Supreme Court and determined that based on the facts of the case, the defendant did not perform an act traditionally relegated to the states, was not under the control of the state, nor was there a "symbiotic relationship" because the Commonwealth relied on the defendant's test results. *Id.* at 3. A similar result was reached in *Sammons v. National Commission on Certification of Physician Assistants, Inc.*, 104 F.

SA-59

Supp. 2d 1379 (N.D. Ga. 2000) (*relying in part on Gilliam v. Nat'l Comm'n for Certification of Physician Assistants, Inc.*, 727 F. Supp. 1512 (E.D. Pa. 1989). The defendant was a private non-profit corporation that administered a nationwide testing and certification program for physician assistants. The plaintiff, a foreign physician, was told that she was ineligible for certification because she failed to meet the defendant's threshold requirements. The court determined that the defendant did not act under color of state law because it was a private organization that received no governmental financial support and operated on an independent basis. *Sammons*, 104 F. Supp. 2d at 1382-83. The court rejected the argument that the defendant was a state actor under the "public function" test and found that the defendant could not meet the "close nexus" test because the defendant was an autonomous body that evaluated students without external states influence.

Similarly, a district court in Illinois has considered whether NBME is a state actor. *Brown v. Fed'n of State Med. Bds. of the U.S.*, Civ. A. No. 82-7398, 1985 WL 1659 (N.D. Ill. May 31, 1985). The plaintiff in *Brown* had received his medical degree from a foreign institution but had taken and failed his licensing exam, although he asserted that he had actually passed the exam. He sought to personally review his test booklet and answer sheet. Acting *pro se*, he claimed, *inter alia*, that his civil rights had been violated by three defendants: (1) the Federation of State Medical Boards of the United States, a non-profit corporation identified as the certifying examiner responsible for selecting questions for licensing tests; (2) the Educational Commission for Foreign Medical Graduates, Inc. ("Commission"), a non-profit corporation responsible for certifying foreign medical graduates and also selecting questions for tests it administered and sent to NBME for scoring; and (3) the NBME, which prepared the tests, sent them to various state boards to be administered, and scored them. The Commission determined what qualified as a passing score and certified those who

15

passed the test. Some state boards required certification for foreign medical students before they could receive a license, although none of the defendants were responsible for licensing physicians.

The court concluded that none of the defendants were state actors and therefore dismissed the complaint. *Id.* at *5. The defendants merely supplied a service but the actual state actors were the state licensing boards, which maintained control over whether to use and if so how to use the test. *Id.* Supplying testing services did not make the defendants state actors. *Id.*; *see also Johnson*, 754 F.2d at 24 (holding that the defendant non-profit corporation that prepared and administered law school admission test was not a state actor as it lacked authority to make admission decisions).

Plaintiff's Complaint contains no allegation that NBME does anything other than write the test and establish standards. This is consistent with NBME's description of its role as an independent, non-profit company that provides tests for health professions. NBME performs tests and evaluates doctors. It does not license physicians and has no power over any state with respect to who may or may not practice medicine in a given jurisdiction. Simply because states may choose to rely on NBME's evaluation does not render them state actors. Similarly, MRAC merely offers retraining services to doctors so that they may re-apply for admission or re-admission to a state medical board. MRAC plays no role in the ultimate decision to admit Dr. Boggi nor does it appear that its services are required prior to re-admission.

In *McKeesport Hospital v. The Accreditation Council for Graduate Medical Education*, the court considered whether a private accrediting body's decision constituted state action. The case involved a hospital's challenge to the decision of a private unincorporated association to recommend withdrawal of the hospital's residency program's accreditation. The Third Circuit concluded that the defendant was not a state actor. *Id.* at 524. First, no state officials participated in the decision

16

and therefore the hospital failed to show "overt, significant assistance" as required. *Id.* (quoting *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 622 (1991)). Furthermore, the defendants were not ultimately responsible for approving medical training facilities in the Commonwealth and thus the private actor was not exercising a power traditionally left to the state. *Id.* at 524-25. The court also rejected the contention that the defendant and the state were so interdependent that a "symbiotic relationship" existed given the fact that the state board merely recognized and relied upon the expertise of the defendant. *Id.* at 525.

Dr. Boggi has presented nothing that would lead this Court to stray from the decisions of these cases. The State of Maryland, through the Board, is responsible for licensing doctors. Dr. Boggi cannot file a civil rights lawsuit seeking to reinstate his license against those not involved in the decision-making process regarding his ability to practice medicine. None of his allegations gives rise to an inference that Maryland acted with Defendants, controlled Defendants, instructed Defendants, or were even aware of Defendants interactions with Dr. Boggi. The actions of NBME and MRAC are not attributable to Maryland and thus neither Defendant, nor any of the persons working for either Defendant, can de deemed a state actor.

**B.    Claims Against Individual Actors**

The caption also names Larry Downs, Esquire; Drs. Manaker, Hawkins, Melnick, and Sokolowski; and Andrea Ciccone. The Complaint however, contains no further mention of these individuals. The Amended Complaint is no more helpful as it states only that he consulted with all Defendants about his testing and retraining. (Am. Compl. ¶ 8.) Ciccone is an Assistant Vice President, Post Licensure Assessment System at NBME; Dr. Melnick is the President of the Post Licensure Assessment System at NBME; Dr. Hawkins is a former NBME Vice President,

17

SA-62

Assessment Programs; and Dr. Manaker is an independent consultant to NBME who conducted the clinical interview of Dr. Boggi. (NBME Mem. at 2; Am. Compl. ¶ 24.) Downs' appears to be MRAC's President and Dr. Sokolowski's position is unclear. Dr. Boggi's Complaint contains no basis for holding any of these individuals liable. With the exception of Dr. Manaker, who interviewed Dr. Boggi, his interactions with these individuals is unclear and does not support a claim. All of these individuals are dismissed from this action.

