he got into his vehicle to leave before being dismissed by the MPs. In doing so, the Respondent unintentionally struck one of the MPs with the door of the vehicle. The Respondent left the scene and was stopped again by the MPS a short distance from the original traffic stop and charged with fleeing and alluding (or its equivalent). The Respondent was not charged with assault.

5.    During the arrest, the Respondent received another call from the Emergency Room. The MPS allowed the Respondent to return to the hospital to attend to the patient and to turn himself in later for processing on the criminal charge.

6.    The Respondent's privileges at Kimbrough Army Hospital were first held in abeyance and then suspended as a result of the incident with the MP. The Respondent received psychiatric evaluation and treatment.

7.    The Army did not pursue a Medical or Administrative Board and his privileges were fully reinstated in June of 1993. The Respondent was honorably discharged from the Army in January of 1994.

8.    The BPQA **(Board)** was informed that the Respondent's privileges at Kimbrough Army Hospital were suspended and referred the Respondent to the Physician Rehabilitation Committee ("PRC") for evaluation but did not take any adverse action against the Respondent's license.

9.    The Respondent was first diagnosed as having Attention Deficit Disorder, Hyperactivity ("ADD"), by Dr. Nicholas Rock, Chief of the Department of Psychiatry at Walter Reed Army Medical Center in 1988.

10.   When the Respondent was diagnosed with ADD he began taking methylphenidate (10 mg PO TID) and had a good response to the medication. The medication was discontinued in 1990. He resumed taking methylphenidate in March of 1992.

11.   After the incident with the MPs, Dr. Andrew Gergely evaluated the Respondent on July 31, 1992, and noted that the Respondent had a sense of entitlement and inflated self-worth as well as a diagnosis of ADD, adult residual type. Dr. Gergely noted that "Narcissistic personality disorder traits" were present in the Respondent.

12.   The Respondent was evaluated in August of 1992, by Harry E. Gwirtsman, M.D. Dr. Gwirtsman diagnosed the Respondent with Attention Deficit Disorder, Residual Type.

4

13.    Ronald J. Koshes, M.D., is a Board Certified Psychiatrist. Dr. Koshes treated the Respondent from 1991-92, while the Respondent was in the Army and from 1995 until the present.  **Dr. Koshes has known Dr. Boggi as a colleague ever since he was an intern and Dr. Boggi was a resident at the same time, at Walter Reed. In 1993, Dr. Koshes recommended that Dr. Boggi engage in weekly psychotherapy and daily medication management. Dr. Boggi, after a period where he was not receiving therapy, began therapy and medication management with Dr. Koshes in June of 1995.   Dr. Boggi sees Dr. Koshes for therapy for approximately one half hour per month. Dr. Koshes allows Dr. Boggi to change the amount of methylphenidate on his own. Dr. Koshes also prescribes Paxil, Trazadone and, since the summer of 1998, Depakote.**

14.    In October of 1992, Dr. Koshes was the Chief of the Department of Psychiatry at Walter Reed. Dr. Koshes completed a psychiatric evaluation of the Respondent consisting of seven (7) visits including neuropsychological testing and radiographic studies.  Dr. Koshes diagnosed the Respondent as having an Adjustment Disorder with mixed emotional features as AXIS I and Attention Deficit Hyperactivity Disorder, moderate residual type, on AXIS II.

The Psychiatric evaluation ordered by the BPQA

15.    After the Respondent's request for privileges at Holy Cross Hospital were denied, the hospital sent a Report of Disciplinary Action to the BPQA, as required by law.

16.    On October 29, 1997, the BPQA's Weekly Review Panel, recommended that the Respondent be reevaluated by the PRC **(Physician Rehabilitation Committee)** based on the denial of Medical Staff membership and clinical privileges at Holy Cross Hospital.

17.    **The PRC initially allowed Dr. Boggi to supply the names of two psychiatrists, but these two psychiatrists declined to evaluate Dr. Boggi.  One of these psychiatrists, however, recommended Dr. Lee Haller, and the PRC recommended that Dr. Boggi be referred to Dr. Haller for the evaluation.**  The PRC met with the Respondent on January 13, 1998, and recommended to the BPQA that the Respondent be referred to Lee Haller, M.D. for a "second opinion".

18.    It is the PRC's practice to have the physician being evaluated contact the evaluator directly to schedule the appointment.

19.    The Respondent contacted Dr. Haller to interview him regarding his knowledge of Adult ADD.  **Dr. Boggi then refused to be evaluated by Dr.**

5

**Haller.** The Respondent requested that he be allowed to see another doctor for an evaluation and the PRC agreed. **Dr. Boggi informed the PRC that he wished to be evaluated by a Dr. Troshinsky. Dr. Boggi did not inform the PRC that he had been previously evaluated by Dr. Troshinsky and that Dr. Troshinsky had previously testified in favor of Dr. Boggi at a hearing.** The PRC usually sends the evaluating doctor information as to what it expects to be included in the evaluation. In the Respondent's case this was not done because the period of time between the selection of Dr. Troshinsky by the Respondent, and the appointment, was brief.

20.     Charles H. Troshinsky, M.D. evaluated the Respondent on February 17, 1998, and sent a brief report to the Psychiatric Rehabilitation Committee. Dr. Troshinsky found the Respondent suffered from ADD but did not find any other psychopathology. Dr. Troshinsky further opined that he had no way of evaluating the Respondent's competency as an internist.

21.     The BPQA was informed of the results of Dr. Troshinsky's evaluation. By letter dated April 15, 1998, the BPQA informed the Respondent that he was directed to appear for a psychiatric examination with Ellen G. McDaniel, M.D., on April 27, 1998. The BPQA's letter to the Respondent is silent regarding whether the Respondent may have contact with Dr. McDaniel prior to the evaluation; it does state that if the Respondent needs directions he can contact Dr. McDaniel by facsimile. **The Board advised Dr. Boggi in writing that he was to contact a named Board employee if he had any questions about this appointment. Dr. Boggi was told verbally on two occasions by different Board staff members not to contact Dr. McDaniel by telephone prior to the scheduled appointment. Dr. Boggi was aware of these instructions but deliberately ignored them and attempted to contact Dr. McDaniel by telephone.**

22.     The Respondent discussed the BPQA's directive, **to submit to a psychiatric evaluation,** with his attorney, Keith Rosenberg. Mr. Rosenberg had been retained to represent the Respondent in prior matters and gave the Respondent legal advice in this matter between March and May 12, 1998. ~~Mr. Rosenberg advised the Respondent not to submit for the evaluation with Dr. McDaniel because the Respondent had advised him that he had already submitted to one psychiatric evaluation with positive results.~~ **Mr. Rosenberg was never retained by Dr. Boggi to represent him before the Board. In the course of a telephone conversation during which Mr. Rosenberg told Dr. Boggi that he was not representing him, Mr. Rosenberg stated that he didn't believe that the Board had the right to make Dr. Boggi undergo this evaluation. Dr. Boggi did not establish that he had fully informed Mr. Rosenberg of the complete factual scenario at the time Mr.**

6

**Rosenberg made this statement. In fact, Mr. Rosenberg's statement of his opinion was clearly conditional, as he proposed that Dr. Boggi pay him a retainer so that he could get into the case and "find out" the answer.**

23.    Mr. Rosenberg notified the BPQA on or about May 12, 1998, that he had not been retained by the Respondent to represent him in the pending matter before the BPQA.

24.    The Respondent did not appear for the psychiatric evaluation with Dr. McDaniel on April 27, 1998.

25.    On April 29, 1998, the Respondent appeared at the offices of the BPQA without an appointment. Richard Walton and Charles Cichon met with the Respondent. Mr. Cichon told the Respondent that he could not come to the offices to talk with BPQA staff without an appointment. Mr. Cichon also accused the Respondent of giving a false name to gain entry; the Respondent denied giving a false name. **Dr. Boggi sent at least three faxes to Board staff in which he stated that he had tricked staff.** The Respondent was also advised that if he had an attorney representing him he should have the attorney communicate with the BPQA.

26.    Mr. Walton also spoke with the Respondent separately. Mr. Walton told the Respondent that, speaking as a friend, he should submit to the psychiatric evaluation because the BPQA could suspend the Respondent for failing to cooperate with the evaluation.

27.    The Respondent initiated many telephone calls and sent numerous facsimiles to the BPQA between March and July 1998. Some of the facsimiles were duplicates of earlier facsimiles sent to the BPQA and some were sent very late at night.

28.    The Respondent also visited the offices of the BPQA on several occasions. During these telephone calls and visits, the Respondent's communication appeared unfocused and at times he spoke in a low whisper and other times he became quite loud. The Respondent exhibited a wide range of emotions during many of his contacts with the BPQA, **often appearing alternately excited, calm, confused and at times in tears. Dr. Boggi faxed a letter to the Executive Director which stated:**

> **The last time I was seen at your office I had to trick one of your staff. How do you do that? One causes confusion by going four or five steps down an argument.**

7

**Your are smarter and so I am going to just come up there.**

**I am the one with the red in his eyes and a dark grey suit. You can send out the others to check me out. I will be sitting there a bit hunched over, looking as if I am, in the distance. Occasionally I will sigh a bit and shrug my shoulders to give a more relaxed impression. Other than that you will see that I am in good shape with a fine heart and strong eyes.**

**That is how I looked last time. Quite a few people came by before they considered approaching me.**

**Dr. Boggi's communications to the Board's staff could at times reasonably be interpreted, and in fact were interpreted, as threatening.**

29.    The Respondent called Dr. McDaniel on May 18, 1998, and left a message with Dr. McDaniel's answering service stating that he wanted Dr. McDaniel to call him so that they could discuss attention deficit disorder.  Dr. McDaniel did not return the call.  **Dr. McDaniel did not return the call because it is her policy not to engage in telephone conversations with a client until she has explained, in person, the waiver of confidentiality.  Dr. Boggi had been informed that he should not contact her directly.**

30.    On May 21, 1998, the Respondent called Dr. McDaniel, **contrary to the instructions given to him by Board staff,** and she answered; an appointment was scheduled for June 3, 1998. ~~The June 3rd appointment was rescheduled for June 17, 1998, and took place on that date.~~  **Dr. Boggi stated that he would be available on that date.  On the following day, however, he stated that he would not be available on that date.  When Board staff rescheduled the date for June 17, 1998, Dr. Boggi again, contacted Dr. McDaniel, this time by fax, in an unsuccessful attempt to schedule the appointment earlier.**

## Respondent's Employment History

31.    The Respondent was employed at Convenient Health Care from October 1994 to January 1995, and returned to Convenient Health Care in July of 1995 until December of 1996.  Convenient Health Care is an urgent care center accepting both walk-in and return patients.

32.    The Respondent exhibited good clinical skills at Convenient Health Care and there were no complaints from patients.  Some of the return patients would specifically request that the Respondent care for them.

8

33. There were no complaints from the staff at Convenient Health Care except for one physician assistant who believed the Respondent took too many breaks, **was not available for consultations and would sign prescription pads and leave the facility for extended periods of time. This physician assistant refused to work with Dr. Boggi at first, but Dr. Wiggins prevailed upon him to continue.**

34. The Respondent has a direct, sometimes abrupt, approach with staff and expected his directions to be followed without excuses.

35. Prior to December 24, 1996, the Respondent had asked the Director of Convenient Health Care, Dr. Wiggins, for additional hours. **Dr. Boggi's hours had steadily increased during his tenure at Convenient Health Care. Dr. Boggi had frequently refused additional hours which Dr. Wiggins** sometimes offered to him. Dr. Wiggins **sometimes** offered the Respondent additional hours by calling him the day he needed the Respondent to work. (1224.) **He was sometimes offered the Friday night shift, but he refused, making a statement that this would interfere with his social life. He was also offered other shifts which frequently went unstaffed.**

36. Late in the afternoon of December 24, 1996, the Respondent ~~met with~~ **left a note for** Dr. Wiggins again to request more hours on a regular basis. Dr. Wiggins told the Respondent that he would ~~not give him additional hours on a regular basis~~ **take his request under advisement.**

37. The Respondent was frustrated and upset by the result of his conversation with Dr. Wiggins. The Respondent went to look for a place in the office where he could be alone and cope with his disappointment in not being given additional hours. All the areas usually used by staff for taking a break were occupied.

38. The Respondent hit the wall outside the x-ray processing room with his fist causing a large and deep dent in the wall. No one saw the Respondent hit the wall.

39. The Respondent was not treating, diagnosing or caring for patients when he hit and damaged the wall. No patients asked what happened to the wall or what caused the noise. **At the time of the incident, Dr. Boggi was on duty. Dr. Wiggins and the rest of the staff were all busy seeing patients. The sound of Dr. Boggi punching the wall could be heard in a treatment room where a patient was being treated. The hole was punched in the wall across from other patient treatment rooms.**

9

SA-97

40. When the Respondent hit the wall, Dr. Wiggins was in a treatment room with a patient and heard the noise **and came out within a minute in order to investigate the sound of the wall being damaged.**  ~~It did not interfere with Dr. Wiggins' treatment of his patient.~~[1]

41. The Respondent subsequently apologized to Dr. Wiggins and to the other staff for his actions.  He promised to fix the damage to the wall.

42. Dr. Wiggins fired the Respondent **for this incident.**  The Respondent **refused to** leave the clinic and Dr. Wiggins spoke with his partner, Dr. Abramson, by telephone.  **Dr. Wiggins was unhappy to be firing Dr. Boggi on Christmas Eve.  Dr. Abramson recommended that Dr. Wiggins let Dr. Boggi work for a few more days before effecting the termination.**

43. As a result of the conversation between Dr. Wiggins and Dr. Abramson, the Respondent worked his regular assigned shifts the week between Christmas Eve and New Year's Eve.  The Respondent's shifts were completed without incident, **except that Dr. Boggi began displaying a sullen affect, began communicating in whispers, and approached Dr. Wiggins in an unusual, hunched-over posture.  Dr. Wiggins, was at this point in fear of Dr. Boggi because of the incident and because of his subsequent manner.**  The Respondent began repairs to the walls with his own equipment and supplies.

44. As the Respondent was leaving the clinic on December 31, 1996, Dr. Wiggins ran up to him, and in the presence of the other staff, told the Respondent that he was fired.  **Dr. Wiggins was afraid of Dr. Boggi's anticipated reaction to being fired, and he had asked staff to be with him for his protection.**  The Respondent stated in a non-threatening manner, that he would come back to the clinic on the next day it was open.  **Dr. Wiggins told him that he could not come back.  Dr. Boggi repeated that he would come back.**

45. During the holiday, the Respondent attempted to get Dr. Wiggins' partner, Dr. Abramson, to rescind the termination **by sending him repeated long, rambling E-mails, even though Dr. Boggi knew that Dr. Abramson was**

---

[1]There is no basis for the last sentence of this finding.  This breaking of the wall clearly, at a minimum, interrupted Dr. Wiggins' thought process while treating a patient, and it may well have interrupted the treatment itself.  See Tr. 259, 287-88.

10

aboard a sailing ship on vacation **and even though Dr. Wiggins, as Medical Director, had the authority to fire personnel.**[2]

46.  The Respondent returned to the clinic the first day it was open after the holiday. **Dr. Boggi was aware that his presence was not welcome and anticipated possibly being escorted off the premises. Dr. Wiggins had called the police ahead of time, but they left when Dr. Boggi had not arrived for 30 minutes after the beginning of the shift. When Dr. Boggi did arrive Dr. Wiggins summonsed the police again. Dr.** ~~Wiggins~~ **Boggi** collected his belongings and left the clinic ~~without incident~~ **but not until personnel from the sheriff's department had arrived and escorted him from the premises. Dr. Wiggins had cleared out one side of the clinic in order to minimize the anticipated disruption.**

47.  The Respondent was hired by Thomas Dooley, M.D., a general practitioner, in Olney, Maryland, in November of 1994. The Respondent began working full time for Dr. Dooley on December 15, 1994, and left Dr. Dooley's practice on June 26, 1995 **as a result of being fired.**

47a. **Dr. Dooley notified Dr. Boggi of numerous complaints about his professional conduct from other health care professionals, health care entities and from patients. As a result of these complaints, and Dr. Boogi's conduct in the office, Dr. Dooley decided to fire Dr. Boggi. Pursuant to their employment contract, Dr. Dooley gave Dr. Boggi 180 days notice on June 15, 1995. Dr. Boggi refused to accept this notice. Shortly thereafter, however, after the office incident described in Finding of Fact No. 53c, Dr. Dooley fired Dr. Boggi immediately.**

48.  Dr. Dooley's office was very disorganized and the medical records kept for patients were not up to date and were poorly organized. Dr. Dooley disliked dictating notes for the medical records and some of the other administrative tasks necessary in running a medical practice.

49.  Dr. Dooley's wife, Sharon Dooley, was the office manager. Dr. Dooley and his wife often disagreed about both personal and business matters. There

---

[2]The Administrative Law Judge, in her Discussion, declined to decide whether Dr. Wiggins had the authority to fire Dr. Boggi. [Proposed Decision, p. 35.] The Board finds as a fact that Dr. Wiggins had the authority to fire Dr. Boggi. The Board disagrees with the statement by the Administrative Law Judge in her discussion that the original decision to fire Dr. Boggi was "rescinded." Id. Instead, a decision was made at that time not to force the issue, on Christmas Eve, while Dr. Boggi was refusing to leave the premises -- but to fire him at a later date.

11

was an ongoing tension in the office because of the frequent disagreements between Dr. Dooley and his wife.

