

RECEIVED
JUL 2 0 2010
U.S.C.A. - 3rd

10 JUL 19 PM 11: 07
USDC-EDPA
REC'D CLERK

No. 10-1619

In the
United States Court of Appeals
for the Third Circuit

Joseph 0. Boggi, D.O. Internal Medicine, Plaintiff-Appellant

v.

Medical Review and Accrediting Council, Larry Downs, Esq., Director MRAC, Joe
Sokolowski, M.D., President MRAC, Institute for Physical Education, Andrea
Ciccone, Scott Mannaker, M.D., National Board of Medical Examiners, Richard
Hawkins, M.D., Donald Melnick, M.D., UMDNJ, and Unnamed Consultant
Defendants-Appellees

Response to MRAC, Larry Downs, and Joe Sokolowski.
July 19, 2010

Received and Filed

7-20-10  SB

Marcia M. Waldron,
Clerk

No. 10-1619


In the
United States Court of Appeals
for the Third Circuit

Joseph 0. Boggi, D.O. Internal Medicine, Plaintiff-Appellant

v.

Medical Review and Accrediting Council, Larry Downs, Esq., Director MRAC, Joe
Sokolowski, M.D., President MRAC, Institute for Physical Education, Andrea
Ciccone, Scott Mannaker, M.D., National Board of Medical Examiners, Richard
Hawkins, M.D., Donald Melnick, M.D., UMDNJ, and Unnamed Consultant
Defendants-Appellees


Informal Response to MRAC, Larry Downs, and Joe Sokolowski
July 19, 2010


1   Pages

The Court provided an outline for an informal brief. I followed that outline, and provided three of the last filings in support of my case as an appendix. The Court did not provide an outline for this portion of this effort. To wit, I will try to STRICTLY follow the outline of the defendants. I submit this as an INFORMAL RESPONSE to MRAC, Larry Downs Esq, and Joe Sokolowski M.D.

Contents

Response  + Proof of Service
Appendix
Exhibit 1 The Declination letter from MRAC et al.
Dr. Mileikowsky Writ of Mandamus CS 04CS00969
Dr. M Opening Brief
Dr. M Amicus Brief
Citing District Judge's Actions During Trial Gina Passarella 7/3/2008

2 Pages

**I.**         **The** Trial Court Incorrectly Decided Appellees, Medical Review and
              Accrediting Council, Larry Downs, and Joseph Sokolowski's Motions
              to Dismiss The Plaintiff's Complaint Pursuant to Rule 12(b)(6)

        A.    The Trial Court Did Err **In** Dismissing The Plaintiff's Claims
              Under 42 U.S.C. 1983

1. MRAC, Larry Downs, and Joseph Sokolowski were
   Acting under the Color of State Law
2. The Plaintiff's Rights, Privileges or Immunities under the United States
Constitution or Federal Law were Violated

        B. The Plaintiff did State a Claim under Title II of the
              Americans with Disabilities Act

1. MRAC, Larry Downs, Esq and Joseph Sokolowski M.D.
are State Entities as Defined by the ADA
2. The Plaintiff is Disabled Consistent with the Definition
      of the ADA

        C. The plaintiff did have a contract with the defendants. This issue is
              not disputed by them.

D. The Defendants claim the US Constitution applies to them. They cannot treat
The Plaintiff this way because they do not like him. The Plaintiff is a class of one.
This helps to invoke the equal protection clause of the US Constitution.

E. The Plaintiff did File his Complaint Within the Applicable
              Statute of Limitations, the District Court agreed with The
              Plaintiff.   The defendants only proffered this new version of
              their opposition to my complaint, after they realized I did file
              my complaint on time.   Initially, they just objected to my filing in
              October, 2008. ( supposedly missing by a day or two )

              3 Pages

IL The Cases Cited By The Plaintiff Allegedly Supporting His Position Do Stand For the Proposition Cited.

    A.    <u>Mileikowsky</u> v. Medical Board of <u>California</u> does support the position asserted by The Plaintiff

    B.    The Plaintiff's Position is Supported by <u>Ewing v. Board of Regents</u>

    C.    The Court's Decision in <u>Cohane v. NCAA</u> does Support Dr. Boggi's Position

    D.    The Supreme Court's Opinion in <u>Youngberg v. Romeo</u> does Support The Plaintiff's Position

    E.    The Plaintiff's Argument Regarding <u>NLRB v. Universal Camera</u> has a large bearing on this case.

    F.    I offered these cases as the top five. I also provided the three briefs as an appendix. They contain pertinent cases. One of these was mentioned by the defense.

CONCLUSION

1. How many times can you touch fire without being burnt? That is the question. MRAC, Larry Downs Esq, and Joe Sokolowski touched fire FOUR times and still the defense claims they are not state actors.

**4 Pages**

## SUMMARY OF THE ARGUMENT

The District Court incorrectly determined that the plaintiff failed to state a claim upon which relief could be granted. The Plaintiff presented claims under both 42 U.S.C. 1983 and Title II of the Americans with Disabilities Act (42 U.S.C.) and Contract Law.

If I did not state a claim, then I should be granted leave to amend the complaint.

To present a valid claim under 42 U.S.C. 1983, a Plaintiff is required to show that the Defendant was acting under the color of state law and that the conduct of the Defendant deprived the Plaintiff of a right, privilege or immunity secured by the United States Constitution or federal law. The Plaintiff did comply with these requirements in his pleading. The Plaintiff did plead facts sufficient to show that Appellees, MRAC, Larry Downs, and/or Joseph Sokolowski were state actors and therefore subject to liability pursuant to 1983.

Additionally, the plaintiff did plead facts sufficient to show that his rights, privileges or immunities guaranteed by the Constitution or Federal Law were infringed. The plaintiff claims that both his procedural and substantive due process rights were violated. The plaintiff argues that he was deprived of his property right to his medical license and training.

Finally, a deprivation of procedural due process requires government action and The Plaintiff has plead facts sufficient to show that MRAC, Larry Downs, or Joseph Sokolowski are state actors.

5 Pages

The Plaintiff also asserted claims against MRAC, Larry Downs, and Joseph Sokolowski under Title II of the Americans with Disabilities Act (ADA) (42 U.S.C. 12131, et seq.) This claim did allege facts sufficient to support a finding that MRAC is an entity subject to Title II of the ADA.

The Plaintiff also plead facts necessary to show that he is a qualified individual with a disability. Such a showing was necessary to support a claim made under the ADA.

The Plaintiff also filed his action within the applicable Statute of Limitations. This was affirmed by the District Court. Both 1983 actions and actions brought under the ADA are subject to a two-year statute of limitations.

Finally, in his brief, The Plaintiff cited to a number of cases in support of his position. A review of those cases shows that they do stand for the proposition asserted by The Plaintiff.

### Before we get into the law, let's go over just what happened. It is instructive.

The IPE section of the NBME and FSMB ( which STILL exists btw ) produced the test report. By any objective reading I passed the tests with flying colors. It also contains words that can be exploited by an unscrupulous evaluator. That report got to someone at the UMDNJ along with the information provided by the state of Maryland. That included ALL of my Psychiatric reports.

Then the declination letter got drafted. It is excerpted below. That process detailed in that letter seems simple but it is not.

**6 Pages**

**"On July 17, 2006 MRAC provided you with the results of your competency evaluation. You have requested that the MRAC develop a remedial program to address the deficiencies identified in the competency evaluation. MRAC referred your testing results and the information you supplied from the licensing authorities in Maryland to our colleagues at UMDNJ to discuss a possible remediation program. "**

According to the MRAC, the persons ( more than one ) at the UMDNJ received all of the material, and made a decision. The STATE made the decision. They were getting paid by me, through their financial arrangement with the MRAC Furthermore, they did a lot more than just make a decision.

Here is what they did. The State of Maryland information said that I was Narcissistic, Dangerous in a physical sense, and Mentally incompetent, in addition to having ADHD. Keep in mind that at this point, the state had paid for THREE examinations, and two of them said I am fine. The latest, written by Paul Prunier M.D. was most emphatic on that point. So, in the face of NOT having any criteria for any of the above disorders, the folks at the UMDNJ chose Narcissitic Personality disorder, and discarded dangerous person, and mentally incompetent person. They too cherry picked the ONE negative report out of about 10. I say they were just making up a story that they thought would fly. They also did it without seeing me. And they added a diagnosis, disordered thinking, that is not supported by any fact. ( only empty assertion ) It is a new diagnosis. It does NOT appear on ANY information from the State of Maryland.

In other words, these people at the UMDNJ were deliberately indifferent about what they put on my chart, to the point that it shocks the conscience. The other option is that someone at the MRAC did the synthesis. Dr. Sokolowski did not have an intimate knowledge of the details of the case. I can tell you that first hand. Larry Downs could have done it, but that would be illegal, since he is not a doctor. Any way you cut it folks acted illegally, and knew it when they were drafting that letter. The letter says that the folks at the UMDNJ did the final assessment. I believe that letter.

7 Pages

The results. The oral interviewer noted 11 times that I passed the test, he also said that I had disordered thinking. Here are the 11 notations that say I passed the oral interview.

***Here is what the examiner said about my performance.***

***a. Page 1 B. "His patient evaluations were sufficiently detailed to achieve diagnostic accuracy."***

***b. Page 2 Differential Diagnosis and Medical Knowledge.***
***" He provided reasonable differentials for all 8 cases, including many life threatening*** possibilities and also uncommon conditions, and atypical presentations."

c.Page 2 of the report paragraph 4. . "During the TSR interview, Dr. Boggi demonstrated fair medical knowledge that related to the cases that rate **above** the applicable standards of care."

d. Page 2 Clinical Reasoning and Managing Therapy
Dr. Boggi demonstrated an appropriate and adequate ability to distinguish the severity of illness,"

e." He usually responded to each patient presentation with appropriate supportive measures, paired with an early approach to logical and reasonable diagnostic algorithms."

f. "His management strategies were successful and logical." Fine. This is the best thing. It is OBJECTIVE EDIVENCE that my thinking was fine. I did not just cross over into another state of mind. Dr. Manaker states that my thinking was logical. An objective review of the test data, the scores on the CCS says the same thing. There was no disordered thinking.

g.End of page two of the report. " In each case, he could discuss a reasonable differential diagnosis, and revealed understanding of the limitations and utility of the clinical data gathered during the simulation.

8 Pages

h.Continuing on the top of page three. "But could identify the primary disease process, the life threatening alternative diagnosis, pursue an appropriate diagnostic intervention, and provide alternative therapy.

i."Dr. Boggi identified each life threatening complication, or condition, and appropriately instituted life saving therapies in a rapid and expeditious manner." Fine. Just like in the movies on flight simulators, they throw you curves, that may lead to a crash of the plane. Essentially, I kept the plane flying despite the curves thrown at you by the simulation.

j. Page 3 of the report, Patient Risk "None of the patients were exposed to increased risk." "In no cases did he order dangerous, improper, or even inappropriate testing or therapy."

k.Page 4 of the report TSR Summary "Dr. Boggi demonstrated basic medical knowledge that was adequate"

l. This report proves that I took good care of the patients. I could discuss the specifics of the cases upon request and after review of the details. More than that, when I finished this recall effort, which frankly, was available from the print out, for the most part, we went on to the next case. MUCH to my consternation. I had studied for this test for three years. I had so much background on each of these cases. In the past, I had given lectures to my house staff about ALL of the cases, in one way or the other. After awhile, teaching becomes second nature. And the worst part, when I started one case, with a Clinical Pathological Conference all the way back from 1983, I was stopped in my tracks by the boisterous voice of Dr. Manaker. He did go on to say that he could not be sure about my care of more complicated patients. My answer to that, I am STILL waiting to discuss that part. We had some routine patients, for the most part. Nevertheless, I could have gone on for AT LEAST 20 minutes for each patient. WITHOUT repeating a issue.

9 Pages

m. The notion that I have disordered thinking is absurd. It is a confabulation
The examiner wanted to see how well I recite the orders and results
with no preparation. It made for a more realistic test, he said. Well, no one
can remember three hours of material completely in order. Notwithstanding
that, as I can prove to you, and to anyone, I did a very good job on that. I will
do it again for anyone who is interested.

The other results of the testing. In addition to this oral test which did show I
had logical thinking, the IPE gave me a Micro Cog. It was a screening IQ
test, and cognition test. I passed that. I would call stress the Micro portion of
the cognition test. While I passed it, it did not stress me, at all.   Exhibit 4

On the Multiple choice questions, I scored no lower than a 75. That was
average for that test. In one of the tests I scored in the top 10% of practicing
physicians. ANY objective observer would say they support one thing, retraining.
Furthermore, they do not criticize me for my test results, only for two disorders that
are not present.

ARGUMENT

I.    The Trial Court Incorrectly Decided Appellees, Medical Review and Accrediting Council, Larry Downs, and Joseph Sokolowski's Motions to Dismiss **The Plaintiff's Complaint Pursuant to Rule 12(b)(6)**

**A.        The Trial Court Did Err In Dismissing The Plaintiff's Claims Under 42 U.S.C. 1983**

In this action, The Plaintiff asserted claims under 42 U.S.C. 1983. In order to demonstrate a claim under 42 U.S.C. 1983, a Plaintiff must be able to prove that (1) the challenged conduct was committed by a person acting under the color of state law; and (2) that the conduct deprived the Plaintiff of a right, privilege, or immunity secured by the United States Constitution or federal law. West v. Atkins, 487 U.S. 42, 48 (1988). To establish proximate causation for 42 U.S.C. 1983 claim, a Plaintiff must demonstrate a "plausible nexus" or "affirmative link" between the Defendants conduct and a deprivation of rights. Bielevicz v. Dubinon, *915* F.2d 845, 850 (3d Cir. 1990). Negligence is not sufficient to bring a claim pursuant to 1983. Daniels v. Williams, 474 U.S. 327, 330 (1986).

1.        MRAC, Larry Downs, and Joseph Sokolowski were acting under the Color of State Law

Here, The Plaintiff will be able to show that the actions of Appellees, MRAC, Larry Downs, and/or Joseph Sokolowski were performed by a person acting under the color of state law. The basic purpose of 1983 is to deter state actors from using their authority to deprive individuals of their federally guaranteed rights and to provide related relief Richardson v. McKnight, 521 U.S. 399, 402 (1997). To assert a prima facie case under 1983, the Plaintiff must demonstrate a violation of his federal rights under the color of state law. Groman

**11 Pages**

v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir. *1995), citing* Gomez v. Toledo, 446 U.S. *635,* 640 (1980). To satisfy the "under the color of law" requirement, the Plaintiff must make a showing that the Defendant "exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." West, 487 U.S. at 49.

The "under the color of law" inquiry is fact specific. Burton v. Wilmington Parking Auth., 365 U.S. 715, 725-26 (1961). In Mark v. Borough of Hatboro, the Third Circuit Court of Appeals identified three tests used by the United States Supreme Court to identify whether there has been state action. Mark v. Borough of Hatboro, 51 F.3d 1137, 1142 (3d Cir. 1995). The first test examines whether the private entity has exercised powers that are traditionally the exclusive prerogative of the state. Id., *citing* Blum v. Yaretsky, 457 U.S. 991, 1004 (1982). The second test considers whether the private party has acted with the help or in concert with state officials. **M.,** *citing* McKeesport Hospital v. Accreditation Council for Graduate Medical Ed., 24 F.3d 519, 524 (3d Cir. 1994). The third test involves situations in which the state has so far insinuated itself into a position of interdependence with the private party that it must be recognized as a joint participant in the challenged activity. Lci., *citing* Krynicky v. University of Pitt sburgh, 742 F.2d 94, 98 (3d Cir. 1984).

The Plaintiff alleges facts sufficient to show that MRAC, Larry Downs, or Joseph Sokolowski are state actors. Although The Plaintiff alleges that these Appellees are state actors he does come forward with evidence to support that assertion in a letter sent to him by MRAC.

**12 Pages**

The true meaning of that letter is delineated above. It shows that the people at the UMDNJ had to make the critical decision. Furthermore, I paid them $5000, against $500 an hour. The Preceptor was to come from and All of the retraining was to be done at the UMDNJ.

The Plaintiff does allege sufficient facts to show that the Moving Defendants are state actors under any of the three tests identified in <u>Mark</u>. Under the first test, the Plaintiff must be able to show that the Appellees exercised powers that are traditionally the exclusive prerogative of the state. This point is uncontested. PRIOR to the establishment of the collaborators for the IPE, the FSMB, the organization of ALL of the Medical Boards tested and retrained people in Texas. Also, the NBME did the same in Philadelphia. Both ended that practice, in order to reduce their liability. This is mentioned many times in the past, and is also uncontested. As with the Bar, organizations which provide services that are required for licensure are state actors.

The MRAC would not exist if the FSMB joint program of the FSMB and the NBME, the IPE ( Which still exists ) did not get out of the business of testing and retraining doctors.

Under the second test discussed in <u>Mark</u>, The Plaintiff must show that MRAC acted with the help or in concert with state officials. Again, The Plaintiff DID make this showing in his Complaint. The Plaintiff alleges that MRAC does evaluations and re-training through the UMDNJ. S.A. at 14. He then concludes that MRAC's activities are state action because of this alleged connection with UMDNJ. S.A. at 14 and 21. As evidence of this connection he points to a letter dated October 16, 2006 that he has attached to the Complaint. S.A. at 183. I went over the details in that letter previously. Also, I was told that all of the retraining would be done at the UMDNJ under a UMNDJ preceptor. I was told that umpteen times.

13 Pages

The details of the letter are noted above. Further, the letter clearly states that if The Plaintiff would like for his contacts at UMDNJ to assist him, he should inform MRAC in writing so that they may provide his documents to "a third party." S.A. at 183. The UMDNJ is a large institution. The M.D portion does the retraining. I have contacts in the D.O. portion. This D.O.portion truly is a third party, in this case. It furthermore shows that there is a relationship with that certain M.D. part of the UMDNJ, otherwise, there would be no need to reference a third party. As an aside, the assertion that I could take a letter like that and try and get retrained is just an attempt to get me to go away.

Pursuant to the third test discussed in <u>Mark</u>, The Plaintiff must be able to show that the State of New Jersey has so far insinuated itself into a position of interdependence with MRAC that it must be recognized as a joint participant in the challenged activity.

1. Typically, where the Courts have found this sort of relationship to exist, there has existed some sort of financial relationship between the private entity and the state. See <u>Mark</u>, 51 F.3d at 1143. Here, The Plaintiff did plead facts sufficient to suggest that a financial relationship existed between MRAC and the state. I noted that the defendants charged me $5000, against $500 an HOUR. I was told over, and over, that the bill, most of which would go to retraining could be VERY large. This money would go to the UMDNJ preceptor. That was entirely clear, and mentioned MANY times, by me in the pleadings, and to me by the MRAC personnel.