### C.    Americans with Disabilities Act Claim

Dr. Boggi's ADA claim is brought under Title II, which provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A public entity includes: state and local governments; "any department, agency, special purpose district, or other instrumentality of a State or States or local government;" and the National Railroad Passenger Corporation and any commuter authority. 42 U.S.C. § 12131. Neither MRAC nor NBME falls within the definition of a public entity under Title II of the ADA and the claims must therefore be dismissed.

But because Dr. Boggi is acting *pro se*, this Court will also determine whether he states a claim under another section of the ADA. Under Title III of the ADA,

> Any person that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or post-secondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals.

42 U.S.C. § 12189. Neither NBME nor MRAC argue that they fall outside the scope of the ADA and the law is clear that both entities must comply. *See Love v. Law Sch. Admissions Council, Inc.,*

18

513 F. Supp. 2d 206, 223 (E.D. Pa. 2007) (finding that private, non-profit entity responsible for

administering test required for admission to law school had to comply with ADA); *see also Scheibe*

*v. Nat'l Bd. of Med. Examiners*, Civ. A. No. 05-180, 2005 WL 1114497, at *3 (W.D. Wis. May 10,

2005) (citing cases concluding that NBME is subject to ADA); *Biank v. Nat'l Bd. of Med.*

*Examiners*, 130 F. Supp. 2d 986, 988 (N.D. Ill. 2000) (holding that NBME, "as a private entity

offering examinations related to licensing, is subject to ADA under Section 12189").

Although NBME and MRAC must comply with the ADA, Dr. Boggi's claim remains legally

deficient because it lacks any allegations that Defendants discriminated against him because of his

disability.[5] His original Complaint objects to the number of questions he was required to complete

in a given amount of time. However, the Complaint explicitly states that despite his ADHD, he "can

go that fast." (Compl. at 11.) His other problems with the testing involved the slow speed of the

computer provided, the subjects on the test, and the method of scoring the test. (*Id.* at 11-13.) Of

course, none of these complaints in any way relate to his disability. His Amended Complaint does

not expound upon his ADA claim, although he does assert that he is disabled under the ADA and

that he had been discriminated against on the basis of his disability. But this is a legal conclusion

for which he provides no factual support. Furthermore, Dr. Boggi's Amended Complaint makes

explicit that Dr. Boggi "do[es] not need an accommodation, [and] never asked for an

accommodation." (Am. Compl. ¶ 46.) Dr. Boggi cannot state a claim simply by asserting that he

---

[5] Defendant Dr. Sokolowski claims that Dr. Boggi's ADA claim should be dismissed because he has failed to allege that he falls within the definition of disabled under the ADA, namely that he pled no facts sufficient to show that his ADHD substantially limits one or more major life activities. (Sokolowski Mem. of Law in Supp. of Mot. to Dismiss at 14-15.) While the Court finds Dr. Boggi's allegations to be lacking with respect to this issue, his Complaint fails even accepting that he meets the definition of disabled under the ADA.

19

has ADHD coupled with his inability to receive the retraining he seeks. The record contains no factual allegations from which one can conclude that NBME had any interactions with Dr. Boggi let alone did anything that violated the ADA; similarly there are no factual allegations from which one can infer that MRAC's decisions were based on any perceived disability from which Dr. Boggi suffered. The ADA claims against NBME and MRAC must therefore be dismissed.

The ADA claims against individual Defendants must also be dismissed. Although not directly addressed by the Supreme Court or the Third Circuit Court of Appeals, the overwhelming authority on the issue has concluded that no such individual liability exists. *See Koslow v. Pennsylvania*, 302 F.3d 161, 178 (3d Cir. 2002) ("[T]here appears to be no individual liability for damages under Title I of the ADA."); *see also McQuaid v. ACTS Retirement Communities Southhampton Estates*, Civ. A. No. 04-3620, 2005 WL 2989642, at *2 (E.D. Pa. Aug. 8, 2005) (citing cases in this District and from other circuits holding that individual liability under ADA does not exist); *McInerney v. Moyer Lumber & Hardware, Inc.*, 244 F. Supp. 2d 393, 398 (E.D. Pa. 2002). Individual liability under the ADA does not exist under Titles II or III of the ADA. *Emerson v. Thiel Coll.*, 296 F.3d 184, 189 (3d Cir. 2002) (finding individuals not liable under Title III of ADA "comports with decisions of other courts of appeals holding that individuals are not liable under Titles I and II of the ADA").

## IV.    CONCLUSION

Dr. Boggi has not alleged facts sufficient to support the legal conclusion that NBME and MRAC are state actors and his § 1983 claim against all Defendants must be dismissed. His ADA claims also fail to state a claim. An appropriate Order will be docketed separately.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOSEPH O. BOGGI,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **MEDICAL REVIEW AND** | : | |
| **ACCREDITING COUNCIL,** *et al.,* | : | **No. 08-4941** |
| **Defendants.** | : | |

### ORDER

**AND NOW**, this **26th** day of **January, 2010**, upon consideration of the Motion to Dismiss by Defendant University of Medicine and Dentistry of New Jersey ("UMDNJ") and Plaintiff's response thereto, as well as Plaintiff's Motion in Support of Oral Argument in this Case and Plaintiff's Motion for Default Against Preceptor/Consultant it is hereby **ORDERED** that:

1.    Defendant's motion to dismiss (Document No. 70) is **GRANTED**.[1]

2.    Plaintiff's Motion in Support of an Oral Argument in this Case (Document No. 73) is **DENIED**, pursuant to Local Rule 7.1(f).