50. The Respondent wanted to organize the medical records and update all of the charts in Dr. Dooley's office. The Respondent began organizing and updating the records. Mrs. Dooley did not want the Respondent to organize the records and she removed the records and locked them behind a door presenting a problem to staff needing a chart on a current patient.

51. Both Dr. Dooley and Mrs. Dooley would **sometimes** communicate their disagreements with each other and with other staff by writing memos. Both Dr. Dooley and Mrs. Dooley would **sometimes disagree with which version of a letter to send out** ~~instruct staff to follow his or her respective memo and not that of his/her spouse.~~[3] **Dr. Boggi on several occasions, on being given a memo from Dr. Dooley, immediately threw it in the trash without reading it, in front of Dr. Dooley.**

52. Dr. Dooley would become angry over personal and business disagreements with Mrs. Dooley. On one occasion he broke a light switch and a filing cabinet in the office with a crowbar.

53. There were occasions when the Respondent and Dr. Dooley had verbal disagreements that escalated into loud arguments. There was no physical violence involved. These arguments took place in non-patient areas and were not while the Respondent was engaged in treating, diagnosing or caring for patients, **at least to the extent that neither was at those precise moments conversing with or examining a patient. In fact, Dr. Dooley never saw Dr. Boggi interacting with a patient.**

**Dr. Boggi approached Dr. Dooley during these arguments in such a way as to require Dr. Dooley to continually step backward, sometimes placing a piece of furniture between him and Dr. Boggi so that the conversation could continue.**

53a. **Dr. Dooley received complaints from three separate individuals, including the Administrator and the Director of Nursing of Friends Nursing Home, as well as health care personnel at Montgomery General Hospital, that Dr. Boggi's abrasive communication style made it difficult for them to deal with him.**

53b. **On one occasion, Dr. Boggi failed to make rounds, and failed to order crucially necessary parenteral nutrition for a hospitalized patient, and**

---

[3]The modifications made more accurately reflect the testimony of Ms. Ellen Bowen.

SA-100

did not communicate this to Dr. Dooley. Dr. Dooley did not find out about this until he was notified by nurses at the hospital.[4]

53c. When Dr. Boggi was admonished by Dr. Dooley for this event, Dr. Boggi approached Dr. Dooley's office, yelling angrily through the office as he approached. Dr. Dooley was on the phone, talking with an insurance company about patient coverage. Dr. Boggi then screamed at Dr. Dooley and grabbed the phone out of his hand. This was the final incident which caused Dr. Dooley to accelerate Dr. Boggi's termination. Dr. Boggi then refused to accept the letter of termination.

53d. Dr. Dooley himself felt threatened by Dr. Boggi, and he had received complaints that other health care workers had felt intimidated or insulted.[5]

---

[4]Dr. Dooley's testimony on this issue is much more credible than Dr. Boggi's conclusory denial. [Tr. 354, 371-73, 1077.] Dr. Boggi, in his written statements [St. Ex. 85, 86] and his testimony [Tr. 1365] admitted that he sometimes causes confusion deliberately in order to obtain his ends. His testimony on this issue appeared to be such an instance. Some of his other testimony about Dr. Dooley also appeared to be designed to confuse and mislead.

[5]These additional facts paint, the Board believes, a more complete picture of Dr. Boggi's behavior and competence at this employment -- and that is the issue in this case.

The Administrative Law Judge treated the screaming incident (finding of fact 53c) as if it were a credibility issue between the two parties. Actually, Dr. Dooley's testimony [Tr. 345] was compatible with Dr. Boggi's testimony. [Tr. 1079.] Dr. Boggi appeared to be describing the same incident; Dr. Boggi didn't mention whether he screamed or grabbed the phone -- but he wasn't asked. He did testify that Dr. Dooley held the phone up to him as if to have a witness to Dr. Boggi's anger. The Board infers that this action on Dr. Dooley's part shows that Dr. Dooley was startled or intimidated.

The Board disagrees with the Administrative Law Judge's statement that Ms. Bowen's testimony regarding Dr. Dooley's "demeanor" detracts from Dr. Dooley's credibility. (Proposed Decision, p. 38.) Actually, Ms. Bowen testified that Dr. Dooley was "passive, old fashioned, pretty nice, a nice old guy" who, if he was angry at a particular person "rarely approached that person" but would "hold it in." Ms. Bowen never saw Dr. Dooley express his anger at a person, and never saw Dr. Dooley interacting at all with Dr. Boggi. [Tr. 1279, 1286, 1287.] Dr. Boggi was the only physician fired from the practice. [Tr. 1288.] Ms. Bowen's testimony does not support an inference that Dr. Dooley was the party who was likely to act aggressively during this confrontation.

13

SA-101

53e.   **Dr. Boggi was denied privileges at Holy Cross Hospital because during the interview he was evasive, nonresponsive, and failed to give direct answers to questions, and because his thoughts appeared disorganized and lacked apparent focus. The credentialing committee, and the appellate body, found that he did not possess the professional attributes necessary to function as a hospital doctor. Dr. Boggi withdrew his applications for privileges at Montgomery General Hospital and Shady Grove Adventist Hospital.**[6]

54.    The Respondent was briefly employed at 75th Medical in Ocean City. Several days after the Respondent began working there, he overslept and missed his shift on April 17, 1998. **Dr. Boggi was due to work at 9:00 a.m. but failed to show or to call. The staff tried twice at 10:00 a.m. to call him, but he did not answer his phone. Office staff then visited him at his residence and advised him that coverage had been arranged, and he was not to report to work that day. Dr. Boggi then called office staff several times that day in an agitated state, sometimes crying, and dropped off a letter to his supervisor.**

55.    Later in the afternoon of April 17, 1998, the Respondent came to the center and became involved in an argument with Dr. Gong, the medical director of the center, concerning the Respondent's contract.

55a.   **Dr. Boggi began this confrontation by walking into a room where Dr. Gong was treating a patient. Dr. Gong asked Dr. Boggi to leave the room and to meet him upstairs. Dr. Gong then left the room and met Dr. Boggi upstairs. In addition to the first patient, there was another patient in another room awaiting Dr. Gong's treatment.**

55b.   **At this point, Dr. Boggi was concerned about his salary. His time cards were relevant to the argument. Dr. Gong obtained the time cards and had them in his hand for the purpose of copying them for Dr. Boggi.**

56.    After an escalating verbal argument, ~~in which the~~ **Dr. Boggi grabbed a time card out of Dr. Gong's hands. Dr. Gong then grabbed Dr. Boggi's arms.**

---

[6]The Board has added this finding, which is relevant to Dr. Boggi's functioning in a professional context. Dr. Boggi's failure to convince the credentials committee of a hospital (which has a liberal credentialing policy), that he is competent to practice medicine, is relevant evidence on the issue of competence, though it certainly is not dispositive of that issue. The Board draws no inferences from Dr. Boggi's withdrawal of his application for privileges at Montgomery General and Shady Grove Hospitals, because the evidence regarding those hospitals was excluded. The Board disagrees with the exclusion of this evidence, however, as it may have shed additional light on the relevant issues.

14

SA-102

Respondent yelled at Dr. Gong to keep his hands off of him. **Dr. Boggi then flung him off.**[7] Dr. Gong fell back into a wall, and police were summonsed by the center's staff. **Dr. Boggi would not leave the premises voluntarily, and would not leave even after the police came until they had talked to him at some length.**

57.     The argument between the Respondent and Dr. Gong occurred in administrative offices upstairs and away from the clinical areas where patients were seen and treated. Neither the Respondent nor Dr. Gong was treating, diagnosing or caring for patients during the argument. The argument between the Respondent and Dr. Gong did not interfere with the treatment, diagnosis or care of patients, **that is, neither of them were at that precise moment in the act of treating or diagnosing any particular patient. The two physicians, however, were discussing Dr. Boggi's employment contract at the time. They were on the medical office premises in professional attire. The altercation could have been heard by waiting patients; and, in fact, one patient had to be moved from a waiting room so she would not be exposed to the altercation. The staff at the front desk heard the altercation, and staff repeatedly asked Dr. Boggi to maintain decorum. Dr. Gong was scheduled to see a patient immediately after the altercation.**

58.     The Respondent was the Medical Director for Med Rehab Clinic in Lanham, Maryland from November 1996 until January 1998. **Dr. Boggi described this clinic to Dr. McDaniel as a "scam," and stated that he was forced out of the clinic.** The Clinic closed due to financial problems.

59.     From November of 1996 until January 1998, Barry E. Thompson worked with the Respondent at Med Rehab Clinic. Mr. Thompson is a physician's assistant and observed the Respondent's work with patients every day that the clinic was open (i.e., Mondays, Wednesdays, and Fridays). The Respondent had a good rapport with patients.

Respondent's Psychiatric Condition:

Evaluation of the Psychiatric Evidence

The Board will modify some of the findings of fact regarding the psychiatric and

neurological condition of Dr. Boggi in order to reflect more accurately the weight of the

---

[7]Dr. Boggi's admission to the police, and his admission of this fact in his letter to Dr. McDaniel (St. Ex. 31 and 51), are sufficient, together with the other evidence, to clearly and convincingly establish this fact.

15

SA-103

psychiatric evidence produced at the hearing. In the Board's opinion, the Administrative Law Judge gave too much weight to her own observations of Dr. Boggi's psychiatric condition. See p. 22 of the Proposed Decision. While these observations are relevant to some extent, the Board places more weight on the professional opinions.

With respect to these professional opinions, the Board places more weight on Dr. McDaniel's opinion than did the Administrative Law Judge. The Board places more weight on Dr. McDaniel's opinion because she was an independent evaluator. Unlike Dr. Koshes, she did not have an old collegial relationship with Dr. Boggi which goes back over a decade. Unlike Dr. Koshes, her information is not limited to that provided by Dr. Boggi. Throughout the testimony, Dr. McDaniel seemed much more attuned to the actual facts of Dr. Boggi's recent employment situations than Dr. Koshes, who admitted that his knowledge of the events at the 75th Street Medical Clinic and at Convenient Health Care and at Dr. Dooley's office came basically from Dr. Boggi himself.

Dr. Koshes' credibility with respect to his opinion was further diminished in the Board's eyes when he testified that Dr. Boggi was in good control when he punched the wall at Convenient Health Care and when interacting with Dr. Dooley. Dr. Koshes' testimony that Dr. Boggi has done a good job keeping himself together and focused over the past several years also detracted from his credibility. While the Board understands how, from a therapist's point of view, Dr. Koshes may feel that Dr. Boggi is doing well as

16

SA-104

a patient, this opinion seems disconnected from the reality of Dr. Boggi's actual attempts to function as a physician.[8]

Dr. Koshes' explanation of the bizarre fax quoted in Finding of Fact No. 28 as Dr. Boggi's attempt to be "poetic" was also less than convincing.  The Board can only conclude based on this glib answer that that Dr. Koshes cannot explain how this part of the evidence fits in with his opinion.

The Board also places more weight on Dr. McDaniel's opinion than the opinion of Dr Harmon.  Dr. Harmon had not read the police report concerning the MP incident, and he admitted that the information he received from Dr. Boggi about the incident was "fuzzy." He did not have all of the documents to which Dr. McDaniel had access, and admitted that he did not look at any of the documents he did have in detail.  Dr. Harmon's testimony was unusually vague, and his tendency to blame most of Dr. Boggi's problems on a "transition" was problematic.  The transition period, he testified, started when Dr. Boggi left the military in 1992 and extended for two to three years.  At a later point in his testimony, however, Dr. Harmon stated that this transition was a "continuing process with him still not getting in a stable situation."  The thrust of Dr. Harmon's testimony on this issue seemed to be that Dr. Boggi's disruptive actions during his medical employments were not representative of his actual condition, since he was in transition -- and that Dr. Boggi's actual condition will not manifest itself until he stabilizes himself enough to attain and function well at a regular medical position.  This is of course a circular argument, since the issue is whether Dr.

---

[8]With respect to the quality of patient care provided, Dr. Koshes admitted that he would know of no clinical problems unless someone told him, and that he had not spoken to any of Dr. Boggi's supervisors over the last four or five years.

17

Boggi can function well in a normal medical position. And Dr. Harmon's evasive and vague testimony did little to clarify this issue. Dr. Harmon also found Dr. Boggi's boundary violations "benign," and nonthreatening, characterizations which seem unrealistic in the light of the incidents related in the Findings of Fact.

60.   The Respondent has not been and is not presently psychotic nor does he have suicidal or homicidal ideations.

61.   The Respondent does have a sense of entitlement and Narcissistic Personality ~~traits~~ **Disorder** but the Respondent is not limited to that pattern of behavior and interaction in all interpersonal and social settings. **This pattern of behavior has, however, significantly and persistently interfered with professional relationships in job settings, to the detriment of medical care in those settings.**

62.   ~~The Respondent does not lack insight or empathy and can accept constructive criticism and learn from past mistakes.~~ **Dr. Boggi lacks sufficient insight to understand that his behavior is the source of many of his problems; lacking this insight, he has an inability to learn from past experience. He has a sense of entitlement which, together with his communication problems and abrasive interpersonal style, makes it extremely difficult for him to accept constructive criticism or learn from past mistakes.**

63.   The Respondent does ~~not~~ have a fixed pattern of violating the personal boundaries of others. **This pattern was displayed during at least his last three medical jobs, during his interactions with Board staff, and during the evaluation process with Dr. McDaniel.**[9]

64.   The Respondent does ~~not~~ have a Narcissistic Personality Disorder as set forth in the Diagnostic Statistical Manual ("DSM-IV") of the American Psychiatric Association **which has been detrimental to his practice of the profession of medicine.**

---

[9]Indeed, the pattern may go back much further and include the traffic-stop incident at Walter Reed. This pattern is so blatantly obvious that the Board must reverse the Administrative Law Judge on this issue. Although there may have been a legitimate reason for Dr. Boggi to be aggravated or upset on some of these occasions, his reaction to a number of different situations over a number of years was to violate personal and professional boundaries.

SA-106

65. The Respondent has an Attention Deficit Hyperactivity Disorder, Predominantly Hyperactive, Impulsive Type. **This has resulted, among other things, in many incidents of impulsive behavior which have disrupted the medical workplace and which, in turn, have resulted in co-workers and others being intimidated and afraid of him.**

66. The Respondent's communication is goal-directed. When speaking, the Respondent digresses into related but unnecessary detail which interferes or obscures communication. This is called "branching." **The ability to communicate effectively with colleagues and co-workers is an essential attribute of the practice of medicine.**

67. The Respondent's branching becomes much more severe when he is under conditions of stress such as a confrontational setting. **The practice of medicine is at times stressful, in almost all practice settings. Dr. Boggi, because of his detrimental personality traits, including abrasiveness, lack of empathy, inability to learn from past experience, a sense of entitlement, a lack of reliability, emotional liability and communication problems has a marked tendency to provoke confrontations and increase tension and stress in situations which otherwise could be handled in a normal professional manner. Much of the stress which exacerbates Dr. Boggi's communication problems is self-created.**

68. ~~When reading or relating specific medical conditions/treatments of patients, the Respondent's communication is quite fluent and with good concentration. (Respondent's Exhibit 21, Dr. Koshe's report dated October 7, 1992, and observations of Respondent's testimony during hearing.)~~ **Dr. Boggi is intelligent and is capable of fluently communicating with respect to material he has read or memorized. He has, however, consistently displayed significant communication problems when dealing with people in a wide range of professional settings.**[10]

69. **With respect to his verbal digressions,** the Respondent's communication impairment is due to his ADD and is in the area of expressive, not but receptive, communication. **With respect to the broader aspect of Dr. Boggi's frequent inability to communicate in professional settings, this**

---

[10]The Administrative Law Judge's finding is somewhat unclear, as it states that Dr. Boggi's communication is quite fluent "when reading or relating specific medical conditions/treatments of patients." The exhibit cited actually states that Dr. Boggi is quite fluent "when presented with reading material or memorizing material." In any case, the Board is unsure of what is meant by "relating specific medical conditions/treatments of patients." Dr. Boggi himself reported to Dr. Gwirtsman "severe difficulty in communication skills." [Resp. Ex. 21, Gwirtsman report.] Dr. McDaniel reported the same.

failure is also caused by his sense of entitlement and lack of insight or empathy.

70.  ~~There are three criteria for evaluating an individuals's potential for future dangerousness: past dangerous behavior; substance abuse; and, the presence of a psychotic disorder.[11]~~

71.  The Respondent has never physically injured a patient, medical staff member or colleague.  He has, however, engaged in a physical confrontation, spoken abrasively, raised his voice inappropriately, destroyed property and caused others to have a justified fear of his presence.  He has established a pattern, at least in the past several years, of such conduct at places of employment.  The Respondent has no history of substance abuse.  The Respondent is not psychotic.

72.  Because of a combination of his Attention Deficit Hyperactivity Disorder and his Narcissistic Personality Disorder, Dr. Boggi is currently unable to control his behavior towards others and to effectively communicate to the extent necessary to provide competent medical care.

73.  Dr. Boggi's inability has persisted despite continuous treatment with both psychotherapy and medication.

74.  The ability to interact with and to effectively communicate with other physicians, including one's supervisor, and with other medical and medical-related personnel is an essential element of the competent practice of medicine.

75.  Dr. Boggi's inability to competently practice medicine poses a direct threat to the patient population.

---

[11]The Board rejects this finding.  The term "dangerousness" is vague, and, in the context of this case, misleading.  The issue in this case is not the degree to which it is likely that Dr. Boggi will seriously harm someone by means of a physical attack.  The issue is whether Dr. Boggi is competent to practice medicine.  The factual issue is whether he can control his behavior and can communicate to the extent necessary to provide competent care in a real world setting.  The danger involved is the danger to the public posed by incompetent medical care.