14 Pages
Further, The Plaintiff asserts that the letter is evidence that the state

exerts "a large amount of control over the MRAC." The details of how that declination came to pass, show that indeed, the UMDNJ had a large affect on the outcome. The letter says that the UMDNJ made the decision, after being given tons of information. After going through the process, it is entirely clear to me, that there is VERY little for the MRAC to do, other than to collect my money, and send it to the preceptor and testing facility. In fact, in conversations with the staff, when the MRAC was formed, they thought they would make a lot of money. However, almost ALL of the large sums of money that come in for retraining go to those who do the retraining. That came directly from the support staff who handled the disbursements.

1.                                                                                    The Plaintiff is alleging that Lany Downs and Joseph Sokolowski were state actors by virtue of their employment with MRAC. What is more, these state actors were deliberately indifferent, as they supported conclusions that both shock the conscience and are totally illegal.

2.            The Plaintiff's Rights, Privileges or Immunities under the United States Constitution or Federal Law were Violated

The Plaintiff has plead facts sufficient to show that his rights, privileges or immunities under the United States Constitution or Federal Law have been affected. In the Complaint, The Plaintiff alleged violations of both his procedural and substantive due process rights.

The Plaintiff alleged that by depriving him of his medical license, his property interest has been "attacked". Therefore, The Plaintiff is attempting to state a procedural due process claim. Procedural due process claims require the consideration of three distinct factors. Matthews v. Eldridge, 424 U.S. 319 (1976). First, the Court must consider the private interest affected by the official actions. Matthews, 424 U.S. at 335. Second, the Court must consider the risk of erroneous deprivation through the procedures used and the probable value, if any, of Additional or substitute safeguards. Matthews, 424 U.S. at 335. Finally, the Court must consider the government's interest. Matthews, 424 U.S. at 335.

15 Pages

The fundamental requirements of due process are notice and a

meaningful opportunity to be heard. <u>Harris v. City of</u> <u>Philadelphia</u>, 47 F.3d 1333, 1338 (3d Cir. *1995).*

In the instant case, the traditional procedural due process considerations are directed at my retraining in medicine. Ewing v Board of Regents is instructive here. While Ewing was a horrible student, and ultimately did not prevail, the property interest in his training was established, as was his right to due process. That did not happen here, at all.

There is EFFECTIVELY one organization that does the testing and overseas the retraining. It is the IPE. I was told that this site in New Jersey was opening by Andrea Ciccone, the director of the IPE. It was close to me, and having no choice, but to pick from IPE sites, I went there. Later Andrea Ciccone specifically FORBADE any more testing, at ANY site.

The Plaintiff also has a property interest in his suspended medical license and in obtaining medical training. The Courts have determined that a person can have a property interest in a medical license where that same person has completed all prerequisites upon which a license may automatically be granted in accordance with a statute or regulation. <u>llerz v. Degnan</u>, 648 F.2d 201, 208 (3d Cir. 1981). However, to have a property right a plaintiff must have more than an abstract need or desire... he must, instead, have a legitimate claim of entitlement to it. <u>Board of</u> <u>Regents v. Roth</u>, 408 U.S. *564,* 577 (1972). Here, The Plaintiff did not lose any legitimate claim of entitlement to his medical license as a property right at the time it was suspended in 1999. Therefore, he had a property right in the license and therefore he can support a procedural due process claim. Dr. Meleikowsky asserted his property right after he was suspended. Ewing also exercised his property right correctly, although his performance in general was poor and it was ruled he did get due process. The property right to a medical license and training is not something new. It is a long held notion.

16 Pages

Also, it should be noted that JUST getting a Medical License in the first place is a feat that FEW can accomplish. Given reasonable conditions, there is no need to posit an abstract need or desire. I DID WELL ON the TESTING. There is every reason to think I could teach again, at some point.

The Plaintiff also alleged in his Complaint that his liberty interest was affected by the actions of the Appellees. S.A. at *15*. Specifically, he alleges that because he has been listed as mentally incompetent, a dangerous person with a narcissistic personality disorder, this has acted as a form of "incarceration." S.A. at 17. I say to the attorney for the defense, you are DAMN STRAIGHT, live as I do for a month, and you will agree. The Plaintiff has properly pled an infringement of his liberty interests. The interest in medical license and training affects both property and liberty interests. It is NOT necessarily there because these illegal diagnoses have been given to me. It is the nature of the medical license/training issue.

The Plaintiff has also alleged a violation of his substantive due process rights and based this claim on the holding in <u>Zinermon v. Burch</u>, 494 U.S. 113, 124 (1990). The Plaintiff in <u>Zinermon</u> was claiming a violation of his procedural due process rights. Id. at 126, 127. The Court in <u>Zinermon</u> did state that the Complaint could be read to assert a claim for substantive due process, however the petition for certiorari did not raise a substantive due process claim. Id. at 126. Therefore, the Court declined to render any opinion regarding substantive due process. Id.

What The Plaintiff is truly seeking in this case is to have his medical training carried out. The Court HAS the authority and/or the jurisdiction to Order this medical training.

B.        The Plaintiff did State a Claim under Title II of the Americans with Disabilities Act

        1.        MRAC, Larry Downs, and Joseph Sokolowski are State Entities as Defined by the ADA

17

The Plaintiff also asserted a claim under Title II of the American with Disabilities Act in his Complaint. Title II of the Americans with Disabilities Act (codified as 42 U.S.C. 12131, et seq.) states:

Subject to the provisions of this title, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.
See 42 U.S.C. 12132.

Section 12131, et seq., specifically relates to the actions of a public entity. As defined in 12131(1), a public entity is:

(A)          any State or local government;
     (B)     any department, agency, special purpose district, or other instrumentality of a State or States or local government; and
     (C)     the National Railroad Passenger Corporation, and any commuter authority (as defined in section 103(8) of the Rail Passenger Service Act [49 USCS 24 102(4)]).

See 42 U.S.C. 12131.


Clearly, MRAC does fall under the definition of a public entity as defined by 12131.


2.                    The Plaintiff is Disabled as Defined by the ADA

The Plaintiff is able to maintain a cause of action under 42 U.S.C. 1213 1, et seq., because he is disabled pursuant to the definition found in the statute. Section 12131 defines a qualified individual with a disability as:

18

an individual with a disability who, with or without
reasonable modifications to rules, policies, or practices, the
removal of architectural, communication, or transportation barriers, or
the provision of auxiliary aids and services, meets the essential eligibility
requirements for the receipt of services or the participation in programs
or activities provided by a public entity.

See 42 U.S.C. 12131. An individual is described as having a disability
under the ADA when they have:

> (A)   a physical or mental impairment that substantially limits
> one or more major life activities of such individual;
> (B)   a record of such an impairment; or
> (C)   being regarded as having such an impairment.

$~ 42 U.S.C. 12102. Major life activities include, but are not limited to,
caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping,
walking, standing, liffing, bending, speaking, breathing, learning, reading,
concentrating, thinking, communicating, and working. ~ 42 U.S.C. 12102.
sufficient to show that his ADHD substantially limits
one or more major life
activities.

In the instant case, as best as can be discerned,
The Plaintiff has alleged that he is a qualified
individual with a disability because he suffers from Attention Deficit
Hyperactivity Disorder (ADHD). Specifically he alleges that he was
discriminated against because the plaintiff has ADHD. Period.

Further, the Plaintiff has plead how his ADHD has substantially limited
a major life activity. While I note the cases presented by the defense, it is to be
noted that I am getting this discriminatory treatment in large part, because I
have ADHD. Why else would one confabulate a bunch of diagnoses. Everyone
knows, that you need more than one to take action.

As a Physician, I do not think like a lawyer. In other words, in my experience, to HAVE ADHD IS to truly meet the criteria for having multiple areas of your life affected. This meets one of the requirements of the ADA. ( I imagine that there are folks who have the diagnosis who truly can fly below the radar, but they are not known to me )

Furthermore, I presented ALL of my Psychiatric records. These records note how the areas of my life, affected by my ADHD are treated. The records offer a huge amount of my Psychiatric history. The Court could easily have inferred how my life is affected from these records.

I also noted how I request an accomodation. That DIRECTLY speaks to the affect ADHD has on my life.

If I have not followed the rules properly in regard to delineating the details of my ADHD, then the district court should have returned my brief with the intention of granting me leave to amend the complaint.

While this does not directly address  why I am a qualified individual under the ADA. The court should know that not everyone who has ADHD is dumb. The entire range of IQs is present with ADHD. So for instance, while I may tend to procrastinate, I am also known as someone who is very thorough. Now, before I put that thoroughness into my medical practice, I had to train myself, with the help of my mentors. While I was in the top third of my class in D.O. I had to redouble my efforts to compete with those who graduated from Harvard and Johns Hopkins when I did my residency at Walter Reed Army Medical Center. While this was a large adjustment, I did it. One day my chief told me so. Keith Kellogg Hunt, my chief,  wrote one of my letters which you have in evidence. I am very proud of that letter.

Also, having gotten the diagnosis relatively late in life, I had to undo some behaviors.

20

"It should be noted that every normal individual exhibits ADHD like symptoms occasionally (when tired or stressed, for example) but to have the diagnosis, the symptoms should be present from childhood and persistently interfere with functioning in multiple spheres of an individual's life: work, school, and interpersonal relationships. The symptoms that individuals exhibit as children are still present in adulthood, but manifest differently as most adults develop compensatory mechanisms to adapt to their environment."

http://en.wikipedia.org/wiki/Adult_attention_deficit_hyperactivity_disorder

Below are the DSM - IV criteria for ADHD. Again, to have ADHD is to say that you are life is affected in accordance with the rules of the ADA. Take a look at the criteria for diagnosis. Note that the symptoms must have been present in childhood, among other things. Also, my symptoms AFTER treatment are much different than before treatment. Furthermore, there are many sub types and what not. My specific diagnosis is in the record.

On a minute to minute basis, on treatment, I am fine. That said, I have always bothered people with my hyperactivity. I no longer blurt out the answers. My Hyperactivity alone has and does affect my social, and work experience. I have never controlled that to a degree people find acceptable. I am controlled however, and very well treated. Although, I can prove that I pay attention, I do not always appear to be doing so. This bothers people to no end. I am relating to you features that are always present, on my best day. As part of my ADHD, I have anxiety. This often affects my sleep. I have taken medication for this for a long time. As my doctor says, I like you better on such and such a medication.

Again, all of this information could have been gleaned from my medical record. That is why I provided it. While I do tell the truth, the record for the most part is truly objective.

To meet the diagnostic criteria according to the DSMIV (Diagnostic and statistical Manual of psychiatric disorders) a couple of aspects have to be considered to meet a diagnosis of adhd:

21

A. Six (or more) of either 1) Inattention, or 2) Hyperactivity/Impulsivity Symptoms must have persisted for at least 6 months to a degree that is maladaptive and inconsistent with developmental level:

1) Inattention

   * often fails to give close attention to details or makes careless mistakes in homework, work, or other activities
   * often has difficulties sustaining attention in tasks or play activities
   * often does not seem to listen when spoken to directly
   * often does not follow through instructions and fails to finish schoolwork, chores, or duties in the workplace (not due to oppositional behavior or failure to understand instructions)
   * often has difficulties organizing tasks and activities
   * often avoids, dislikes or is reluctant to engage in tasks that require sustained mental efforts
   * often loses things necessary for tasks or activities (e.g. toys, school assignments, pencils, books)
   * is often easily distracted by extraneous stimuli
   * is often forgetful in daily activities

2) Hyperactivity/Impulsivity

Hyperactivity

   * often fidgets with hands or feet or squirms in seat
   * often leaves seat in classroom or in other situations in which remaining seated is expected
   * often runs about or climbs excessively in situations in which it is inappropriate (in adolescents or adults, may be limited to subjective feelings of restlessness)
   * often has difficulty playing or engaging in leisure activities quietly
   * is often "on the go" or often acts as if "driven by a motor"
   * often talks excessively

22

Impulsivity

  * often blurts out answers before questions have been completed
  * often has difficulty awaiting turn
  * often interrupt or intrudes on others (e.g. butts into conversations or games)

B) Some symptoms causing impairment were present before age 7 More.

C) Some impairment from the symptoms is present in two or more settings (e.g. at school and at home) More.

D) There must be clear evidence of clinically significant impairment in social, academic or occupational functioning More.

E) Occurrence is not exclusively during the course of a Pervasive Developmental Disorder, Schizophrenia or other Psychotic Disorder

The assessment of whether a person has ADHD or not must be done by a psychiatrist who is an expert on ADHD.

In short, I am a qualified individual with a disability. It affects at least one of the areas of my life, and usually more than one. A small accommodation ameliorates almost all of the issues with my ADHD.

C.       The Plaintiff did File his Complaint Within the Applicable Statute of Limitations

When I got the test results, I rejoiced. I did so with good reason. Prior to the receipt of the results I did not think that I would be able to prove that I had passed the tests. With test results in hand, I fully expected, after some hemming and hawing perhaps, that the MRAC ET AL, would retrain me.

On October 16, 2006, the letter of declination was finally written. I did not get the letter until a few days later. I properly filed my lawsuit on October 16, 2008. It should be noted that the defense initially argued that I did not file on the correct date in October. When they realized that I DID FILE on the correct date, they filed MORE papers regarding this interpretation of the rules in the District Court. The District Court PROPERLY rejected the notion that I missed the deadline for filing my lawsuit.

It is interesting that in trying to say that I should have filed earlier, the defense is now ADMITTING that there were irregularities in the testing.

I thank them for that. I was not injured until the letter of declination was written. The District Court agreed with me on that score.

**II.    The Cases Cited By The Plaintiff which Allegedly Support His Position Do Stand For the Proposition Cited by Appellant**

In his brief, The Plaintiff cited to a number of cases that he asserts supports his position in this matter.

**A.         Mileikowsky v. Medical Board of California does support the position asserted by The Plaintiff**

The first case cited by The Plaintiff is **Mileikowsky v. Medical Board of California.**

The <u>Mileikowsky</u> matter referred to by The Plaintiff involves a challenge by Dr. Mileikowsky to an Order by the California State Medical Board that he undergo an examination under section 820 of the California Business and Professions Code. The Court stated that such an order requires good cause and that due to certain irregularities in the process that resulted in the order good cause did not exist. Specifically, the Court identified a possible conflict of interest, the failure to consider materials supplied by Dr. Mileikowsky, and the consideration of events that occurred more than two years prior to the issuance of the order as irregularities.

The Plaintiff has cited this opinion to support his position that it was improper for the State of Maryland to force him to undergo a forced psychiatric evaluation prior to the suspension of his medical license. The Court in <u>Mileikowsky</u> held that irregularities existed in the process of ordering a psychiatric evaluation and that there was no good cause to have ordered Dr. Mileikowsky's psychiatric evaluation.

Since these documents can only be found apparently, on the web site mentioned, I included them in the Appendix. Please note this is in ADDITION, to the initial referral of Dr. M which is Exhibit 16.

It is NOTABLE, that Dr. M did cite his property interest in his medical license in this case. I submit, that like him, my misdeeds fit no pattern. And they occurred over an even longer period of time. This action was taken based on Dr. M's property interest in his medical license. Here are snippets from the opening brief and from the writ of mandamus. Keep in mind that each state has laws governing physicians. In California, that law is called the Business and Professions Code.

D.  The IndeDendent Judment Test Is  Applicable Here

It is well settled that a physician has a **vested** property right in license to practice medicine. *Hewitt* 1' . *Board of Medical Examiners* (1906) **148 Cal. 590, 592;** *Smith* v. *Board of Medical Quality Assurance* (1988) 202 CaI.App.3d 3 **16,326.**

Suffice it to say, that my experience is a combination of Dr. M, and Ewing, the next case. ( I opined more extensively in my initial brief )

B.          The Plaintiff's Position is Supported by <u>Ewing v. Board of Reuents</u>

The second case that The Plaintiff relies on is <u>Ewing v. Board of Regents</u>, 742 F.2d 913 (6th Cir. 1984). It should be noted from the outset the Sixth Circuit's decision in this case was overturned by the United States Supreme Court in <u>Regents of University of Michigan v. Ewing</u>, 474 U.S. 214 *(1985)*. The Plaintiff's position that he has property and liberty interests in his medical license IS supported by the case law.

Additionally, even if <u>Ewing</u> had not been overturned the case does support The Plaintiff's situation. The Sixth Circuit held that an implied understanding existed between the parties that the Plaintiff could not be arbitrarily dismissed from the university. The Court went on to hold that the implied understanding represented a property interest in his medical training under Section 1983. <u>Ewing</u>, 742 F.2d at *915. While Ewing did have a property interest, his grades were poor, he did get due process, and subsequently he was dismissed after the Board succeeded on appeal.*

"While determining that respondent had a constitutionally protected property interest in continued enrollment in the Inteflex program, the District Court found no violation of his due process rights. The Court of Appeals reversed.

Held:

Even if respondent's assumed property interest gave rise to a substantive right under the Due Process Clause to continue enrollment free from arbitrary state action, the facts of record disclose no such action. The record unmistakably demonstrates that the decision to dismiss respondent was made conscientiously and with careful deliberation, based on an evaluation of his entire academic career at the University, including his singularly low score on the NBME Part I examination."

C.        The Court's Decision in <u>Cohane</u> <u>v. NCAA</u> does Support the
          Plaintiff's Position

     The Plaintiff also cited to the Second Circuit decision in <u>Cohane v.
NCAA</u> to support his position. ~ The Plaintiff's Brief at
p. 8. In <u>Cohane</u> the Court held that the District Court for the
Western District of New York erred in holding that the
National Collegiate Athletic Association (NCAA) could never be a state actor.
<u>Cohane v.NCAA</u>, 215 Fed. Appx. 13, 16 (2d Cir. 2007). The Plaintiff now
asserts that the relationships between the parties in the instant matter are
similar to the relationship between the NCAA and the state university that
employed the Plaintiff in <u>Cohane</u>.

     The Court held that the District Court erred in finding that
the NCAA was never a state actor when conducting an
investigation of a school. <u>Cohane</u>, 215 Fed. Appx. at 16. The Second
Circuit also stated that the NCAA could still show that it did not engage in
concerted action with the university. <u>Cohane</u>, 215 Fed. Appx. at 16.


D.        The Supreme Court's Opinion in <u>Youngberg</u> <u>v. Romeo</u> is pertinent
          in this case.

     The Plaintiff asserts that the holding in <u>Youngberg v. Romeo</u> supports
his position in this case. See The Plaintiff's Brief at p. 8. Specifically, The
Plaintiff argues that it is necessary to reach a determination as to whether
professional judgment was exercised in determining that he could not be re-
trained in medicine. See The Plaintiff's Brief at p. 8.

     A plain reading of the <u>Youngberg</u> case is analogous to the instant matter.
The Court in <u>Youngberg</u> does hold that professional judgment must be
exercised in determining appropriate training. This judgement refers to
psychiatrists in particular, and those who make similar diagnoses.