---

[1] The Court set forth the factual allegations underlying Boggi's claim in a Memorandum dated September 15, 2009 and will not repeat them here. Plaintiff claims that the Medical Review and Accrediting Council (MRAC) acted through UMDNJ to deny him medical retraining. Indeed, his Complaint and Amended Complaint repeatedly reference the alleged action of MRAC, with nary a word about his relationship with UMDNJ or its conduct toward him. Furthermore, an October 16, 2006 letter from Defendant Larry Downs, to which Plaintiff has referred, indicates that it was MRAC and not UMDNJ that evaluated Boggi and denied him the remediation plan he seeks. MRAC and the National Board of Medical Examiners (NBME) worked together to provide Boggi with competency training. Boggi cannot state a claim against UMDNJ by simply lumping it in with MRAC and NBME and assuming that they acted in concert. Ultimately, none of Boggi's filings show that UMDNJ did anything to affect his Maryland medical license. Indeed, it does not appear that Boggi had any relationship with UMDNJ at all. As for his Americans with Disabilities Act claim against UMDNJ, it is also dismissed for the reasons stated in this Court's September 15, 2009 Memorandum.

3.   Plaintiff's Motion for Default Against Preceptor/Consultant (Document No. 74) is

DENIED.[2]

4.   The Clerk of Court is directed to close this case.

BY THE COURT:

_____

**Berle M. Schiller, J.**

---

[2] The Court declines to enter default against an unnamed, unserved party.  Additionally, this Court's decision to dismiss all claims against UMDNJ applies to any alleged agent of it.

2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOSEPH O. BOGGI

08-4941
District Court Docket Number

vs.

MEDICAL REVIEW AND ACCREDITING COUNSEL, ET AL.

Notice of Appeal Filed : 2/25/10
Court Reporter(s)/ESR Operator(s)

Filing Fee:
    Notice of Appeal __Paid  _X_ Not Paid  __Seaman
    Docket Fee     __Paid  _X_ Not Paid  __USA/VI

CJA Appointment (Attach Copy of Order)

__Private Attorney
__Defender Asociation or Federal Public Defender
__Motion Pending

Leave to Proceed In Forma Pauperis status, if applicable: (Attach copy of the Order)

_X_ Motion Granted
__Motion Denied
__Motion pending before district judge

Certificate of probable cause (state habeas corpus): (Attach copy of the Order)

__Granted
__Denied
__Pending

CC: APPEALS
    USCA
    BMS
    ALL PARTIES AND COUNSEL

Defendant's Address (for criminal appeals)

Prepared by : _S/Robert D. Fehrle_____
                    Robert D. Fehrle,Deputy Clerk/2/25/10

PLEASE APPEND TO THE NOTICE OF APPEAL AND FORWARD TO
THE OFFICE OF THE CLERK, U.S. COURT OF APPEALS
notapp.frm

# UNITED STATES DISTRICT COURT

for the

Eastern DISTRICT OF Pennsylvania

Joseph O.Boggi D.O.,                                  )
                                                      )
                    Plaintiff                         )
                                                      )
        v.                                            )
                                                      )     Case No. 08-4941
Medical Review and Accrediting Council                )
                                                      )
Larry Downs Esq Director                              )
Joe Sokolowski M.D. President                         )
Two Princess Road
Lawrenceville, NJ


Institute for Physician Education
Andrea Ciccone Director IPE
Scott Manneker M.D. consultant



National Board of Medical Examiners
Richard Hawkins M.D. VP NBME ( since
moved )
Donald Melnick M.D. President
3750 Market Street
Philadelphia Pennsylvania, 19104
215-590-9772


UMDNJ
and the un-named "consultant"
65 Bergen Street, Newark, NJ 08854,
Defendant(s)

## NOTICE OF APPEAL

Notice is hereby given that Joseph O. Boggi D.O., plaintiff in the above named case against MRAC et al (all defendants), hereby appeal to the United States Court of Appeals for the Third Circuit from the final judgment, of the United States District Court Eastern District entered in this action on January 26, 2010.

Date: February 24, 2010

Joseph O. Boggi D.O.
Internal Medicine
1207 Ballard Street
Silver Spring, Maryland 20910
joboggi@pol.net
240-330-6837

UNITED STATES DISTRICT COURT
for the
Eastern DISTRICT OF Pennsylvania

| | | |
|---|---|---|
| Joseph O.Boggi D.O . | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Case No. 08-4941 |
| | ) | |
| NIRAC et al. | ) | |
| | ) | |
| Defendant(s) | ) | |
| | ) | |