SA-108

## CONCLUSIONS OF LAW

1.    Summary Suspension

The Board concludes that the standard of proof in a summary suspension hearing is by a preponderance of the evidence. These hearings are held under the authority of the Administrative Procedure Act, Md. Code Ann., St. Gov't § 10-226. The Administrative Procedure Act provides that, unless otherwise required by statute, regulation or constitution, the standard of proof is by a preponderance of the evidence. Md. Code Ann., State Gov't § 10-217. Board regulations also provide that the standard of proof is a preponderance of the evidence. COMAR 10.32.02.05 F.

The Administrative Law Judge concluded, apparently as a matter of constitutional law, that possible consequences to a physician outweighed the "minimal (if any) burden to the State," and thus that the State need prove a summary suspension case by clear and convincing evidence. The Board does not agree with this proposition. The relevant interest of the State is not the fiscal and administrative "burden" of proving a case, but the risk to public health posed by the continued practice by an incompetent physician. In the Board's view, this risk is substantial, especially in this case, and the balance of interests does not justify a finding that the Administrative Procedure Act is unconstitutional.

In any case, the Board finds that the evidence meets the higher standard. It was shown by clear and convincing evidence that the health, welfare and safety of the public imperatively required the Board to suspend this license. Dr. Boggi's continued practice of medicine, while he is adversely affected by the neurological and personality problems to the degree found in the Findings of Fact, did pose and continues to pose a danger to the

21

SA-109

public. The Proposed Decision of the Administrative Law Judge on this issue is not adopted. The Order of summary suspension is AFFIRMED.

2.    Charges Under § 14-404(a) of the Act

The first issue under this section of the statute is whether Dr. Boggi "is professionally, physically or mentally incompetent," within the meaning of Md. Code Ann., Health-Occ. § 14-404(a)(4) (1994 & Supp. 1998).

It is not disputed that Dr. Boggi suffers from Attention Deficit Disorder, Hyperactive Type, that he has significant communication difficulties, that he is impulsive, violates boundaries, and that he displays, at a minimum, significant narcissistic personality traits.

It is also basically undisputed that Dr. Boggi has suffered a series of professional setbacks which his medical employers have attributed to his communication difficulties, his failure to acknowledge professional boundaries and his impulsive behavior sometimes bordering on violence. He has also been refused privileges at a hospital because of the perception that his thinking is disorganized. He has withdrawn his applications at other hospitals for reasons which are not shown in the record.

During the course of the investigation of this case, Dr. Boggi displayed to Board staff behavior that was perceived as incoherent and uncooperative, and he failed to follow clear instructions, and communicated in a way that was reasonably perceived as bizarre and threatening.

Dr. Boggi has been treated with methylphenidate and with other drugs, as well as psychotherapy for years. He has been treated by Dr. Koshes, a former colleague of his, from 1991 to 1992 and from 1995 to the present.

22

SA-110

The Administrative Law Judge issued a Proposed Decision in this case which found that Dr. Boggi is indeed mentally incompetent. The Administrative Law Judge went on to state, however, that his license should not be revoked because the Board has not proven by clear and convincing evidence that Dr. Boggi would still be incompetent if "properly treated." The Administrative Law Judge thus proposed that Dr. Boggi's license not be revoked but that the Board order that he continue his present treatment and also obtain additional treatment.

Because the Board disagrees with some of the underpinnings of the decision of the Administrative Law Judge, the Board will not adopt the Discussion or Conclusions of Law set out in the Proposed Decision. The Board has already set out its disagreements, on the issues of fact. The Board also disagrees on some issues of law, and to some extent with the method by which the evidence was evaluated.

## DISCUSSION

A.    Three Terminations from Employment

The Board has set out in its Findings of Fact some specific disagreements with the proposed factual findings made by the Administrative Law Judge, together with numerous instances where the Board adopts certain proposed factual findings but also makes additional findings on the same issue. As a general statement, the Board finds that the Administrative Law Judge minimized the importance of the instances where Dr. Boggi's psychiatric and character problems resulted in his termination and/or forced removal from the premises of his medical employment.

23

SA-111

As the Administrative Law Judge stated:

> It is an acceptable working hypothesis that if one has a series of positions (with different employers who do not know each other) that all end in "significant controversy," it is more likely than not that the one constant in the equation (the physician/employee) is responsible for those controversies.

Proposed Dec., p. 41.

The Board finds that this working hypothesis was reasonable. The Board also finds that this hypothesis was borne out by the evidence in this case.

In making this finding, the Board is aware that these three employment situations were less than ideal, and that the medical directors may not have been acting with the utmost diplomacy. In other words, there may have been, at least in Dr. Boggi's mind, some provocation for each of these events.

But the issue is whether he is "professionally, physically or mentally incompetent" to practice in the stressful world of medicine, where frustrating situations and disagreements inevitably do arise, but where professional cooperation and communication is still essential to patient care.

The Board agrees with Dr. McDaniel's opinion that Dr. Boggi's neurological and personality problems, which have resulted in impulsivity, agitation, lack of insight and empathy, impaired judgment, abrasive personal interactions, a lack of reliability, communication problems and emotional lability, make him incompetent to practice medicine.

The Board concludes that Dr. Boggi's termination from Dr. Dooley's office because of complaints from a nursing home, hospital personnel and some patients, because of a

24

failure to make rounds or to communicate this fact to Dr. Dooley, and because of an incident where Dr. Boggi screamed at Dr. Dooley through the office and at Dr. Dooley while he was on the phone, was to a large extent the fault of Dr. Boggi. This is true even though Dr. Dooley's office was less than an ideal place of employment.

Dr. Boggi's failure at this place of employment lends support to Dr. McDaniel's opinion, and it is also some evidence itself of incompetence. Dr. Boggi failed to show that this was an intolerable employment situation. His credibility on the overall issue of "fault" was considerably weakened by his successive failures at other places of employment. In fact, his lengthy defense of his sometimes irrational actions at these places of employment, arguing in each case that it was basically the fault of the employer, lends more credence to Dr. McDaniel's opinion that he lacks insight and is unable to learn from past experience.

Likewise, the Board finds that Dr. Boggi's punching his fist into one layer of drywall on the premises of Convenient Health Care, under the circumstances described, was alarming and aberrant behavior on the part of Dr. Boggi and it helped to convince the Board that Dr. McDaniel's opinion was correct; and this incident also is some evidence itself of professional, physical or mental incompetence. The subsequent incident at Convenient Health Care, where Dr. Boggi returned after being fired and refused to leave until being escorted from the premises by the Sheriff, was also substantially his own fault and could be appropriately considered by Dr. McDaniel and the Board.

Finally, the incident at the 75th Street Medical Clinic, where Dr. Boggi, after oversleeping and missing his shift, appeared on the premises, interrupted Dr. Gong's treatment of a patient, raised his voice inappropriately, grabbed documents out of Dr.

SA-113

Gong's hand, and engaged in a tussle with him during which he flung Dr. Gong off and which resulted in Dr. Gong falling back into a wall, was substantially Dr. Boggi's fault; and it was appropriate and fair for Dr. McDaniel to consider this in rendering her medical diagnosis and opinion and for the Board to consider it in making the ultimate factual findings in this case. The same comment applies to his failure to leave those premises even after the police arrived, until after the police had talked to him at length.

Although these practice situations may not have been ideal, none of them were so bad as to justify his failed communication, his violation of reasonable boundaries, and his unnecessarily loud, argumentative, abrasive, threatening and sometimes violent behavior.

B.    "... in the Practice of Medicine"

The Administrative Law Judge repeatedly discounted the evidence of Dr. Boggi's impulsive, irrational, confused and sometimes threatening behavior on the grounds that the State had not proven that this conduct was "in the practice of medicine." Proposed Dec. at pp. 48-52. Dr. Boggi's attorney repeatedly cited the decision of the Court of Special Appeals in Banks v. Board of Physician Quality Assurance, 116 Md. App. 249 (1997) as setting the standard by which Dr. Boggi's conduct must be measured.

The Banks case is not on point. The Banks case and its predecessor, McDonnell v. Commission on Medical Discipline, 301 Md. 426 (1984), dealt with another section of the law, § 14-404(a)(3), which prohibits immoral or unprofessional conduct "in the practice of medicine." (Emphasis added) The courts made it clear in those cases that they were largely concerned with the limitations imposed by those five words. Banks at 116 Md. App.

26

SA-114

262; McDonnell, at 301 Md. 437.[12]  Those five words obviously prohibit the Board from imposing its own views of morality on physicians whose conduct takes place outside of the medical context.

Dr. Boggi, however, is charged with a violation of a different section, § 14-404(a)(4), for being "professionally, physically or mentally incompetent."  This section of the law does not contain the "in the practice of medicine" limitation.  Consequently, the Board concludes that the legislature did not intend to impose the strict standard enunciated in McDonnell or Banks.  The intent of the statute in enacting subsection (4) is obviously to allow the Board to protect the public by disqualifying practitioners whose incompetence, from a professional, physical or mental standpoint, threatens the public's receipt of quality medical care.  Since the Board is not judging the morality of conduct, but the competence of medical care, the Board has been given the authority to discipline incompetence which threatens that care in any way.  If incompetence is proven and is likely to affect patient care, the Board can and must act under subsection (4).

In addition, the Board notes that the Court of Special Appeals' decision in Banks has been reversed by the Court of Appeals.  In Banks v. Board of Physician Quality Assurance, 354 Md. 59 (1999), the Court ruled a physician's immoral conduct was "in the practice of medicine" because he was on duty in a hospital, even where the immoral conduct was conducted toward a non-medical person, in a hallway, and was apparently not seen or heard by patients.  The Court affirmed the Board's conclusions that a threat to patients was

---

[12]The Court of Appeals subsequently reversed the decision of the Court of Special Appeals, in Banks v. Board of Physician Quality Assurance, 354 Md. 59 (1999), finding that the Court of Special Appeals had too narrowly defined the term "in the practice of medicine."  The effect of the new Banks decision on this case is discussed below.

27

posed by the disruption of the hospital environment in general, and that conduct which threatens the teamwork approach to health care is conduct "in the practice of medicine. " Banks, 354 Md. at 75.

In this case, of course, there is no aspect of Dr. Boggi's conduct which could be characterized as "immoral."   Dr. Boggi's conduct is caused by a combination of neurological and characterological problems.  Dr. Boggi's conduct, however, appears to pose as much of a threat if not more to the patient care environment than did the immoral conduct of Dr. Banks.  None of Dr. Boggi's impulsivity, refusals to accept boundaries, or threatening or violent behavior shown in this record was directed at a patient; but the disruption of the medical office environment was obvious, and the disruption of professional communication was severe.  Thus, even if Dr. Boggi's "professional, mental or physical incompetence," under § 14-404(a)(4) had to meet the strict standard of being "in the practice of medicine" as set out in § 14-404(a)(3) and as eludicated by the Court of Appeals in Banks, his case does meet that standard.

C.    The Americans with Disabilities Act (ADA)

There is no question but that Dr. Boggi's disruptive conduct is caused, at least in part, by Attention Deficit/Hyperactive Disorder.  He also has a Narcissistic Personality Disorder.  These problems together have caused him to engage in threatening behavior towards others, as well as a refusal to accept the normal boundaries of what is appropriate at the medical workplace in terms of speech and action.

Dr. Boggi argues that the ADA prohibits the Board from taking any action against his license based on his diagnosis of Attention Deficit/Hyperactive Disorder.  He argues

that his neurological problems have not negatively affected the essential functions of being a physician, and that he does not pose a direct threat to patients.

The Administrative Law Judge applied the ADA in a different way. The Administrative Law Judge ruled that the State had established that Dr. Boggi was mentally incompetent. But the Administrative Law Judge also ruled, at least by implication, see Proposed Dec. at 58, that the ADA requires the State to prove that Dr. Boggi would still be mentally incompetent even if "properly treated."

The Board does not agree with either of these theories. With regard to Dr. Boggi's argument, the Board concludes that if a physician is professionally, physically or mentally incompetent, that physician by definition poses a direct threat to patient care. Dr. Boggi's argument would require the Board to allow an incompetent physician to practice medicine until that incompetence actually caused harm to a patient. The Board does not believe that this is the purpose of § 14-404(a)(4), nor does the Board believe that the ADA requires the Board to allow an incompetent person to practice medicine up until the time that it is proven that he has directly harmed a patient. If Dr. Boggi's argument prevailed, the whole section of the statute dealing with incompetence would be rendered meaningless, and the Board would be unable to protect the public from demonstrably incompetent physicians until the harm had already been done. The Board does not believe that the ADA infringes that much on this State's right to protect its citizens against a situation which poses danger to the public health. See generally, Major v. Department of Professional Regulation, Board of Medicine, 531 So.2d 411 (Fla. 1988). (Board need not wait for a physician to engage in acts of gross malpractice before it acts to protect the public interest.) See also,

29

SA-117

Ramachandar v. Sobol, 838 F. Supp. 100 (S.D.N.Y., 1993) (A reasonable accommodation in the case of a mentally impaired physician is one that eliminates significant risks to patients.)

Dr. Boggi's impairments are so severe that they pose a substantial risk of patient harm. This risk poses a direct threat to patient's health.

The Board also does not agree with the approach taken by the Administrative Law Judge. The Administrative Law Judge found Dr. Boggi mentally incompetent. The Board agrees with and adopts this finding. The Board's finding is based not only on the psychiatric reports and diagnoses but on Dr. Boggi's actual performance at his last several medical jobs, his communications with the Board, and, to a lesser extent, on his functioning during a job related interview. Dr. Boggi has been treated for his condition since at least 1988, and has been continuously treated by both medication and therapy since 1995. Whether this treatment is the "proper treatment" referred to by the Administrative Law Judge or not is unclear. It is clear that this is the type of treatment which Dr. Boggi has been willing and able to obtain. This is an important fact because Dr. Boggi's recent history shows that he is mentally incompetent to practice medicine, from neurological, characterological and functional points of view, despite this treatment.

The Administrative Law Judge would place the burden on the State to show that Dr. Boggi would remain incompetent even if "properly treated," and she recommended treatment in addition to that already being obtained by Dr. Boggi.

As the disposition of this case will show, the Board has no objection to Dr. Boggi practicing medicine if he does locate and avail himself of treatment that actually works, i.e.,

30

SA-118

enables him to safely practice. It is certain, however, that the treatment which he has been receiving does not work to this extent. The Administrative Law Judge engaged in speculation that there is an as-yet-untried treatment that will "work." Her recommendation is that the Board allow Dr. Boggi to practice medicine until that treatment is obtained and begins to work. The Board believes that it would be unreasonable to require the public to bear the risk of being treated by an incompetent practitioner while Dr. Boggi searches for a more effective therapy for his problems.

The Administrative Law Judge's rationale also places an impossible evidentiary burden on the State. Under this rationale, the State would have to prove that there was no possible treatment which could remediate Dr. Boggi's problems so that he could safely practice medicine. But this is requiring the State to prove a negative, by clear and convincing evidence. To the Board's knowledge, the cases dealing with the Americans with Disabilities Act have never imposed such a burden on a State.

There is always a possibility that a future change in the treatment plan will remediate Dr. Boggi's problem. The Board will consider this factor in fashioning a disciplinary sanction in this case. It will not, however, have an effect on the Board's conclusions of law.

Dr. Boggi was also charged with unprofessional conduct in the practice of medicine, under § 14-404(a)(3) of the Act. His conduct in disrupting the work environment at three medical offices by his loud, abrasive, threatening confrontations with his medical supervisors, and his sometimes violent actions, would clearly tend to have a detrimental effect on the practice of medicine in those offices and was thus "in the practice of medicine." See Banks, 354 Md. at 75. The Board has no difficulty in finding that punching

31

SA-119

a hole in a wall, screaming at one's supervisor, grabbing a time card out of a supervisor's hand, raising one's voice in an argument after being asked to lower it because it could be heard in a patient area, appearing on the premises at inappropriate times and refusing to leave until the police have been called, and engaging in loud and abusive verbal confrontations on a repeated basis, constitute unprofessional conduct in the practice of medicine.

The Board also concludes that Dr. Boggi failed to cooperate with the Board's lawful investigation, in violation of § 14-404(a)(33) of the Act. In this regard, Dr. Boggi cannot be penalized for his refusal to see Dr. Haller for an evaluation, since the Physician's Rehabilitation Committee acquiesced to Dr. Boggi's request that he not be required to see Dr. Haller. Dr. Boggi's actions with respect to Dr. McDaniel, however, were uncooperative. When ordered by the Board to undergo an evaluation by Dr. McDaniel, Dr. Boggi refused to go. Only after he was served formal notice that he might be summarily suspended for his refusal did he actually go. He also violated Board staff's directives by repeatedly contacting Dr. McDaniel on his own prior to the evaluation. Dr. Boggi's recalcitrance required the Board initially to issue a Notice of Intent to Summarily Suspend his license based on his refusal to be evaluated, and to schedule a Board hearing on that issue; it also greatly complicated the scheduling and performance of the evaluation, and required the Board to pay for a missed three-hour appointment.

Dr. Boggi's excuses for the non-cooperation are without merit. He argues that he relied on the advice of counsel, yet he did not engage counsel, nor did he apparently fully inform the attorney of the entire situation. Dr. Boggi's "attorney's" advice with respect to

32

the evaluation was tentative, and he stated that he would "find out" a more definite answer if he were retained. Dr. Boggi did not retain this attorney nor receive any definite advice based on the full factual situation. This is an insufficient excuse for his deliberate failure to cooperate.