27

" The proper standard for determining whether the State has adequately protected such rights is whether profes-sional judgment, in fact, was exercised. And in determining what is 'reasonable,' courts must show deference to the judgment exercised by a qualified professional, whose decision is pre-sumptively valid."

I do realize that the Supreme Court changed the wording of the second portion of this quote. It initially mentioned standards. I believe that was a mistake. Now, if you are to read the MANY so called diagnoses I carry, you would truly believe I am the Romeo in this case. ANY reading of the facts would find that unprofessional judgment was exercised by QUITE a few people, Dr. Manaker first among them. (It should be noted that Dr. Manaker did apologize and offer to reexamine me)

When reading Schwartz, this was the case that spoke to psychiatric reports.

**E.       The Plaintiff's Argument Regarding <u>NLRB</u> v. Universal Camera has no Bearing on the Instant Action**

The Plaintiff argues in his Brief that the holding in <u>Universal Camera v. NLRB</u>, 340 U.S. 474 (1951) "was incorrectly applied in this case, or needs to be updated." See The Plaintiff's Brief at p. 9.

While the attorney for the defense seems ignorant of the facts, I am sure the Court KNOWs that ~with~ this case, along with the Administrative Procedure Act Boards can completely reverse the findings of a judge. The District Court , in this case, chose to state the facts as determined by the State, The State could only make these conclusions, reversing ALL of the findings of the Judge because of this case, and law. And so, that makes this case pertinent. When I first heard of the deference given to the state board I said, well, that seems right. I had no idea, that meant the state could do exactly what it wanted to do, regardless of any outcome in court. Furthermore, that outcome must be upheld by subsequent courts. In other words, this case is dreamt of by Junior ADA's across the nation. They can do whatever they want.

"(a) A trial examiner's findings are not as unassailable as a master's, and may be reversed by the Board when when not clearly erroneous. P. 340 U. S. 492."

28

A final case. This body has disciplined this District Court judge in the past for doing something very similar to what Dr. McDaniel and Dr. Manaker did to me. I pray that you take the same approach with the opinions of the two doctors mentioned above. Also, the bias shown by the District Court, in this case is severe, and approaches that which he did in person in this case. For instance, in his dismissal of MRAC, he did not mention the UMDNJ connection once. In my view, the MRAC is just a shell. It is UMDNJ that does the heavy lifting.

http://www.law.com/jsp/article.jsp?id=1202422742487
30
The court, in Svindland v. The Nemours Foundation, vacated a defense verdict in a medical malpractice action because District Court Judge Berle M. Schiller of the Eastern District of Pennsylvania did not leave enough in the record as to his reasoning for his rulings and repeatedly interrupted plaintiffs' counsel, according to the opinion.

"The lack of reasons given by the District Court, when combined with the manner in which the District Court dealt with these issues with counsel, has left us with the impression that the District Court interrupted counsel to a point where intelligible argument could not be had," Senior Circuit Judge Leonard I. Garth said in the nonprecedential opinion.

*Uncontested issues.* These are presented in order. In total, they speak to why the Court should find in my favor.

My medical career as listed in the Brief to the Third Circuit is not contested by the appellee/defense. I assume they checked, and noted my co authorship of a medical article still quoted in the literature, among other very significant milestones in my career.

29

The appellee/defense does not contest that a contractual relationship existed between MRAC and Larry Downs Esq, and Joe Sokolowski M.D. It is notable that I paid them $5000 against $500 an hour. It should be noted that according to the MRAC, the preceptor was going to be spending the most time with me. That was the preceptor from the UMDNJ. However, for some reason, the appellee/defense denies that there was a financial relationship between the UMDNJ and the MRAC. I suspect he has not talked to his client on that score.

[I was told over and over, that the testing would ONLY be prescriptive. Everyone is given a prescription for remediation, however some can get VERY expensive. I can hear the VERY part reverberating in my head to this day. Both Mr. Downs and his assistant stressed this part. Also, my preceptor was to get involved from the start. He or she was to be from the UMDNJ. I was to meet with that person FIRST. Also, the LARGE expense would MOSTLY go to that preceptor, since they would be spending the most time with me. Various scenarios were described, most involved book work, and review.]

The results of the testing were not disputed, except for the notion that I have disordered thinking. This is significant in that I did very well on the testing. [These two notions, doing well, and having disordered thinking are truly mutually exclusive.] When examined, it will be shown that this part refers to my recitation of the events of the Computer simulated testing. I was told to relate what I did to the patients, as it happened, along with the results, as they returned, along with my coincident thinking. I was told to do this with no warning. As noted by the examiner, I eventually related all of the data. For some reason, NOT being able to do this perfectly means that I have disordered thinking. Indeed, it shows two things. I have a VERY good memory. And I related most of the information in order. ( You have to take my word on that part of it, until I can perform for you. ) See Exhibit 4.

The diagnosis of ADHD is not contested.

The notion that I have no any criteria for Narcissitic Personality Disorder, Dangerous person, and Mentally Incompetent person is NOT disputed by the defendants.

30    This

The notion that I do NOT have any criteria for a Thought disorder, in support of their notion that I have disordered thinking, is uncontested.

The notion that the court MAY consider the findings of Judge Kehinde is NOT disputed by the appellees/defendants. They do not consider those findings, but they did not dispute the notion that the court can consider them.

It is uncontested that the court MAY consider the MANY psychiatric reports, especially the two reports ordered by the state that clear me. Granted, the defendants ignore these reports, but the notion that the court may consider these reports is uncontested.

The notion that the boss of the oral interview examiner ( Manaker) in this case noted that they have problems with him, just as I described IS UNCONTESTED. Keep in mind, the examiner works at the Hospital for the University of Pennsylvania. His boss is the Chief of Pulmonary at HUP. ( Hansen Flaschen)

The notion that prior to the establishment of the "collaborators " of the IPE, the Federation of State Medical Boards, FSMB, and the NBME did two things. They formed a joint organization, the PLAS in order to retrain physicians. The PLAS came up with the IPE and the SPEX ( not important here ). The key to this uncontested notion is this. Prior to the collaborators doing this work, the ONLY body doing it was THE group of State Medical Boards. I was told that they stopped doing this ( just before I was tested ) for liability reasons. This assertion is also uncontested. In other words, historically, the activity WAS done by the state and the state alone.

The UMDNJ and the State of NJ send their doctors to the MRAC. This is uncontested. The defendant disputed that MRAC and the UMDNJ have a financial relationship, but The MRAC does pay the UMDNJ money for their services. I paid $5000 as a retainer against $500 an hour, much of which was to go to the Preceptor after the drafting of the remediation plan. It is undisputed that MRAC gave ALL of the documents to the UMDNJ for evaluation. Are we to believe that they were not paid? Or that at the least, payment was not expected?

The defendants did assert their seventh amendment rights to a jury trial. They do not comment on the notion that since they are claiming the constitution applies to them, it also must apply to me. They must respect my property and liberty interests in medical training.


## CONCLUSION

The Plaintiff did state a claim upon which relief can be granted in either the Complaint or Amended Complaint filed in this action. Therefore, the District Court improperly dismissed his Complaint and Amended Complaint.

The defendants are essentially showing that they do not like me, and creating a group of one, against which they are discriminating. This invokes the equal protection clause and further protects me.

If I have failed to state a claim, then I should be granted leave to amend my complaint. In the brief, the Court asked what I wanted them to do. I ordered them in terms of importance. I am not sure what you can or plan to do. Any combination of those requests would further my case.

Because of the MANY uncontested points, the Court MUST find in my favor.

Joseph O. Boggi D.O.
Internal Medicine
1207 Ballard Street
Silver Spring, Maryland 20910

240-330-6837
32

## CERTIFICATE OF SERVICE

I, Jospeh O. Boggi D.O. Internal Medicine,  do hereby certify that a true and correct copy of Appellant's answer was served via the Court's Electronic Filing System, on the date indicated below, on the following counsel of record:

Joseph 0. Boggi, D.O
1207 Ballard Street
Silver Springs, MD 20910
*Pro Se Plain tiff*

Michael E. Sacks, Esquire
Hamburg & Golden, P.C.
1601 Market Street
Suite 3310
Philadelphia, PA 19103


Kern E. Chewning, Esq.
Archer & Greiner
One Centennial Square
P.O. Box 3000
Haddonfield, NJ 08033

Joseph Goldberg, Esquire
Michael B. Pullano, Esquire
2000 Market Street, 13th Floor
Philadelphia, PA 19103
*(215) 972-7900*
*(215) 564-7699* _fax
goldberg(~wg1aw.com
mpullanoc~wg1aw.com
Attorneys for Appellees,



October 16, 2006

Joseph O. Boggi, DO
1207 Ballard Street
Silver Spring, Maryland 20910

RE:          *Remediation Request*

Dear Dr. Boggi:

We regret to inform you that we cannot assist you any further in this matter. Based on the record established by the Maryland Medical Board and confirmed by the evaluation performed by MRAC, we are unable to offer any remediation plan.

On July 17, 2006 MRAC provided you with the results of your competency evaluation. You have requested that MRAC develop a remedial program to address the deficiencies identified in the competency evaluation. MRAC referred your testing results and the information you supplied from the licensing authorities in Maryland to our colleagues at UMDNJ to discuss a possible remediation program.

A review of your case showed that you performed well on some of the standardized testing, however problems were revealed on the Transaction Stimulated Recall (TSR) portion of your testing. The results of the TSR indicate disordered thinking which is consistent with some of the findings reported in the Maryland Board summary. The underlying dual problems of adult variant ADD and narcissistic personality disorder present real problems for any remediation plan MRAC could provide.

After review of the materials and the test results it becomes apparent that MRAC does not have the capacity to engage in a remediation for your circumstance. We have previously provided you with your test scores and transaction report developed in the course of our evaluation. At this point we are closing your file.

I understand from your many emails and phone messages that you have personal contacts at UMDNJ that you believe can assist you in your efforts. Should you need us to forward copies of our files to a third party please make a request in writing so that we have your permission to do so.

Sincerely,

Lawrence Downs, Esq.

Two Princess Road   Lawrenceville, NJ   08648-2302
609-896-1766 ext. 258   FAX 609-896-1368

DEC-22-04  05:41PM    FROM-MAIN STREET LAW BUILDING        +3103929029        T-899  P.06/13  F-212

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SACRAMENTO

| | | | |
|---|---|---|---|
| DATE/TIME | : 12/21/04 nunc pro tunc December 10, 2004 | DEPT. NO | : 2S |
| JUDGE | : Raymond M. Cadei | CLERK | : Cindy Jo Miller |
| REPORTER | : none | BAILIFF | : Michelle Luther |

|  |  |
|---|---|
| GIL N. MILEIKOWSKY, M.D. - RET,<br>Petitioner, | PRESENT:<br>Roger Diamond, Esq. &<br>Paul Hittleman, Esq. |
| VS.    Case No.: 04CS00969 | Robert C. Miller,<br>Deputy Attorney General |
| MEDICAL BOARD OF CALIFORNIA-RES,<br>Respondent. | David B. Parker, Esq. for Applicant<br>and Proposed Amicus Curiae - Assoc of<br>American Physicians & Surgeons, Inc. |

| Nature of Proceedings: | AMENDED MINUTE ORDER<br>HEARING RE: PETITION FOR WRIT OF MANDAMUS |
|---|---|

The above-entitled cause came on for hearing this day for which the court issued a tentative ruling the previous day. The court affirmed its tentative ruling in that neither party requested hearing to argue the tentative ruling.

MILEIKOWSKY v. MEDICAL BOARD OF CALIFORNIA, Case No. 04 CS 00969:

The following shall constitute the Court's tentative ruling on the petition for writ of mandate, set for hearing on Friday, December 10, 2004. The tentative ruling shall become the ruling of the Court unless a party desiring to be heard so advises the clerk of this Department no later than 4:00 p.m. on the court day preceding the hearing, and further advises the clerk that such party has notified the other side of its intention to appear.

The petition for writ of mandate is granted.

An order for examination under Business and Professions Code section 820 is an investigatory procedure that does not require the full range of procedural due process protections that are available to a licensee in an adjudicatory procedure. (See, *Alexander D. v. Board of Dental Examiners* (1991) 231 Cal App. 3d 92.)

| | |
|---|---|
| BOOK : 25<br>PAGE :<br>DATE : December 10, 2004<br>CASE NO. : 04CS00969<br>CASE TITLE : Mileikowsky v. Med Brd | SUPERIOR COURT OF CALIFORNIA,<br>COUNTY OF SACRAMENTO<br><br>BY: Cindy Jo Miller,<br>Deputy Clerk |

Page 1 of
\\SMCH10\DATA\Counclerk\dept25\04CS00969 Amended Writ Hrg 121004 doc

DEC-23-04 05:42PM    FROM-MAIN STREET LAW BUILDING    +3103828029    T-888  P.07/13  F-212

CASE NUMBER: 04CS00969                                          DEPARTMENT: 25
CASE TITLE:  Mileikowsky v. Med Brd
PROCEEDINGS:  COURT'S RULING ON PETITION FOR WRIT OF MANDATE

Nevertheless, such an order does require a showing of good cause, and where no such showing has been made the licensee's privacy rights have been violated, the order is not valid, and the licensee cannot be disciplined under Business and Professions Code section 821 for failing to obey it. (See, *Kees v. Medical Board* (1992) 7 Cal. 4th 1801.)

In this case, the Court finds that, as the result of various irregularities in the process that resulted in the order that petitioner submit to a mental examination, no showing of good cause was made, or, in fact, could be made under the procedure followed in this case. Those irregularities may be summarized as follows.

The "805 report" on which the order was based does not, by itself, inevitably lead to the conclusion that petitioner suffers from mental or physical illness that renders him unable to practice medicine safely within the meaning of Business and Professions Code section 820. The incidents described in the report do not appear to fit into a neat pattern, and not all of them truly suggest bizarre or unbalanced behavior. Some of the incidents described in the report, in fact, are equivocal in nature and might just as accurately be characterized as incidents of aggressive or unpleasant behavior by petitioner in the context of a confrontation, rather than as evidence of mental illness or impairment. Some of the incidents listed in the report, such as that petitioner was required to be monitored by security personnel while on hospital premises, or that a representative of the nurses' union complained that nurses felt threatened by petitioner, are presented without any specific factual context, are based on hearsay, and (as above) may reflect a confrontational personality rather than mental illness or impairment. Finally, two of the incidents were at least a year old at the time of the report, and all of them were more than two years old at the time of the order. The age of the incidents raises questions about their relevance to determining petitioner's condition at the time of the order.

Petitioner contends that many of the incidents recounted in the report may indeed by explained as arising out of a dispute between himself and the hospital management. Respondent permitted petitioner to submit documentation explaining his side of the matter, but the record indicates that respondent did not forward those materials to the assigned medical reviewer for consideration. Moreover, it does not appear that petitioner's materials were considered in respondent's investigation report, although there is evidence that they had been forwarded to the assigned investigator approximately seven months prior to the date of the report. Similarly, there is no indication in the final order for examination that petitioner's materials were considered by anyone on behalf of respondent.

BOOK        : 25
PAGE        :
DATE        : 12/21/04 nunc pro tunc 12/10/04.
CASE NO.    : 04CS00969
CASE TITLE  : Mileikowsky v. Med Brd

SUPERIOR COURT OF CALIFORNIA,
COUNTY OF SACRAMENTO

BY:  Cindy Jo Miller,
     Deputy Clerk

Page 2 of 3
\\SMCH10\DATA\Court\clerk\dept25\04CS00969 Amended Writ Hrg 121004 doc

900 ②                        SAC SUPERIOR COURT        12/21/2004 17:43 FAX 9168745620

DEC-22-04 05:42PM    FROM-MAIN STREET LAW BUILDING    +3103829020    T-898  P.08/13  F-212

CASE NUMBER: 04CS00969    DEPARTMENT: 25
CASE TITLE: Mileikowsky v. Med Brd
PROCEEDINGS:   COURT'S RULING ON PETITION FOR WRIT OF MANDATE

Finally, and perhaps most significantly, the record shows that the assigned medical reviewer, Dr. Noble, was associated with the institution that had made the "805 report", and that respondent knew of that association at the time he was appointed to review petitioner's case. Such association suggests, at a minimum, the possibility of a conflict of interest that might taint Dr. Noble's ultimate conclusions. As noted, Dr. Noble did not receive the material petitioner submitted to explain his actions. His declaration in support of the petition to compel the examination of petitioner largely mirrors the content of the "805 report", with, however, at least one additional allegation (regarding petitioner taking up to 150 photographs after a hysterectomy) that does not appear in the "805 report", the source of which has never been adequately explained.

In any case, Dr. Noble's declaration, which appears to have been the only expert medical opinion in support of the order, does not address the age of the allegations against petitioner or the explanatory factual context in which they arose. Whether this was the reflection of a conflict of interest or of a simple failure to have available and consider all of the relevant facts, the result is that Dr. Noble's declaration fails to establish good cause to order petitioner to submit to an examination.

Based on the foregoing, the Court finds that there was no showing of good cause to support the order that petitioner submit to an examination under Business and Professions Code section 820. Under the principles stated in *Kees v. Medical Board, supra,* 7 Cal. App. 4th at 1815, as a matter of law the finding that petitioner violated section 820 cannot stand. The petition for writ of mandate accordingly is granted to require respondent to vacate the disciplinary order entered against petitioner dated July 16, 2004 as well as the underlying order for examination dated November 12, 2002. The stay previously entered by the Court shall be continued in effect until respondent has complied with the writ. The Court's ruling does not preclude respondent from taking further action on the basis of the "805 report", as opposed to the orders that have been vacated by this ruling, provided that such action is taken in conformity with the views expressed herein regarding full consideration of all relevant factors and available evidence, and the use of a disinterested medical reviewer.

In the event that this tentative ruling becomes the final ruling of the Court, counsel for petitioner is directed to prepare a written order, judgment and writ of mandate in conformity with this ruling, submit them to counsel for respondent for approval as to form, and thereafter submit them to the Court pursuant to Rule of Court 391.

BOOK        : 25
PAGE        :
DATE        : 12/21/04 nunc pro tunc 12/10/04
CASE NO.    : 04CS00969
CASE TITLE  : Mileikowsky v. Med Brd

SUPERIOR COURT OF CALIFORNIA,
COUNTY OF SACRAMENTO

BY: Cindy Jo Miller.
    Deputy Clerk

Page 3 of 3

\\SMCH10\DATA\Courtclerk\dept25\04CS00969 Amended Writ Hrg 12\004.doc

DEC-22-04 05:42PM    FROM-MAIN STREET LAW BUILDING            +3103828029         T-898  P.06/13  F-212

December 10, 2004
Mileikowsky:MedBd
JOPWAM

1  Roger Jon Diamond, Esq.
   2115 Main Street
2  Santa Monica, CA 90405
   State Bar No. 40146
3  Telephone No: 310/399-3259
   Facsimile No.: 310/392-9029
4
   Paul M. Hittelman
5  12400 Wilshire Blvd., 15th Fl.
   Los Angeles, CA 90025-1023
6  Telephone No: 310/442-0555
   Facsimile No: 310/442-0888
7
   Attorneys for Petitioner
8  GIL NATHAN MILEIKOWSKY, M.D.