## AFFIDAVIT ACCOMPANYING MOTION
## FOR PERMISSION TO APPEAL IN FORMA PAUPERIS

| **Affidavit in Support of Motion** | **Instructions** |
|---|---|
| I swear or affirm under penalty of perjury that, because of my poverty, I cannot prepay the docket fees of my appeal or post a bond for them. I believe I am entitled to redress. I swear or affirm under penalty of perjury under United States laws that my answers on this form are true and correct. (28 U.S.C. § 1746; 18 U.S.C § 1621.) | Complete all questions in this application and then sign it. Do not leave any blanks: if the answer to a question is "0," "none," or "not applicable (N/A)," write that response. If you need more space to answer a question or to explain your answer, attach a separate sheet of paper identified with your name, your case's docket number, and the question number. |
| Signed: _____ | Date: _____February 24, 2010_____ |

My Issues on appeal are:

1.    *For both you and your spouse estimate the average amount of money received from each of the following sources during the past 12 months. Adjust any amount that was received weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate. Use gross amounts, that is, amounts before any deductions for taxes or otherwise.*

| Income source | Average monthly amount during the past 12 months | | Amount expected next month | |
|---|---|---|---|---|
| | You | Spouse | You | Spouse |
| Employment | $ 0 | $ | $ 0 | $ |
| Self-employment | $ 0 | $ | $ 0 | $ |
| Income from real property (such as rental income) | $ 0 | $ | $ 0 | $ |
| Interest and dividends | $ 0 | $ | $ 0 | $ |
| Gifts | $ 550 | $ | $ 550 | $ |
| Alimony | $ 0 | $ | $ 0 | $ |
| Child support | $ 0 | $ | $ 0 | $ |
| Retirement (such as social security, pensions, annuities, insurance) | $ 0 | $ | $ 0 | $ |
| Disability (such as social security, insurance payments) | $ 0 | $ | $ 0 | $ |
| Unemployment payments | $ 0 | $ | $ 0 | $ |
| Public-assistance (such as welfare) | $ 0 | $ | $ 0 | $ |
| Other (specify): | $ 0 | $ | $ 0 | $ |
| **Total monthly income:** | $ 550 | $ | $ 550 | $ |

2.  *List your employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| None | | | $ |
| | | | $ |
| | | | $ |

3.  *List your spouse's employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| none | | | $ |
| | | | $ |
| | | | $ |

4.  *How much cash do you and your spouse have? $100* and change. *Below, state any money you or your spouse have in bank accounts or in any other financial institution.*

| Financial Institution | Type of Account | Amount you have | Amount your spouse has |
|---|---|---|---|
| Bank of America | checking | $ 100 and change | $ |
| | | $ | $ |
| | | $ | $ |

*If you are a prisoner, you must attach a statement certified by the appropriate institutional officer showing all receipts, expenditures, and balances during the last six months in your institutional accounts. If you have multiple accounts, perhaps because you have been in multiple institutions, attach one certified statement of each account.*

5.  *List the assets, and their values, which you own or your spouse owns. Do not list clothing and ordinary household furnishings.*

| Home | Other real estate | Motor vehicle #1 | |
|---|---|---|---|
| (Value) $         NA | (Value) $         NA | (Value) $         0 | |
| | | Make and year | |
| | | Model | |
| | | Registration # | |

| Motor vehicle #2 | Other assets | Other assets |
|---|---|---|
| | | |

| (Value) $ | (Value) $ | (Value) $ |
|---|---|---|
| Make and year: | Personal Items? | |
| Model: | Computer      ? | |
| Registration #: | Camera      ? | |

6.    *State every person, business, or organization owing you or your spouse money, and the amount owed.*

| Person owing you or your spouse money | Amount owed to you | Amount owed to your spouse |
|---|---|---|
| NA | $ | $ |
| | $ | $ |
| | $ | $ |
| | $ | $ |

7.    *State the persons who rely on you or your spouse for support.*

| Name [or, if a minor (i.e., underage), initials only] | Relationship | Age |
|---|---|---|
| NA | | |
| | | |
| | | |

8.    *Estimate the average monthly expenses of you and your family. Show separately the amounts paid by your spouse. Adjust any payments that are made weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate.*

| | You | Your Spouse |
|---|---|---|
| Rent or home-mortgage payment (including lot rented for mobile home)<br>    Are real estate taxes included?      [ ] Yes  [X] No<br>    Is property insurance included?      [ ] Yes  [X] No | $ 0 | $ |
| Utilities (electricity, heating fuel, water, sewer, and telephone) | $ 100 | $ |

| | | |
|---|---|---|
| Home maintenance (repairs and upkeep) | $ 40 | $ |
| Food | $ 250 | $ |
| Clothing | $ 20 | $ |
| Laundry and dry-cleaning | $ | $ |
| Medical and dental expenses | $ 65 | $ |
| Transportation (not including motor vehicle payments) | $ 40 | $ |
| Recreation, entertainment, newspapers, magazines, etc | $ 15 -25 | $ |
| Insurance (not deducted from wages or included in mortgage payments) | | |
|    Homeowner's or renter's: | $    0 | $ |
|    Life: | $    0 | $ |
|    Health: | $    0 | $ |
|    Motor vehicle: | $    0 | $ |
|    Other: | $    0 | $ |
| Taxes (not deducted from wages or included in mortgage payments) (specify): | $    0 | $ |
| Installment payments | | |
|    Motor Vehicle: | $    0 | $ |
|    Credit card (name): | $    0 | $ |
|    Department store (name): | $    0 | $ |
|    Other | $    0 | $ |
| Alimony, maintenance, and support paid to others | $    0 | $ |
| Regular expenses for operation of business, profession, or farm (attach detailed statement) | $    0 | $ |
| Other (specify): | $    0 | $ |
| **Total monthly expenses:** | $   550 | $ |

9.    *Do you expect any major changes to your monthly income or expenses or in your assets or liabilities during the next 12 months?*

    [ ] Yes        [XX ] No        If yes, describe on an attached sheet.