Dr. Boggi also argues that he did not have to cooperate with the Board's instructions not to contact Dr. McDaniel prior to the evaluation, because such an instruction "trenches" on his First Amendment rights. He cites no law for the proposition. This argument is utterly frivolous. The Board can set reasonable parameters for the conduct of a psychiatric evaluation. There was a good reason for the Board's instructions. There is no constitutional right to contact and pre-screen one's own psychiatric evaluators.

## DISPOSITION

Based on the findings of fact and conclusions of law reached by the Board, the Board by a majority of its full authorized membership, makes the following disposition of the case.

Since the State has proven by a preponderance of the evidence that the health, welfare and safety of the public imperatively required the suspension of Dr. Boggi from the practice of medicine, the Board AFFIRMS its previous decision to summarily suspend Dr. Boggi's license under COMAR 10.32.02.05 H (1). The Board disagrees with and does not adopt the Administrative Law Judge's proposed finding on this issue.

Because Dr. Boggi has been found, by clear and convincing evidence, incompetent to practice medicine under HO § 14-404(a)(4), has committed unprofessional conduct in

the practice of medicine under § 14-404(a)(3), and has failed to cooperate with the Board's investigation, under § 14-404(a)(33), the Board hereby:

ORDERS that the Respondent's license shall be SUSPENDED for one year from the date of this decision and thereafter, until Dr. Boggi obtains that treatment which enables him to practice medicine competently and safely, and until Dr. Boggi complies with the following conditions:

1. obtains current neuropsychological testing and completes a personality inventory as recommended in the report of Dr. McDaniel;

2. begins treatment no later than 30 days from the date of this Order with a psychiatrist approved by the Board who shall be provided with a copy of this Order and all supporting documentation including psychiatric reports;

3. undergoes this treatment for at least one year with the Board-approved psychiatrist;

4. is re-evaluated by Dr. McDaniel after that period of time;

5. subsequently appears before the Board's Case Resolution Conference to provide satisfactory evidence that he is competent to practice medicine safely; and

6. provides evidence satisfactory to the Board that he has become competent to practice medicine safely; and it further

ORDERS that if the Board finds that the Respondent is mentally competent to safely practice medicine, it may in its discretion, place reasonable limitations on the Respondent's practice based on any recommendations of the evaluating psychiatrists; and it further

ORDERS that the Respondent shall be responsible for all costs incurred under this Order; and it further

ORDERS that this is a Final Order of the Board of Physician Quality Assurance, and, as such, is a PUBLIC DOCUMENT.

34

SA-122

SO ORDERED, this _22nd_ day of September, 1999.

_9/22/99_
Date

Sidney B. Seidman, Chair
Board of Physician Quality Assurance

## NOTICE OF RIGHT TO APPEAL

Pursuant to Maryland Health Occupations Code Ann., § 14-408, Respondent has the right to take a direct judicial appeal. Any appeal shall be made as provided for judicial review of a final decision in the Administrative Procedure Act, State Government Article and Title 7, Chapter 200 of the Maryland Rules of Procedure.

SA-123

UNREPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1213

September Term, 2000

---

JOSEPH O. BOGGI

v.

STATE BOARD OF PHYSICIAN
QUALITY ASSURANCE

---

Davis,
Salmon,
Howe, Barbara K.
(Ret., Specially
Assigned),

JJ.

---

Opinion by Salmon, J.

---

Filed:    December 13, 2001

024C994949

The main focus of this opinion will be to determine whether the State Board of Physician Quality Assurance ("the Board") correctly applied the Americans with Disabilities Act ("ADA") when it suspended Dr. Joseph O. Boggi from medical practice for one year.

## I.    PROCEDURAL BACKGROUND[1]

In 1996, appellant, Dr. Joseph Boggi, applied for staff privileges at Holy Cross Hospital in Silver Spring, Maryland. His application was denied. Holy Cross notified the Board of its denial of privileges and the possibility that grounds for disciplinary action against Dr. Boggi might exist. See Md. Code Ann., Health Occ. ("H.O.") § 14-413 (2000 Repl. Vol.).[2] In its letter to the Board, Holy Cross said:

> On January 7, 1997, the Medical Executive Committee voted to recommend that Doctor Joseph Boggi's initial application for Medical Staff membership and clinic privileges be denied. During interviews of Doctor Boggi on November 7 and December 4, 1996, he was evasive, non-responsive, and failed to give direct answers to questions; also, his thought appeared to be disorganized and lacked apparent focus. In addition, he failed to complete his application in a timely and organized manner, and he failed to respond to inquiries from the Medical Staff Office, indicating that he is unlikely to perform

---

[1] A substantial portion of the Procedural Background section of this Opinion has been taken, without direct attribution, from the trial judge's opinion.

[2] Section 14-413(a)(1)(ii) of the Health Occupations article requires hospitals and other related institutions to report the denial of medical staff membership to the Board if that denial is for reasons that might be grounds for disciplinary action under Section 14-404 of the same article.

principal aspects of his job in a timely and effective manner.
Moreover, the Medical Executive Committee believes that he
apparently has difficulty interacting with physicians and staff
based on his interviews and the fact that he appears to have had
difficulty with almost all of his postgraduate professional
activities.

As a result of Holy Cross's action, the Board required Dr.
Boggi to undergo a psychiatric examination. He refused to be
examined, and as a consequence, the Board issued a show cause order
requiring him to explain why his license should not be summarily
suspended. Dr. Boggi then agreed to submit to an examination
whereupon the Board withdrew the show cause order. Later, after
receipt of the report of the psychiatric examination, the Board
issued an order requiring Dr. Boggi to show cause why he should not
be summarily suspended for being medically incompetent to practice
medicine.

On June 24, 1998, a hearing was held by the Board concerning
the show cause order. Later, it issued an "Amended Order for
Summary Suspension of License to Practice Medicine." The
suspension was made under the authority granted to the Board by
section 10-226(c) of the State Government article of the Maryland
Code. Dr. Boggi appealed the Board's suspension to the Office of
Administrative Hearings ("OAH").

In a separate matter, the Board, on August 17, 1998, filed
three charges against Dr. Boggi, alleging that (1) he was guilty of
immoral or unprofessional conduct in the practice of medicine; 2)
he was professionally, physically, or mentally incompetent to

2

practice medicine; and 3) he had failed to cooperate with a lawful
investigation conducted by the Board.

The case involving the suspension and the one relating to the
three charges lodged by the Board were consolidated. Thereafter,
an eight-day hearing took place before Administrative Law Judge
("ALJ") Ann C. Kehinde. On January 28, 1999, the ALJ issued a
proposed decision in which she concluded:

1. The Board has not proven Dr. Boggi guilty
of immoral or unprofessional conduct in
the practice of medicine;

2. The Board has proven that Dr. Boggi
presently was mentally incompetent to
practice medicine due to his Attention
Deficit Hyperactive Disorder and needs
treatment, medication, and monitoring for
that condition;

3. The Board has proven that Dr. Boggi
initially failed to cooperate with the
lawful investigation by the Board;

4. Dr. Boggi's license to practice medicine
ought not be revoked.

At the time of the ALJ's decision, Dr. Boggi was undergoing
psychiatric treatment. The ALJ recommended supervision of the
psychiatric treatment and monitoring of Dr. Boggi's practice. Both
Dr. Boggi and the State filed exceptions to the proposed decision.
The exceptions hearing took place before the Board on April 24,
1999. The Board issued a final order on September 22, 1999,
finding: (1) Dr. Boggi was guilty of unprofessional conduct in the
practice of medicine; (2) he was presently mentally incompetent to
practice medicine; and (3) he failed to cooperate with the Board's

3

lawful investigation.  The Board suspended Dr. Boggi's medical license for one year and imposed conditions for reinstatement.

Dr. Boggi filed a petition for judicial review in the Circuit Court for Baltimore City. Following a non-evidentiary hearing, the circuit court issued an order, dated June 15, 2000, affirming the Board's decision.

Dr. Boggi filed a timely appeal to this Court and raises three questions:

> I. Did the Circuit Court, unlike the Board, err in failing to consider Dr. Boggi's defenses against the Board's actions under the Americans with Disabilities Act and Maryland's policies forbidding discrimination against the disabled?

> II. Did the Circuit Court fail to apply the correct relevance criteria or standards of review to the facts, with the result that it affirmed factfinding which was irrelevant and/or could not be sustained upon a proper standard of review?

> III. Did the Board and the Circuit Court err in failing to consider and honor Dr. Boggi's First Amendment and *ultra vires* defenses to charges that he failed to cooperate with a lawful investigation?

## II.   FACTS DEVELOPED AT THE HEARING BEFORE THE ALJ[1]

In 1983, Dr. Boggi obtained an osteopathy degree[4] from the University of Osteopathic Medicine and Surgery in Des Moines, Iowa.

---

[1]The ALJ received 124 exhibits and heard testimony from fifteen witnesses.

[4]Osteopathy is a system of medicine based on the theory that disturbances in the musculoskeletal system affect other bodily parts, causing disorders that can be treated by manipulative techniques in conjunction with conventional therapeutic procedures. *American Heritage College Dictionary* 967 (3d ed. 1997).

4

He joined the United States Army and served his residency in internal medicine at Walter Reed Army Medical Center ("Walter Reed") in Washington, D. C., from 1985 until 1988. In 1988, Dr. Boggi received his board certification in internal medicine. This was also the year that he was diagnosed with Attention-Deficit/Hyperactivity Disorder ("ADHD") by the Chief of the Department of Psychiatry at Walter Reed. ADHD causes interference with appropriate social, academic, and/or occupational functioning. The essential feature of this disorder is a persistent pattern of inattention and hyperactivity-impulsivity. Individuals diagnosed with this disorder often have difficulty sustaining attention to tasks, maintaining coherent conversations, and listening to others. The hyperactivity aspect may be manifested by feelings of restlessness and difficulty engaging in quiet sedentary activities. The impulsivity aspect often manifests itself by impatience, difficulty in delaying responses, and engagement in activities without consideration of possible consequences. *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 85-86 (4th ed. 2000) (hereinafter "DSM-IV-TR").

To treat his condition, Dr. Boggi began taking methylphenidate (a drug that acts as a mild stimulant of the central nervous system), to which he had a good response. Later, he was also prescribed Paxil, Trazadone, and Depakote. Paxil and Trazadone are antidepressants; Depakote is a mood stabilizer.

Dr. Boggi remained in the Army and in 1991 was transferred to Kimbrough Army Community Hospital ("Kimbrough"), Fort Meade,

5

Maryland. He served for a time at Kimbrough as chief of internal
medicine. In June 1992, he was returning from an emergency call at
the hospital when he was stopped by the military police ("MP") for
speeding. After receiving a speeding citation, he left the scene
before the MPs were ready for him to go. In Dr. Boggi's words,
"[The MPs] said that I fled. . . . [T]echnically they're correct,
but I had gotten my ticket and it was time for me to go." As Dr.
Boggi was leaving the scene, he hit an MP with the door of his
vehicle. Dr. Boggi explained this by saying that the MP was
"standing there, I [was] upset, close[d] the door and hit him with
it, not on purpose." Moments later, he was, again, stopped by the
MPs and was charged with fleeing and eluding. As a consequence of
this incident, Dr. Boggi's privileges at Kimbrough were suspended
and he was required to undergo psychiatric evaluation and
treatment.

Dr. Boggi was evaluated by Dr. Andrew Gergely, who concluded
in 1992 that his patient had a sense of entitlement and inflated
self-worth. His diagnosis was of Attention Deficit Disorder
("ADD"), adult residual type.[5] ADD is an "umbrella" disorder under
which ADHD falls. It is characterized by a persistent pattern of
inattention, but without the pattern of hyperactivity-impulsivity
that typifies ADHD. In Dr. Gergely's opinion, Dr. Boggi also was
afflicted with Narcissistic Personality Disorder traits. In June

_____

[5] In 1992, Dr. Boggi was also evaluated by Dr. Harry E. Gwirtsman and diagnosed
with ADD, residual type. Also, in that time frame, he was treated by Dr. Ronald J.
Koshes from 1991-1992, and in October 1992, Dr. Koshes diagnosed him as having an
Adjustment Disorder with mixed emotional features and ADHD, moderate residual type.

6

1993, the Army reinstated Dr. Boggi's medical privileges. He was honorably discharged from the U.S. Army in January 1994.

### A. Post-Discharge Employment History

From April 1, 1994, until June 12, 1994, Dr. Boggi worked for an organization called Convenient Health Care under Roger Halterman, M.D., in Damascus, Maryland. Dr. Halterman fired Dr. Boggi because Dr. Boggi "was not an independent worker and his quality was not good."

In October 1994, Dr. Boggi began employment at Convenient Health Care, an urgent care center in Waldorf, Maryland. He remained there until January 1995. Dr. Boggi exhibited good clinic skills during his time with the clinic,[4] and there were no complaints from patients. In fact, many patients specifically asked to be treated by him. From January to June 1995, Dr. Boggi

---

[4]John Redding, an X-ray technologist who worked at Convenient Health Care while Dr. Boggi was employed there, testified:

> [Dr. Boggi] was concerned with finding out what was wrong with the patient. He allowed the patient to give him information that would help with the patient's treatment. You know, he was receptive to what the patient had to say. And then, he treated the patient according to what he believed was the problem and the best medical advice he could give them.

> * * *

> He was very informative. He would tell [the patients] exactly what they needed to do . . . . whatever would make it better. He would pretty much fill them in. If it was basically keep your foot up or something like that, he basically just gave them more than enough information, as far as I'm concerned, to take care of the problem.

When asked about Dr. Boggi's communication skills, Mr. Redding replied:

> Like I said, the only complaint I ever heard was that he wasn't as nice as somebody else was or something like that. He didn't coat it with sugar; he basically just said, "I want this done," and he expected it to be done. He was never aggressive towards any of the other staff, nothing like that.

7

worked for Dr. Thomas Dooley, who owned a private internal medicine practice in Olney, Maryland. A number of problems existed within Dr. Dooley's office, resulting in a tense office atmosphere. Problems included frequent disagreements between Dr. Dooley and his wife, who was office manager.[7]    Dr. Boggi had frequent disagreements with Dr. Dooley, which occasionally escalated into verbal altercations. These arguments, however, did not take place in areas where patients were allowed.

Dr. Dooley testified that there were two incidents in which Dr. Boggi had acted unprofessionally. The first involved a patient who was admitted to Shady Grove Hospital. Dr. Boggi failed to notify him of the admission. As a consequence of this omission, Dr. Dooley never followed up on this patient.

Dr. Boggi contradicted that testimony, and his testimony was believed by the ALJ. According to Dr. Boggi, he informed Dr. Dooley of the patient's admission by a note that he placed where Dr. Dooley's phone messages were usually kept.[8]

The second incident involved a patient named James A., who was being treated by Dr. Boggi at Montgomery General Hospital. James

---

[7] Mary Ellen Bowen, a transcriptionist formerly employed by Dr. Dooley, testified that the tense atmosphere created by Dr. Dooley and his wife made it difficult to encourage associates to stay with the practice. She further testified that Dr. Dooley's office was poorly organized and that his wife was "very territorial," resenting anyone but her deciding how the office should be run. Ms. Bowen said that Dr. Boggi had attempted to organize the office records but was met with intense resistance from Mrs. Dooley. She further testified that Dr. Dooley had a bad temper. For example, he became so angry that on one occasion he broke a light switch and filing cabinet with a crowbar.

[8] The ALJ made a demeanor based determination that there was no clear and convincing evidence that Dr. Boggi was responsible for Dr. Dooley being uninformed of the patient's admission. The ALJ explained: "Ms. Bowen's credible testimony cast considerable doubt on Dr. Dooley's first allegation that [Dr. Boggi] did not inform him of the admission of a patient."

8

A. suffered from kidney failure, which required all of his nutrition to be administered intravenously. On June 20, 1995, Dr. Boggi failed to make rounds at Montgomery General Hospital and, as a consequence, failed to see James A. Dr. Boggi testified that he had failed to attend to James A. because he had been told that James A. had been transferred to Walter Reed. As a result of Dr. Boggi's failure to make rounds on June 20, he did not order necessary intravenous feeding.

Dr. Dooley testified that, although Dr. Boggi was initially unaware that James A. had not been transferred, he was "sure" that the hospital, later that day, made Dr. Boggi aware that James A. was still at the hospital because Montgomery General sent Dr. Boggi a fax concerning an order for the treatment of James A. According to Dr. Dooley, Dr. Boggi filled out an order for "parenteral nutrition"[9] but never sent it back to the hospital. Dr. Dooley further testified that he was at Montgomery General "once or twice" on June 20 and the nurses asked him to write the nutritional orders for James A. He declined, saying that James A. was "on Dr. Boggi's service" and that Dr. Boggi would do it. By 11:00 p.m., however, when Dr. Boggi still had failed to write the order, it was written by Dr. Dooley.[10]

---

[9] Parenteral means "taking into the body or administered in a manner other than through the digestive tract, as by intravenous injection." American Heritage College Dictionary 992 (3d ed. 1997).

[10] He also wrote an order for "either a serum calcium with or without albumin or ionized calciums," which Dr. Boggi refers to in his testimony discussed, infra.