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                 FOR THE COUNTY OF SACRAMENTO

11

12  GIL NATHAN MILEIKOWSKY, M.D.  )   CASE NO: 04CS00969
                                  )
13       Petitioner,             )   JUDGMENT GRANTING PEREMPTORY
                                  )   WRIT OF ADMINISTRATIVE MANDAMUS
14       vs.                     )
                                  )
15  MEDICAL BOARD OF CALIFORNIA, )   Judge:    Hon. Raymond M. Cadei
                                  )
16       Respondent              )
                                 )
17

18       The Court having read and considered the verified Petition for

19  Writ of Administrative Mandamus, the motions for peremptory writ of

20  administrative mandamus, the opposition, the reply, and the

21  administrative record, the Court having issued a tentative decision and

22  neither party having requested oral argument, and GOOD CAUSE APPEARING

23       IT HEREBY ORDERED, ADJUDGED, AND DECREED that a peremptory writ of

24  administrative mandamus issue under the seal of this Court directing

25  Respondent Medical Board of California to vacate its order of November

26  12, 2002 compelling Petitioner to submit to a mental and physical

27                                  1

28  JUDGMENT GRANTING PEREMPTORY WRIT OF ADMINISTRATIVE MANDAMUS

ENDORSED

DEC 2 1 2004

By C. Miller, Deputy

DEC-22-04 05:42PM  FROM-MAIN STREET LAW BUILDING                +3103923029              T-888  P.10/13  F-212

December 10, 2004
Milakowsky/MludEd
IGPWAX

1  examination, and to vacate its order of July 16, 2004, which had

2  adopted a proposed decision submitted on June 24, 2004 by the

3  Administrative Law Judge.

4      This judgment is based upon the Court's Minute Order filed

5  December 10, 2004.

6      Petitioner shall recover his costs in the sum of $_____ against

7  Respondent Medical Board of California.

8                                  RAYMOND M. CADEI

9

10                                      HON. RAYMOND M. CADEI,
                                        JUDGE

11      It is further ordered that this Judgment does not preclude

12  Respondent from taking further action on the basis of the "805

13  report", as opposed to the orders that have been vacated by this

14  ruling, provided that such action is taken in conformity with the

    views expressed herein regarding full consideration of all relevant

15  factors and available evidence, and the use of a disinterested

16  medical reviewer.

17

18

19

20

21

22

23

24

25

26

27

28

The annexed instrument is a correct copy of
the original on file in my office.

Attest:
Certified:        DEC 2 2 2004

Superior Court of California
By _____ Deputy Clerk

2

JUDGMENT GRANTING PEREMPTORY WRIT OF ADMINISTRATIVE MANDAMUS

@003                        SAC SUPERIOR COURT              12/21/2004 17:43 FAX 9168745820

1   **IUNGERICH & SPACKMAN**
**A Professional Law Corporation**
2  Russell Iungerich, State Bar No. 43440
Paul Spackman, State Bar No. 149754
3  28441 Highridge Road, Suite 201
Rolling Hills Estates, California 90274-4871
4     Telephone: (310) 697-0288
      Fax: (310) 697-0289
5
Attorneys for Petitioner
6  GIL MILEIKOWSKY, M.D.

7

8       SUPERIOR COURT OF THE STATE OF CALIFORNIA

9          FOR THE COUNTY OF SACRAMENTO

10  GIL N. MILEIKOWSKY, M.D.,     )  Case No. 04CS00969
                      )  MBC Case No. 17-2000-116392
11     Petitioner,        )  OAH No. L-2003020385

12                      )  **PETITIONER'S OPENING BRIEF**

13     v.               )

14                      )

15  MEDICAL BOARD OF CALIFORNIA, )

16     Respondent.      )  Date:   October 8, 2004
                      )  Time:  10:00 a.m.
                      )  Dept.:  25 (Judge Raymond Cadei)

17

18                  **TABLE OF CONTENTS**

19

20

21                                              Page

PRELIMINARY STATEMENT                       1

STATEMENT OF THE CASE                     5

     A.  Background to the 805 Report               5
     B.  The 805 Report to the Board               7
     C.  The Board's Initial Response to the 805 Report   7
     D.  Investigator Seely Selects a Medical Consultant
         with an Egregious and Apparent Conflict of Interest   9
     E.  The Board Proceeds Solely on Noble's Less Than Impartial
         Declaration                       10
     F.  How Seely (Not the Board) Filled in the Blanks   12
     G.  Mileikowksy's Objections and the Stonewall Response   13

28

1  ARGUMENT

2      I.    The First Amended Accusation Based on the Board's Order
             Was in the Nature of a Contempt Proceeding and Had To Be
3            Complete In and of Itself To Be Enforceable                           15

4      II.   No Violation of the Board's Order Was Proved by Evidence
             in the Administrative Record                                           18
5
       III.  As A Matter of Law, The Medical Board Was Obliged to Consider
6            and Decide Dr. Mileikowsky's Defense That The Designated
             Examiners Were Non-Neutrals and That Dr. Gorbaty Not Competent         19
7
       IV.   There Should Be a Dismissal for Unreasonable Delay                     24
8
       V.    The Board Did Not Consider Exculpatory Evidence Before
9            Proceeding                                                             25

10     VI.   The Discipline Imposed Is Improper Punishment                          25

11     VII.  The $12,315 Of Costs is Punitive and Improper                          27

12

13  CONCLUSION                                                                      28

14

15  PROOF OF SERVICE

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

| Cases | Page |
|---|---|
| Abelleira v. District Court of Appeal (1941) 17 Cal.2d 280, 292-293 | 23 |
| Bixby v. Pierno, (1971) 4 Cal.3d 130, 144 | 3 |
| Boardman v. Indus. Acc. Comm'n (1956) 140 Cal.App.2d 273, 277 | 21 |
| Brunton v. Superior Court (1942) 20 Cal.2d 202, 205 | 15 |
| Butler v. Superior Court (1960) 178 Cal.App.2d 763, 765 | 16 |
| Cooper v. Kizer (1991) 230 Cal.App.3d 1291, 1299 | 5 |
| Ettinger v. BMQA (1982) 135 Cal.App.3d 853, 856 | 26 |
| Fountain Valley Reg. Hosp. & Med. Center v. Bonta (1999) 75 Cal.App.4th 316, 323-324 | 24 |
| Fukuda v. City of Angels Camp, (1999) 20 Cal.4th 805, 817 | 5 |
| Gates v. Department of Motor Vehicles (1979) 94 Cal.App.3d 921, 925 | 24 |
| Gottlieb v. Superior Court (1959) 168 Cal.App.2d 309, 313 | 16 |
| Haas v. County of San Bernardino (2002) 27 Cal.4th 1017, 1025-1027 | 21 |
| Hallinan v. Committee of Bar Examiners (1966) 65 Cal.2d 447, 471 | 27 |
| Hewitt v. Board of Medical Examiners (1906) 148 Cal.590, 592 | 4, 17 |
| Jarchow v. Transamerica Title Ins. Co. (1975) 48 Cal.App.3d 917, 948 | 19 |
| Johnson v. City of Loma Linda (2000) 24 Cal.4th 61, 70 | 23 |
| Johnson v. Superior Court (1975) 15 Cal.3d 248, 254-255 | 25 |
| Kimura v. Roberts (1979) 89 Cal.App.3d 871, 875 | 22 |
| In Re:Berry (1968) 68 Cal.2d 137, 156 | 17 |
| In Re:Stephanie M. (1994) 7 Cal.4th 295, 318-319 | 25 |
| Landgate, Inc. v.Cal.Coastal Comm'n. (1998) 17 Cal.4th 1006, 1040 | 19 |
| Lentz v. Macmahon (1989) 49 Cal.3d 393, 400 | 19 |
| Little v. Superior Court (1968) 260 Cal.App.2d 311, 318 | 16 |
| Long Beach City Employees Assn. v. City of Long Beach (1986) 41 Cal.3d 937, 943-944 | 26 |

PETITIONER'S OPENING BRIEF

**TABLE OF AUTHORITIES (Cont'd)**

<u>Cases</u>                                                                                    <u>Page</u>

Mathews v. Eldridge (1976) 424 U.S. 319, 335                                          21

Morrison v. State Board of Education (1969) 1 Cal.3d 214, 229                         27

Richardson v. Board of Supervisors (1988) 203 Cal.App.3d 486, 494                    27

Rock Island, Ark. & La.R.R. v. United States (1920) 254 U.S. 141, 143                19

Sierra Club v. San Joaquin Local Agency Formation Com. (1999) 21 Cal.4th 489, 495   23

Smith v. Board of Medical Quality Assurance (1988) 202 Cal.App.3d 316, 326        4, 17

Sorenson v. Superior Court (1969) 269 Cal.App.2d 73, 78                               16

Suckow v. Alderson (1920) 182 Cal.247, 250                                           17

Tatum v. Southern Pacific Co. (1967) 250 Cal.App.2d 40, 42                            22

Vaill v. Edmonds (1991) 4 Cal.App.4th 247, 257                                         5

Yakov v. Board of Medical Examiners (1968) 68 Cal.2d 67, 73 n.6                       26

Yellen v. BMQA, (1985) 174 Cal.App.3d 1040, 1056                                       5


<u>Statutes</u>

<u>California</u>

Business and Professions Code

       §820                                                              1, 16, 18, 20

       §821                                                              1, 16, 24, 27

       §805                                                                         7

       §822                                                                        22

Government Code

       §11513(d)                                                                   19

1    **IUNGERICH & SPACKMAN**
     **A Professional Law Corporation**
2    Russell Iungerich, State Bar No. 43440
     Paul Spackman, State Bar No. 149754
3    28441 Highridge Road, Suite 201
     Rolling Hills Estates, California 90274-4871
4    Telephone: (310) 697-0288
     Facsimile: (310) 697-0289
5
     Attorneys for Petitioner
6    GIL NATHAN MILEIKOWSKY, M.D.

7

8               SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                    FOR THE COUNTY OF SACRAMENTO

10   GIL NATHAN MILEIKOWSKY, M.D.,    )   Case No.  04CS00969
                                      )
11        Petitioner,                 )   **PETITIONER'S OPENING BRIEF**
                                      )
12        v.                          )
                                      )
13   MEDICAL BOARD OF CALIFORNIA,     )   Hearing
                                      )   Date:   October 8, 2004
14        Respondent.                 )   Time:   10:00 a.m.
                                      )   Dept:   25 (Judge Raymond Cadei )
15   ─────────────────────────────────

16                       **PRELIMINARY STATEMENT**

17        A.    **Petitioner's Background and Absence of Prior Discipline**

18             Petitioner    GIL   N.   MILEIKOWSKY,   M.D.   (hereinafter   "Dr.

19   MILEIKOWSKY"), was a Board-certified obstetrician and gynecologist whose practice

20   focuses on reproductive medicine. His license has never previously been disciplined by the

21   MEDICAL BOARD for any reason whatsoever.  (Pet., p. 2, ¶¶ 1 & 2.)  The instant Decision

22   does not impose discipline for gross negligence, repeated negligent acts, incompetence or

23   even general unprofessional conduct with respect to any patient or patients Dr.

24   MILEIKOWSKY has ever treated in his career as a physician in this state. Indeed, no patient

25   has brought this  complaint against Dr. MILEIKOWSKY.

26        B.    **The First Amended Accusation Sought a Discipline As the**

27             **Equivalent of a Contempt Against Dr. MILEIKOWSKY**

28        The  First Amended Accusation upon which the MEDICAL BOARD brought

                                         1
                          PETITIONER'S OPENING BRIEF

1  the underlying administrative proceedings was brought pursuant to Business and Professions

2  Code section 820, which provides:

3      "Whenever it appears that any person holding a license, certificate or

4      permit under this division or under any initiative act referred to in this division

5      may be unable to practice his or her profession safely because the licentiate's

6      ability to practice is impaired due to mental illness, or physical illness affecting

7      competency, the licensing agency may order the licentiate to be examined by

8      one or more physicians and surgeons or psychologists designated by the agency.

9      The report of the examiners shall be made available to the licentiate and may

10     be received as direct evidence in proceedings conducted pursuant to Section

11     822."

12     Business and Professions Code section 821 provides:

13     **"The licentiate's failure to comply with an order issued under**

14     **Section 820 shall constitute grounds for the suspension or revocation of the**

15     **licentiate's certificate or license."**

16         In this case, the MEDICAL BOARD order imposes suspension and revocation

17  of Dr. MILEIKOWSKY's license, which he has held since February 27, 1984, because he

18  objected to the apparent lack of neutrality of two examiners designated by a Board

19  investigator but not named in the incomplete order issued by the BOARD pursuant to

20  Business and Professions Code section 820[1] and the lack of qualifications of Dr. Gorbaty to

21  perform any of the tasks set forth in the First Amended Accusation.

22         In its Decision, respondent MEDICAL BOARD did not even consider Dr.

23  MILEIKOWSKY's objections to the apparent lack of neutrality of the examiners, which was

24

25      [1]The BOARD's decision nowhere explains how a letter from an investigator can "amend"
    or "supplement" an order of the BOARD which is incomplete. Business and Professions Code
26  section 821 provides that only "the licensing agency may order" the compelled examinations
    ordered here. The BOARD (agency) did not name the examiners in its order; only the
27  BOARD, sitting as the agency and not an investigator, could amend its order issued as a
28  BOARD.

2

PETITIONER'S OPENING BRIEF

1  a legitimate excuse not to have these examiners perform examinations of his person or his

2  personality.

3        The   petition filed by petitioner MILEIKOWSKY raises issues of first

4  impression under these two statutes with regard to fairness and due process as well as the

5  proper procedures which the BOARD must follow in order to coercively compel a licensed

6  physician to submit to psychiatric, neurologic and drug testing based on suspicions

7  engendered by a report to the BOARD from a hospital. The California Supreme Court has

8  held that the abrogation of a vested right in a professional license ". . . is too important to the

9  individual to relegate it to exclusive administrative extinction." *Bixby v. Pierno* (1971) 4

10 Cal.3d 130, 144, 93 Cal.Rptr. 234, 244. One only has to recall the abuses of Stalinist Russia

11 in sending political dissidents and undesirables to mental hospitals to be sensitized to the

12 serious concerns – privacy and otherwise – engendered by coercive orders to compel

13 physicians charged with no crimes and no disciplinary offenses to submit to psychiatric,

14 neurologic, and drug testing under sections 820 and 821.

15        Petitioner MILEIKOWSKY came to the attention of the MEDICAL BOARD

16 OF CALIFORNIA because of a Business and Professions Code section 805 report filed by

17 Encino-Tarzana Regional Medical Center (a Tenet Health Systems Hospital)[hereinafter

18 "Encino-Tarzana"] **on December 11, 2000 – now more than three years ago.** This report

19 referred to an initial incident which occurred on February 2, 1999, and to other incidents.

20 (Complainant's Exh. 10.)  From the date of receiving the report in December of 2000 until

21 October of 2002, complainant BOARD did nothing about the 805 report. Any claim that Dr.

22 MILEIKOWSKY represents an imminent danger to the public must fall on deaf ears because

23 the information upon which the underlying order was based was more than two years old

24 when the order for a mental and physical examination was first sought. Dr. MILEIKOWSKY

25 has been practicing without relevant incident or evidence of impairment from 1984 to the

26 present.    Indeed, recent psychiatric, neurologic and drug screens to which Dr.

27 MILEIKOWSKY has submitted by neutral and disinterested examiners show that he does not

28 suffer from any condition that impairs his ability to practice medicine safely.

PETITIONER'S OPENING BRIEF

1    The Decision and Order of respondent MEDICAL BOARD OF CALIFORNIA
2  under review in this proceeding is the functional equivalent of a contempt proceeding,
3  imposing discipline to coerce Dr. MILEIKOWSKY to comply with a BOARD order for
4  psychiatric, etc., test, finding that he did not comply with the BOARD's order for psychiatric,
5  neurologic, and drug testing.

6    **C.    The Discipline Sought To Be Vacated**

7    In the BOARD's Decision filed July 16, 2004, which was to have become
8  effective on August 16, 2004, until stayed by this Court on August 12, 2004, the BOARD has
9  disciplined petitioner MILEIKOWSKY in part by revoking his license, staying revocation of
10 his license, and placing him on suspension and permanently revoking his license as follows:

11    "a.    If within 30 days after the effective date of this Decision, Respondent
12    complies with the Division's Order by being examined and evaluated physically
13    and psychologically by the doctors designated by the Division to do those
14    examinations, then sixty days after the effective date of the Decision, the
15    suspension will be terminated and the revocation permanently stayed.[2]"

16    "b.    However, if Respondent fails to comply with the Division's Order as
17    provided in paragraph 1(a) of this Order, then, on the 31st day after the effective
18    date of this Decision, the suspension will be terminated, the stay of the
19    revocation will be lifted, and the order of revocation will be imposed."

20    A copy of this Decision is attached as Exhibit A to this Petition.

21    **D.    The Independent Judgment Test Is Applicable Here**

22    It is well settled that a physician has a vested property right in license to practice
23 medicine. *Hewitt v. Board of Medical Examiners* (1906) 148 Cal. 590, 592; *Smith v. Board of*
24 *Medical Quality Assurance* (1988) 202 Cal.App.3d 316, 326.

25

26    [2]"The suspension serves the dual purpose of providing protection to the public and
27 allowing Respondent the opportunity to reflect on his obligation to obey the laws and regulations
that govern the practice of medicine in California."  [This footnote is in quotation marks because
28 it is a footnote in the BOARD's order."

1    Accordingly, a physician is not only entitled to judicial review of license discipline,
2    but review of underlying factual findings under the independent judgment test. In applying the
3    independent judgment test, the trial court weighs the evidence and makes its own determination as
4    to whether the board's decision should be upheld. *Vaill v. Edmonds* (1991) 4 Cal.App.4th 247, 257.
5    Under the independent judgment test, this court must make its own determination of the credibility
6    of witnesses. *Cooper v. Kizer* (1991) 230 Cal.App.3d 1291, 1299; *Yellen v. BMQA* (1985) 174
7    Cal.App.3d 1040, 1056. In *Fukuda v. City of Angels Camp* (1999) 20 Cal.4th 805, 817, the
8.   California Supreme Court reaffirmed its continued support of the independent judgment test. While
9    noting that there is a strong presumption of correctness concerning administrative findings, that
10   presumption is rebuttable, and the party challenging the administrative has the burden of convincing
11   the court that the administrative findings are contrary to the weight of evidence. *Id.*

12   **E.    The Administrative Record**

13   The administrative transcript of the hearing before Administrative Law Judge
14   Carolyn Magnuson and complainant's and respondent's exhibits have been lodged with the
15   Court already so that this Court could consider them in ruling on the ex parte application for
16   a stay which this Court granted on August 12, 2004.