10.    *Have you paid — or will you be paying — an attorney any money for services in connection with this case, including the completion of this form?* [ ] Yes XX No

*If yes, how much?* $ _____
*If yes, state the attorney's name, address, and telephone number:*

11.    *Have you paid-or will you be paying-anyone other than an attorney (such as a paralegal or a typist) any money for services in connection with this case, including the completion of this form?* [ ] Yes [XX ] No

*If yes, how much?* $ _____
*If yes, state the person's name, address, and telephone number:*

12.    *Provide any other information that will help explain why you cannot pay the docket fees for your appeal.*

*I have no means of income. It is all gifted.*

13.    *State the [city and state] of your legal residence.* Silver Spring, Maryland 20910

*Your daytime phone number:* (240) 330-6837

*Your age:* 52    *Your years of schooling:* 24

*[Last four digits of] your social-security number:* 5853

United States District Court
Eastern District of Pennsylvania

Joseph O. Boggi D.O                           Case No. 08-4941
Internal Medicine                             Civil Action

v.

Medical Review and Accrediting Council, et al.

Certificate of Service

I, Joseph O. Boggi D.O. hereby certify that the filing Memorandum regarding the

Notice of Appeal to ALL defendants by email on this date.

They were also notified that the filing could be found on the ECF in due course

Joseph O. Boggi D O
Internal Medicine
1207 Ballard Street
Silver Spring, Maryland 20910

240-330-6837

October 19, 2009

| | | |
|---|---|---|
| IN THE MATTER OF | * | BEFORE THE |
| JOSEPH O. BOGGI, D.O. | * | STATE BOARD OF PHYSICIAN |
| Respondent | * | QUALITY ASSURANCE |
| License Number: H36807 | * | Case Number: 97-0515 |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## AMENDED ORDER FOR SUMMARY SUSPENSION
## OF LICENSE TO PRACTICE MEDICINE

Based on information received by the State Board of Physician Quality Assurance (the "Board") concerning the medical practice of Joseph O. Boggi, D.O. ("Respondent"), (D.O.B. 10/21/57), License Number H36807, the Board has reason as set forth below, to find that the public health, safety and welfare imperatively requires emergency action under Md. Code Ann., State Gov't §10-226 (c) (1995 Repl. vol.). The Board has received reliable information that questions the mental competency of Respondent to practice medicine; specifically, that Respondent is displaying threatening, maladaptive behavior.

## BACKGROUND

The Board has received reliable information that the following facts are true:

1.  At all times relevant hereto, Respondent was and is licensed to practice medicine in the State of Maryland. Respondent was initially licensed to practice medicine in Maryland in 1988, under license number H36807.

2.  Respondent is not presently affiliated with any hospitals. Respondent applied for medical staff privileges at Montgomery General Hospital, and later withdrew his application. He also applied for privileges at Shady Grove Adventist Hospital, and later withdrew his application as well.

3.  Respondent completed a residency program at Walter Reed Hospital in Internal Medicine. Since completing his residency program, Respondent lists eleven separate professional practice sites on his curriculum vitae. Many of Respondent's employment stints have been for brief periods of time including but not limited to Immediate Care, an outpatient facility in Damascus from April 1994 through June 1994; Convenient Health Care, an outpatient facility in Waldorf from October 1994, through January 1995; and from July 1995 through December 1996; Thomas Dooley, M.D.'s office in Olney, from November 1994 through June 1995; and 75th Street Medical , in Ocean City from April 11, 1998 through April 16, 1998.

4.  Respondent was terminated from employment; or his employment ended abruptly from several different work-sites including Immediate Care, Convenient Health, Dr. Dooley's offices, and from 75th Street Medical.

5.  On or about December 24, 1996, while employed as a physician at Convenient Health Care, during office hours, with patients present in the facility, Respondent punched a hole in a hallway wall. Respondent was allowed to complete his scheduled shifts. Several days later, however Respondent returned to the facility. When asked to leave the facility by the Medical Director of the facility he refused. The Medical Director contacted the sherrif's department to escort Respondent from the premises.

6.  On or about April 17, 1998, when Respondent was employed by 75th Medical Street Clinic in Ocean City, Maryland he had an altercation with his supervisor, Dr. Victor Gong that necessitated police involvement. The altercation occurred during office hours, and at least one patient was on the premises.

2

## REASONS IN SUPPORT OF SUMMARY SUSPENSION

7.    Sometime during March of 1996, Respondent applied for initial Medical Staff membership and clinical privileges at Holy Cross Hospital ("Holy Cross") in Silver Spring, Maryland. On January 7, 1997, the Medical Executive Committee at Holy Cross voted to recommend that Respondent's initial application for Medical Staff membership and clinical privileges be denied.

8.    Holy Cross based its denial on its findings during interviews of Respondent, as well as on its thorough review of documents addressing Respondent's education, training and professional experience. Its denial was based on the following:

> ...During interviews of Doctor Boggi on November 7 and December 4, 1996, he was evasive, non-responsive, and failed to give direct answers to questions; also, his thought appeared to be disorganized and lacked apparent focus. In addition, he failed to complete his application in a timely and organized manner, and he failed to respond to inquiries from the Medical Staff Office, indicating that he is unlikely to perform principal aspects of his job in a timely and effective manner. Moreover, the Medical Executive Committee believes that he apparently has difficulty interacting with physicians and staff based on his interviews and the fact that he appears to have had difficulty with almost all of his postgraduate professional activities.