9

Dr. Dooley sent a letter to Dr. Boggi concerning the latter's failure to attend to James A.    Dr. Boggi was angered by the contents of the letter.  Dr. Dooley testified that on June 26, 1999, when the letter was received, Dr. Boggi screamed Dr. Dooley's name, ran down the hallway to his office, grabbed the phone from his hand, "screamed at an insurance representative" to whom Dr. Dooley was speaking, and either hung up the phone or handed the phone to Dr. Dooley - he could not remember which.    Upon recommendation of his attorney, Dr. Dooley fired Dr. Boggi after this last mentioned incident.

Dr. Boggi's version of events differed from that of Dr. Dooley, as to his treatment of James A. and his reaction to Dr. Dooley's letter.  He testified that he discharged James A. to Walter Reed after speaking with a senior resident at Walter Reed who said there was an open bed at that hospital.  Later on that day, Dr. Boggi heard back from someone at Montgomery General Hospital that James A. was still there, but he was told that James A. was still going to be sent to Walter Reed.  Dr. Boggi did not go to the hospital at that point because "I was in the middle of patients and so [I did not] go over, and I was told he was gone." Dr. Boggi further testified that because Dr. Dooley was on call that night [the night of June 20, 1995] at Montgomery General, it "was [Dr. Dooley's] duty to cover anything," including "any work" that had to be done on James A. in the event that James A. had not yet been transferred.

10

Dr. Boggi conceded that he was "immediately upset" when he received Dr. Dooley's letter on June 26. He testified:

> For the first time, [Dr. Dooley] was questioning my medical abilities. This was the first time he did it. And, you know, there's certain things that make me upset. I was angry and I was in an angry mood. He was on the phone and he turned the phone toward me so - I didn't know who was on the other side - so he could have a witness, and it was apparent he was kind of being passive aggressive to the whole thing, and I left.

Dr. Boggi emphatically denied that he either yelled into the telephone or hung up the phone.[11]

After being fired by Dr. Dooley, Dr. Boggi went back to work at Convenient Health Care in July 1995. On December 24, 1996, while still at Convenient Health Care, Dr. Boggi became upset with his supervisor, Dr. Stephen Wiggins, because Dr. Wiggins did not assign him the additional work hours he had requested. Dr. Boggi located an area where no one else was present and, in anger, struck the wall outside an x-ray developing room, leaving a dent in the wall. No one saw him hit the wall, but Dr. Wiggins heard the noise and approached Dr. Boggi, at which time the latter immediately apologized and promised to repair the damage. Dr. Wiggins fired him on the spot, but Dr. Boggi would not leave the clinic. Dr. Wiggins then consulted with his partner and decided to let Dr. Boggi work through the end of the year. He once again fired Dr.

---

[11]After describing Dr. Boggi's response to the allegation by Dr. Dooley that he either yelled into the telephone or hung up the telephone on the insurance representative, the ALJ stated: "I find [Dr. Boggi's] testimony on this issue to be credible both in light of Ms. Bowen's testimony regarding Dr. Dooley's demeanor and due to the fact that [Dr. Boggi] has admitted to other events that do not portray him in the best light."

11

Boggi on December 31, 1996. Despite being fired, Dr. Boggi
returned to work when the clinic opened for business after the New
Year's break. In response to Dr. Boggi's unwanted return, Dr.
Wiggins called the police. Once the police arrived, Dr. Boggi
collected his belongings and left.

Dr. Boggi was employed, without incident, as Medical Director
for the "Med Rehab Clinic" in Lanham, Maryland, from November 1996
until January 1998.

In April 1998, Dr. Boggi contracted to work as a summer
physician for Dr. Victor Gong at the 75th Medical Clinic in Ocean
City, Maryland. Several days after he began working, he overslept
and missed his shift. Later, on the same day, Dr. Boggi went to
the clinic to see Dr. Gong to finalize negotiations on issues
remaining open in his employment contract. What started as a civil
conversation escalated into a loud argument. Ms. Loselle Savage,
the office manager, testified that because there were patients near
her office, and due to the loud tone of his voice, it was
necessary, on several occasions, for her to go upstairs to ask Dr.
Boggi to keep his voice down and maintain a professional demeanor.
At one point during the argument, Dr. Gong took Dr. Boggi's time
card out of his hand. Dr. Boggi grabbed the time card back,
whereupon Dr. Gong grabbed both of Dr. Boggi's arms. Dr. Boggi
told Dr. Gong to remove his arms. When he didn't, Dr. Boggi
testified that he "growled and flung him off." Dr. Gong fell back
into a wall. Dr. Boggi was then fired, and the police were called
to escort him from the premises.

### B. Psychiatric Evaluations

Following Holy Cross Hospital's January 7, 1997, denial of staff privileges, the Board recommended that the Physician Rehabilitation Committee ("PRC") evaluate Dr. Boggi. The PRC met with Dr. Boggi on January 13, 1998, and recommended that he be referred to Dr. Lee Haller for evaluation.

Dr. Boggi contacted Dr. Haller to inquire about the latter's knowledge of Adult ADD. Apparently dissatisfied with the amount of information Dr. Haller possessed, Dr. Boggi requested that he be allowed to see another doctor for the evaluation. The PRC agreed. Dr. Boggi then chose Dr. Charles H. Troshinsky, who performed an evaluation on February 17, 1998. Dr. Troshinsky's evaluation was as follows:

> Today, at his request, I evaluated Dr. Boggi from a psychiatric perspective. He informs me that as a result of being denied privileges at Holy Cross Hospital in Silver Spring, Maryland he is being requested by your program to present information regarding his ability to perform as a physician.
>
> He told me that he was turned down because of 3 deficiencies.
>
> 1.  Lack of competency in hospital practice as he had not practiced in an inpatient setting for some time.
> 2.  Problems with interpersonal relations.
> 3.  Poor presentation at his interviews.
>
> His history is significant in that he suffers from Attention Deficit Disorder which could explain items 2 & 3. However, when he takes his medication, Ritalin 10mg 3 times a day, his symptoms of irritability, impulsivity and lack of organization are significantly alleviated.

13

Another handicap is his speech. He is not as
fluent as he should be. As a result, he can
appear to be not as intelligent as he is.
This symptom probably contributed to his poor
showing at the interviews. Ritalin helps to
allow him to speak more slowly and fluently.

He also takes Paxil 30 mg daily to help with
his mood and anxiety. His family history
reveals significant mood disorders. Both his
Ritalin and Paxil are being prescribed and
monitored by his psychiatrist.

Except for the neurologic handicaps mentioned
above, the psychiatric evaluation revealed no
psychopathology.

Of course, I have no way of determining his
competency as an internist.

After the Board was informed of the results of Dr.
Troshinsky's evaluation, it notified Dr. Boggi by letter, dated
April 15, 1998, that he was to appear for another psychiatric
examination to be conducted by Dr. Ellen McDaniel on April 27,
1998. The letter said that he should contact the Board if he had
any questions about the examination and that he could send a fax to
Dr. McDaniel if he needed directions to her office.

After receiving notice of the appointment with Dr. McDaniel,
Dr. Boggi contacted Keith Rosenberg, an attorney who had once
represented Dr. Boggi in another matter. Because he was not
retained by Dr. Boggi and did not research the issue, the attorney
told the doctor that his advice was only tentative. His tentative
advice was that Dr. Boggi should not submit to an exam by Dr.
McDaniel because he had already been examined by a psychiatrist
(Dr. Troshinsky) with "positive" results. Dr. Boggi accepted this

14

advice, and without bothering to notify either Dr. McDaniel or the Board, he simply failed to show up for his April 27 appointment.

Dr. Boggi received a show cause order as a consequence of his failure to appear. Later, he re-thought his position and agreed to be examined. The examination was reset for June 1998. Despite being told by Board staff members not to contact Dr. McDaniel, Dr. Boggi called the doctor on May 18, 1998, and left a message with her answering service indicating that he wanted to discuss ADD with her. The call was not returned. The Board next instructed Dr. Boggi, in a letter dated May 29, 1998, not to contact Dr. McDaniel prior to the evaluation. Immediately after receipt of the letter, Dr. Boggi disobeyed the Board's instruction by faxing Dr. McDaniel a list of questions that he wanted her to answer together with twenty-one pages of psychiatric reports he wanted her to consider. On June 17, 1998, Dr. Boggi met with Dr. McDaniel for his evaluation.

In a report to the Board dated July 13, 1998, Dr. McDaniel described what happened after the interview:

> After Dr. Boggi left my office at the conclusion of the interview, I began a session with a patient. Dr. Boggi then returned to the office, banged loudly on my closed (and fortunately locked) office door, and said in an agitated voice that he has to tell me something. I would not let him into the office and told him to fax me anything he had to say (as a way to end the interruption as quickly as possible.) Dr. Boggi sent me a fax within the hour in which he justified his behavior with Dr. Gong and stated he was suing Dr. Gong.

15

Dr. McDaniel concluded that Dr. Boggi met the criteria for ADHD and that he also had what could best be described as Narcissistic Personality Disorder, which is a disorder characterized by a pervasive pattern of excessive emotionality and attention seeking, beginning by early adulthood and present in a variety of contexts, as indicated by five (or more) of the following:

1. feeling discomfort in situations in which he or she is not the center of attention;
2. interaction with others is often characterized by inappropriate sexually seductive or provocative behavior;
3. displaying rapidly shifting and shallow expression of emotions;
4. consistently using physical appearance to draw attention to self;
5. having a style of speech that is excessively impressionistic and lacking in detail;
6. showing self-dramatization, theatricality, and exaggerated expression of emotion;
7. being suggestible;
8. considering relationships to be more intimate than they actually are.

DSM-IV-TR at 714.

In her report to the Board, Dr. McDaniel said:

Dating as least as far back as 1992, Dr. Boggi has a documented pattern of behavior that physically threatens other people and this maladaptive behavior pattern ultimately led to his current professional difficulties. He also has personality traits that impair his ability to practice in a competent fashion: e.g. abrasive interpersonal interactions, lack of empathy, inability to learn from past experience, a sense of entitlement, lack of reliability, communication problems, emotional lability. Because of the continuing presence of these problems, I recommend that Dr. Boggi cease practicing medicine until his personality and behavioral problems are

16

>addressed and modified. I am skeptical that sufficient modifications are possible to the degree that would permit Dr. Boggi to practice medicine in the future.
>
>I strongly recommend neuropsychological testing (along with a personality inventory) for Dr. Boggi. He is bright and motivated. He attributes all of his difficulties to ADD and the deficiencies in others with whom he has worked. In my opinion, he would benefit if he and his treating doctors have a comprehensive understanding of all of his cognitive and emotional his [sic] difficulties. The contribution of problems in addition to ADD should be considered.

When asked during the hearing before the ALJ whether Dr. Boggi's psychiatric difficulties had affected his medical practice, Dr. McDaniel testified, "I don't know of any instance reported to me where direct harm to a patient was documented. But he certainly has had, as I've described, ongoing problems in the practice of medicine because of these mental problems." She added, "[B]ased on the severity of his behavioral problems, [Dr. Boggi] was not mentally competent to practice medicine until he could get those difficulties under better control."

Drs. Ronald J. Koshes and Ronald L. Harmon were offered as experts in psychiatry by Dr. Boggi. Dr. Harmon also testified as an expert in ADD.

Dr. Koshes was Dr. Boggi's treating psychiatrist from October 1992 until 1993 and then again from June 1995 to the present. While Dr. Koshes agreed with Dr. McDaniel's conclusion that Dr. Boggi suffers from ADHD, he did not agree that his patient suffered from Narcissistic Personality Disorder ("NPD"). While he acknowledged that Dr. Boggi may have narcissistic traits, he opined

17

that those traits should not be diagnosed as a personality disorder when, as in Dr. Boggi's case, it was not demonstrated that the individual is limited to that pattern of behavior and interaction in all interpersonal social settings.

Dr. Koshes testified that Dr. McDaniel's reference to communication problems being consistent with the diagnosis of NPD was inappropriate because the problems are actually consistent with ADHD. In support of his conclusions, Dr. Koshes said that the Diagnostic and Statistical Manual of Mental Disorders specifically states that an Axis I diagnosis (e.g., NPD) is not made if other Axis II symptoms and behaviors are explained by an Axis I diagnosis (e.g., ADHD).

When Dr. Koshes was asked his opinion concerning whether Dr. Boggi posed a threat of future violence toward any person in the practice of medicine, he testified that Dr. Boggi does not meet the criteria for the potential of violence. He continued:

> Do I believe that [Dr. Boggi] will in the future slam his hand on a desk and say a swear word when something frustrates him? Yes, with certainty, because he's had a past history of doing that – as all of us have. Do I believe that he will put someone in the hospital with broken bones as a result of his attention deficit disorder? No way.

Dr. Harmon evaluated Dr. Boggi on three different occasions. The first took place on May 26, 1998. His findings concerning Dr. Boggi's narcissistic traits and other psychiatric problems were consistent with those of Dr. Koshes.

18

### C.  Contact with the Board

Over the course of the Board's investigation, Dr. Boggi sent many facsimiles and made phone calls to Board staff members and also visited the Board's offices on several occasions.  During the telephone calls and visits, Dr. Boggi exhibited a wide range of emotions, appeared unfocused, and often alternated his voice volume between a low whisper and a loud bellow.

One letter, dated April 29, 1998, faxed to the Board's Executive Director, was almost completely irrational, *viz*:

> The last time I was seen at your office I had to trick one of your staff.  How do you do that?  One causes confusion by going four or five steps down an argument.
>
> You are smarter and so I am going to just come up there.
>
> I am the one with the red in his eyes and a dark grey suit.  You can send out the others to check me out.  I will be sitting there a bit hunched over, looking as if I am, in the distance.  Occasionally I will sigh a bit and shrug my shoulders to give a more relaxed impression.  Other than that you will see that I am in good shape with a fine heart and strong eyes.
>
> That is how I looked last time.  Quite a few people came by before they considered approaching me.

Approximately one-and-a-half hours after sending the first fax, Dr. Boggi sent an identical one, save for a change of the first sentence.  The new first sentence read: "The last time I was seen at your office only because I tricked one of your staff."

On April 30, 1998, Dr. Boggi faxed another letter to the Executive Director discussing his third visit to the Board's

19

offices and his perceived treatment by the staff. The letter was,

at a minimum, peculiar:

> I went up there to find out how my life was
> going. After repeated lecturing I was forced
> to ask permission to leave. At first, I am
> told that I have to be spoken to in the
> parking lot and then I am held captive to a
> repeated berating.
>
>     . . . The rules now say this is my last
> direct communication with you.
> You should have seem [sic] them saying, well
> now you ran to a lawyer. I want an apology.

When questioned at the hearing as to why he sent these faxes,

Dr. Boggi responded: "I was creating confusion. The first [rule

of] warfare is to create confusion." He continued, "[A]s you can

see by the fact that I sent [the April 29 fax] twice, it was

purposeful. When you get something that's confusing you say, gee,

I better talk to this guy. So, I wanted to talk to them."


### III.  THE ALJ'S PROPOSED DECISION

The ALJ ruled that the State had the burden of proving the

necessity for summary suspension of Dr. Boggi's medical license by

clear and convincing evidence.[12]  She then summarized the expert

testimony of Drs. McDaniel, Koshes, and Harmon.

---

[12]As already mentioned, the ALJ consolidated the hearing on summary
suspension with the hearing on the Board's charges. The parties disagreed as to
the proper standard of proof required when considering whether to suspend Dr.
Boggi's license. The ALJ noted that the standard of proof in a proceeding before
the Board is by preponderance of the evidence, COMAR 10.32.02.05F(2); however,
the regulations are silent regarding the standard of proof in an evidentiary
hearing before an ALJ. Weighing the administrative burden on the Board and the
risk of error from using a preponderance standard, the ALJ concluded that due to
the "serious consequences" to Dr. Boggi resulting from summary suspension of his
medical license, the proper standard of proof in the hearing is the clear and
convincing evidence standard.

20

In assessing the weight to be given to the differing opinions, the ALJ stated:

> Although one could argue that Dr. Koshes' opinion should be given more weight as the treating physician, the argument to the contrary is that Dr. Koshes' testimony may have been influenced by his desire to preserve the rapport that has been established in the psychiatrist-patient relationship. The weight that can be attached to each doctor's opinion can not be based on simply how long the doctor has known [Dr. Boggi], or even on whether the doctor was qualified as an expert in ADD, but must be based on how the doctor explained the basis for his/her conclusion.

The ALJ attached greater weight to the opinions of Drs. Koshes and Harmon than that of Dr. McDaniel, because, in her view, they explained their reasons "for their conclusions that [Dr. Boggi] has ADD and certain personality traits (as opposed to NPD) as a result of coping with ADD." Conversely, Dr. McDaniel made generalizations concerning her diagnosis of Dr. Boggi, and "she did not specifically explain _how_ or _why_ she arrived at [her] conclusion[s]."

The ALJ, of course, had the opportunity to observe Dr. Boggi throughout the eight-day hearing and his behavior while testifying on three of those days. She noted that, although Dr. Boggi may have been on his best behavior during the hearing, she did not believe that he would have been able to conceal his true pattern of behavior through an eight-day hearing if he truly suffered from NPD.[13]

---

[13]The ALJ's determination that Dr. Boggi does not suffer from NPD was a derivative inference. Her inference stemmed from her review of all prior
(continued...)