17   **F.    What Dr. MILEIKOWSKY Seeks**

18   Dr. MILEIKOWSKY seeks to have this Court grant his petition for
19   administrative mandamus and to have this Court vacate by peremptory writ the Decision and
20   Order of the MEDICAL BOARD OF CALIFORNIA, the underlying First Amended
21   Accusation, and the order of November 12, 2002.

**STATEMENT OF THE CASE**

22

23   **A.    Background to the 805 Report**

24   In 1999, petitioner MILEIKOWSKY was a member of the staff of the Encino-
25   Tarzana Regional Medical Center, a hospital owned and operated by Tenet Health System
26   [hereinafter Tenet]. On February 2, 1999, after being advised by Tenet that he had failed to
27   renew his staff privileges after they had expired upon his alleged failure to submit a timely
28   application for reappointment, petitioner went to the medical staff office and requested a

5

1   reappointment application as it was the last day he could submit one. The exact confrontation
2   between petitioner and the medical staff is in dispute as to what actually occurred at the
3   medical staff office.[3]

4        On April 6, 1999, petitioner filed an action in the Los Angeles County Superior
5   Court to compel Tenet to process his application for reappointment to the medical staff,
6   *Mileikowsky v. Tenet Health System, etc.*, Los Angeles County Case No. BS056525. On April
7   20, 1999, the Los Angeles County Superior Court (the Honorable Robert O'Brien) granted
8   petitioner's request for preliminary injunction over the objection of Tenet. The preliminary
9   injunction required Tenet to process his application for reappointment to the medical staff.

10       Having been compelled by the Los Angeles County Superior Court to process
11  petitioner's application for renewal staff privileges, Tenet retaliated. On January 11, 2000,
12  the Medical Executive Committee voted to deny petitioner's reappointment application.
13  Petitioner appealed that decision by requesting a Judicial Review Committee, which began
14  hearing evidence in October, 2000 with respect to petitioner's reappointment application.

15       While petitioner's reappointment application had not yet been finally resolved,
16  Tenet summarily suspended petitioner's privileges on November 16, 2000 without any
17  medical or legal foundation. Petitioner appealed on November 17, 2000 and on November
18  28, 2000, the Medical Executive Committee upheld the summary suspension. On November
19  30, 2000, petitioner MILEIKOWSKY's judicial review hearing was improperly stopped by
20  hearing officer hired by Tenet.[4]

21

22     [3] The confrontation between petitioner and some medical staff personnel at the Tenet
23  Hospital on February 2, 1999 is the basis for the contention (false) the petitioner engaged in
    bizarre behavior justifying a psychiatric examination. The accusation of the bizarre behavior is
24  totally unfounded. Petitioner was simply concerned that Tenet deliberately failed to send to
    petitioner his renewal application form because petitioner had become an outspoken critic of
25  certain, deficient health care. On June 19, 2000, Dr. MILEIKOWSKY was designated as an
26  expert witness in a battery and gross negligence case against Tenet and two physicians.

27     [4]Later, on April 26, 2001, the appeal body overturned the decision to terminate the
    hearing and the hearing then resumed. It was combined with a second hearing involving the
28  summary suspension.

### B.    The 805 Report to the BOARD

On December 5, 2000, Chief Executive Officer Dale Surowitz of Tenet sent respondent MEDICAL BOARD an "805 report" (Bus. & Prof. Code § 805) advising the MEDICAL BOARD of petitioner MILEIKOWSKY's summary suspension setting forth a one-sided version of eight separate incidents, none of which involved a patient complaint of substandard care by petitioner.[5]

### C.    The BOARD's Initial Response to the 805 Report

For more than a year, the Medical Board did nothing with this December 5, 2000, 805 report about this unresolved summary suspension. It was not until February 4, 2002, that the MEDICAL BOARD did anything in response to the 805 report. On February 4, 2002, the Board Senior Investigator Janet M. Seely, sent a letter to petitioner. (Resp. Exh. D).

In response to Exhibit D – the February 8, 2002 letter – petitioner sent voluminous exculpatory materials to Ms. Susan Cady, Supervisor of Staff Services, for the Medical Board, to be forwarded to Investigator Seely (Res. Exh. C). None of these exculpatory materials was made part of the Board's file, nor shown to the Board's Medical Consultant, Dr. Randolph Noble before he signed the declaration seeking a psychiatric and medical examination of petition. The exculpatory materials contained petitioner MILEIKOWSKY's point-by-point rebuttal to each and every allegation made in the December 5, 2000 805 report. Indeed, as this Court noted during the ex parte proceedings for a stay, Dr. Noble signed his declaration in support of the examination before Senior Investigator Seeley finished her investigative report.

On March 15, 2002, Susan Cady sent a letter to petitioner (Resp. Exh. B) stating

_____

[5]Pursuant to Business and Professions Code Section 805, petitioner MILEIKOW-SKY through attorney Arthur R. Chenen, sent to the MEDICAL BOARD a letter dated March 7, 2001 responding to the Tenet 805 report. This response was not placed in the administrative record by the BOARD nor was it ever shown to Dr. Noble, who signed the declaration in support of the BOARD's examination order.

1    that the MEDICAL BOARD had concluded its review of the information which petitioner has
2    submitted. Cady acknowledged that the petitioner had requested that the Medical Board
3    initiate an investigation regarding a false 805 report. Cady stated in her letter of March 15,
4    2002 that she had taken the liberty *of providing the information petitioner submitted to the*
5    *investigator assigned to his case.*[6]

6          On August 5, 2002, Tenet submitted a second 805 report to the Medical Board.
7    This second 805 report did not include any additional allegations of alleged bizarre behavior
8    by petitioner MILEIKOWSKY, but simply recounted the fact that on March 30, 2002, the
9    hearing officer hired by Tenet terminated petitioner's consolidated hearings at the hospital
10   because petitioner MILEIKOWSKY allegedly made it impossible for the peer review process
11   to be completed. What was not disclosed in the second 805 report is that petitioner
12   challenged the authority of the hearing officer to terminate the hearing without allowing the
13   peer review process to be completed. In the California Court of Appeal, Second Appellate
14   District, Division Four, petitioner MILEIKOWSKY is challenging the authority of an attorney
15   hired by Tenet to terminate a peer review hearing without allowing the physicians comprising
16   the peer review panel to decide the merits of the case. *Mileikowsky v. Tenet Health System,*
17   *etc.* 2d Dist. Case No. B168705.[7]

18

19

---

20       [6]This was later proven to be false at the hearing. Investigator Seeley testified that the
21   information submitted by petitioner MILEIKOWSKY was not provided to Dr. Randolph Noble,
    upon whose Declaration and order was later issued directing petitioner to submit to a mental and
22   physical examination. (AT 62.)

23       [7]In the course of the Los Angeles Superior Court proceedings involving the challenge to
    the decision of the attorney hired by Tenet to terminate the proceedings, attorneys for Tenet, on
24   March 4, 2003, submitted the Medical Board accusation filed in the instant case to the superior
25   court, which was considering petitioner's petition for writ of administrative mandamus to
    overturn the decision to terminate the peer review hearing. This was done by Tenet to prejudice
26   the superior court against petitioner. Although it was an accusation only and had not yet been
27   resolved, Tenet submitted the accusation to the Los Angeles County Superior Court, *Mileikowsky*
    *v. Tenet Health System, etc.*, Case No. BS079131, review of the judgment in which is now
28   pending before the California Court of Appeal.

PETITIONER'S OPENING BRIEF

D.     **Investigator Seeley Selects a Medical Consultant**

**with an Egregious and Apparent Conflict of Interest**

Senior Investigator Janet Seeley, who retired from the Medical Board on May 1, 2004 (AT, p. 40.) was the investigator assigned to petitioner's case. Seely decided to utilize Dr. Randolph Noble to prepare a declaration for the order compelling the psychiatric examination etc., even though she knew at the time she gave petitioner's file to Dr. Noble that he was on the staff of the very hospital that had sent the 805 report to the Medical Board. The transcript of the May 12, 2004 hearing, reveals the following questions submitted to Ms. Seely:

"Q     Miss Seely, at the time you gave the file to Dr. Noble, were you aware

that he was on staff at the hospital that was the referring hospital of the

805 report?"

"A     Yes."  (AT, p. 66, lines 7-9).

Seely acknowledged that she had seen Dr. Noble's curriculum vitae showing that he was on staff at the Encino-Tarzana hospital that filed the 805 report. She further acknowledged that Noble's curriculum vitae showed that he[8] was on the staff of the Encino-Tarzana Medical Center (owned and operated by Tenet) (AT, p. 67, lines 12-15).

Janet Seely became evasive during cross-examination during the administrative hearing in this case with respect to her contact with Tenet's attorneys. Counsel for petitioner MILEIKOWSKY asked Seely whether during the course of her investigation she had ever spoken to someone named Anna Suda. After first playing some word games regarding the question of whether Suda was a witness or an attorney and with respect to the question of whether Seely interviewed her or simply talked to her, Seely finally acknowledged she had spoke with Anna Suda (AT, pp. 74-75). Anna M. Suda is one the attorneys for Tenet.

---

[8]It should be noted in selecting Dr. Noble as the medical consultant on this case, she deliberately choose the only consultant with a conflict of interest by being on the medical staff of the same hospital that made the 805 report.  That was more than mere coincidence.  It tends to show that the BOARD's investigation was calculated to skew the result against petitioner. Indeed, the investigative report mirrors the Tenet 805 report.

PETITIONER'S OPENING BRIEF

E.    **The BOARD Proceeds Solely on Noble's Less Than Impartial Declaration**

On October 10, 2002, Dr. Noble signed a Declaration with respect to the "investigation of Gil Mileikowsky, M.D." (Resp. Exh. F.) Dr. Noble's declaration essentially quoted from the 805 report submitted by Tenet on December 5, 2000, accepting the unproved allegations as if they were true. After summarizing the incidents, Dr. Noble stated in his Declaration that ". . .there is a reason to believe that Dr. Mileikowsky has behavioral dysfunction with anger dyscontrol and a possible Intermittent Explosive Disorder..." Dr. Noble also stated that it was "reasonably probable that Dr. Mileikowsky has a Paranoid Personality Disorder as he has been observed to take up to 150 pictures after performing a hysterectomy and his statements indicate significant paranoid thoughts..."[9] (Resp. Exh. F, page 4, lines 12-21). This reference to 150 pictures was not contained in the 805 report and had to have been obtained from sources at Encino-Tarzana Medical Center. Janet Seely acknowledged in her testimony that Dr. Noble did not have the information submitted by petitioner MILEIKOWSKY when he prepared his declaration. (AT, p. 62, lines 6-8.)

On November 4, 2002, not knowing that Dr. Noble had already signed the Declaration, petitioner MILEIKOWSKY faxed to the Medical Board additional exculpatory material to rebut the 805 reports that had been submitted. (Resp. Exh. C.) The material in Respondent's Exhibit C was Dr. MILEIKOWSKY's point-by-point rebuttal of the allegations in the 805 reports.

On November 6, 2002, two days after petitioner MILEIKOWSKY faxed Exhibit C to the MEDICAL BOARD, Ron Joseph, the Executive Director of the BOARD, signed the

---

[9]How Dr. Noble could declare under penalty of perjury that he had come to a "reasonably probable" diagnosis of an Axis I psychosis from the taking photographs of a hysterectomy (150 sounds like hyperbole or extreme puffing) and from hearsay statements that may or may not have been paranoid (as opposed to real grievances about shabby treatment at Tenet) should raise a red flag that Dr. MILEIKOWSKY has legitimate concern about his being evaluated by biased and conflicted examiners.

1  petition to compel petitioner MILEIKOWSKY to submit to a mental and physical
2  examination. The petition signed by Mr. Joseph on November 6, 2002 concluded with a
3  prayer that the Division of Medical Quality issue an order directing petitioner ". . . to undergo
4  a mental and physical examination, including drug testing and including psychological testing
5  if deemed warranted by the psychiatric examiner, by one or more physician and surgeons
6  and/or psychologists designated by the division or its designee, at a time convenient to all
7  parties, but not later than 30 days from the date of service of the division's order, to determine
8  whether respondent's (petitioner) ability to practice medicine safely is impaired due to mental
9  illness (or) physical illness affecting competency. . . ."

10          Not having the benefit of any of petitioner's responses to the false 805 reports,
11  Dr. Ronald Wender[10], on behalf of the Division of Medical Quality of the California Medical
12  Board on November 12, 2002, issued an order compelling petitioner to submit to the mental
13  and physical examination. Dr. Wender's order of November 12, 2002 stated that it appeared
14  ". . . to the Division that ...[petitioner] may be unable to practice medicine safely because his
15  ability to practice is impaired due to mental illness and/or physical illness affecting
16  competency.." On behalf of respondent MEDICAL BOARD, Dr. Wender ordered petitioner
17  MILEIKOWSKY to ". . . submit to a psychiatric examination and a physical examination by
18  one or more physicians and surgeon and/or psychologists designated by the Division or its
19  designee . . . ."

20          The order specified that petitioner MILEIKOWSKY was to submit to the
21  examinations at a time convenient to him and to the examiners" but not later than thirty (30)
22  days from the date of service of this order." (Compl. Exh. 5.) Importantly, while the order
23  gave Dr. MILEIKOWSKY less than 30 days to comply – the order commenced to run from
24  the date of mailing in Sacramento, not from Dr. MILEIKOWSKY's receipt of the order by
25  certified mail – it did not name the examiners nor did it give Dr. MILEIKOWSKY their

26
_____

27      [10]Dr. Wender himself was conflicted in this case because he was on staff at Cedars-Sinai
    Medical Center which had wrongfully terminated Dr. MILEIKOWSKY's privileges. Dr. Moy,
28  as well as Dr. Wender, were Medical Board panel members which adopted the instant Decision.

1    addresses and telephone numbers so that he had a full 30-days to comply.

2             The order did not say that Investigator Seeley was empowered to designate who

3    the examiners were to be – it said that the designation was to be by the DIVISION (the

4    Division of Medical Quality) or its designee. On its face, the order did not specify how the

5    DIVISION was doing this or who its designee was.

6             **F.    How Seeley (Not the BOARD) Filled in the Blanks**

7             On November 15, 2002, Senior Investigator Janet Seely sent a letter to petitioner

8    MILEIKOWSKY stating that Dr. James Rosenberg was to conduct the psychiatric

9    examination and Dr. Isaac Gorbaty was to conduct the medical examination. (Compl. Exh.

10   6; Resp. Exh. I.)

11            With respect to this November 15 letter (Compl. Exhibit 6), that letter states that

12   "the Medical Board has designated James Rosenberg to carry out your psychiatric

13   examination and Isaac Gorbaty, M.D., to carry out your medical examination." (AT 56-57.)

14   On cross-examination at the administrative hearing, Investigator Seeley was asked "who at

15   the Medical Board designated these individuals?" She said that "the doctors would have been

16   chosen by Dr. Noble, our Medical Consultant." With respect to the choice, Ms. Seeley was

17   asked whether the Medical Board did not designate these individuals because someone else,

18   Dr. Noble, designated them (not the BOARD sitting as a BOARD). At this point the

19   administrative law judge interrupted and said the MEDICAL BOARD did not make the

20   selection, Dr. Noble did as an employee of the Board. Investigator Seeley that said was

21   "right." (AT 57.) Investigator Seeley admitted that these two examiners – Rosenberg and

22   Gorbaty – were not named in the order that came from the Medical Board. (AT 58.)

23   Investigator Seeley could not answer what authority Dr. Noble had to designate Drs.

24   Rosenberg and Gorbaty. She did not know how Dr. Noble was the one who made the

25   designation of these two. (AT 58.) The only thing Dr. Noble told her about Drs. Rosenberg

26   and Gorbaty was just that these doctors should be used to carry out the investigations. (AT

27   61.)

28            Investigator Seeley testified that Dr. Noble was only part-time at the Medical

                                            12

1   Board. She testified that she had seen his curriculum vitae which was attached to the back of

2   Complainants' Exhibit 5 (the petition for the order for psychiatric and medical examination).

3   Investigator Seeley testified that at the time she gave the file to Dr. Noble she was aware he

4   was on staff at the hospital that was the referring hospital of the 805. (AT 66.) Counsel for

5   Dr. MILEIKOWSKY was not allowed to ask Investigator Seeley whether she wanted

6   someone impartial and not connected to the hospital to serve as medical consultant on Dr.

7   MILEIKOWSKY's case. When asked if she knew that Dr. Noble had had administrative

8   positions at the referring hospital (Encino-Tarzana Regional Medical Center), Investigator

9   Seeley testified that she was sure she had seen Dr. Noble's CV but she did not know that she

10   had ever thoroughly read it. (AT 67.)

11         **G.   MILEIKOWSKY's Objections and the Stonewall Response**

12         In response to the order of November 12, 2002, and the letter of November 15,

13   2002, on November 29, 2002, petitioner's attorney, Russell Iungerich, wrote a letter to David

14   Thornton, MEDICAL BOARD Chief of Enforcement, specifically objecting to the procedures

15   followed by the MEDICAL BOARD. The letter pointed out that the incidents related in the

16   805 reports were stale and occurred in 1999 and 2000. The letter pointed out that petitioner

17   had not been interviewed before the order was sought, nor did the Board consider any

18   evidence which petitioner provided. This letter was attached to petitioner MILEIKOWSKY's

19   notice of defense, which is part of Complainant's Exhibit 2 and is part of Respondent's

20   Exhibit O at the hearing. This letter further pointed out that Dr. Noble should have recused

21   himself from participating in petitioner's investigation. The letter pointed out that Dr. Noble

22   was not impartial because he was affiliated with the 805 reporting entity. The letter further

23   pointed out that the two doctors designated in Investigator Seeley's letter, Drs. James

24   Rosenberg and Isaac Gorbaty, were members of the medical staff of the reporting hospital.

25   The letter pointed out that petitioner could not get an impartial examination from these

26   doctors. The letter concluded with a request that petitioner to comply with the order be

27   withdrawn. The letter requested that a different investigator and a different regional medical

28   consultant be utilized by the Board.

1    Totally ignoring the November 29, 2002 letter from petitioner's attorney, the
2  Board on December 13, 2002 filed its original accusation alleging that petitioner
3  MILEIKOWSKY had violated the November 12, 2002 order compelling him to submit to a
4  mental examination and a psychiatric examination within 30 days by not scheduling
5  examinations with Drs. Rosenberg and Gorbaty, who had conflicts of interest by being
6  connected with Tenet, the reporting entity on the 805 reports. The Board did not even see fit
7  to wait for 30 days after the November 15, 2002 letter, which first designated the specific
8  physicians to conduct the examinations. It filed its accusation on the 30th day after the order
9  was mailed to Dr. MILEIKOWSKY and it never addressed that lack of impartiality of its
10  medical consultant and its designated examiners. The accusation was filed in a blatantly
11  obvious attempt to force these examiners upon Dr. MILEIKOWSKY without regard to
12  conflicts of interest or lack of qualifications to perform the exams.