9.    By letter dated January 15, 1997, Holy Cross filed a Report of Disciplinary Action with the Board in accordance with Health Occ. §14-413 (1994), that addressed the information listed in paragraphs (7) and (8) above.

10.    Following Holy Cross' initial denial of privileges to Respondent, Respondent requested a hearing on the hospital's recommendation. On or about October 9, 1997, Holy Cross' final decision was to deny Respondent's application for initial appointment.

11.    Following Holy Cross' final action, the hospital filed an Adverse Action Report with the

3

Board, which was based on the following:

On October 9, 1997, the Board of Trustees took final action after due process rights had been exhausted, to deny Dr. Boggi's application for initial appointment. The Board found that Dr. Boggi provided insufficient evidence of his current competence to practice in an acute care setting and is unlikely to be able to consistently perform the principal functions of being a medical staff member, including but not limited to interacting with patients, staff and other physicians, maintaining appropriate records, and providing quality care to his patients in the Hospital.

12. Based on Holy Cross' Report, the Board, at its Weekly Review Panel meeting on October 29, 1997, the Board opened an investigation into this matter, and recommended that Respondent be re-evaluated by the Physician Rehabilitation Committee ("PRC") of the Medical and Chirurgical Faculty of Maryland.

13. The PRC agreed with the Board, that Respondent be re-evaluated based on the new information received from Holy Cross. The PRC recommended that Respondent be evaluated by psychiatrist, Lee Haller, M.D.

14. Respondent telephoned Dr. Haller and interviewed him regarding his experience with Adult Attention Deficit Disorder. Respondent was not satisfied with Dr. Haller's responses to his inquiries, and in lieu of being evaluated by Dr. Haller, scheduled an appointment with a psychiatrist of his choosing, Dr. Charles Troshinski.

15. Dr. Troshinski submitted a brief letter to the PRC outlining his visit with Respondent. He briefly discussed Respondent's neurologic handicaps, and in sum he stated, "Of course, I have no way of determining his competency as an internist." Based on this inadequate evaluation, the PRC was unable to evaluate Respondent's ability or competency as an internist. Further the PRC was unable to "speculate on the impact his 'neurologic handicaps' may have on his practice of medicine."

4

16. Because the PRC was unable to evaluate Respondent's competency, the Board, by letter dated April 15, 1998, directed Respondent to be evaluated for a psychiatric examination by Dr. Ellen G. McDaniel in Towson. The appointment was scheduled for April 27, 1998, at 1:00 p.m. The cost of the examination was to be covered by the Board.

17. By letter dated April 23, 1998, Respondent informed the Board:

...[I]f the board is still interested in paying for yet another exam I would have to decline.

18. By letter dated April 26, 1998, Respondent informed the Board:

I consulted with my attorney regarding your wish that I undergo a second Psychiatric evaluation. He advised me that your office already sent for one. He recommended that I not have another evaluation.

19. On April 27, 1998, Respondent failed to appear at his scheduled psychiatric examination with Dr. McDaniel. Further, he failed to notify Dr. McDaniel that he was not planning to appear. Dr. McDaniel had set aside three hours for Respondent's evaluation.

20. On April 29, 1998, Respondent appeared at the Board's offices without an appointment. Respondent reacted defensively to Mr. Charles Cichon, Chief of Investigations, and was argumentative. Respondent telephoned the Board's staff approximately 20 minutes after leaving the Board's offices, and requested Dr. McDaniel's telephone number.

21. On or about May 20, 1998, despite requests to not do so by the Board's investigative staff, Respondent called Dr. McDaniel's office and left a message for her to contact him regarding her knowledge of Adult Attention Deficit Disorder. Dr. McDaniel did not return his call.

22. On May 21, 1998, the Respondent again contacted Dr. McDaniel by telephone, and asked

5

to schedule an appointment with her for an evaluation. Dr. McDaniel agreed to schedule an appointment with him for June 3, 1998, at 1:30 p.m.

23.    On May 22, 1998, Respondent wrote a letter to Richard Walton, Compliance Analyst, and represented that he would not be able to see Dr. McDaniel on the date that he had scheduled with her. He requested further dates from Mr. Walton, and then represented that he had scheduled appointments with three psychiatrists of his choosing. He sent the letter to Mr. Walton by facsimile and typed on the cover page, "How about lunch on Tuesday?"

24.    Beginning in March of this year, Respondent began sending numerous letters and faxes to the Board's staff; although some letters made reference to the Board's investigation, some of the Respondent's correspondence contained bizarre content. An example of bizarre content is two letters that were written by Respondent to Mr. Michael Compton, the Executive Director of the Board, that were both dated April 29, 1998. The content of the second letter was amended very slightly; the first letter was faxed to Mr. Compton at 5:11 a.m., and the second letter was faxed at 6:36 a.m. Both letters contained the following paragraph:

> I am the one with the red in his eyes and a dark grey suit. You can send out the others to check me out. I will be sitting there a bit hunched over, looking as if I am, in the distance. Occasionally I will sigh a bit and shrug my shoulders to give a more relaxed impression. Other than that you will see that I am in good shape with a fine heart and strong eyes....