21

After recounting Dr. Boggi's employment history, specifically his time at Covenant Health Care, Dr. Dooley's office, and the 75th Street Medical Clinic, the ALJ concluded that, although Dr. Boggi experienced difficulties while employed at those jobs, the difficulties did not involve his clinical or technical skills as a doctor. Rather, the problems involved interpersonal difficulties he had with his employers - interpersonal difficulties that may be explained by his ADHD. The ALJ found that the "evidence presented by the Board, vis-à-vis [Dr. Boggi's] work history, does not demonstrate clear[ly] and convincingly that patients were adversely affected as a result of [Dr. Boggi's] altercations with his employers." Accordingly, the ALJ concluded that there was nothing in Dr. Boggi's psychiatric or employment history that necessitated a summary suspension of his license to protect the public's health, welfare, and safety. See H.O. § 10-226(c).

The ALJ also concluded that the Board did not prove by clear and convincing evidence that Dr. Boggi was guilty of immoral or unprofessional conduct in the practice of medicine as prohibited by H.O. section 14-404(a)(3) and that, even if Dr. Boggi was guilty of unprofessional conduct in various instances, there had been no showing that his misconduct was "in the practice of medicine."

---

[1][...continued]
psychiatric evaluations of Dr. Boggi and the explanatory nature of the testimony of Drs. Koshes and Harmon. In regards to her observations of Dr. Boggi throughout the eight-day hearing, the ALJ said: "Although I do not purport to have any psychiatric training, my observations of [Dr. Boggi's] demeanor while testifying and participating in the hearing process is consistent with Doctors Koshes and Harmon's opinion that [he] is not grandiose, nor does he have trouble accepting constructive criticism or have a sense of entitlement."

22

The ALJ did find, however, that unless his ADHD disorder is adequately treated, Dr. Boggi is mentally incompetent to practice medicine within the meaning of H.O. section 14-404(a)(4). She based this conclusion on Dr. Boggi's "impaired expressive communication" abilities, which affect his mental competency to practice medicine. Although the ALJ found Dr. Boggi mentally incompetent to practice medicine, she did not recommend that his license should be suspended because the Board failed to prove that Dr. Boggi would remain mentally incompetent after proper treatment.

The ALJ agreed with Dr. Boggi's argument that ADHD is considered a disability within the meaning of Title II of the Americans with Disabilities Act ("ADA"),[14] 42 U.S.C. § 12132 (1994), and that the ADA applied to Dr. Boggi's case. The ALJ concluded that the ADA statute, when read in conjunction with Board of Physician Quality Assurance v. Banks, 354 Md. 59 (1999),[15] required the State to prove a nexus between Dr. Boggi's mental incompetence (based on his disability) and the practice of medicine.

With respect to the investigation conducted by the Board, the ALJ found that although Dr. Boggi initially failed to comply with the

---

[14] The ADA is a federal anti-discrimination statute designed to "assure[] that truly disabled, but genuinely capable, individuals will not face discrimination in employment because of stereotypes about the insurmountability of their handicaps." Halperin v. Abacus Tech. Corp., 128 F.3d 191, 200 (D. Md. 1997) (quoting Forrisi v. Bowen, 794 F.2d 931, 934 (4th Cir. 1986)).

[15] In Banks, the Court of Appeals interpreted the phrase "in the practice of medicine" as it is used in H.O. section 14-404(a)(3) (providing that the Board may revoke or suspend a license if the licensee is "guilty of immoral or unprofessional conduct in the practice of medicine"). The Court concluded that because the physician was on duty at the hospital and present in the working areas of the hospital when the unprofessional conduct occurred, he was sufficiently "in the practice of medicine" for purposes of 14-404(a)(3). Banks, 354 Md. at 72-73.

23

Board's directive to undergo a second psychiatric evaluation, his refusal was mitigated by his eventual compliance and his reliance upon advice of counsel.

### IV. BOARD'S OPINION AND ORDER

On September 24, 1999, the Board issued its final order, suspending Dr. Boggi's license for one year and thereafter until such time as he obtains treatment rendering him capable of practicing medicine competently and safely. Dr. Boggi's reinstatement is conditioned on his:

1. obtaining current neuropsychological testing and completing a personality inventory as recommended in Dr. McDaniel's report;

2. beginning treatment no later than 30 days from the date of this Order with a psychiatrist approved by the Board, who is provided with a copy of this Order and all supporting documentation;

3. undergoing treatment for at least one year with the Board-approved psychiatrist;

4. being re-evaluated by Dr. McDaniel after one year;

5. subsequently appearing before the Board's Case Resolution Conference to provide satisfactory evidence that he is competent to practice medicine safely; and

6. providing evidence satisfactory to the Board that he has become competent to practice medicine safely.

The Board accepted Dr. Dooley's testimony concerning the James A. incident and found that, on one occasion, Dr. Boggi "failed to make rounds, failed to order crucially necessary parenteral

24

nutrition for a hospitalized patient, and did not communicate this to Dr. Dooley." The ALJ made no finding in this regard. The Board also accepted Dr. Dooley's testimony that, upon receipt of a letter criticizing his handling of the matter, Dr. Boggi stormed into Dr. Dooley's office, yelling angrily, while Dr. Dooley was on the phone. The Board found that Dr. Boggi then screamed at Dr. Dooley and grabbed the phone out of his hand. The Board stated: "Dr. Dooley's testimony on this issue is much more credible than Dr. Boggi's conclusory denial." This last mentioned finding rejected the ALJ's demeanor-based determination that Dr. Boggi neither yelled into the telephone nor hung it up. See supra note 11.

The Board also gave more weight to Dr. McDaniel's opinion than it did to Dr. Koshes's. It did so, in part, because Dr. McDaniel was an independent evaluator, whereas Dr. Koshes knew Dr. Boggi as both a colleague and a patient. The Board also credited Dr. McDaniel with having greater information than Dr. Koshes on which to base her opinion about Dr. Boggi.[16] The Board similarly placed more weight on Dr. McDaniel's opinion than it did on Dr. Harmon's, primarily because Dr. Harmon did not have all of the documents to which Dr. McDaniel had access and because his testimony was "unusually vague."

Lastly, in contrast to the ALJ's determination, the Board concluded that the standard of proof required in a summary

---

[16]Prior to her meeting with Dr. Boggi, Dr. McDaniel reviewed psychiatric evaluations of Dr. Boggi dating back to 1992, various communications between Dr. Boggi and the Board, written material related to Dr. Boggi's application for privileges at Holy Cross Hospital, and written material related to his employment at Convenient Health Care, at Dr. Dooley's office, and at 75th Street Medical.

25

suspension hearing is by a preponderance of the evidence.
Nonetheless, even if it were to apply the higher burden of proof,
the Board found that it was shown by clear and convincing evidence
that the health, welfare, and safety of the public imperatively
required the Board to suspend Dr. Boggi's license.

### A.    Section 14-404(a)(4):   "Professionally, Physically or Mentally Incompetent"

The Board agreed with the ALJ to the extent that the ALJ
determined that Dr. Boggi's condition rendered him mentally
incompetent to practice medicine under H.O. section 14-404(a)(4).
It based this determination on the circumstances surrounding Dr.
Boggi's termination from three places of employment and on Dr.
McDaniel's opinion.  The Board disagreed with the ALJ's view that
it should be required to prove that Dr. Boggi would still be
incompetent to practice medicine if properly treated and noted that
the treatment Dr. Boggi had been receiving thus far had not been
effective.  With respect to the ADA, the Board concluded that the
Act does not require the Board "to allow an incompetent person to
practice medicine up until the time that it is proven that he has
directly harmed a patient."   The Board viewed Dr. Boggi's
impairments as so severe as to pose a direct threat to patient
health.   In light of this, it determined that a suspension was
warranted.

26

### B.   Section 14-404(a)(3):   Guilty of Unprofessional Conduct in the Practice of Medicine

The Board determined that Dr. Boggi's conduct, including "his loud, abrasive, threatening confrontations with his medical supervisors, and his sometimes violent actions," disrupted the work environment and tended to have a detrimental effect on the practice of medicine in those offices. The Board found that

> punching a hole in the wall, screaming at one's supervisor, grabbing a time card out of a supervisor's hand, raising one's voice in an argument after being asked to lower it because it could be heard in a patient area, appearing on the premises at inappropriate times, refusing to leave until the police were called, and engaging in loud and abusive verbal confrontations on a repeated basis

all constituted unprofessional conduct in the practice of medicine.

### C.   Section 14-404(a)(33):   Failing to Cooperate with a Lawful Investigation

The Board also concluded that Dr. Boggi failed to cooperate with its lawful investigation in two ways. First, he refused to undergo an evaluation by Dr. McDaniel and only went to the evaluation after he was served with formal notice that he risked being summarily suspended due to his refusal. Second, he violated the Board staff's instructions by repeatedly contacting Dr. McDaniel prior to the evaluation.

### V.   STANDARD OF REVIEW

"The Court's task on review is *not* to 'substitute its judgment for the expertise of those persons who constitute the

27

SA-151

administrative agency.'" <u>Riffin v. People's Counsel for Baltimore County</u>, 137 Md. App. 90, 93 (2001) (quoting <u>Stover v. Prince George's County</u>, 132 Md. App. 373, 380-81 (2000)). In this case the Board constitutes the "agency." To the extent the issues on appeal turn on the correctness of an agency's findings of fact, our role is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions. <u>Riffin</u>, 137 Md. App. at 93. To find substantial evidence, we must decide "whether a reasoning mind reasonably could have reached the factual conclusion the agency reached." <u>Bd. of Physician Quality Assurance v. Banks</u>, 354 Md. 59, 68 (1999). Finally, we must review the agency's decision in the light most favorable to the agency. <u>Id.</u>

## VI.  ANALYSIS

### Issue I

Whether the circuit court, unlike the Board, erred in refusing to consider issues raised by the ADA and related State policies.

Whether the Circuit Court erred is of no relevance when, as here, an appellate court reviews an agency's decision. "We review an administrative agency's decision under the same statutory standards as the Circuit Court. Therefore, we reevaluate the decision of the agency, not the decision of the lower court." <u>Gigeous v. Eastern Correctional Inst.</u>, 363 Md. 481, 495-96 (2001). Our role is "precisely the same as that of the circuit court."

28

SA-152

*Riffin*, 137 Md. App. at 93. We concern ourselves only with the propriety of the agency's decision.

Despite appellant's phrasing of Issue I, a substantial portion of his argument concerning that issue focuses on whether the Board correctly applied the ADA. We therefore address that question.

The Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, prohibits discrimination in State programs against an otherwise qualified individual on the basis of a disability. 42 U.S.C. § 12132. The term "state program" includes public licensure. *Clark v. Virginia Bd. of Bar Examiners*, 880 F. Supp. 430 (E.D. Va. 1995). Thus, Dr. Boggi, if he is a qualified individual, cannot be suspended from the practice of medicine solely on the basis of his disability.

In order to enjoy protection under the ADA, it was necessary for Dr. Boggi to prove three things: (1) that he had a disability; (2) that he is qualified to perform the duties of a physician; and (3) that he was discriminated against solely on the basis of his disability. *Doe v. University of Maryland Medical System Corp.*, 50 F.3d 1261, 1264-65 (4th Cir. 1995). Failure to prove *any* of these three items renders the ADA inapplicable.

A "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." *Johnson v. State*, 940 F. Supp. 873, 877 (D. Md. 1996). In this case, there is no dispute that ADHD constitutes a "disability."

29

SA-153

The ADA protects only "qualified individuals" from discrimination based on their disability. 42 U.S.C. § 12112(a) (2001). "The term 'qualified individual with a disability' means an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (2001). The pertinent inquiry is whether Dr. Boggi could perform the essential functions of his job, and if not, whether any reasonable accommodation by his employer would enable him to perform those functions. See Johnson v. State, 940 F. Supp. 873, 877-78 (D. Md. 1996); Champ v. Baltimore Co., 884 F. Supp. 991, 995 (D. Md. 1995). The term "reasonable accommodation" may include:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9)(B) (2001).

### Is Dr. Boggi a "Qualified Individual"?

The first question to address, then, is whether Dr. Boggi is a "qualified individual" within the meaning of the ADA; if he is not a qualified individual, then the ADA does not cover him. A person is not a qualified individual if he cannot perform the

30

essential functions of his job with or without reasonable accommodation. Additionally, a person is not a qualified individual if he poses a direct threat to the health or safety of others. "Essential functions are 'fundamental job duties,' not 'marginal functions' of an employment position." Campbell, Jr. v. Federal Express Corp., 918 F. Supp. 912, 920 (1996) (citing 29 C.F.R. § 1630.2(n) (2001)).

A.   Ability to Perform Essential Functions of the Job

Concerning the issue of whether Dr. Boggi could perform the essential functions of his job, the Board framed the issue as: "whether [Dr. Boggi] can control his behavior and communicate to the extent necessary to provide competent care in a real world setting." Dr. Boggi argues that the Board, in effect, equated "core function of medical practice" with "unhampered communication skills and a personality that is always reliably harmonious with colleagues." This "knocks over a straw man" because it inaccurately summarizes what the Board said. In pertinent part the Board found:

> 68. Dr. Boggi is intelligent and is capable of fluently communicating with respect to material he has read or memorized. He has, however, consistently displayed significant communication problems when dealing with people in a wide range of professional settings.
>
> 69. With respect to his verbal digressions, the Respondent's communication impairment is due to his ADD and is in the area of expressive, not but receptive [sic], communication. With respect to the broader aspect of Dr. Boggi's frequent inability to communicate in professional settings; this

31

failure is also caused by his sense of entitlement and lack of insight or empathy.

\* \* \*

71. The Respondent has never physically injured a patient, medical staff member or colleague. He has, however, engaged in a physical confrontation, spoken abrasively, raised his voice inappropriately, destroyed property and caused others to have a justified fear of his presence. He has established a pattern, at least in the past several years, of such conduct at places of employment. . . . The Respondent is not psychotic.

72. Because of a combination of his Attention Deficit Hyperactivity Disorder and his Narcissistic Personality Disorder, Dr. Boggi is currently unable to control his behavior towards others and to effectively communicate to the extent necessary to provide competent medical care.

73. Dr. Boggi's inability has persisted despite continuous treatment with both psychotherapy and medication.

74. The ability to interact with and to effectively communicate with other physicians, including one's supervisor, and with other medical and medical-related personnel is an essential element of the competent practice of medicine.

75. Dr. Boggi's inability to competently practice medicine poses a direct threat to the patient population.

(Footnote omitted.)

Dr. Boggi wishes to define essential functions only in terms of behavior that has a direct and immediate impact on a patient. He admits that, "arguably," absent some amelioration through treatment, his ability to function well in a cooperative working environment will always be affected by his disability. According

32

to Dr. Boggi, this makes no difference because anything not directly related to patient contact is outside the definition of "essential functions." In support of that argument, Dr. Boggi directs our attention to the American Medical Association's Principles of Medical Ethics, which, in his view, "focus very much on the doctor-patient relationship, not relationships of colleagues . . . ." Specifically, he cites Principle I: "A physician shall be dedicated to providing competent medical service with compassion and respect for human dignity." American Medical Association, Principles of Medical Ethics, 1998 § 1. Dr. Boggi fails to cite, however, Principle IV, which provides: "A physician shall respect the rights of patients, of colleagues, and of other health professionals . . . ." Id. at § 4. Thus, the AMA principles do "focus" on relationships with colleagues. But, in any event, nothing in the AMA's Principles of Ethics indicates that it is intended as a guide to the essential core functions of a physician.

Except for his reference to the Principles of Medical Ethics, Dr. Boggi provides no authority to support his position, which is, in essence, that it is not an essential function of a physician to be able to "interact with and to effectively communicate with other physicians . . . and with other medical and medical-related personnel. . . ." It is unsurprising that no authority for that proposition is cited. On its face, it would appear to be impossible to practice modern medicine without the ability to effectively communicate with medical specialists (e.g., oncologists, cardiologists, OBGYNs, etc.), hospital staff and other

33

medical-related personnel such as x-ray technicians, pharmacists, nurses, etc.

Appellant apparently disagrees and asserts:

> [T]here is more than one way of being a doctor. Even given the relentless corporate structuring of the medical marketplace, there are still many solo practitioners. Although Dr. Boggi, with a record of success in many medical workplaces, does not expect to lack options once his license is restored, the marketplace may render Dr. Boggi a solo practitioner. But that is a determination for the marketplace, not for the regulators. The question the Board faced here was whether Dr. Boggi can perform the core functions of his job. Defining the core functions to include skills not demanded of every practitioner simply does not comply with governing law.

(Footnote omitted.)

While it is probably true that there are "still many solo practitioners," it is unlikely, at least in our opinion, that any solo practitioner can competently practice medicine without being able to communicate effectively and interact, in a professional way, with other physicians or other medical-related personnel. Tests must be performed, patients must be referred to specialists, and patients must be hospitalized. We need not rely, however, upon our own perceptions as to what constitutes the essential functions of a physician. Instead, we not only can, but are required to, rely on the expertise of the Board in matters dealing with the practice of medicine. The Board's findings that professional communication is an essential element of the practice of medicine, and that this communication must be maintained in the face of

34

stress, concern a matter within the Board's "expertise." Md. Code
Ann., State Gov't § 10-213(i).

The Board's findings as to essential functions of a physician
were supported even by the testimony of Dr. Boggi's own experts.
Dr. Koshes admitted that medicine is a high stress profession and
that communication is essential to the practice of medicine.  Dr.
Harmon's testimony was to the same effect.  The Board consists of
15 members, 11 of whom are required, by statute, to be "practicing
licensed physicians."  H.O. § 14-202(a).  Given the degree of
expertise on the Board, it is in a far better position than we are
to determine what constitutes "essential functions" of the job of
a physician.  Solomon v. Bd. of Physician Quality Assurance, 132
Md. App. 447, 455 (2000) ("[T]he expertise of the agency in its own
field should be respected.").