13    The hearing on the First Amended Accusation was held on May 12, 2004,
14  before Administrative Law Judge Carolyn Magnuson. The Decision of the BOARD (Exh.
15  A to the Petition in this Court) did not consider Dr. MILEIKOWSKY's objections to the
16  examiners at all. The First Amended Accusation does not assert that Dr. MILEIKOWSKY
17  could not practice medicine safely. It just asserted that he violated the order by not being
18  examined by Dr. Rosenberg and Gorbaty.

19    The only witnesses at the hearing were Investigator Seeley and Dr.
20  MILEIKOWSKY in his own defense. Petitioner testified that he objected to being examined
21  at all because there was no basis for the request. Petitioner also pointed out that Dr. Noble
22  did not consider any of his responses to the 805 reports prior to preparing his declaration in
23  support of the petition for the order compelling mental and physical examination of his
24  person. The unrebutted testimony of Dr. MILEIKOWSKY was that Dr. Noble and Dr.
25  Gorbaty were on the staff of the same hospital that filed the 805 report. (AT, pp. 106, 110.)

26    As regards Dr. Rosenberg who was to perform the psychiatric exam, Dr.
27  MILEIKOWSKY testified that he was closely involved with Dr. Noble at UCLA and was also
28  connected with 805 reporting entity, having an office in the Encino-Tarzana medical building.

14

1   As regards to the order for a neurological examination, that was assigned to Dr.
2   Gorbaty who was not a neurologist but an internist and nephrologist (a kidney specialist).
3   Gorbaty was on the staff of the 805 reporting entity (giving him a conflict of interest) and was
4   known to do slipshod work.   Dr. MILEIKOWSKY offered Respondent's Exhibit L, a
5   reporter's transcript from a Medical Board hearing in which Dr. Gorbaty had rendered an
6   opinion regarding the wrong patient named Smith, which should have been admitted.

7   **ARGUMENT**

8   **I**

9   **THE FIRST AMENDED ACCUSATION BASED ON THE BOARD'S ORDER**
10  **WAS IN THE NATURE OF A CONTEMPT PROCEEDING AND HAD**
11  **TO BE COMPLETE IN AND OF ITSELF TO BE ENFORCEABLE**

12  The MEDICAL BOARD's order in this case is in the nature of a contempt for
13  non-compliance with the order.   In superior court, to hold a person guilty of contempt for
14  violating an injunction, the acts constituting the contempt must be clearly and specifically
15  prohibited by the terms of the injunction.   *Brunton v. Superior Court* (1942) 20 Cal.2d 202, 205.
16  The party bound by an injunction must be able to determine from its terms what he may and may not
17  do; he cannot be held guilty of contempt for violating an injunction that is uncertain or ambiguous,
18  just as he may not be held guilty of violating a criminal statute that fails to give him adequate notice
19  of the prohibited acts.   *Id.*

20  In the present case, by analogy, petitioner MILEIKOWSKY could be found guilty of
21  violating the BOARD's order only if the acts complained of in the First Amended Complaint were
22  clearly set forth in the terms of the BOARD's order.   The BOARD's order did not designate the
23  names, addresses, and telephone numbers of the examiners who were to examine Dr.
24  MILEIKOWSKY.   If he was to comply with the BOARD's order, they had to be within the four
25  corners of the order.   They were not.   The BOARD did not designate any examiners or specify
26  the details of how the examinations were to be conducted (such as the drug testing).
27  Investigator Seeley admitted at the hearing that Dr. Noble selected the examiners.   She did
28  not know what authority he had to amend the BOARD's order or to designate examiners.

1    It is a corollary to the principles enunciated in the *Brunton* case, *supra*, that any
2  ambiguity in an injunction must be resolved in favor of the accused. *Sorenson v. Superior*
3  *Court* (1969) 269 Cal.App.2d 73, 78; *Little v. Superior Court* (1968) 260 Cal.App.2d 311,
4  318; *Butler v. Superior Court* (1960) 178 Cal.App.2d 763, 765; *Gottlieb v. Superior Court*
5  (1959) 168 Cal.App.2d 309, 313.   Since the proceedings on the First Amended Accusation
6  in this case were in the functional equivalent of a contempt proceeding, the failure of the
7  BOARD's order to designate examiners and how the drug testing was to be conducted was
8  something that had to be clearly spelled out in the order which Dr. MILEIKOWSKY is found
9  to have violated.   There is no evidence in this record that anything that the BOARD did not
10 supply in its order of November 12, 2002, could be filled in by anything short of a further
11 order of the BOARD designating the examiners and the details of the drug testing.   If
12 BOARD action was required in the first instance to issue the order for the examination, then
13 any amendment or supplementation of the BOARD's order had to come from the BOARD
14 and not from some ad hoc action of Dr. Noble who had sought the order in the first place.
15    The language of Business and Professions Code sections 820 and 821, as well
16 as case law relating to contempts for violation of injunctions, requires this result also.   Under
17 these sections, any failure to comply with the order should be excused because the order was
18 incomplete on its face.    While the order purports to compel psychiatric and medical
19 examinations of Dr. MILEIKOWSKY, it does not specify (1) who the examiners are, (2) their
20 addresses and telephone numbers, and (3) what the areas  about which each is to examine Dr.
21 MILEIKOWSKY. There is to be drug testing but the nature and type of testing is not spelled
22 out in the order.   Is there to blood or urine testing?  Who is to conduct the testing?  What
23 laboratory is to be used to test the sample for the results?
24    Business and Professions Code section 820 states in relevant part that the
25 licensing agency may ". . . order the licentiate to be examined by one or more physicians and
26 surgeons designated by the agency." This language clearly implies that, at a bare minimum,
27 the names of the designated physicians must appear in the 820 order.  Indeed, the addresses
28 and telephone numbers and who is to perform what examination(s) should be in the order by

1    inference from the  language of the statute.

2              The law of contempt again is instructive here.  A directive "in terms so vague
3    that men of common intelligence must necessarily guess at its meaning and differ as to its
4    application, violates the first essential of due process of law." *In re Berry* (1968) 68 Cal.2d
5    137, 156.  The section 820 order in this case does not tell Dr. MILEIKOWSKY **by whom**
6    he must be examined within 30 days.

7              It is petitioner MILEIKOWSKY's position that the order on its face must be
8    complete without resort to letters and phone calls filling in the gaps at later dates, especially
9    where the BOARD is seeking a suspension or revocation of a license for non-compliance in
10   a short time frame.  If the order leaves blanks to be filled in which the BOARD itself has not
11   filled in, it should logically follow that the order may not be enforced by suspension or
12   revocation. A physician has a vested property right in his certificate to practice medicine in
13   California.  *Suckow v. Alderson* (1920) 182 Cal. 247, 250; *Hewitt v. Board of Medical
14   Examiners* (1906) 148 Cal. 590, 592; *Smith v. Board of Medical Quality Assurance* (1988)
15   202 Cal.App.3d 316, 326.

16             The position of the BOARD in its decision is Draconian in the extreme.  It
17   requires everything to be done within 30 days from November 12 and the BOARD's
18   investigator and consultant are still filling in the gaps on November 15 – but no extension of
19   time is allowed – even though if Dr. MILEIKOWSKY wanted to call anyone to schedule an
20   appointment on November 12 he would not have had the information necessary to comply
21   with the order.   If the clock were started on November 15 when the first notice of the names
22   of the examinees was given to Dr. MILEIKOWSKY, the accusation  was filed prematurely
23   because it was filed *two days before* Dr. MILEIKOWSKY received notice of the names of the
24   examiners.   But that notice is deficient because it was not given in an order that was an
25   official act of the BOARD itself.

26             The Decision of the BOARD blows off this argument in paragraphs 21 and 22
27   of the Decision treating a later letter from Investigator Seeley to Dr. MILEIKOWSKY as an
28   "amendment" to the original order of November 12. (Exh. A to Pet., p. 14; Dec. p. 5.)  That

1   letter was not an amendment to the order, because only the BOARD could amend the order.

2   Furthermore, there is no evidence in the record that the examiners were ever designated by

3   the BOARD. Dr. Noble, the not impartial Medical Consultant, selected the examiners. (AT

4   pp. 56-58.) ALJ Magnuson summarized the testimony on the record – "The Medical Board

5   did not make the selection, Dr. Noble did." (AT 57.)  He did so not as a member of the

6   Division of Medical Quality, but as an employee of the BOARD. (AT 57.)   Since the

7   BOARD did not amend its order, Investigator Seeley did not have the  power to amend the

8   order by her letter of November 15, 2002.

9           The BOARD can be as loosey-goosey as it wants when fundamental rights of

10  physicians to practice their profession are not involved. However, orders of the BOARD are

11  supposed to be orders of the BOARD and are not supposed to be amended by non-members

12  of the BOARD to cure fundamental defects. Only the BOARD is empowered to do that.  On

13  this point, Dr. MILEIKOWSKY should prevail. This is an important issue of first impression

14  – there is no case on point interpreting section 820 – and Dr. MILEIKOWSKY should not be

15  suspended or revoked.

16                                              II

17       **NO VIOLATION OF THE BOARD'S ORDER WAS PROVED**

18          **BY EVIDENCE IN THE ADMINISTRATIVE RECORD**

19          There was no competent evidence offered by Investigator Seeley that Dr.

20  MILEIKOWSKY did not comply with the BOARD's order. Investigator Seeley testified that

21  she called the offices of Drs. Rosenberg and Gorbaty and spoke to persons unknown who told

22  her that Dr. MILEIKOWSKY had not scheduled an appointment pursuant to the BOARD's

23  order. She claimed that she spoke to Dr. Rosenberg directly. (AT 45-49.) This evidence was

24  let in over a hearsay objection.  (AT 45.)  There was no foundation that the person at the

25  other end of the line had any knowledge of either doctor's appointment calendar, or whether

26  this kind of examination went on the regular appointment calendar, or was competent to

27  answer the investigator's question.  Since the order under review was the equivalent of a

28  contempt  order, the evidence of a violation should at least be substantial evidence.  This

18

1    evidence does not even rise to the minimum level of substantiality. "Substantial evidence"

2    has been defined as "relevant evidence of ponderable legal significance which is reasonable

3    in nature, credible, and of solid value." *Jarchow v. Transamerica Title Ins. Co.* (1975) 48

4    Cal.App.3d 917, 948.    If this evidence does not rise to the "solid value" required of

5    substantial evidence, it does not rise to the weight of evidence for purposes of the independent

6    judgment standard.

7            The evidence of the purported violation here runs afoul of another rule specific

8    to administrative law.    Even if one assumes that the designation of Drs. Rosenberg and

9    Gorbaty was somehow a lawful designation by the BOARD itself, Government Code section

10    11513(d) provides that administrative hearsay will not support findings unless it would be

11    admissible as hearsay over objection.    The only proof offered by the BOARD at the

12    administrative hearing was that Investigator Seeley called the offices of Drs. Rosenberg and

13    Gorbaty and was told that Dr. MILEIKOWSKY had not scheduled an appointment.    That

14    evidence was hearsay.   It was administrative hearsay, not admissible under any exception to

15    the hearsay rule, not findings of violation of the BOARD's order could be based on such

16    administrative hearsay.

17                            **III**

18    **AS A MATTER OF LAW, THE MEDICAL BOARD WAS OBLIGED**

19    **TO CONSIDER AND DECIDE DR. MILEIKOWSKY'S DEFENSE**

20    **THAT THE DESIGNATED EXAMINERS WERE NON-NEUTRALS**

21    **AND THAT DR. GORBATY NOT COMPETENT**

22            Justice Oliver Wendell Holmes, Jr., once observed in a different context that

23    citizens "must turn square corners when they deal with the government." *Rock Island, Ark.*

24    *& La. R.R. v. United States* (1920) 254 U.S. 141, 143. This maxim has been held to be

25    reciprocal in the California cases. *E.g., Landgate, Inc. v. Cal. Coastal Comm'n* (1998) 17

26    Cal.4th 1006, 1040 (Brown, J., dissenting); *Lentz v MacMahon* (1989) 49 Cal.3d 393, 400.

27    In other words, the same principle holds true when government deals with its citizens –

28    indeed even more so, given the power of government and the overwhelming forces at its

1  command.

2       In this case, investigator Seeley testified that she had medical consultant
3  Randolph Noble, M.D., even though she knew he had a conflict of interest – he was on the
4  medical staff of the same hospital that had made the 805 report against Dr. MILEIKOWSKY.
5  (AT 66, lines 7-10.)    The doctors designated to examine Dr. MILEIKOWSKY – Drs.
6  Rosenberg and Gorbaty – were selected by Dr. Noble, who himself had a conflict of interest.
7  (AT 56-59.)    These examiners had the same conflict of interest – being on staff at Encino-
8  Tarzana and closely connected with that entity or with Dr. Noble.  (*Id.*)

9       Dr. MILEIKOWSKY's principal defense that he should not have been
10 compelled to comply with the BOARD's order was that he was entitled to have disinterested
11 examiners.  *See* Special Notice of Defense and its attached letter.  (Part of Compl. Exh. 2.)
12 Prior to the filing of the accusation in this case, Dr. MILEIKOWSKY through counsel
13 objected to the examiners purported designated by the BOARD as being partial rather than
14 impartial. *See* letter attached to Special Notice of Defense, part of Compl. Exh. 2.    The
15 BOARD should not have proceeded to issue an order from examination based on a declaration
16 from a medical consultant who had privileges at the same hospital which had made the
17 Business and Professions Code section 805 report.    The evidence showed that he had more
18 than privileges; he had served as an administrator at the entity making the report. (Noble
19 Curriculum Vitae, attached to Petition, part of Compl. Exh. 5.)    Furthermore, each of the
20 designated examiners were connected with the hospital which had made the report from which
21 the order for examination emanated.

22       It should go without saying that, if an examination pursuant to an 820 order is
23 to be compelled by the MEDICAL BOARD, the examination should be conducted by neutral
24 examiners, not one's who may have the slightest suspicion of partisanship.  In the worker's
25 compensation setting, it is the rule that the report of the independent medical examiner never
26 be subject to the possibility that it is based upon matters imparted to the examiner by one so
27 closely connected with a party as to leave it questionable as to whether the information
28 imparted is objective and not partisan.  *Boardman v. Indus. Acc. Comm'n* (1956) 140

1   Cal.App.2d 273, 277. *Boardman* further held that this rule was one which should be strictly
2   enforced because ". . . A report based, even in small part, on its violation, is so tainted as to
3   destroy its value."

4           With the thousands of physicians in Los Angeles, the MEDICAL BOARD
5   cannot legitimately be heard to argue that it could not find examiners who were not connected
6   with the hospital which had generated the 805 report that had triggered the investigation of
7   Dr. MILEIKOWSKY. The BOARD has callously persisted in ordering Dr. MILEIKOWSKY
8   to be examined by non-neutrals. If this Court were to enforce the BOARD's Decision and
9   Order by not granting a peremptory writ of mandate in this case, it would be forcing Dr.
10  MILEIKOWSKY to be examined by examiners selected by a non-neutral medical consultant
11  (not the BOARD itself).

12          This issue rises to the level of constitutional due process. The nature of the
13  process due in proceedings such as these turns on a balancing of the "three distinct factors"
14  specified in *Mathews v. Eldridge* (1976) 424 U.S. 319, 335, (1) the private interests affected
15  by the proceeding, (2) the risk of error created by the State's chosen procedure, and (3) the
16  countervailing governmental interest supporting use of the challenged procedure. Applying
17  the first factor, the private interests affected are Dr. MILEIKOWSKY's property interests in
18  his medical license (indeed his right to practice his profession). This factor weighs heavily
19  in Dr. MILEIKOWSKY's favor.

20          The second factor – the risk of error created by the State's chosen procedure –
21  is a second factor weighing heavily in petitioner's favor here. The risk of error from having
22  non-neutral examiners and non-neutral examinations is very high indeed. It is virtual
23  certainty rather than a risk of error if Dr. MILEIKOWSKY is forced to be examined by non-
24  neutral examiners. This factor has to weigh in Dr. MILEIKOWSKY's favor because our
25  system of jurisprudence does not favor non-neutrals making potentially outcome-
26  determinative decisions. It has recently been held that administrative hearing officers must
27  be unbiased. *See Haas v. County of San Bernardino* (2002) 27 Cal.4th 1017, 1025-1027.

28

1   Frequently medical experts disagree on medical issues within the scope of their specialties,
2   but psychiatric examinations are even more subjective than physical examinations. One
3   would truly have to be "crazy" to submit to a mental examination by a psychiatrist with a
4   conflict of interest and prejudice against such a person.    When a doctor is subject to
5   examination by a biased psychiatrist, he is in clear danger of having his reputation destroyed.
6   Business and Professions Code section 822 authorizes use of the examiners psychiatric report
7   as direct evidence in a hearing regarding competency of the physician who has been
8   examined.

9           In this case, there was a clear conflict of interest, as well as a need to prevent
10  bias, in Dr. Noble, rather than the BOARD, selecting the examiners for Dr. MILEIKOWSKY.
11  An analogy exists in connection with the courts, where the law deems it necessary to prevent
12  bias, conflicts of interest, or the appearance of either. *Kimura v. Roberts* (1979) 89 Cal.App.3d
13  871, 875. Such rules have been categorized by the courts as necessary not only to guard actual
14  impartiality but also to insure public confidence. *See Tatum v. Southern Pacific Co.* (1967) 250
15  Cal.App.2d 40, 42.

16          In the administrative proceedings, the BOARD's Decision makes it clear that
17  it refused to consider the lack of impartiality of its examiners. The Decision avoids
18  consideration of the important threshold question which provided Dr. MILEIKOWSKY an
19  important defense. (Decision, pp. 5-6, ¶¶ 24-25, Exh. A to Pet., pp. 14-15.) In short, the
20  BOARD's position is that "25. If Respondent had objections to the Order as originally issued
21  or as amended, his proper course of conduct was to apply to a Superior Court for a writ. But
22  he made no such request. . . ."