25.    One day later, on April 30, 1998, Respondent sent another letter by facsimile to Mr. Compton. In the letter Respondent discusses his third visit to the Board's offices on that date; and his perceived treatment by the Board's staff. In the letter he states:

> ...I went up there to find out how my life was going. After repeated lecturing I was

6

forced to ask permission to leave. At first I am told that I have to be spoken to in the parking lot and then I am held captive to a repeated berating. At the end, I said in a low but strained voice that I was given no respect to Mr. [Cichon] and he just huffed.

...The second time I was in your office...Ms. [Cromer] chose to stand less than a foot away from me. I had to move to the left nearer Mr. Rose.

...The rules now say this is my last communication with you. You should have see[n] them saying, well now you ran to a lawyer. I want an apology.

26.    Respondent has made multiple telephone calls to the Board's staff, which have involved a

range of emotions. In some of the telephone contacts, Respondent has relayed bizarre

statements to the investigative staff. On May 18, 1998, Respondent contacted Richard

Walton, Compliance Analyst regarding multiple previous telephone calls that he had placed

to the Board. Respondent was very emotional on the phone. During the conversation,

Respondent alternated between excitement, confusion, calmness; and at times began

crying.

27.    On or about May 28, 1998, Respondent agreed to be evaluated by Dr. McDaniel.

Richard Walton, Compliance Analyst scheduled the appointment for Respondent for June

17, 1998, from 9:00 until 12:00 noon.

28.    On June 17, 1998, Respondent appeared as scheduled for his appointment with Dr.

McDaniel. Dr. McDaniel submitted a preliminary report to the Board based on her

findings during the three hour interview; and of her review of documentation submitted by

the Board's staff. Dr. McDaniel made the following preliminary conclusions:

For at least the past five years, Dr. Boggi has demonstrated a pattern of behavior that physically threatens other people, and this maladaptive behavior pattern ultimately led to his current professional difficulties. Complicating matters, Dr. Boggi lacks the ability to look at his behavior from another person's perspective and thereby does not learn from

7

past experiences. I saw evidence of the inability to honor the boundaries of others in many of the documents as well as during the interview with me. **Because of the continuing presence of threatening maladaptive behavior, I recommend that Dr. Boggi cease practicing medicine until he has control over his behavior and makes the necessary changes in his behavior patterns. I am not sure if this is possible, given Dr. Boggi's cognitive rigidity in interpersonal problem solving.**

29.     Dr. McDaniel further recommended that Respondent undergo neuropsychological testing, along with a personality inventory.

30.     Based upon the above information, the Board has probable cause to charge Respondent and the information contained in Addendum A, with the following violations of the Medical Practice Act, Health Occupations Article, Annotated Code of Maryland ("the Act"), §§14-404(a) In general. — Subject to the hearing provisions of § 14-405 of this subtitle, the Board, on the affirmative vote of a majority of its full authorized membership, may reprimand any licensee, place any licensee on probation, or suspend or revoke a license if the licensee:

        (3)     Is guilty of immoral or unprofessional conduct in the practice of medicine;

        (4)     Is professionally, physically, or mentally incompetent; and

        (33)     Fails to cooperate with a lawful investigation conducted by the Board.

31.     Based on Dr. McDaniel's evaluation, the Board has probable cause to believe that and the information contained in Addendum A, Respondent is mentally incompetent to practice medicine, and that his continued practice of medicine would jeopardize the health, safety and welfare of the citizens of Maryland.

## CONCLUSIONS OF LAW

Based on the foregoing reasons, the Board finds that the public health, safety and welfare imperatively requires emergency action in this case, pursuant to Md. Code Ann., State Gov't §10-226(c) (2) (1995 Repl. Vol.).

8

## ORDER

Based on the foregoing, it is this 24th day of _____June_____, 1998, after a Show Cause Hearing, by a majority of the full authorized membership of the Board of Physician Quality Assurance:

**ORDERED** that pursuant to the authority vested by Md. State Gov't Code Ann. §10-226, Respondent's license to practice medicine in the State of Maryland be and is hereby **SUMMARILY SUSPENDED**; and be it further

**ORDERED** that upon the request of Respondent, in writing within ten (10) days of the issuance of this **SUMMARY SUSPENSION**, a hearing be scheduled to consider this **SUMMARY SUSPENSION**, to be held at the Office of Administrative Hearings, Administrative Law Building, 11101 Gilroy Road, Hunt Valley, Maryland 21031-1301, within thirty (30) days of Respondent's request; and be it further

**ORDERED** that on presentation of this Order, Respondent **SHALL SURRENDER** to the Board's Compliance Analyst, the following items:

    (1)    Respondent's original Maryland license number H36807;

    (2)    Respondent's current renewal certificate;

    (3)    Respondent's DEA Certificate of Registration;

    (4)    Respondent's Maryland Controlled Dangerous Substance Registration; and

    (5)    All prescription forms and pads on which his name and DEA number are imprinted;

and be it further

**ORDERED** that a copy of this Order of Summary Suspension shall be filed with the Board in accordance with Md. Code Ann., Health Occ. §14-407 (1994);

9

**ORDERED** that this is a Final Order of the Board and, as such is a **PUBLIC**

**DOCUMENT** pursuant to Md. Code Ann., State Gov't §10-611 et seq. (1995 Repl. Vol.).

6·24·98
_____
Date

Suresh C. Gupta, M.D.
Chair, Maryland Board of Physician Quality Assurance

10

IN THE MATTER OF        *     BEFORE THE

JOSEPH O. BOGGI, D.O.       *     STATE BOARD OF PHYSICIAN

        Respondent           *     QUALITY ASSURANCE

License Number: H36807     *     Case Number: 97-0515

*     *     *     *     *     *     *     *     *     *     *     *

## ADDENDUM A

During the course of the predeprivation hearing, the Board had extensive opportunity to evaluate the responses of, demeanor, organizational and communicative abilities of the Respondent. Based on these observations and other evidence available to the Board as set forth in the Amended Order, the Board finds, by clear and convincing evidence, that the Respondent lacks the capacity and insight to process information necessary in the practice of competent medical care.