### B.    Reasonable Accommodation

Dr. Boggi makes the argument that the Board never attempted to
provide reasonable accommodation for his disability.  We will
assume, arguendo, that this is true.  But it is Dr. Boggi who had
the burden of establishing his ability to perform the essential
functions of his position with reasonable accommodation.  See Champ
v. Baltimore Co., 884 F. Supp. 991, 995 (D. Md. 1995) (citing
Tyndall v. Nat'l Educ. Ctr., 31 F.3d 209, 213 (4th Cir. 1994)).
"Once a plaintiff produces sufficient evidence to establish a
facial showing that accommodation is possible, the burden of
production shifts to defendants to show its [sic] inability to
accommodate." Champ, 884 F. Supp. at 1000.  Dr. Boggi did not make

35

a facial showing that accommodation was possible. Instead, his
defense before the Board was, essentially, that he had the ability
to perform the essential functions of his profession without
reasonable accommodation.

### C.    Direct Threat

"[A]n individual is not otherwise qualified if he poses a
direct threat to the health or safety of others because of his
disability that reasonable accommodation cannot eliminate." Champ,
884 F. Supp. at 998; see 42 U.S.C. § 12111(3) (2001). "Direct
threat" is defined as "a significant risk to the health or safety
of others that cannot be eliminated by reasonable accommodation."
42 U.S.C. § 12111(3) (2001). The determination that an individual
poses a direct threat must be based on

> an individualized assessment of the
> individual's present ability to safely perform
> the essential functions of the job. This
> assessment shall be based on a reasonable
> medical judgment that relies on the most
> current medical knowledge and/or on the best
> available objective evidence. In determining
> whether an individual would pose a direct
> threat, the factors to be considered include:
>
> 1) The duration of the risk;
> 2) The nature and severity of the potential
> harm;
> 3) The likelihood that the potential harm will
> occur; and
> 4) The imminence of the potential harm.

29 C.F.R. § 1630.2 (2001).

With regard to the required "individualized assessment," the
Board points to its thorough inquiry into Dr. Boggi's psychiatric
history and diagnoses, the determination of the functional

36

limitations flowing from his problems, and the factual inquiry into his difficulties at a series of medical jobs. Upon review of this material, the Board determined that Dr. Boggi was mentally incompetent to practice medicine, and concluded that any physician deemed professionally, physically, or mentally incompetent was, by definition, a direct threat to patient care.

Dr. Boggi argued that the Board had not made a case that he had caused "substantial harm" and, as such, it failed to conform to the "direct threat" analysis set forth in Title 29, section 1630.2 of the Code of Federal Regulations.

The Board counters that it is not necessary to prove past harm to a patient; the Board's job is to prevent patient harm. If Dr. Boggi's logic were to obtain, section 14-404(a)(4) of the Medical Practice Act would be meaningless. The Board asks rhetorically: What reason would there be to have a Board if it is unable to protect the public from a demonstrably incompetent physician until that physician has directly harmed a patient? It is the Board's position that it would be "unreasonable to require the public to bear the risk of being treated by an incompetent practitioner while [he was searching] for a more effective therapy for his problems." We agree with the Board's analysis. Substantial evidence exists to support the Board's determination that Dr. Boggi is mentally incompetent and that his impairments are severe enough to pose a direct threat to patient health, including:   (1) Dr. Boggi's failure to order necessary intravenous nutrition for a patient at Montgomery General Hospital while employed by Dr. Dooley; (2) Dr.

37

Boggi's inability to interact and effectively communicate with other physicians and medical personnel despite treatment with psychotherapy and medication; (3) his impulsive, erratic behavior toward supervisors; (4) his behavior directed toward the Board that was reasonably perceived as uncooperative, bizarre, and threatening; (5) the perception by the Holy Cross Hospital interviewers that Dr. Boggi was evasive in his answers to questions, that his thoughts were disorganized and lacked focus, that he lacked the ability to work cooperatively with others and render high quality patient care; (6) the suspension of his privileges at Kimbrough Army Hospital; and (7) the expert opinion of Dr. McDaniel.

### Issue II

> Whether the circuit court failed to apply the correct relevance criteria or standards of review to the facts, with the result that it affirmed fact finding which was irrelevant and/or could not be sustained upon a proper standard of review.

The second issue presented, like the first, inappropriately focuses upon the (alleged) errors by the circuit court, rather than the issue of whether the Board erred. Nevertheless, Dr. Boggi does criticize two of the Board's findings of fact and those criticisms will be addressed. The first factual finding by the Board that Dr. Boggi attacks involved the incidents surrounding his failure to make rounds at Montgomery General Hospital.

38

SA-162

In <u>Dep't of Health & Mental Hygiene v. Shrieves</u>, Judge Diana
Motz summarized the role of the reviewing court when an ALJ and an
agency disagree as to factual matters:

> [W]hen an administrative agency overrules the
> recommendation of an ALJ, a reviewing court's
> task is to determine if the agency's final
> order is based on substantial evidence in the
> record. In making this judgment, the ALJ's
> findings are, of course, part of the record
> and are to be considered along with the other
> portions of the record. Moreover, where
> credibility is pivotal to the agency's final
> order, <u>ALJ's findings based on the demeanor of
> witnesses are entitled to substantial
> deference and can be rejected by the agency
> only if it gives strong reasons for doing so.</u>
> If, however, after giving appropriate
> deference to the ALJ's demeanor-based findings
> there is sufficient evidence in the record to
> support both the decision of the ALJ and that
> of the agency, the agency's final order is to
> be affirmed — even if a court might have
> reached the opposite conclusion. This
> approach preserves the rightful roles of the
> ALJ, the agency, and the reviewing court: it
> gives special deference to both the ALJ's
> demeanor-based credibility determinations and
> to the agency's authority in making other
> factual findings and properly limits the role
> of the reviewing court.

100 Md. App. 283, 302-03 (1994) (emphasis added).

In <u>Shrieves</u>, Judge Motz made clear the important distinction
between demeanor-based findings and derivative inferences, i.e.,
inferences drawn from the evidence itself. <u>Id.</u> at 299 (citing
<u>Kopack v. Nat'l Labor Relations Bd.</u>, 668 F.2d 946, 953 (7th Cir.
1982)). In this regard, the <u>Shrieves</u> Court quoted <u>Penasquitos
Village, Inc. v. Nat'l Labor Relations Bd.</u>, 565 F.2d 1074 (9th Cir.
1977), with approval, as follows:

39

> The [agency], therefore, is viewed as
> particularly capable of drawing inferences
> from the facts . . . . Accordingly, . . . a
> [reviewing court] must abide by the [agency's]
> derivative inferences, if drawn from not
> discredited testimony, unless those inferences
> are "irrational," . . . . "tenuous" or
> "unwarranted." . . . . As already noted,
> however, the [agency], as a reviewing body,
> has little or no basis for disputing an
> administrative law judge's testimonial
> inferences.

*Id.* at 1079 (internal citations omitted).

With respect to the incident involving James A., Dr. Boggi
asserts that the Board's finding cannot be sustained because it did
not give substantial deference to the demeanor-based finding of the
ALJ. As mentioned earlier, the Board concluded, on the basis of
Dr. Dooley's testimony, that Dr. Boggi had failed to make rounds,
failed to order crucially necessary intravenous nutrition for James
A., and failed to communicate with Dr. Dooley in this regard. The
trouble with Dr. Boggi's argument regarding the James A. incident
is that the ALJ never made any findings concerning Dr. Boggi's
failure to make rounds, etc., and therefore the *Shrieves* rule is
inapplicable.

There was substantial evidence to support the Board's finding
that Dr. Boggi had failed to make rounds at Montgomery General
Hospital, and as a consequence, James A. did not receive the
required nutrition for a time. Such evidence was provided by Dr.
Dooley.

Appellant also argues that the Board's reasons for
disbelieving him as to the James A. incident were based upon (1) a

40

SA-164

false belief that his explanation of his handling of the incident was merely a "conclusory denial" and (2) a misinterpretation of his testimony that he (Dr. Boggi) sometimes causes confusion deliberately in order to obtain his ends.

Appellant characterizes his testimony regarding the James A. incident as "quite circumstantial, taking up four pages of transcript . . . ." We believe he intended to say his explanation was "quite substantial." Dr. Boggi's explanation was substantial only in the sense that it was lengthy. The explanation was disorganized and, for the most part, impossible to understand. He testified:

> Well, I reviewed the chart. We got a copy of the chart and Dr. Dooley's order reflected low potassium. Low potassium has to be qualified by the albin, which is the protein, which is simply, without going into the details, if you have a low potassium, your calcium is actually higher. So he was vilifying me for not having rounded on a patient and also not caring for the patient when the electrolytes were fine.
>
> Medically he was stable as a rock. He had been on the Board [sic] for a very long time. I had dictated and put on the chart that day a five-page discharge summary and I had discharged the patient.

Q: To Walter Reed?

A: To Walter Reed, to people I knew who were experts in swallowing and a junior resident who had been my intern at Fort Meade. I called over and reported to Sue, who was - I think she was junior, she might have been a senior resident. They said they had a bed, but I know how Walter Reed works; sometimes you have a bed, sometimes you don't. So later in the day I heard back from the hospital. I did know he was there, but he was still going.

41

I was in the middle of patients and so you
don't go over, and I was told he was gone.
Well, apparently he didn't go, and Dr. Dooley
did the right thing, he put a note in the
chart.  He misread the chart and found out
that the calcium was normal.  As far as
communications go, well, I knew the patient
was going but I didn't know for sure, and
that's part of the duty to put it in the
chart.  You know, he was on call that night,
that's why he was there at 6:00 admitting a
patient.  It was his duty to cover anything.

Q:  Including this patient?

A:  Right.  No, waiting – this waiting to
11:00, but I mean I didn't have my beeper on.
I don't even know where I was that night, but
I didn't have any messages from – I mean the
next day we had a disagreement about that.
So, I don't know, this 11:00 business, I don't
understand that.  But –

Q:  Was it – I'm sorry, go ahead.

A:  It was just overblown.  This was after –
do you want me to put it in context?

Q:  I'm sorry?

A:  Do you want me to put in context of the
time frame?

Q:  Yes, go ahead.

A:  This was three or four days after I had
resigned, and then he fired me.  I resigned
because he was – I was getting knowledge he
wanted to fire me.  I got a job with Dr. Shigo
and then you – and they found this, which
doesn't amount to anything more than it sounds
like Walter Reed again.  They accepted the
patient but they decided not to have a bed.
And that was that.  Do you want me to go into
what happened the next morning as a result of
this?

The Board's characterization of Dr. Boggi's explanation as a

"conclusory denial" was appropriate.  He claimed that he "was told

42

that [James A.] was gone" to Walter Reed, but Dr. Boggi did not say from whom or when he received the information nor did he contradict Dr. Dooley's testimony that Montgomery General Hospital sent him a fax about James A. or that he (Dr. Boggi) filled out a form regarding "parenteral nutrition" for James A., but that he never sent it.

Moreover, as can be seen from the just-quoted excerpt of Dr. Boggi's testimony, his testimony regarding James A. was, in fact, confusing. Whether the testimony was intentionally confusing is certainly debatable. But the Board, noting that Dr. Boggi admitted, both in written communications with the Board and in his testimony, that he sometimes deliberately causes confusion to achieve his ends, found that his testimony regarding James A. was "such an instance" of trying to cause confusion.

Appellant criticizes the Board for drawing this derivative inference by saying his remarks about intentionally sowing confusion "were wrenched" from statements made "in a far different context"[17] and therefore the statements "could not bear the

---

[17] Dr. Boggi testified:

> As far as multiple faxes go, people sat up here and said they didn't know why I was sending them. There you go. That's why I sent all the faxes. They didn't know why I was sending them faxes. They didn't read them, did they? I was trying to schedule this. I was trying to communicate about this, I was having a problem with Ms. Cromer, and then they actually withdrew her from the case, at least they said so in writing.

> I was trying to communicate. People said up here what was Dr. Boggi doing by these faxes and, you know, except for two of them, it was quite plain. The other two regarding Mrs. Cromer and Mr. Compton, I was creating confusion. The first warfare is to create confusion. First, you go around to get in. It wasn't a big deal. Everybody else thought I caused more
> (continued...)

43

construction the Board placed on them." Although Dr. Boggi's
remarks about intentionally causing confusion explained a different
action (i.e., why he sent two incomprehensible faxes to the Board),
the Board could fairly infer that if Dr. Boggi intentionally tried
to confuse others as to one subject he was likely to intentionally
try to confuse others as to a completely different subject.

Another finding of fact by the Board, which Dr. Boggi
challenges, is that Dr. Boggi suffers from NPD. Under the heading
entitled "Statement of Facts," Dr. Boggi says:

> Dr. McDaniel, alone among the 10
> psychiatrists or psychologists who diagnosed
> Dr. Boggi over the years, also found that he
> suffers from Narcissistic Personality Disorder
> ("NPD"). Even though the administrative
> prosecutor essentially abandoned this
> diagnosis (not saying a word to support it in
> her briefing to the Board), the Board
> resurrected it and accepted it. However, this
> finding is not sustainable.

(Footnote and reference to record extract omitted.)

The Board concluded that the ALJ gave too much weight to her
own observations of Dr. Boggi's behavior at the hearing in reaching
her conclusion as to Dr. Boggi's psychiatric condition, and in her
evaluation of the psychiatric testimony of the expert, the Board

---

[17](...continued)
confusion that I should have, but they didn't ask me.
They just looked at me like I was sick.

      * * *

I'm sorry that everyone is concerned about that
one, but as you can see by the fact that I sent it
twice, it was purposeful. When you get something that's
confusing you say, gee, I better talk to this guy. So,
I wanted to talk to them. I didn't think I was going
get to [sic].

(Emphasis added.)

44



acknowledged that it placed more weight on Dr. McDaniel's opinion that Dr. Boggi's neurological and personality problems – which have resulted in impulsivity, agitation, lack of insight and empathy, impaired judgment, abrasive personal interactions, a lack of reliability, communication problems and emotional lability – made him incompetent to practice medicine. The Board concluded that Dr. McDaniel's opinion was more factually grounded than those of the other doctors because she had reviewed more documentation concerning Dr. Boggi's past psychiatric problems, his communications to the Board, and material relating to his history of employment trouble.

Section 10-213(i) of the Administrative Procedure Act states that an agency "may use its experience, technical competence, and specialized knowledge in the evaluation of evidence." Md. Code Ann., State Gov't § 10-213(i) (2001). As stated previously, we will respect the expertise of the agency in its own field. Dr. McDaniel's testimony constituted substantial evidence to support the Board's finding that Dr. Boggi suffers from NPD. We therefore reject Dr. Boggi's argument that the Board's finding "was not sustainable."

### Issue III

Whether the Board and the circuit court erred in failing to consider and honor Dr. Boggi's First Amendment and ultra vires defenses to charges that he failed to cooperate with a lawful investigation.

Dr. Boggi argues that the Board's directive not to contact Dr. McDaniel prior to the psychiatric evaluation was an infringement of

45

SA-169

his First Amendment right to speak freely. He contends that due to this infringement, the lawfulness of the investigation was suspect and therefore could not be considered to be a violation of H.O. section 14-404(a)(33). Additionally, he contends that the Board was acting beyond the scope of its authority in directing him not to contact Dr. McDaniel.

Dr. McDaniel testified that her policy is to direct that all communication (from a licensee) go through the Board; similarly, any information that needs to be communicated to the licensee goes through the Board. She has this policy for two reasons: first, she wants the Board to be aware of all scheduled appointments; second, she wants to be able to inform the licensee, in person, that psychiatrist-patient confidentiality does not extend to her evaluation. This is important because, if during a telephone conversation the licensee should act in a manner that Dr. McDaniel might later use in a mental status finding, she did not want to be later constrained in the use of that information because she had not explained that their conversations were not confidential.

Dr. Boggi says in his brief that he has a "First Amendment right to address Dr. McDaniel in whatever way and about whatever subject he cho[oses]." We disagree. "The right to express ideas does not include the right to impose the communication of those ideas upon an unwilling listener . . . . Citizens have a right to speak. Citizens also have a right not to be forced to listen." *Von Lusch v. State*, 39 Md. App. 517, 525 (1978).

46

Dr. Boggi was not prevented from speaking to the public, in general, about his case. He was simply directed, in accordance with the examining psychiatrist's wishes, not to contact her prior to the evaluation.

We also disagree with Dr. Boggi's contention that the Board was acting outside the scope of its authority in directing Dr. Boggi to conform to professional protocols for the examination. H.O. section 14-402(a) explicitly grants the Board the power to conduct examinations of licensed physicians.[18] H.O. section 14-205(2) gives the Board the right to investigate any alleged violations of Title 14. In addition to powers explicitly granted, the Board also has the implied power to conduct business in an organized and efficient manner. Encompassed within that implied power is the right of the Board to direct an interviewee to adhere to certain guidelines in the psychiatric evaluation process, particularly guidelines set at the request of the interviewing psychiatrist.

Just as a law student about to take a Bar Exam could legitimately be prohibited from contacting the Bar Examiner to question him or her about the examiner's qualification to give a law examination, the Board has the implied power to prohibit a physician (who is about to undergo a psychiatric examination) from contacting the psychiatrist that is assigned to give the examination. If the rule were otherwise, the person taking the

---

[18]Additionally, in return for the privilege given by the State issuing the license, the individual is deemed to have consented to submit to an examination under this section. H.O. § 14-402(b)(1).