23          This argument is plainly wrong on the law. While there is a doctrine of
24  exhaustion of administrative remedies, there is no doctrine of exhaustion of judicial remedies
25  equaling waiver of defense in administrative proceedings. If Dr. MILEIKOWSKY had filed
26  a petition in superior court or filed a complaint for an injunction after the BOARD's
27  accusation was filed on December 13, 2002, any such petition or complaint would have been
28  precluded by the doctrine of administrative remedies court relief. It is well established that

1  the doctrine of exhaustion of administrative remedies precluded relief in superior court once
2  the accusation was filed.   The rule governing the exhaustion of administrative remedies
3  holds that "where an administrative remedy is provided by statute, relief must be sought from
4  the administrative body and this remedy exhausted before the courts will act." *Abelleira v.*
5  *District Court of Appeal* (1941) 17 Cal.2d 280, 292.   Where an adequate administrative
6  remedy is provided by statute, resort to that forum is a "jurisdictional" prerequisite to judicial
7  consideration of the claim. *E.g., Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 70;
8  *Sierra Club v. San Joaquin Local Agency Formation Com.* (1999) 21 Cal.4th 489, 495;
9  *Abelleira v. District Court of Appeal, supra,* 17 Cal.2d at 292- 293.

10        Since the BOARD's decision on this issue is clearly erroneous as a matter of
11  law, it is clear that Dr. MILEIKOWSKY has not had his day in either the administrative
12  forum or a court on this important issue of first impression.

13        Before leaving this point, however, it is important to consider other grounds for
14  the disqualification of the examiners.   The declaration of Dr. Noble in support of the order
15  compelling examination states that Dr. MILEIKOWSKY ". . . will benefit by having both a
16  compelled psychiatric as well as an internal evaluation in order to rule out an organic as well
17  as a functional psychiatric disorder." (Compl. Exh. 5; Resp. Exh. F, p. 4, lines 19-21.)   The
18  nature of the organic disorder is described as neurological in the preceding couple of
19  sentences of the declaration.

20        Dr. Rosenberg's curriculum vitae indicates that he is a psychiatrist, but not a
21  neurologist.   The only purpose of the medical examination is supposedly to check on the
22  possibility of an organic neurological disorder.   Dr. Gorbaty is not a neurologist.   He is
23  board-certified in internal medicine, with a specialization in nephrology. (See Resp. Exh. K.)
24  Obviously, the wrong doctor  in the wrong specialty was designated by the BOARD to
25  conduct the non-psychiatric examination.   Nothing in the BOARD's order spells out how the
26  drug testing was to be accomplished.

27
28

## IV

## THERE SHOULD BE A DISMISSAL FOR UNREASONABLE DELAY

In *Gates v. Department of Motor Vehicles* (1979) 94 Cal.App.3d 921, 925, the Court of Appeal concluded that the trial court has the inherent power to dismiss administrative proceedings brought to revoke a state-issued license where there has been an unreasonable delay between the discovery of the facts constituting the reason for the revocation and the commencement of revocation proceedings, and where the licensee has been prejudiced by the delay. It held that the trial court's determination in such a case should be reversed only upon a showing of manifest abuse of discretion resulting in a miscarriage of justice. In *Gates*, there was a delay of 15 months between the Department of Motor Vehicles' investigation of plaintiff's business and its initiation of an administrative action against the plaintiff. That was followed by a three month delay in commencing the administrative hearing. The trial court determined there was no reasonable explanation for the delays, and found that plaintiff was prejudiced by them. The reviewing court affirmed.

The time sequences in this case exceed those in *Gates* by a substantial margin. There was a two-year delay from the filing of the 805 report, and another two-year delay in bringing this case to trial.  To defeat a finding of laches, the agency, here the Medical Board, must (1 ) show that the delay involved in the case was excusable, and (2) rebut the presumption that such delay resulted in prejudice to the opposing party. *Fountain Valley Reg. Hosp. & Med. Center v. Bonta* (1999) 75 Cal.App.4th 316, 323-324.  There was prejudice to Dr. MILEIKOWSKY from the fact that the 805 report nowhere suggested that he was an impaired physician and that a section 821 petition was sought only after the Board's investigation apparently found no deviation from the standard of care that would warrant an accusation.

## V

## THE BOARD DID NOT CONSIDER EXCULPATORY EVIDENCE
## BEFORE PROCEEDING

In this case, the BOARD proceeded with the Accusation without according Dr. MILEIKOWSKY an opportunity to present his side of the case at an interview, which is normally the opportunity according to every physician before proceeding to an accusation. Even though Susan Cady had forwarded materials from Dr. MILEIKOWSKY to Investigator Seeley, those materials were not placed in the investigative file nor were they even shown to Dr. Noble before he sought an order compelling a psychiatric and medical examination from the BOARD.   The failure to consider this evidence, and the written opposition to the 805 report, should also be a basis for granting this petition.  In *Johnson v. Superior Court* (1975) 15 Cal.3d 248, 254-255, it was held that that when a district attorney seeking an indictment is aware of evidence reasonably tending to negate guilt, he is obligated to inform the grand jury of its nature and existence, so that the grand jury may exercise its power under the statute to order the evidence produced.   By a parity of reasoning, the MEDICAL BOARD investigator in this case should have made the exculpatory evidence part of the investigative file available to Dr. Noble before these proceedings were commenced.  Failure to have done so should be a basis for granting the writ in this case.

## VI

## THE DISCIPLINE IMPOSED IS IMPROPER PUNISHMENT

In this case, Dr. MILEIKOWSKY's license is being suspended and potentially even revoked because he sought to obtain impartial examiners under the BOARD's order. "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason." *In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.

It is a well established principle of administrative law that "The purpose of an administrative proceeding concerning the revocation or suspension of a license is not to punish the individual; the purpose is to protect the public from dishonest, immoral, disreputable or incompetent practitioners." *Ettinger v. BMQA* (1982) 135 Cal.App.3d 853,

25

1  856. The California Supreme Court has expressed this same point in these words: "The
2  purpose of an action seeking revocation of a doctor's certificate is not to punish the doctor but
3  rather to protect the public." *Yakov v. Board of Medical Examiners* (1968) 68 Cal.2d 67, 73
4  n. 6.

5          Protection of the public does not justify the order made in this case. The order
6  exceeds all bounds of reason. The 805 report nowhere contained an allegation that Dr.
7  MILEIKOWSKY was impaired. Investigator Seeley so admitted at the administrative
8  hearing (AT 50-51). Suspension was not justified when Dr. MILEIKOWSKY presented
9  more than colorable evidence of a conflict of interest on the part of Dr. Noble and the two
10 examiners selected by Dr. Noble. Until the BOARD considered and resolved Dr.
11 MILEIKOWSKY's objections to Dr. Noble as the consultant and the examiners selected by
12 him, the BOARD had no public purpose justification for either a suspension or a revocation
13 of Dr. MILEIKOWSKY's license to practice medicine.

14         In *Long Beach City Employees Assn. v. City of Long Beach* (1986) 41 Cal.3d
15 937, 943-944, the California Supreme Court observed that an individual's right to privacy
16 encompasses mental privacy, including thoughts, emotions, expressions, and personality,
17 noting "[i]f there is a quintessential zone of human privacy it is the mind." The Supreme
18 Court said the test to determine whether a polygraph examination violated the constitutional
19 right to privacy would involve (1) whether a compelling government interest in administering
20 the examination had been shown and (2) whether this interest could be accomplished by less
21 intrusive means. *Id.* at p. 948, fn. 12.)

22         In this case, the MEDICAL BOARD did not consider "less intrusive means"
23 such as first interviewing Dr. MILEIKOWSKY. Nor did it even consider his objections to
24 the examiners chosen and their method of selection. It just went straight to imposition of a
25 sanction that put him out of practice before it was even determined that he had any
26 impairment. A physician should not be subject to suspension or revocation when he resists
27 an invasion of his mental privacy on at least colorable grounds when there exist "less intrusive
28 means" of resolving his objections before slamming him with the equivalent of a contempt

1  sanction.  A licensing agency's power to discipline is predicated upon the discipline imposed
2  having a direct or rational relationship to the charges as they reflect upon a licensee's fitness
3  to practice a particular vocation.  *Morrison v. State Board of Education* (1969) 1 Cal.3d 214,
4  229; *Hallinan v. Committee of Bar Examiners* (1966) 65 Cal.2d 447, 471.  The imposition of
5  suspension and revocation of Dr. MILEIKOWSKY's license, even though initially stayed,
6  is unreasonable and excessively punitive.  A trial court may overturn an administratively
7  imposed penalty when the penalty is found to be grossly excessive or a manifest abuse of
8  discretion. *Richardson v. Board of Supervisors* (1988) 203 Cal.App.3d 486, 494, and cases
9  cited.  The penalty here is grossly excessive and a manifest abuse of discretion where there
10 exist unreasonable issues of conflict of interest to which the BOARD has blinded itself in its
11 attempt to force its will upon petitioner MILEIKOWSKY.

12                                        VII

13          **THE $12,315 OF COSTS IS PUNITIVE AND IMPROPER**

14          Imposition of $12,315 of costs of investigation is improper in this case.  First
15 of all, the investigation conducted by the MEDICAL BOARD had nothing to do with finding
16 evidence of impairment.  The 805 report did not report Dr. MILEIKOWSKY as an impaired
17 physician.  Dr. Noble did not even consider the investigative report in seeking a petition for
18 an order of examination pursuant to Business and Professions Code section 820.

19          Furthermore, Dr. MILEIKOWSKY objected to imposition of any costs because
20 the BOARD and Deputy Attorney General Fan did not comply with the Prehearing
21 Conference Order which required disclosure of those costs in advance of the hearing.  The
22 Prehearing Conference Order should have been enforced by precluding a costs award at the
23 administrative hearing.  Administrative Law Judge Magnuson allowed the presentation of this
24 evidence in violation of the Prehearing Conference Order.  (AT 132-136.)

25

26

27

28

                                        27
                          PETITIONER'S OPENING BRIEF

1                                    **CONCLUSION**

2              For the foregoing reasons, petitioner MILEIKOWSKY urges that his petition

3    for a peremptory writ of administrative mandate be granted, and that respondent's Decision

4    and Order be vacated.

5    Dated:    August 24, 2004

6                                        Respectfully submitted,

7                                        IUNGERICH & SPACKMAN
                                         A Professional Law Corporation
8

9                                    By
                                         Russell Iungerich
10                                       Attorneys for Petitioner
                                    GIL NATHAN MILEIKOWSKY, M.D.
11

     RI:cgc
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PROOF OF SERVICE BY
FACSIMILE AND FEDERAL EXPRESS

STATE OF CALIFORNIA     )
                              } ss.
COUNTY OF LOS ANGELES )

I am over the age of 18 years, employed in the County of Los Angeles, and not a party to the within action; my business address is 28441 Highridge Road, Rolling Hills Estates, California 90274-4871. I am employed by a member of the bar of this court.

On August 24, 2004 I served the within

**PETITIONER'S OPENING BRIEF RE: MILEIKOWSKY V. MEDICAL BOARD**

in said action by faxing a copy to the fax number below and by placing a true copy of this document in a Federal Express package, addressed as follows, and entrusted the same with Federal Express at Rolling Hills Estates, California for next day delivery:

Amy Fan
Deputy Attorney General
California Department of Justice
300 S. Spring St., Suite 1702
Los Angeles, CA 90013
Fax: (213) 897-9395

David Parker, Esq.
Parker, Mills & Patel, LLP
865 So. Figueroa St., Suite 3200
Los Angeles, CA 90017
Fax:(213) 622-1444

I declare under penalty of perjury that the foregoing is true and correct. Executed this 24th day of August, 2004, at Rolling Hills Estates, California.

_Cherry Cochrell_
—————————————————
Cherry Cochrell

Client:Mileikowsky

ENDORSED

AUG 1 0 2004

By C. Miller, Deputy

1  PARKER MILLS & PATEL LLP
   DAVID B. PARKER, ESQ. (SBN: 072132)
2  865 South Figueroa Street, Suite 3200
   Los Angeles, CA 90017
3  Telephone:   (213) 622-4441       COPY
   Facsimile:   (213) 622-1444

4
   Attorney for **Applicant and Proposed Amicus Curiae**
5  **ASSOCIATION OF AMERICAN PHYSICIANS & SURGEONS, INC.**

6

7              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

8                  **FOR THE COUNTY OF SACRAMENTO**

9  GIL NATHAN MILEIKOWSKY, M.D.,        )  Case No:      04CS00969
                                        )
10                                      )
                                        )  **APPLICATION FOR LEAVE TO FILE**
11 vs.                                  )  **AMICUS CURIAE BRIEF IN SUPPORT**
                                        )  **OF PETITIONER BY ASSOCIATION OF**
12                                      )  **AMERICAN PHYSICIANS &**
   MEDICAL BOARD OF CALIFORNIA,         )  **SURGEONS, INC.**
13                                      )
                                        )
14        Respondent.                   )  (ASSIGNED TO Judge Raymond Cadei)
                                        )
15 _____ )  Department 25

16

17

18

19

20

21

22

23

24

25

26

27

28

{DBP5007.DOC}                                   1

**APPLICATION FOR LEAVE TO FILE AMICUS CURIAE BRIEF IN SUPPORT OF PETITIONER BY
ASSOCIATION OF AMERICAN PHYSICIANS & SURGEONS, INC.**

**TO THE HONORABLE COURT AND THE ABOVE ENTITLED ACTION:**

The Association of American Physicians & Surgeons, Inc. ("AAPS") is a non-profit, national group of thousands of physicians founded in 1943. For over 60 years, it has defended the practice of private and ethical medicine. AAPS is dedicated to defending the patient-physician relationship and free enterprise in medicine. AAPS is one of the largest physician organizations that is almost entirely funded by physician membership, including many in California. This enables it to speak directly on behalf of physicians and their patients. AAPS files amicus briefs in cases of high importance to the medical profession, like this one. *See Sinaiko v. Medical Board of California*, No. 99-CS-02275 (Cal. Super. Ct., Ronald Robie, J.); *see also Stenberg v. Carhart*, 530 U.S. 914 (2000) (U.S. Supreme Court citing AAPS frequently); *United States v. Rutgard*, 116 F.3d 1270 (9th Cir. 1997).

AAPS opposes unjust interference in the practice of medicine by medical boards particularly where, as here, there has been retaliation against the physician for complaining at a hospital. Hospitals are notorious in initiating peer reviews that are motivated by economic or other improper factors rather than genuine concern about patient care, and in particular retaliating against Dr. Mileikowsky here. AAPS brings this application and seeks leave to make the amicus curiae submission set forth below in order to emphasize the need to protect Dr. Mileikowsky and others like him from arbitrary and capricious action by the Medical Board, as prompted by the hospital.

AAPS hereby applies for leave as *amicus curiae* to present the following:

1.     AAPS submits that the Medical Board of California ("Medical Board") has ordered a psychiatric examination of Dr. Gil Mileikowsky ("Dr. Mileikowsky") in an arbitrary and capricious manner. As reflected in the record in support of the Petition, Dr. Mileikowsky has done nothing to jeopardize the health of any patient that would justify a state-mandated order of a psychiatric evaluation. He has not been sued for malpractice in over 14 years. He is not aware of any patient complaints about his practice. The Medical Board is apparently acting without a single patient complaint about Dr. Mileikowsky.

BKER MILLS & PATEL LLP
South Figueroa Street
Suite 3200
os Angeles, CA 90017
(213) 622-444

APPLICATION FOR LEAVE TO FILE AMICUS CURIAE BRIEF IN SUPPORT OF PETITIONER BY
ASSOCIATION OF AMERICAN PHYSICIANS & SURGEONS, INC.

2.    It was Dr. Mileikowsky who spoke up and commendably reported the improper destruction of the embryos of a couple and agreed to testify against the Tenet-owned hospital Encino Tarzana Regional Medical Center in a malpractice proceeding. The Medical Board's Order dated June 24, 2004 ignores these pivotal facts and cites no support for ordering a psychiatric evaluation. The Decision of Ronald L. Moy, M.D., dated July 16, 2004, further fails to cite any support for so draconian an Order.

3.    The record further reflects that Dr. Mileikowsky complained to the Medical Board as early as February 2002 about improprieties at his hospital. Many months passed, and yet neither the Board nor the Attorney General took any disciplinary or remedial action against physicians at that hospital. On November 4, 2002, Dr. Mileikowsky complained further to the Medical Board that two physicians at that hospital removed a patient's fallopian tubes without consent and that frozen embryos had been improperly destroyed. This was a serious allegation of battery, yet, once again, neither the Medical Board nor the Attorney General took any action against those responsible. Instead, it has taken this unjustified action against Dr. Mileikowsky.

4.    Business and Professions Code § 820 only allows state-mandated psychiatric examinations when a physician "may be unable to practice his or her profession safely because the [physician's] ability to practice is impaired due to mental illness, or physical illness affecting competency, [in which case] the licensing agency may order the [physician] to be examined by one or more physicians and surgeons or psychologists designated by the agency." To take such extreme action, the Medical Board must make a showing of a threat to safety due to mental impairment. The Medical Board cannot willy-nilly order any physician to undergo a psychiatric examination. Here, Tenet's 805 Reports do not document any basis for believing such a threat exists, much less that Dr. Mileikowsky has abused drugs.

5.    Here, Dr. Mileikowsky has practiced for several years while the Medical Board has considered his matter. By the Medical Board's own actions, it does not genuinely feel there is a threat to patient safety. Nor does it give any reason in its order explaining why it thinks there may be a threat to safety posed by Dr. Mileikowsky. An expert urologist reviewed the relevant procedure, a circumcision, and said it was performed properly. The hospital's medical expert was

AKER MILLS & PATI LLP
South Figueroa Street
Suite 3200
os Angeles, CA 90017
(213) 622-4441

APPLICATION FOR LEAVE TO FILE AMICUS CURIAE BRIEF IN SUPPORT OF PETITIONER BY
ASSOCIATION OF AMERICAN PHYSICIANS & SURGEONS, INC.

1  someone who had never done one himself. In any court proceeding, such purported expert

2  testimony would not even be permitted.

3      6.      In addition, the Medical Board does not remotely suggest any impairment by this

4  physician. That is because there is none. Dr. Mileikowsky acted courageously in alerting the

5  board to misconduct at the hospital and should not be subjected to a psychiatric examination

6  because of it.

7      7.      AAPS is all too familiar with the use of state-mandated psychiatric examinations to

8  unfairly destroy good physicians. The state selects and pays the psychiatrist, who is not then likely

9  to bite the hand that feeds it. AAPS has painfully watched physicians agree to seemingly

10 innocuous psychiatric examinations paid by their adversaries, only to be shocked at how the

11 evaluation departs from the standard of care in finding impairments where none exist. These tragic

12 misuses of psychiatric examinations to retaliate against physicians have become a national

13 calamity for medicine.

14     8.      Meanwhile, this type of retaliation by a Medical Board and the Attorney General

15 sets a dreadful precedent for other physicians knowledgeable about poor hospital care. Dr. Scott

16 Plantz published a study of about 400 physicians in a 1998 edition of the *Journal of Emergency*

17 *Medicine.* He found that almost 1 in 4 of roughly 400 physicians who responded to his survey had

18 been terminated or threatened with termination for reporting problems with patient care. Steve

19 Twedt of the *Pittsburgh Post-Gazette* has reported on that same problem in his series "The Cost of

20 Courage." His articles demonstrated the pervasiveness of this problem nationwide, describing in

21 detail the experiences of 25 physicians and a nurse, all of whom suffered retaliation after trying to

22 improve care at their respective institutions. The author has informed us that Dr. Mileikowsky's

23 hospital peer review, yet to be completed, is the longest-running one in the nation.