These cognitive, behavioral, and communicative deficits clearly impact on the Respondent's ability to safely practice medicine and imperatively require the summary suspension of Respondent's license to practice medicine in order to protect the public health, safety and welfare of the citizens of Maryland.

Pending a full hearing on this summary suspension decision, the Board has concluded that no alternative disposition or accommodation can adequately protect the public health, safety and welfare of the citizens of Maryland.

_6·24·98_
Date

_Suresh Gupta_
Suresh C. Gupta, M.D.
Chair, Board of Physician Quality Assur.

SA-88

IN THE MATTER OF       *    BEFORE THE MARYLAND

JOSEPH O. BOGGI, D.O.       *    STATE BOARD OF

      Respondent.       *    PHYSICIAN QUALITY ASSURANCE

License No. H36807       *    Case No. 97-0515

    *     *     *     *     *     *     *     *     *     *     *

## FINAL OPINION AND ORDER

### INTRODUCTION

On June 24, 1998, the Maryland State Board of Physician Quality Assurance (the "Board") issued to Joseph O. Boggi, D.O. (the "Respondent"), an Amended Order for Summary Suspension of License to Practice Medicine pursuant to Md. Code Ann., State Gov't § 10-226(c).

On August 17, 1998, the Board charged the Respondent with violations of Md. Code Ann., Health Occ. § 14-404(a)(3), (4) and (33) for immoral or unprofessional conduct in the practice of medicine; being professionally, physically, or mentally incompetent; and, failing to cooperate with a lawful investigation conducted by the Board.

An evidentiary hearing was held on September 16, 17, 18 and 23, and October 1, 2, 26 and 30, 1998, before an Administrative Law Judge at the office of Administrative Hearings.

On January 28, 1999, the Administrative Law Judge issued a Proposed Decision with Findings of Fact, Conclusions of Law and a Proposed Disposition. On February 16, 1999, both the State and the Respondent filed Exceptions to the Administrative Law

1

Judge's Proposed Decision. Responses to those Exceptions were filed by each party on March 3 and March 9, 1999, respectively.

On April 28, 1999, the parties appeared before the Board for an oral hearing on the Exceptions. After considering the Proposed Decision, the original summary suspension, the record of the administrative hearing, the Exceptions and responses thereto, the Board issues this Final Order.

## FINDINGS OF FACT

The Board adopts the findings of fact made by the Administrative Law Judge, with the exceptions noted below. The Board also will, in some cases, supplement the factual findings made by the Administrative Law Judge by making additional factual findings.

In general, the Board finds that the Administrative Law Judge failed to take into account some facts which were in large part undisputed, and at times minimized the significance of certain facts. For example, the Administrative Law Judge's findings that Dr. Boggi's loud, argumentative and physically threatening or violent conduct was not "in the practice of medicine" were unrealistic findings – since competent patient care requires effective and functional professional communication between physicians, between physicians and other health care workers, and non-threatening working relationships on the premises at which patients are treated.

In a similar vein, the Administrative Law Judge essentially brushed off Dr. Boggi's bizarre, disorganized, noncompliant and threatening behavior toward Board staff because that conduct was not shown to be "in the practice of medicine"; but that evidence was presented for another purpose, i.e., to show that Dr. McDaniel's diagnosis was consistent

2

with and based upon actual behaviors of Dr. Boggi.  The Administrative Law Judge, by brushing off this behavior because it was not conducted "in the practice of medicine," apparently failed to recognize that this behavior was nevertheless a legitimate factor which Dr. McDaniel could take into consideration in reaching her diagnoses and prognosis.

If one refrains from the tendency to fragment and pigeonhole evidence in this manner, the entire body of evidence shows Dr. Boggi to be a more disorganized, disruptive, and threatening figure than that depicted by the Administrative Law Judge.

In sum, while the Board agrees with most of the findings of fact made by the Administrative Law Judge, the Board will make some additional findings which, in the Board's opinion, more appropriately reflect the seriousness of the aberrant behavior displayed by Dr. Boggi.  The Board's additional findings are noted in bold print.  Where the Board disagrees with a  proposed finding, that proposed finding is stricken over.

### Specific Findings

Having considered all of the evidence presented, the Board finds the following facts by clear and convincing evidence:

1.  The Respondent received a doctorate in osteopathy from the University of Osteopathic Medicine and Surgery, Des Moines, Iowa in 1983.

2.  The Respondent served his residency at the Walter Reed Army Medical Center in Internal Medicine from 1985 to 1988 and he also received his certification in internal medicine from the American Board of Internal Medicine in 1988.

3.  In early June, 1992, the Respondent was returning from an emergency call at Kimbrough Army Hospital at Fort Meade.  The Respondent was sleep deprived, was not on medication and had been using caffeine.

4.  The Respondent was stopped by the military police ("MP") for exceeding the posted speed limit.  After the Respondent was issued his speeding citation,

3