47

exam would control the exam – not the examiner, which would invite
chaos.

Dr. Boggi also argues that the Board erred when it rejected
his defense that he initially failed to submit to a psychiatric
evaluation because he relied on advice of counsel. According to
Dr. Boggi, his reliance on Mr. Rosenberg's advice was "reasonable."
The Board had a solid reason for rejecting the "advice of counsel"
defense. Mr. Rosenberg testified that *if* Dr. Boggi had retained
him, then he would get "into this" issue to "find out" whether the
Board had a right to require Dr. Boggi to be evaluated by Dr.
McDaniel. Dr. Boggi never retained Mr. Rosenberg to advise him as
to whether the Board had a right to have him examined, and Dr.
Boggi knew that the advice given by Mr. Rosenberg was only
tentative. This constituted substantial evidence to support the
Board's finding. To rely on unresearched, tentative "curbstone
advice" of the sort Mr. Rosenberg offered was unreasonable.

Lastly, Dr. Boggi claims the Board failed to consider that he
"purged himself of his non-cooperation" by his actions after his
initial failure to meet with Dr. McDaniel. We reject that argument
for the reasons set forth in the Board's brief, viz:

> Dr. Boggi's purported "purging" of his
> non-cooperation is irrelevant. Medical boards
> have a compelling interest in conducting these
> evaluations, *Boedy v. Dept. of Professional
> Regulation*, 463 So.2d at 217, and time is
> obviously of the essence. In addition, Dr.
> Boggi's action was not without cost to the
> Board. The Board was charged by Dr. McDaniel
> for the missed appointment. The Board also

48

spent the time and incurred the expense of
issuing the original Show Cause Order.

(Footnote and references to record extract omitted.)

JUDGMENT AFFIRMED;
COSTS TO BE PAID BY APPELLANT.



July 17, 2006

Joseph Boggi, D.O.
1207 Ballard St.
Silver Springs, MD  20910

Dear Dr. Boggi:

Enclosed are the results of your testing.

You were administered the Internal Medicine Clinical Science Subject Exam, the Pharmacotherapeutics with Ambulatory Care Focus Exam, and the Mechanisms of Disease Exam on May 22, 2006.  You were administered the Computer Case Simulation and Transaction Stimulated Recall interview on May 25, 2006.

Kindly review the test results and contact me with any questions.

Sincerely,

Lawrence Downs
President


LD/sls

Enclosure

Two Princess Road   Lawrenceville, NJ  08648-2302
609-896-1766 ext. 258   FAX 609-896-1368

Joseph O. Boggi, D. O.

Primum®/CCS  Inpatient form
+ Transaction Stimulated Recall (TSR) Interview
& MicroCog

**May 25, 2006**

This summary is based on the results of testing including (A) the content of an 8-case computer simulation (CCS), (B) the transaction stimulated recall interview (TSR) and (C) the MicroCog™, a brief neurocognitive screening assessment.

A.     Primum®/CCS In-patient form

Dr. Boggi stated that he is comfortable with computers in general, but he found the case simulation program difficult because of slow response time. He indicated some concern about his performance because of the differences between computer-based testing and live patient interactions, as well as his perceived inability to advance the time clock within the case simulations. He had practiced with the orientation cases for this examination and found it helpful, though he felt the explanatory and practice information was excessive.

With regard to his medical knowledge for these cases, Dr. Boggi concluded the correct diagnosis for all 8 of the 8 cases during the simulation.

Relative to the reference group of resident physicians who had completed 1 to 3 years of training at the time they managed these cases for initial licensure, his case management performance was above the mean performance for 6 of the 8 cases. Five cases were in the highest quartile and 1 case score was in the 2nd quartile.  In 2 cases his performance was in the 3rd quartile, and in no cases was his performance in the lowest (4th) quartile. (His performance quartile profile was 5 –1 –2 –0). Note: It is not unusual for presumably competent physicians to occasionally mismanage a computer-simulated case.

B.     Transaction Stimulated Recall (TSR) Interview

Dr. Boggi recalled most of the details of the 8 cases; all 8 cases were reviewed and discussed, some in more detail than others. He rated his own performance of the cases as acceptable; however, he continually expressed concern about how the computer-simulation programming frustrated him in several cases because of what he perceived to be a slow response time. Despite this concern, when given the opportunity during the interview, he did not offer any additional diagnostic or therapeutic orders and his patient evaluations were sufficiently detailed to achieve diagnostic accuracy. Because of the breadth of his prior training in both emergency and internal medicine, and previous military as well as civilian practice, examples of clinical presentations from both emergency department and acute inpatient settings were included in the structured interview to facilitate his ability to discuss specific

points of case management. The discussion was collegial, but fractured by his inability to maintain a logical and orderly train of thought, his frequent digressions from a specific question or topic, and his frequent assertions regarding his knowledge, experience, and clinical competence. A thorough analysis of his knowledge base was limited by his difficulty in focusing direct responses to specific queries. Ascertaining the breadth of his knowledge was hampered by the apparently shallow depth of his understanding of the disease processes being discussed.

### Differential Diagnosis and Medical Knowledge

Dr. Boggi stated he approaches a patient first by obtaining history and performing a physical examination in parallel; his differential diagnosis then evolves as he gathers both historical and physical examination data. He provided reasonable differentials for all 8 cases, including consideration of many life-threatening possibilities and also uncommon conditions and atypical presentations.

When asked what resources he uses to maintain his knowledge base, Dr. Boggi responded that he typically reads the Medical Knowledge and Self Assessment Program (MKSAP) offered by the American College of Physicians, supplemented by journals (New England Journal of Medicine, Journal of the American Medical Association, and The Annals of Internal Medicine). Yet, his answers to specific open-ended questions about current treatment options and diagnostic testing alternatives did not reflect integration of new knowledge from these sources. To the contrary, Dr. Boggi did not cite any current readings that might have influenced or impacted his care rendered in each of the 8 cases.

During the TSR interview, Dr. Boggi demonstrated fair medical knowledge related to these cases that rated above the applicable standards of care. He was unable to discuss additional differential diagnoses, mostly related to his tangential thought processes, but nonetheless he provided an appropriately broad differential diagnosis that included the life-threatening complications. The relatively shallow depth of his knowledge was uniform across most of the cases, but sufficient to appropriately triage, diagnose, and treat the 8 cases.

### Clinical Reasoning and Managing Therapy

Dr. Boggi demonstrated an appropriate and adequate ability to distinguish the severity of illness, though his difficulty in maintaining a logical conversation flow created difficulty for him in explaining his reasoning processes. He usually responded to each patient presentation with appropriate supportive measures, paired with an early approach to logical and reasonable diagnostic algorithms. Nevertheless, Dr. Boggi described a delayed approach to consultations that would be consistent with his limited knowledge base regarding long-term patient care and overconfidence in his abilities beyond initial diagnostic and therapeutic maneuvers. His management strategies were successful and logical, though he had difficulty in explaining his thinking logically.

In each case, he could discuss a reasonable differential diagnosis, and revealed understanding of the limitations and utility of the clinical data gathered during the

simulation. He evidenced difficulty in focusing his thinking in relation to the salient features of the presentation, but could identify the primary disease process, the life-threatening alternative diagnoses, pursue an appropriate diagnostic intervention, and provide appropriate therapy.

Dr. Boggi identified each life-threatening complication or condition, and appropriately instituted life-saving therapies in a rapid and expeditious manner. Despite his demonstration of an adequate basic skill set and approach to urgent/emergent patient care, he failed to appreciate recent advances and controversies in subsequent long-term patient management as potentially applicable to these individual cases, thereby demonstrating a limited capacity to maintain a current knowledge base.

- In one case, he had concluded the correct diagnosis in the simulation, and provided appropriate therapy. However, when prompted with suggestions during the interview, and then specifically questioned, he could not articulate the specific clinical situations in which potentially life-threatening therapy (e.g., thrombolysis) would be indicated for the case in question, or for several alternative conditions. Each of the alternative conditions would be encountered in emergency or internal medicine practice. This inability to transfer knowledge across clinical situations in discussion suggests a lack of flexibility in his thinking and also reflects poor understanding of the potential therapies that could represent common links to several of the encounters, which is illustrative of a shallow knowledge base in this area.
- In one case, when confronted with a major radiologic finding of life-threatening significance, he correctly identified the cause of the abnormal finding and requested a surgical consultation for the mandatory operative intervention. Nevertheless, he perseverated in discussion about an additional test, which he had overlooked in the computer-based case simulation. Only upon significant focusing and continued discussion did Dr. Boggi realize that the overlooked test would not have altered the management of the case. This suggests a fixed, algorithmic approach to patient care and is similar to his inability to adapt in discussion to situations requiring thrombolytic therapy, as noted in the previous case.
- In another case his initial diagnosis during the simulation was correct and he recognized and appropriately treated a life-threatening electrolyte abnormality. However, when asked about his approach to aminoglycoside antibiotics in a patient in renal failure, he could not maintain a discussion to any depth. Rather he simply stated that such antibiotics could still be administered, which demonstrates a shallow depth and poor integration of knowledge.
- In one case he correctly diagnosed a common condition in a patient with an atypical presentation.

*Patient Risk*
With regard to patient risk, none of the patients were exposed to increased risk because of acts of commission or omission. In no cases did he order dangerous, improper or even inappropriate testing or therapy; however, his inability to discuss

certain types of therapy might increase the potential risk to patients who were not assessed within the limited scope of this examination.

### Flexibility of Thinking

Dr. Boggi demonstrated little capacity for flexibility in his thinking. In no cases was he able to elaborate during the interview about how new data might alter his thinking or management plan.

### Personal Insight

Dr. Boggi demonstrated little capacity for personal insight. He expressed some reservations about the adequacy of the computer for accurately testing his knowledge base, and was open to suggestions. However, he exuded anxiety during the discussion over his perceived score, while simultaneously expressing overconfidence based primarily upon the breadth of his experiences in military medical practice. He could neither effectively discuss his thinking process nor integrate new knowledge into his approaches. His overconfidence poses a potential threat in approaching an unusual disorder or presentation, particularly when coupled with a relative reluctance for early (or any) consultation.

### TSR Summary

Through this simulation exercise, though most readily apparent during the interview, Dr. Boggi demonstrated basic medical knowledge that was adequate, but limited in scope and dated in currency. Despite an adequate ability to generate reasonable differential diagnoses and to both recognize and treat life-threatening situations, the discussion during the TSR interview highlighted the shallow depth of his medical knowledge, making it is likely that his performance during the simulations does not adequately reflect the limitations of his abilities.

In discussion, his clinical reasoning was guided by appropriate intentions, but limited by his inability to describe and articulate his rationale in making clinical decisions. In general, Dr. Boggi demonstrated an adequate understanding of disease acuity and the corresponding implications for patient risk. In this regard, his management was adequate and appropriately matched to the patient's situation. His responses in the discussion were indicative of relatively inflexible reasoning processes, which pose a potential risk for patients who may challenge the scope of his knowledge base.

(C)     MicroCog™: Assessment of Cognitive Functioning

As a clinical assessment instrument this test provides a brief screening assessment of neurocognitive functions intended to indicate individuals at risk for cognitive impairment. Physicians with findings on this evaluation that fall outside the normative ranges for age and education should seek further follow-up testing with qualified neuropsychological evaluators.

Relative to individuals of comparable age and with an education level beyond high school, Dr. Boggi performed in the average range on a standardized measure for 5 of

the 9 summary indexes. These include: attention/mental control, spatial processing, information processing speed, and both general cognitive functioning and general cognitive proficiency. For the other 4 summary indexes (reasoning/calculation, memory, reaction time, information processing accuracy,) his scores were in the above average range, which is between the 1st and 2nd standard deviations above the mean. The average range includes both one standard deviation above and one below the standardized mean score.

Based on his age- and education-adjusted performance on the nine summary indexes, recommendation for further neuropsychological evaluation is not warranted, per the usual protocol for interpretation provided by the instrument developer.

## Multiple-Choice Examinations
### May 22, 2006

The **Internal Medicine Clinical Science** Subject exam score was 75%, which is in the 5th decile of 4th year rising medical students, or higher than 50% of the 1,124 students in the comparison group, most of whom are finishing their 3rd year.

Performance for Clinical tasks was
79% Mechanisms of disease
72% Diagnostic studies & diagnosis
72% Principles of Management & Health Maintenance

Performance in terms of Urgency to Intervene was
56% Low need
75% Moderate need
94% Immediate intervention

Location of care (as described in the clinical vignette)
70% Office/Ambulatory care
82% Hospital/In-patient
88% Emergency Dept

Organ systems / Processes
Subscores at or above the total score of 75% were
93% Respiratory
83% Nervous
82% Blood / Immunologic
77% Musculoskeletal, skin & connective tissue
75% Cardiovascular

Subscores below the total score of 75% were
62% Gastrointestinal
58% Renal + Endocrine/metabolic

**Pharmacotherapeutics with Ambulatory** care focus
The test score was 87%, which is in the 1st decile, or in the highest 10% of how a random sample of 2,000 examinees might have done on these items. The comparison group comprised those physicians who were taking USMLE Step 3 for the first time and who had completed 1 to 3 years of residency training at the time of testing. (Note: the reference group performance on these test items is higher and in a narrower range than the performance of similarly constructed reference groups on other topics where a greater spread of performance occurs. Thus, for Pharmacotherapeutics there are tighter performance deciles for comparing the performance of practicing physicians, and consequently, lower decile performance groupings for percent correct scores that would be in higher deciles for other topic areas.)

This examinee did not answer the last 2 questions and skipped 1 other question.

Subscores were
88% Core principles, various clinical encounters
83% Ambulatory care clinical encounters

86% Selecting an initial drug therapy
88% Adjusting therapy and providing patient education
86% Applying basic principles and identifying drug effects or interactions

Urgency for physician to intervene (as described by the clinical vignette)
90% Low need
84% Moderate need
83% Immediate intervention required

86% Ambulatory settings
87% Inpatient/Emergency Department

100% no patient age applicable
  83% patient ages neonate through 17 years old
  93% patient ages 18-54 years old
  78% patient ages >54 years old

Patient-specific, gender-referenced clinical vignettes
  80% female vignettes
  90% male vignettes
100% non-specific (rule-based or matching item format)

  95% Cardiovascular drug therapies
  60% Respiratory drug therapies
100% Gastrointestinal drug therapies

**Mechanisms of Disease** test. The total score was 82%, which is in the 5th decile, or higher than 50% of the 558 physicians in the national comparison group who reported a specialty of internal medicine. For the corresponding primary care physicians the score would have been in the 4th decile or higher than 60% of those 761 physicians in the national comparison group who reported practicing family medicine, internal medicine or emergency medicine.

Subscores on the major subcategories ranged between 67% and 90%.
Subscores at or above the total score of 82% were
90% Pathophysiology
88% Infectious Disease & Immunology
87% Pathology & Laboratory medicine
81% Behavioral science

Subscores below the total score of 82% were
73% Anatomic Structure
67% Physiology & Metabolism

Level of organism
67% Subcellular/molecular
95% Cellular
76% Tissue
91% Organ/system
84% Person+Group

Urgency for physician to intervene
84% Low need
76% Moderate need
80% Immediate intervention required

86% Ambulatory settings
76% Inpatient
80% Emergency Department

80% no patient age applicable
94% patient ages neonate through 17 years old
76% patient ages 18-54 years old
91% patient ages >54 years old

Patient-specific, gender-referenced clinical vignettes
91% female vignettes
67% male vignettes
82% non-specific (rule-based or matching item format)

Organ Systems / Processes
Subscores at or above the total score of 82% were
94% Reproductive
94% Renal, electrolytes & systemic
89% Blood / Immunologic
88% Cardiovascular
85% Psychologic

Subscores below the total score of 82% were
81% Musculoskeletal, Skin & Connective tissue
80% Endocrine/Metabolic
77% Neurologic
75% Respiratory
71% Gastrointestinal



October 16, 2006

Joseph O. Boggi, DO
1207 Ballard Street
Silver Spring, Maryland 20910

RE:        *Remediation Request*

Dear Dr. Boggi:

We regret to inform you that we cannot assist you any further in this matter. Based on the record established by the Maryland Medical Board and confirmed by the evaluation performed by MRAC, we are unable to offer any remediation plan.

On July 17, 2006 MRAC provided you with the results of your competency evaluation. You have requested that MRAC develop a remedial program to address the deficiencies identified in the competency evaluation. MRAC referred your testing results and the information you supplied from the licensing authorities in Maryland to our colleagues at UMDNJ to discuss a possible remediation program.

A review of your case showed that you performed well on some of the standardized testing, however problems were revealed on the Transaction Stimulated Recall (TSR) portion of your testing. The results of the TSR indicate disordered thinking which is consistent with some of the findings reported in the Maryland Board summary. The underlying dual problems of adult variant ADD and narcissistic personality disorder present real problems for any remediation plan MRAC could provide.

After review of the materials and the test results it becomes apparent that MRAC does not have the capacity to engage in a remediation for your circumstance. We have previously provided you with your test scores and transaction report developed in the course of our evaluation. At this point we are closing your file.

I understand from your many emails and phone messages that you have personal contacts at UMDNJ that you believe can assist you in your efforts. Should you need us to forward copies of our files to a third party please make a request in writing so that we have your permission to do so.

Sincerely,

Lawrence Downs, Esq.

Two Princess Road   Lawrenceville, NJ   08648-2302
609-896-1766 ext. 258   FAX 609-896-1368