24     9.      Dr. Harry Horner is a physician who had to fight all the way to the Supreme Court

25 of his State of Virginia to obtain reinstatement after retaliation for complaining about poor care at

26 the hospital. *See Horner v. Dep't of Mental Health, Mental Retardation, & Substance Abuse*

27 *Servs.*, 2004 Va. LEXIS 83 (Va., June 10, 2004). Though difficult to glean from the reported

28 decision, Dr. Horner was exposing the poor care of patients when an administrator at Western State

{DBP5007.DOC}                4

RKER MILLS & PATH LLP
South Figueroa Street
Suite 3200
os Angeles, CA 90017
(213) 622-4441

APPLICATION FOR LEAVE TO FILE AMICUS CURIAE BRIEF IN SUPPORT OF PETITIONER BY
ASSOCIATION OF AMERICAN PHYSICIANS & SURGEONS, INC.

1   Hospital charged him with violating another employee's right to confidentiality. Similar to the
2   fatuous charges against Dr. Mileikowsky here, the administration of Dr. Horner's hospital added
3   charges that he was guilty of abuse and neglect because he failed to wear gloves while dressing a
4   wound on a patient's foot. *See* Bob Stuart, "Court Rules for Whistleblower," *News Virginian*, June
5   16, 2004.

6       10.     The incessant retaliation against physicians who report neglegence, as Dr.
7   Mileikowsky did, has kept the numbers of deaths caused by hospitals astronomically high. Several
8   years ago a widely publicized study by the Institute of Medicine revealed that hospitals negligently
9   kill as many as 98,000 patients each year. How could that be with so many physicians watching?
10  The answer is illustrated by this case of Dr. Mileikowsky, who complained about hospital
11  negligence and finds himself subjected to a license revocation and state-mandated psychiatric
12  examination. Predictably, the numbers of deaths caused by hospital negligence have not declined
13  since the Institute of Medicine's report.

14      11.     The *Christian Science Monitor* observed just last month that "about 1 of every 200
15  patients admitted to a hospital died because of a treatment mistake ... [which] was more ... than
16  died in 1998 from highway accidents (43,458), breast cancer (42,297), or AIDS (16,516)." It then
17  added that some experts think this number of deaths due to hospital misconduct "was almost
18  certainly far too low." Gregory M. Lamb, "Fatal Errors Push Hospitals to Make Big Changes,"
19  *Christian Science Monitor*, July 8, 2004. The only way to reduce these errors is to stop retaliation
20  against physicians like Dr. Mileikowsky who speak out against them.

21      12.     In fact, a more recent study by Health Grades, Inc., estimates that medical errors in
22  American hospitals "contributed to almost 600,000 patient deaths over the past three years, double
23  the number of deaths from a study published in 2000 by the Institute of Medicine." Paul Davies,
24  "Fatal Medical Errors Said To Be More Widespread," *Wall. Street Journal*, July 27, 2004, at D5.
25  This Health Grades study was based on data from "37 million Medicare patients in every state over
26  three years." *Id.* But when physicians like Dr. Mileikowsky complain about poor care, they face
27  discipline by the hospital and revocation of their privileges or even license. This retaliation must
28  stop to allow improvement in safety at hospitals.

BAKER MILLS & PATEL LLP
South Figueroa Street
Suite 3200
os Angeles, CA 90017
(213) 622-4441

APPLICATION FOR LEAVE TO FILE AMICUS CURIAE BRIEF IN SUPPORT OF PETITIONER BY
ASSOCIATION OF AMERICAN PHYSICIANS & SURGEONS, INC.

1       13.    The impact of allowing retaliation against physicians like Dr. Mileikowsky is

2  severe. While the hospital benefits economically from hushing up problems and covering up

3  negligence, the public pays an enormous price indeed. Lives are lost and destroyed. In this case,

4  embryos were senselessly destroyed and fallopian tubes wrongfully removed. Establishing quality

5  control of the delivery of medical care is economically harmful to the hospital, but essential to the

6  public's safety and economics. Dr. Mileikowsky's complaining should not force him to see a

7  psychiatrist, which seems plainly more aimed at destroying his credibility. Killing the messenger

8  does not resolve the problem. Instead, the hospital should be held accountable. Dr. Mileikowsky

9  also reported the failure to remove a fallopian tube containing an extra uterine (ectopic) pregnancy,

10  a life threatening condition. Yet, neither the Medical Board of California nor the Attorney General

11  took any corrective action against either hospital or physicians.

12       14.    In 2003, Tenet Healthcare Corporation and Tenet HealthSystems Hospitals, Inc., the

13  owners and affiliates of the hospital at issue here, paid $51 million "to settle government

14  allegations that Tenet's Redding, California facility performed unnecessary cardiac procedures that

15  were then billed to Medicare, Medicaid and TRICARE. In addition, Tenet paid nearly $3 million to

16  reimburse California's Medicaid funds." "Corporate Accountability and Compliance in Health

17  Care - Will Health Care be the Next Enron?", *Mondaq Business Briefing*, July 26, 2004. These are

18  but two reports, among many, involving Tenet. This case should be viewed in that broader

19  context. Punishing Dr. Mileikowsky, who was reporting the misconduct at Tenet, only encourages

20  greater fraud and more losses to the public, to whom the Medical Board and the Attorney General

21  owe their protective mission.

22       15.    AAPS does not contest the power of the Medical Board to order an examination

23  where it provides a legitimate basis for such order. But no such basis exists here. Quite the

24  opposite, Dr. Mileikowsky's skills as a surgeon have never been seriously questioned. Being a

25  whistleblower against a powerful hospital does not suggest the need for psychiatric examination

26  ordered by the State under threat of revocation. If anything, the uncontested fact that he made

27  multiple prior reports of wrongdoing should warrant a higher level of justification by the Medical

28  Board, and correspondingly higher level of scrutiny by this Court.

{DBP5007.DOC}

6

AKIN MILLS & PATEL LLP
South Figueroa Street
Suite 3200
os Angeles, CA 90017
(213) 622-4441

1      16.    The revocation of Dr. Mileikowsky's license would end his career, whether stayed

2  or not by a psychiatric examination. Revocation is typically career-ending for any hospital-based

3  physician such as an OB/GYN like Dr. Mileikowsky, because it announces to the whole world that

4  the physician is so dangerous that he had to be removed from the profession. Federal law requires

5  reporting it to the National Practitioners Data Bank, upon which all hospitals nationwide rely.

6  Revocation is the rarest of disciplinary actions by a hospital, the professional version of the death

7  penalty, and must therefore be confined to situations far more extreme than that presented at bar.

8      17.    It is disastrous to medical economics and public safety for the Board to be able to

9  revoke the license of Dr. Mileikowsky for speaking out in favor of patient care and against the

10  destruction of embryos by the hospital. That outspokenness may well be unsettling to the for-

11  profit, Tenet-owned hospital and maybe even unsettling to the Medical Board, but it does not

12  justify revoking his license or forcing him to undergo a psychiatric evaluation in order to discredit

13  and humiliate. Virtually no good physician would be still practicing if speaking out against

14  hospital negligence or error justified revocation and psychiatric evaluation. *See, e.g., McMillan v.*

15  *Anchorage Comm. Hosp.*, 646 P.2d 857, 859 (Alaska 1982) (reversing a summary suspension of a

16  physician based on "disruptive behavior" without a showing that the physician's "activities or

17  conduct resulted in any immediate threat to a particular patient").

18      18.    AAPS is concerned that while the Attorney General and Medical Board apparently

19  took no action in response to Dr. Mileikowsky's very serious allegations of unconsented surgery

20  and destruction of embryos, the Medical Board is instead acting to revoke Dr. Mileikowsky's

21  license without any patient complaints or substantial evidence of wrongdoing. This is manifestly

22  unjust.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

AKER MILLS & PATE LLP
South Figueroa Street
Suite 3200
Los Angeles, CA 90017
(213) 622-4441

**APPLICATION FOR LEAVE TO FILE AMICUS CURIAE BRIEF IN SUPPORT OF PETITIONER BY ASSOCIATION OF AMERICAN PHYSICIANS & SURGEONS, INC.**

1    19.    Because the Medical Board decision is arbitrary and capricious, and unsupported by

2  substantial evidence, it should be stayed pending a full hearing by this court. It is in the public

3  interest to stay and reverse this revocation in order to prevent the retaliation that it represents.

4  DATED:  August 9, 2004                        Respectfully submitted,

5
                                        PARKER MILLS & PATEL LLP
6                                        DAVID B. PARKER

7

8                                By:

9                                        DAVID B. PARKER
                                        Attorneys for **Applicant and Proposed Amicus**
10                                        **Curiae ASSOCIATION OF AMERICAN**
                                        **PHYSICIANS & SURGEONS, INC.**
11

12  DBP:an

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

{DBP5007.DOC}                            8

RKER MILLS & PATEL LLP
South Figueroa Street
Suite 3200
os Angeles, CA 90017
(213) 622-444

**APPLICATION FOR LEAVE TO FILE AMICUS CURIAE BRIEF IN SUPPORT OF PETITIONER BY
ASSOCIATION OF AMERICAN PHYSICIANS & SURGEONS, INC.**

## PROOF OF SERVICE

STATE OF CALIFORNIA ⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀) ss.
COUNTY OF LOS ANGELES ⠀⠀)

⠀⠀⠀⠀I am employed in the County of Los Angeles, State of California. I am over the age of eighteen (18) years and not a party to the within action; my business address is: 865 S. Figueroa Street, Suite 3200, Los Angeles, CA 90017.

⠀⠀⠀⠀On August 9, I served the following described as: **APPLICATION FOR LEAVE TO FILE AMICUS CURIAE BRIEF IN SUPPORT OF PETITIONER BY ASSOCIATION OF AMERICAN PHYSICIANS & SURGEONS, INC.** on the interested parties in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

## SEE ATTACHED SERVICE LIST

[x] ⠀⠀⠀**(MAIL)** ⠀⠀⠀I am readily familiar with the firm's practice of collection and processing correspondence by overnight mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

[ ] ⠀⠀⠀**(BY TELECOPY)** ⠀⠀⠀I caused such document to be delivered by telecopy transmission to the offices of the addressee.

[ ] ⠀⠀⠀**(BY PERSONAL DELIVERY)** ⠀⠀⠀I caused such envelope to be delivered by hand to the offices of the addressee.

[x] ⠀⠀⠀**(STATE)** ⠀⠀⠀I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

[ ] ⠀⠀⠀**(FEDERAL)** ⠀⠀⠀I declare that I am employed in the offices of a member of this Court at whose direction the service was made.

Executed on August 9, 2004, at Los Angeles, California.

⠀⠀ALICIA NAVARRO ⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀
⠀⠀⠀⠀PRINT NAME ⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀SIGNATURE

[DBP5007.DOC] ⠀⠀⠀9

**APPLICATION FOR LEAVE TO FILE AMICUS CURIAE BRIEF IN SUPPORT OF PETITIONER BY ASSOCIATION OF AMERICAN PHYSICIANS & SURGEONS, INC.**

MRB MILLS & PATEL LLP
South Figueroa Street
Suite 3200
os Angeles, CA 90017
(213) 622-4441

1
2
## SERVICE LIST
3

Gil Nathan Mileikowsky, M.D.
2934 ½ Beverly Glen Avenue, PMB 373
Los Angeles, California 90077

Russell Iungerich, Esq.
IUNGERICH & SPACKMAN
Almar Plaza
28441 Highridge Road., Suite 201
Rolling Hills Estates, California 90274-4869

Amy Fan, Esq.
Deputy Attorney General
California Department of Justice
300 South Spring Street, Suite 1702
Los Angeles, California 90013

Carolyn D. Magnuson
Administrative Law Judge
Office of Administrative Hearings
320 West Fourth Street, 6th Flr., Suite 630
Los Angeles, California 90013

Ronald L. Moy, M.D.
100 UCLA Medical Plaza, Suite 590
Los Angeles, California 90024

Ronald L. Moy, M.D.
Chair – Panel B
Division of Medical Quality
1426 Howe Avenue
Sacramento, California 95825-3236

Bill Lockyer, Esq. – Attorney General
Office of the Attorney General of California
Department of Justice
13001 St., Suite 1101
P.O. Box 944255
Sacramento, California 94244-2550

Gov. Arnold Schwarzenegger
Office of the Governor
State Capitol
Sacramento, California 95814

Mr. David Thornton
Executive Director
MEDICAL BOARD OF CALIFORNIA
Discipline Coordination Unit
1426 Howe Avenue, Suite 54
Sacramento, California 95825-3236

Mitchell S. Karlan, M.D.
President
MEDICAL BOARD OF CALIFORNIA
1426 Howe Avenue
Sacramento, California 95825-3236

Roger John Diamond, Esq.
2115 Main Street
Santa Monica, California 90405

Mitchell S. Karlan, M.D.
Chairman of the Board of Directors
SCPIE HOLDINGS
1888 Century Park East, Suite 800
Los Angeles, California 90067

BKER MILLS & PATIL LLP
South Figueroa Street
Suite 3200
os Angeles, CA 9001
(213) 622-4441

**APPLICATION FOR LEAVE TO FILE AMICUS CURIAE BRIEF IN SUPPORT OF PETITIONER BY ASSOCIATION OF AMERICAN PHYSICIANS & SURGEONS, INC.**

# LAW.COM

Select '**Print**' in your browser menu to print this document.

**Copyright 2010. ALM Media Properties, LLC. All rights reserved.**

Page printed from: http://www.law.com

Back to Article

## Citing District Judge's Actions During Trial, 3rd Circuit Vacates Med-Mal Verdict

Gina Passarella

07-03-2008

The 3rd U.S. Circuit Court of Appeals has vacated a jury verdict and remanded the case to a new judge, not on the merits of the case but over the district judge's actions during trial.

The court, in *Svindland v. The Nemours Foundation*, vacated a defense verdict in a medical malpractice action because District Court Judge Berle M. Schiller of the Eastern District of Pennsylvania did not leave enough in the record as to his reasoning for his rulings and repeatedly interrupted plaintiffs' counsel, according to the opinion.

"The lack of reasons given by the District Court, when combined with the manner in which the District Court dealt with these issues with counsel, has left us with the impression that the District Court interrupted counsel to a point where intelligible argument could not be had," Senior Circuit Judge Leonard I. Garth said in the non-precedential opinion.

"In fact, the District Court was often so impatient and dismissive that the record does not reflect the arguments that the Svindlands sought to make."

Garth said the Circuit Court should not be put in the position of ruling itself in the first instance or speculating as to Schiller's rationale.

"We have no intention of instructing the District Court as to how it should deal with arguments, evidence, and counsel, or how it should conduct the 'business' of its courtroom," he said. "However, when a record such as this one reveals numerous instances of what we can only regard as impatience and precipitous rulings on the part of the District Court judge, to say nothing of countless interruptions of counsel's arguments, our review function as a court of appeals is severely impaired."

Garth said the panel had questions about why particular testimony was allowed at trial and other testimony was not. He said the court couldn't complete the gaps in the plaintiffs' arguments because of interruptions and couldn't understand from the record why Schiller ruled as he did on various issues.

Garth ruled the retrial should be conducted by a different judge.

In the opinion, the panel reproduced part of the transcript as an example of Schiller's conduct during trial. It shows, as far as the brief reproduction entails, that Schiller would cut off the Svindlands' attorney, Theresa M. Blanco, during sidebar and would continually sustain objections to her questioning made by defense counsel John M. Hudgins of Weinberg Wheeler Hudgins Gunn & Dial in Atlanta.

In the one example the 3rd Circuit gave of Blanco objecting to Hudgins' questioning, she was overruled, according to the opinion.

At the end of a sidebar, in which Schiller interrupted Blanco three times, he issued a warning to the attorney.

"And if you keep going down that path where I have to keep sustaining objections, I'm going to hold you in contempt," Schiller said.

"I understand," Blanco said.

"Do you understand that?" Schiller questioned. "Now, sit down and forget this line of questioning. We'll worry about this case."

Appellate attorney Howard Bashman, a regular contributor to *The Legal Intelligencer*, said the outcome in this case is "very unusual."

The 3rd Circuit had the option of asking Schiller to explain his rulings before issuing its decision, Bashman said. In its opinion, the court also pointed to several instances during the trial in which it felt Schiller hadn't explained his rulings. Bashman said that, too, is unusual because trial judges don't usually say more than "sustained" or "overruled" in front of a jury.

"This is a very unusual outcome where essentially not only has the trial judge been reprimanded in an opinion for not providing adequate basis for appellate review but also further reprimanded by not being asked to provide a further explanation or retry the case," he said.

Given the fact that Schiller wasn't asked to offer an explanation to the 3rd Circuit, Bashman speculated it might indicate that the court views the trial judge as "problematic in a repetitive way."

Garth was joined by Circuit Judge Theodore A. McKee and Senior District Judge Joseph H. Rodriguez from the District of New Jersey. Bashman said Rodriguez is more of an "old school" judge who gives attorneys more leeway whereas Schiller has more of a "new school" approach of reining in attorneys.

Paul and Allison Svindland sued, individually and on behalf of their late son Ian's estate, The Nemours Foundation in Delaware and William I. Norwood, a surgeon who performed heart repair surgery on their son, which allegedly led to Ian's death, according to the opinion.

Ian had a hole in the wall of his heart and Norwood performed heart surgery at The Nemours Cardiac Center in Delaware to fix the problem.

He used a procedure known as "deep hypothermic circulatory arrest," which involved connecting Ian to a heart-lung bypass machine. Norwood cooled Ian's body with a refrigeration unit and drained all of his blood to allow Norwood to work in a "bloodless field," according to the opinion. The cooling reduced the oxygen required by Ian's organs without the presence of blood.

A few weeks later, Ian had a second surgery performed by Norwood to repair a separate heart condition and died two weeks later. The Svindlands claimed Norwood only cooled Ian for six minutes during the first surgery, a deviation from standard practices, which ultimately led to his death. They also claimed they were not given the right information when they signed an informed consent to go ahead with the surgery.

The jury found that Norwood was negligent but found the Svindlands' proof was not adequate to establish his cooling technique was the proximate cause of Ian's death. The jury also found no lack of informed consent, according to the opinion.

Frank McClellan of Eaton & McClellan argued the appeal before the 3rd Circuit. Attorneys Blanco and Brian Appel have been handling the cases under the banner of Eaton & McClellan. They declined to comment for the article. Sara Lynn Petrosky of McCann & Geschke argued on appeal on behalf of Nemours and Norwood. She did not return a call for comment by press time.